# 15-1200

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

———————·‡·———————

M.M., on behalf of and as Parent of J.S.,
a student with a disability,

*Plaintiff-Appellant,*

*v.*

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee.*

———————·‡·———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### VOLUME I of IV
### Pages A1 – A135

ERIN MCCORMACK-HERBERT
THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
*Attorneys for Plaintiff-Appellant*
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 exts. 229, 246

MARTA SOJA ROSS
OFFICE OF THE CORPORATION COUNSEL
*Attorney for Defendant-Appellee*
100 Church Street, 6-204
New York, New York 10007
(212) 356-0857

## **Table of Contents**

### **Volume I**

District Court Docket Sheet ........................................................................ A1

Complaint, March 6, 2014 ........................................................................ A5

Amended Complaint, May 14, 2014............................................................ A22

Answer to the Amended Complaint, June 12, 2014 .................................... A45

So-Ordered Letter Motion Concerning the Administrative
    Record, Briefing Schedule, and Waiver of the Requirement
    for the Parties to Submit Statements of Material Facts
    Pursuant to Local Civil Rule 56.1, June 16, 2014 ............................. A64

Order to the Office of State Review Regarding the Certified
    Administrative Record, June 16, 2014 ............................................. A66

Plaintiff's Notice of Motion for Summary Judgment, August 12, 2014 ..... A67

Defendant's Notice of Cross-Motion for Summary Judgment,
    September 12, 2014 .......................................................................... A69

Redacted Transcript of Oral Argument, October 14, 2014 ........................ A71

Memorandum Decision and Order of Hon. George B. Daniels,
    March 17, 2015 ................................................................................. A118

Judgment, March 19, 2015......................................................................... A133

Notice of Appeal, April 15, 2015................................................................ A134

## Volume II

Office of State Review ("OSR") Certification and OSR Record Contents
for Appeal Nos. 13-157 and 14-018, dated July 21, 2014.................. A136

Impartial Hearing Office Certifications dated August 16, 2013,
August 27, 2013, and January 15, 2014 ............................................ A141

OSR Decisions:

Decision No. 13-157 of the State Review Officer dated
November 8, 2013 .................................................................... A144

Decision No. 14-018 of the State Review Officer dated
March 18, 2013[*] ...................................................................... A156

Impartial Hearing Officer ("IHO") Decisions:

Findings of Fact and Decision of IHO Mary Noe, Esq.
dated July 18, 2013 .................................................................. A178

Findings of Fact and Decision of IHO Mary Noe, Esq.
dated December 20, 2013 .......................................................... A192

Pleadings and Memoranda of the Parties – OSR Appeal No. 13-157:

Notice of Intention to Seek Review and Affidavit of
Personal Service dated August 6, 2013 .................................... A204

Notice with Petition dated August 20, 2013; Verified Petition
(Exhibits 1–9 attached) and Affidavit of Verification
dated August 19, 2013; Affidavit (translation) dated
August 20, 2013; Affidavit of Personal Service dated
August 21, 2013 ...................................................................... A207

---

[*] This decision was misdated by the OSR. The cover letter accompanying the decision was dated March 18, *2014*. Upon information and belief, this is the correct date of the decision.

Verified Answer and Cross-Appeal, Affidavit of Verification,
and Affidavit of Service dated September 17, 2013 ............... A274

Verified Reply and Answer to Cross-Appeal, Affidavit of
Verification, and Affidavit (translation) dated
October 4, 2013; Affidavit of Personal Service
dated October 7, 2013 ............................................................ A296

Pleadings and Memoranda of the Parties – OSR Appeal No. 14-018:

Notice of Intention to Seek Review and Affidavit of
Personal Service dated January 9, 2014 .................................. A314

Notice with Petition, Verified Petition (Exhibits 1–2 attached),
Affidavit of Verification, Affidavit (translation), and
Affidavit of Personal Service dated January 23, 2014 ............. A317

Verified Answer, Affidavit of Verification, and Affidavit of
Service dated February 7, 2014 ................................................ A352

Verified Reply to the Verified Answer, Affidavit of
Verification, and Affidavit (translation) dated
February 12, 2014; Affidavit of Personal Service
dated February 13, 2014 .......................................................... A373

## **Volume III**

Impartial Hearing Transcripts:

May 16, 2013 [Replacement] (Pages 1–111 + Word Index) .............. A380

June 6, 2013 [Corrected] (Pages 112–254 + Word Index) ............... A440

June 19, 2013 (Pages 255–296 + Word Index) ................................. A517

## Volume IV

Impartial Hearing Exhibits:

Parent Exhibits A–G, I–S:

Parent's Evidence List ............................................................ A540

Exh. A, New York City Department of Education ("DOE")
Due Process Response dated April 8, 2013 ................... A542

Exh. B, Letter from Charles Gussow to Gerard Donegan
dated June 21, 2012, with fax confirmation
dated June 22, 2012 ...................................................... A545

Exh. C, Letter from Todd Silverblatt to Gerard Donegan
dated August 22, 2012, with fax confirmation
dated August 22, 2012 .................................................. A547

Exh. D, Cooke Center Summer Academy, Summer 2012
Enrollment Contract, signature date June 25, 2012 ....... A550

Exh. E, Cooke Center School Enrollment Contract 2012–13
Academic Year, signature date June 25, 2012 .............. A552

Exh. F, 2012 Federal Income Tax Return, Form 1040 for
J.S., Father of J.S ......................................................... A554

Exh. G, 2012 Federal Income Tax Return, Form 1040 for
M.M., Mother of J.S ...................................................... A556

Exh. I, Affidavit of Katherine Hibbard dated May 10, 2013 ... A558

Exh. J, Affidavit of Victoria Fowler dated May 10, 2013 ...... A565

Exh. K, Affidavit of Mary Clancy dated May 10, 2013 ......... A572

Exh. L, Affidavit of M.M. (Spanish) dated May 10, 2013 ...... A577

Exh. M, Affidavit of Sally Ord dated May 10, 2013 ............... A582

Exh. N, Affidavit of Francis Tabone dated May 10, 2013....... A587

Exh. O, Letter Brief from Amanda Sen to IHO Mary Noe
    dated April 29, 2013, with e-mail transmission
    dated April 29, 2013 ...................................................... A591

Exh. P, Parent's Motion in Opposition to IHO Mary Noe's
    Verbal Order on April 30, 2013 That the Hearing
    Office Not Translate Affidavits Submitted by
    Either Party in This Matter, dated April 30, 2013,
    with e-mail transmission dated April 30, 2013.............. A596

Exh. Q, DOE Response to Parent's Motions, dated
    May 1, 2013, with associated e-mails........................... A600

Exh. R, Parent's Opening Statement (undated), with
    e-mail transmission dated May 13, 2013 ...................... A605

Exh. S, English Translation of May 10, 2013
    Affidavit of M.M........................................................... A610

DOE Exhibits 1–22, 25–27:

DOE Disclosure List ................................................................ A614

Exh. 1, Parent's Due Process Complaint dated
    March 18, 2013 ............................................................. A616

Exh. 2, DOE Meeting Invitation Addressed to M.M.
    dated April 30, 2012 ..................................................... A621

Exh. 3, Individualized Education Program ("IEP")
    dated May 22, 2012....................................................... A625

Exh. 4, Cooke Center Academy Progress Report
for J.S. dated March 2012 ............................................... A640

Exh. 5, Kennedy Child Study Center Comprehensive
Psychoeducational Evaluation of J.S. dated
March 19, 2009 and June 2, 2009 .................................. A656

Exh. 6, IEP Transition Document prepared by S. Ord,
Cooke Center Academy, dated May 22, 2012 ............... A664

Exh. 7, Cooke Center Academy IEP Annual Review
Discussion Document – Speech & Language,
listing IEP review date May 22, 2012........................... A667

Exh. 8, Cooke Center Academy IEP Annual Review
Discussion Document – Academic (English
Language Arts & Social Studies), listing IEP
review date March 22, 2012........................................... A669

Exh. 9, Cooke Center Academy IEP Annual Review
Discussion Document – Academic (Math),
listing IEP review date May 22, 2012........................... A672

Exh. 10, Cooke Center Academy IEP Annual Review
Discussion Document – Counseling (undated).............. A674

Exh. 11, May 22, 2012 IEP Meeting Minutes
prepared by Evelyn Alvarez, DOE .............................. A676

Exh. 12, May 22, 2012 IEP Annual Review Report
prepared by Sally Ord, Cooke Center Academy ........... A679

Exh. 13, Cooke Center Academy Progress Report
for J.S. dated June 2012 ................................................ A683

Exh. 14, Cooke Center Student Assessment Portfolio
for J.S. (undated)........................................................... A700

vi

Exh. 15, Cooke Center Academy Stanford-Binet
  Intelligence Scales, Fifth Edition Narrative
  Report for J.S. dated January 5, 2012 ......................... A707

Exh. 16, DOE Classroom Observation for J.S. dated
  October 27, 2010 ......................................................... A709

Exh. 17, DOE Final Notice of Recommendation:  Annual
  Review and Reevaluation dated June 15, 2012 ............. A710

Exh. 18, Cooke Center Academy Progress Report
  for J.S. dated November 2012 ....................................... A711

Exh. 19, Cooke Center Academy Progress Report
  for J.S. dated March 2013 ............................................ A727

Exh. 20, Cooke Center Summer Academy 2012
  Report for J.S. (undated) .............................................. A744

Exh. 21, Affidavit of Susan Naclerio dated May 9, 2013 ........ A748

Exh. 22, Affidavit of Evelyn Alvarez dated May 9, 2013 ...... A753

Exh. 25, Cooke Center Academy SKILLs Program
  Description (undated) .................................................... A760

Exh. 26, DOE Opening Statement (undated) ......................... A765

Exh. 27, Cooke Center Summer Academy 2012:
  Curriculum Outline (undated) ...................................... A768

IHO Exhibits I–II, IV:

  IHO Exhibit I, SKILLs Schedule 2012–2013 (undated).......... A769

  IHO Exhibit II, Pre-Hearing Order dated April 24, 2013 ........ A770

  IHO Exhibit IV, Order dated June 7, 2013 ............................. A773

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14–cv–01542–GBD

M.M. v. New York City Department of Education
Assigned to: Judge George B. Daniels
Cause: 28:1331ng Fed. Question: Natural Gas Act

Date Filed: 03/06/2014
Date Terminated: 03/19/2015
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**M.M.**
*on behalf of and as parent of J.S., a student with a disability*

represented by **Thomas Chipman Gray**
Partnership For Children's Rights
271 Madison Avenue
New York, NY 10016
(212)–683–7999
Fax: (212)–683–5544
Email: tgray@pfcr.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New York City Department of Education**

represented by **Neil Anthony Giovanatti**
New York City Law Department
100 Church Street Room 2663
New York, NY 10007
(212)–356–0886
Fax: (212)–788–3770
Email: ngiovana@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2014 | 1 | CIVIL COVER SHEET filed. (laq) (laq). (Entered: 03/11/2014) |
| 03/06/2014 | 2 | COMPLAINT against New York City Department of Education. Document filed by M.M..(laq) (laq). (Entered: 03/11/2014) |
| 03/06/2014 | | SUMMONS ISSUED as to New York City Department of Education. (laq) (Entered: 03/11/2014) |
| 03/06/2014 | 3 | ORDER GRANTING IFP APPLICATION: Leave to proceed in this Court without prepayment of fees is authorized. 28 U.S.C. § 1915. (Signed by Judge Paul A. Crotty on 3/5/2014) (laq) (Entered: 03/11/2014) |
| 03/06/2014 | | Magistrate Judge Debra C. Freeman is so designated. (laq) (Entered: 03/11/2014) |
| 03/06/2014 | | Case Designated ECF. (laq) (Entered: 03/11/2014) |
| 03/13/2014 | | NOTICE OF CASE REASSIGNMENT to Judge George B. Daniels. Judge P. Kevin Castel is no longer assigned to the case. (pgu) (Entered: 03/13/2014) |
| 03/13/2014 | 4 | INITIAL PRETRIAL CONFERENCE: Initial Pretrial Conference set for 5/27/2014 at 09:30 AM in Courtroom 11A, 500 Pearl Street, New York, NY 10007 before Judge George B. Daniels. (Signed by Judge George B. Daniels on 3/13/2014) (kgo) (Entered: 03/13/2014) |
| 05/01/2014 | 5 | AFFIDAVIT OF SERVICE. New York City Department of Education served on 5/1/2014, answer due 5/22/2014. Service was accepted by Betty Mazyck, Service |

A1

| | | |
|---|---|---|
| | | Window Clerk. Document filed by M.M.. (Attachments: # 1 Complaint and Summons)(Gray, Thomas) (Entered: 05/01/2014) |
| 05/09/2014 | 6 | ENDORSED LETTER addressed to Judge George B. Daniels from Thomas Gray dated 5/1/2014 re: Counsel requests that the Court adjourn the pre–trial conference. ENDORSEMENT: SO ORDERED. The conference is adjourned to June 24, 2014 at 9:30 a.m. (Signed by Judge George B. Daniels on 5/8/2014) (mro) (Entered: 05/09/2014) |
| 05/09/2014 | | Set/Reset Hearings: Initial Conference set for 6/24/2014 at 09:30 AM before Judge George B. Daniels. (mro) (Entered: 05/09/2014) |
| 05/14/2014 | 7 | AMENDED COMPLAINT amending 2 Complaint against New York City Department of Education.Document filed by M.M.. Related document: 2 Complaint filed by M.M..(Gray, Thomas) (Entered: 05/14/2014) |
| 05/15/2014 | 8 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint. New York City Department of Education served on 5/15/2014, answer due 6/5/2014. Service was accepted by Madelyn Santana, Docketing Clerk. Document filed by M.M.. (Gray, Thomas) (Entered: 05/15/2014) |
| 05/20/2014 | 9 | NOTICE OF APPEARANCE by Neil Anthony Giovanatti on behalf of New York City Department of Education. (Giovanatti, Neil) (Entered: 05/20/2014) |
| 05/23/2014 | 10 | LETTER MOTION for Extension of Time to File Answer re: 7 Amended Complaint addressed to Judge George B. Daniels from Neil Giovanatti dated May 23, 2014. Document filed by New York City Department of Education.(Giovanatti, Neil) (Entered: 05/23/2014) |
| 05/28/2014 | 11 | ORDER granting 10 Letter Motion for Extension of Time to Answer. SO ORDERED. New York City Department of Education answer due 6/12/2014. (Signed by Judge George B. Daniels on 5/23/2014) (mro) (Entered: 05/28/2014) |
| 06/12/2014 | 12 | ANSWER to 7 Amended Complaint. Document filed by New York City Department of Education.(Giovanatti, Neil) (Entered: 06/12/2014) |
| 06/13/2014 | 13 | JOINT LETTER addressed to Judge George B. Daniels from Thomas Gray dated June 13, 2014 re: proposed order, briefing schedule, and briefing. Document filed by M.M.. (Attachments: # 1 Text of Proposed Order)(Gray, Thomas) (Entered: 06/13/2014) |
| 06/16/2014 | 14 | ORDER re: JOINT LETTER: IT IS HEREBY ORDERED that the Office of State Review of the New York State Education Department shall, within 30 days of receipt of this Order, mail a certified copy of the administrative record in Office of Stale Review Appeal Nos. 13–157 and 14–018 to counsel for Defendant, Neil Anthony Giovanatti, New York City Law Department, 100 Church Street Room 2–305, New York, New York 10007; and IT IS FURTHER ORDERED that upon receipt of the certified record from the Office of State Review, Defendant's counsel shall provide a copy of such record to counsel for the Plaintiff, and shall file the certified record with the Court under seal pursuant to Federal Rule of Civil Procedure 5.2(d). (Signed by Judge George B. Daniels on 6/16/2014) (mro) Modified on 6/17/2014 (mro). (Entered: 06/16/2014) |
| 06/16/2014 | 15 | MEMO ENDORSEMENT on re: 13 Letter filed by M.M. ENDORSEMENT: The conference is adjourned to September 9, 2014 at 9:30 a.m. ( Initial Conference set for 9/9/2014 at 09:30 AM before Judge George B. Daniels.) (Signed by Judge George B. Daniels on 6/16/2014) (mro) (Entered: 06/16/2014) |
| 06/16/2014 | | Set/Reset Deadlines: Cross Motions due by 9/12/2014. Motions due by 8/12/2014. Responses due by 9/26/2014 Replies due by 10/10/2014. (mro) (Entered: 06/16/2014) |
| 08/04/2014 | 16 | ORDER: The Initial Conference scheduled in this matter for September 9, 2014, is rescheduled to September 8, 2014, at 9:30 a.m (Initial Conference set for 9/8/2014 at 09:30 AM before Judge George B. Daniels.) (Signed by Judge George B. Daniels on 8/4/2014) (mro) (Entered: 08/04/2014) |

**A2**

| 08/05/2014 | 17 | SEALED DOCUMENT placed in vault.(rz) (Entered: 08/05/2014) |
|---|---|---|
| 08/12/2014 | 18 | MOTION for Summary Judgment . Document filed by M.M.. Responses due by 9/12/2014(Gray, Thomas) (Entered: 08/12/2014) |
| 08/12/2014 | 19 | MEMORANDUM OF LAW in Support re: 18 MOTION for Summary Judgment . . Document filed by M.M.. (Gray, Thomas) (Entered: 08/12/2014) |
| 08/20/2014 | 20 | ORDER: The initial conference currently scheduled in this matter for September 8, 2014 at 9:30AM is adjourned. Oral argument on Plaintiff's motion for summary judgment (ECF No. 18) is scheduled for October 14, 2014, at 10:00AM. ( Oral Argument set for 10/14/2014 at 10:00 AM before Judge George B. Daniels.) (Signed by Judge George B. Daniels on 8/20/2014) (mro) (Entered: 08/20/2014) |
| 09/12/2014 | 21 | CROSS MOTION for Summary Judgment . Document filed by New York City Department of Education.(Giovanatti, Neil) (Entered: 09/12/2014) |
| 09/12/2014 | 22 | MEMORANDUM OF LAW in Support re: 21 CROSS MOTION for Summary Judgment . *And in Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by New York City Department of Education. (Giovanatti, Neil) (Entered: 09/12/2014) |
| 09/26/2014 | 23 | MEMORANDUM OF LAW in Opposition re: 21 CROSS MOTION for Summary Judgment . . Document filed by M.M.. (Gray, Thomas) (Entered: 09/26/2014) |
| 10/10/2014 | 24 | REPLY MEMORANDUM OF LAW in Support re: 21 CROSS MOTION for Summary Judgment . *And in Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by New York City Department of Education. (Giovanatti, Neil) (Entered: 10/10/2014) |
| 10/14/2014 | | Minute Entry for proceedings held before Judge George B. Daniels: Oral Argument held on 10/14/2014 re: 21 CROSS MOTION for Summary Judgment . filed by New York City Department of Education, 18 MOTION for Summary Judgment . filed by M.M.. Plaintiff Counsel: Thomas Chipman Gray; Defense Counsel: Neil Anthony Giovanatti; Eric Porter; Brian Reimels and Court Reporter present. (Vega, Elizabeth) (Entered: 10/15/2014) |
| 03/18/2015 | 25 | MEMORANDUM DECISION AND ORDER granting 18 Motion for Summary Judgment; granting 21 Motion for Summary Judgment: Plaintiff's Motion for Summary Judgment is DENIED. Defendant's Cross–Motion for Summary Judgment is GRANTED. The Clerk of Court is directed to close the motions at ECF Nos. 18 and 21. (Signed by Judge George B. Daniels on 3/17/2015) (tn) (Entered: 03/18/2015) |
| 03/18/2015 | | Transmission to Judgments and Orders Clerk. Transmitted re: 25 Order on Motion for Summary Judgment, to the Judgments and Orders Clerk. (tn) (Entered: 03/18/2015) |
| 03/19/2015 | 26 | CLERK'S JUDGMENT: Plaintiff M.M. having moved for summary judgment and Defendant New York City Department of Education having cross–moved for summary judgment pursuant to Fed. R. Civ. P. 56, and the matter having come before the Honorable George B. Daniels, United States District Judge, and the Court, on March 18, 2015, having rendered its Memorandum Decision and Order (Doc. 25) denying Plaintiff's motion for summary judgment, granting Defendant's cross–motion for summary judgment, directing the Clerk of Court to close the motions at ECF Nos. 18 and 21, it is, ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Decision and Order dated March 18, 2015, Plaintiff's motion for summary judgment is denied; Defendant's cross–motion for summary judgment is granted. (Signed by Clerk of Court Ruby Krajick on 3/19/2015) (mro) (Additional attachment(s) added on 3/19/2015: # 1 Right to appeal attachment 1, # 2 Right to appeal attachment 2) (mro). (Entered: 03/19/2015) |
| 04/15/2015 | 27 | **FILING ERROR – NO ORDER SELECTED FOR APPEAL –** NOTICE OF APPEAL. Document filed by M.M.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Gray, Thomas) Modified on 4/15/2015 (tp). (Entered: 04/15/2015) |

**A3**

| 04/15/2015 | | ***NOTE TO ATTORNEY REGARDING DEFICIENT APPEAL. Note to Attorney Gray, Thomas to RE–FILE Document No. 27 Notice of Appeal. No Order being appealed was selected. Re–file the document as a Corrected Notice of Appeal event and select the correct Order being appealed. (tp) (Entered: 04/15/2015) |
| --- | --- | --- |
| 04/15/2015 | 28 | NOTICE OF APPEAL from 26 Clerk's Judgment,,,, 25 Order on Motion for Summary Judgment,,,. Document filed by M.M.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Gray, Thomas) (Entered: 04/15/2015) |
| 04/15/2015 | | Appeal Remark as to 28 Notice of Appeal filed by M.M. IFP GRANTED 03/06/2014. (tp) (Entered: 04/15/2015) |
| 04/15/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 28 Notice of Appeal. (tp) (Entered: 04/15/2015) |
| 04/15/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 28 Notice of Appeal filed by M.M. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 04/15/2015) |
| 05/15/2015 | 29 | TRANSCRIPT of Proceedings re: MOTION HEARING held on 10/14/2014 before Judge George B. Daniels. Court Reporter/Transcriber: Paula Speer, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained via PACER. Redaction Request due 6/8/2015. Redacted Transcript Deadline set for 6/18/2015. Release of Transcript Restriction set for 8/17/2015.(Grant, Patricia) (Entered: 05/15/2015) |
| 05/15/2015 | 30 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ARGUMENT proceeding held on 10/14/2014 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(Grant, Patricia) (Entered: 05/15/2015) |
| 05/15/2015 | 31 | NOTICE of Intent to Request Redaction. Document filed by M.M.. (Gray, Thomas) (Entered: 05/15/2015) |
| 05/20/2015 | 32 | Redaction of 29 Transcript,, (McGuirk, Kelly) (Entered: 05/20/2015) |
| 05/20/2015 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 10/14/14 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 05/20/2015) |

**A4**

JUDGE CASTEL                    14 CV    1542

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
M.M., on Behalf of and as Parent
of J.S., a student with a disability,                          **COMPLAINT**

                                        Plaintiff,             Civil Action No.

                - against -

NEW YORK CITY DEPARTMENT                                       ECF Case
OF EDUCATION,

                                        Defendant.
-------------------------------------------------------------X

*RECEIVED*
*MAR 0 2014*
*U.S.D.C. S.D.N.Y.*
*CASHIERS*

### PRELIMINARY STATEMENT

1. This action is authorized by the Individuals with Disabilities Education Improvement
Act of 2004 (IDEA), 20 U.S.C. § 1415(i)(2)(A), to review a final administrative decision of the
New York State Review Officer (SRO) regarding the provision of a free appropriate public
education (FAPE) to J.S., a student with a disability.

2. Plaintiff M.M. seeks an order vacating the SRO's November 8, 2013 decision, which
inappropriately limited the issues underlying her claim for tuition funding for J.S.'s placement at
the Cooke Center for Learning and Development (Cooke), a private, not-for-profit school for
students with disabilities, for the 2012–2013 school year, and remanding the case for further
administrative proceedings.

3. This action is timely commenced within four months after the date of the SRO
decision pursuant to 20 U.S.C. § 1415(i)(2)(B) and New York Education Law § 4404(3)(a).

### JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C.
§ 1415(i)(2)(A), and 28 U.S.C. §§ 1331 and 1343.

1

**A5**

5. The Court has supplemental jurisdiction to adjudicate state claims arising out of the same facts as the asserted federal claims. 28 U.S.C. § 1367.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as the judicial district in which defendant New York City Department of Education (DOE) has its principal offices and pursuant to § 1391(b)(2) as the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

7. Plaintiff M.M. is the mother and legal guardian of J.S.

8. J.S. was born in 1994 and is currently 20 years old.

9. J.S. is identified by his initials in the caption of this action and throughout the Complaint consistent with the spirit of Federal Rule of Civil Procedure 5.2(a).[1]

10. M.M. and J.S. reside together in the Bronx, New York.

11. Defendant DOE is a municipal corporation whose principal offices are located at 52 Chambers Street, New York, New York 10007.

12. The DOE is responsible under the IDEA and the New York State Education Law for providing a FAPE to New York City residents between the ages of three and 21 who have been classified as students with disabilities in need of special education services and who have not yet received a regular high school diploma.

---

[1] While J.S. is not a minor, this Complaint refers to him and his mother, M.M., by their initials because the administrative litigation in this matter was commenced on J.S.'s behalf by his mother pursuant to the IDEA. *See P.M. v. Evans–Brant Cent. Sch. Dist.*, No. 08–CV–168A, 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008) ("[I]n an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court"); *see J.M. ex rel. L.M. v. New York City Dep't of Educ.*, No. 12-CV-8504(KPF), 2013 WL 5951436, at *1 n.1 (S.D.N.Y. Nov. 7, 2013) (adopting the logic of *P.M.*).

2

**A6**

## LEGAL FRAMEWORK

13. In enacting the IDEA, Congress created a comprehensive statutory framework for "ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

14. States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and must ensure that all children with disabilities are afforded a FAPE. 20 U.S.C. § 1412(a).

15. In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

16. School districts must have an Individualized Education Program (IEP) in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually. 20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i).

17. School districts must also provide each student with a placement at a school capable of implementing the student's IEP and providing the student with an appropriate education for each school year. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) (stating that school districts do not have "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements"); *M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 163 (S.D.N.Y. 2010) (finding that the "DOE substantively violated the IDEA" by recommending a student for placement in a "school that could not fulfill his educational needs"), *aff'd*, 685 F.3d 217 (2d Cir. 2012); *B.R. v New York City Dep't of Educ.*, 11-CV-8433 (JSR), 2012 WL 6691046,

3

**A7**

at *7 (S.D.N.Y. Dec. 26, 2012) (stating that "the burden [is] on the *school district* to prove that the proposed placement was adequate") (emphasis in original).

### Due Process Procedures

18. The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions," *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415), including the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6)(A).

19. In New York, IDEA due process complaints must be initially litigated in a hearing conducted at the school district level before an impartial hearing officer (IHO). N.Y. Educ. L. § 4404(1); 8 N.Y.C.R.R. § 200.5(i)–(j).

20. New York State law places the burden of proof in impartial hearings on school districts, "including the burden of persuasion and burden of production," "except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. L. § 4404(1)(c).

21. The decisions reached in impartial hearings are subject to administrative appeals to the SRO. 34 C.F.R. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

22. Once administrative remedies have been exhausted, either party may seek independent judicial review of the SRO's decision in the state or federal courts. 20 U.S.C. § 1415(i)(2)(A).

23. In an appeal to the federal district court under 20 U.S.C. § 1415(i)(2)(A), the court

4

**A8**

receives the record of the administrative proceedings and may accept additional evidence at the request of either party. 20 U.S.C. § 1415(i)(2)(C).

24. The district court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997)).

25. The court gives "due weight" to administrative rulings based on educational policy. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

26. The court does not accord "due weight" when there are no administrative findings on an issue. *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 432 (S.D.N.Y. 2008). Nor does a court accord "due weight" to administrative proceedings when determining questions of law. *Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005).

27. Generally, a reviewing court's "analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012). "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.*

28. The IDEA grants courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

29. In *Burlington v. Department of Education*, 471 U.S. 359 (1985), the Supreme Court

5

**A9**

interpreted this statutory provision to "confer[] broad discretion on the court" to grant relief that is "'appropriate' in light of the purpose of the Act," *id.* at 369.

## FACTS

### J.S.'s Disability and Educational History

30. J.S. was 18 years old at the start of the 2012-2013 school year and turned 19 during the course of the year.

31. Starting in May 2012, the DOE classified J.S. as a student with Autism.

32. Prior to May 2012, the DOE classified J.S. as a student with a Speech or Language Impairment.

33. J.S. began receiving early intervention services at age two and one-half. He did not begin to speak until he was four years old.

34. J.S. began attending Cooke in 2008.

35. J.S. was evaluated at a private institution, the Kennedy Child Study Center (Kennedy Center), on March 19 and June 2, 2009. Following the testing conducted on those dates, the Kennedy Center produced a Comprehensive Psychoeducational Evaluation (Psychoeducational Evaluation).

36. The Psychoeducational Evaluation reported that J.S. scored in the extremely low to low average ranges on tests of his cognitive abilities.

37. Socially and emotionally, the Psychoeducational Evaluation indicated that J.S.'s general adaptive functioning, communication, daily living skills, and socialization were in the low range. J.S.'s affective and anxiety problem scores were in the borderline clinical range.

38. In or about the late summer of 2011, M.M. requested that Cooke conduct updated intellectual testing of J.S.

6

**A10**

39. M.M. made this request in connection with a disability benefits application she had filed on behalf of J.S. as well as to support her effort to obtain a guardianship order.

40. Based on testing conducted on October 19, 2011, Cooke produced a Stanford-Binet Intelligence Scales, Fifth Edition, Narrative Report (Stanford-Binet Report) dated January 5, 2012.

41. The Stanford-Binet Report classified J.S.'s overall intelligence as mildly delayed.

42. M.M. did not obtain a copy of the Stanford-Binet Report until February or March 2013, and she did not have it to provide during the May 22, 2012 Committee on Special Education (CSE) meeting, which was held to create an IEP for J.S. for the 2012-2013 school year.

**The DOE's Failure to Engage in the Triennial Reevaluation Process Prior to the Start of the 2012–2013 School Year**

43. The IDEA required the DOE to reevaluate J.S. "at least once every 3 years," unless it came to an agreement with M.M. "that reevaluation [was] unnecessary," 20 U.S.C. § 1414(a)(2)(B)(ii).

44. J.S. was due for a triennial reevaluation in connection with the 2012-2013 school year.

45. The DOE did not engage in the triennial revaluation process of J.S. prior to the start of the 2012-2013 school year.

**The May 22, 2012 IEP**

46. The individuals who participated in the May 22, 2012 CSE meeting were: Ms. Molina; Evelyn Alvarez, a special education teacher assigned to CSE Region 9; Aminah Lucio, a school psychologist assigned to CSE Region 9 who also served as the district representative;

7

**A11**

Sally Ord, a representative from Cooke; and Beth Sullivan, J.S.'s 2011-2012 language arts

teacher at Cooke, who participated by telephone.

47. M.M., a Spanish speaker, was only able to communicate with the CSE

through Ms. Alvarez, a DOE employee, who translated for her.

48. The IEP recommended that J.S. be placed in a 12:1:1 program in a specialized

"District 75" public school for the 12-month school year.

49. The IEP did not provide J.S. with transitional teacher support services to support

him as he transitioned from Cooke's small, highly supportive environment to a larger "District

75" public school setting.

50. The IEP reported that J.S. was reading at an approximately third grade level and

that he was working at a math level equivalent to third to fourth grade. These functional levels

were drawn from informal assessments conducted at Cooke.

51. The IEP contained no information concerning J.S.'s cognitive functioning.

52. While J.S.'s disability classification was changed from Speech and Language

Impairment to Autism, the IEP did not include, and the CSE team did not consider parent

training.

53. The IEP contained no specific information on J.S.'s independent living skills or his

vocational interests, abilities, or needs.

54. The IEP did not designate the party or parties responsible for providing J.S. with

transition services during the 2012–2013 school year.

55. The IEP did not specify whether J.S. would be assigned to a work site for the 2012–

2013 school year or, if so, how much time he would spend at the work site.

56. The IEP goals included activities that had to be conducted in a community setting.

8

**A12**

Among other objectives, J.S. was to "participate in [a] community leisure activity" and "demonstrate accurate money handling" in a "community setting" during the 2012-2013 school year.

57. The IEP included a goal to " use [the] internet to research current events[,] articles and non-fiction information."

58. At the CSE meeting, Ms. Ord objected to the IEP's 12:1:1 program recommendation, indicating that it would not provide J.S. with as small and supportive a learning environment as he required.

59. Ms. Ord stated that it was important for J.S. to receive his related services, speech and language therapy and counseling, integrated with one another and with his academic instruction.

60. Ms. Ord also stated that J.S. needed a program that was balanced to address his academic, transition, and vocational needs.

61. At the CSE meeting, M.M. voiced objections to the IEP program and stated that J.S.'s continued academic progress was of greatest importance to her.

**The DOE's Recommended Placement**

62. In a notice dated June 15, 2012, the DOE recommended P.S. 721X, the Stephen D. McSweeney School (McSweeney) as J.S.'s placement for the 2012-2013 school year.

63. Along with Dr. Francis Tabone, an educator at Cooke, M.M. visited McSweeney on June 20, 2012.

64. During the visit, a McSweeney parent coordinator informed M.M. and Dr. Tabone that because of J.S.'s age, he would spend the entire school day at a worksite.

65. The parent coordinator told M.M. and Dr. Tabone that students received only brief

9

**A13**

academic instruction at the work site and spent most of the day engaged in vocational work.

66. M.M. concluded that McSweeney's program was not appropriate for J.S. and would cause J.S. to regress academically during the 2012-2013 school year.

67. M.M. also concluded that McSweeney would not provide appropriate opportunities for J.S. to achieve his goals of using his academic skills in a community setting.

**Written Notice to the DOE of the Inappropriateness of its IEP and Recommended Placement**

68. On June 21, 2012 and August 22, 2012, counsel for M.M. wrote to the DOE objecting to the DOE's IEP and recommended placement at McSweeney as inappropriate to address J.S.'s needs for the 2012–2013 school year.

69. The DOE did not respond to either the June 21, 2012 or August 22, 2012 letter.

70. The DOE never revised J.S.'s May 22, 2012 IEP or offered J.S. a placement other than McSweeney prior to the start of the 2012-2013 school year.

**J.S.'s Enrollment at Cooke**

71. M.M. reenrolled J.S. in Cooke for the 12-month 2012-2013 school year, signing enrollment contracts with Cooke on June 25, 2012 for both the academic term and summer term.

72. The enrollment contracts afforded M.M. the flexibility to continue working with the DOE to identify a public school placement for J.S. and to withdraw J.S. from Cooke without financial penalty if the DOE offered J.S. an appropriate placement by July 30, 2012 for the summer term, and by October 31, 2012 for the academic term.

73. The enrollment contracts provided that J.S.'s tuition at Cooke was $7,275.00 for the summer term and $48,500.00 for the September to June academic term.

**J.S.'s Educational Program at Cooke**

74. J.S. attended Cooke's summer program from July 2 to August 8, 2012.

10

**A14**

75. Cooke's summer program was designed to help J.S. maintain skills he learned during the academic term.

76. During the September 2012 to June 2013 academic term at Cooke, J.S. participated in an internship two times per week for approximately two hours; a math class four times per week; a literacy class four times per week; individual counseling once a week; group counseling once per week; speech and language therapy two times per week; group occupational therapy three times per week; a current events class two times per week; a vocational skills class once per week; and an internship forum once per week.

77. During the academic term, J.S. was one of five students in his math and literacy classes.

78. The other students in J.S.'s math and literacy classes had similar academic and social needs.

79. J.S.'s math and literacy teacher, Katherine Hibbard, was a certified special education teacher.

80. J.S. received extensive instruction in community settings, including approximately three school trips into the community each week.

81. J.S. had an internship, preparing and serving snacks to children in Cooke's grammar school. He learned both practical skills and "soft skills" such as using appropriate body language and problem solving.

82. While interning, J.S. received the 1:1 support of a Cooke inclusion assistant.

83. Victoria Fowler, a licensed school counselor, worked with the inclusion assistant to determine appropriate internship goals for J.S.

84. Ms. Fowler also taught two of J.S.'s classes, vocational skills and internship forum,

11

**A15**

where J.S. processed what he had learned at his internships and further developed his interpersonal skills related to working.

85. During the 2012–2013 school year, J.S. made progress in literacy and math, and he improved his ability to function in the community, his ability to travel, and his job skills.

**The Impartial Hearing**

86. M.M., through counsel, filed a due process complaint on March 18, 2013.

87. The due process complaint alleged that the DOE denied J.S. a FAPE for the 2012-2013 school year because the DOE failed to adequately evaluate J.S., failed to prepare an appropriate IEP, and failed to offer an appropriate school placement.

88. The due process complaint requested an order directing the DOE to issue direct payment for J.S.'s $55,750.00 tuition at Cooke for the 12-month school year, as M.M. lacked the financial means to pay the tuition in advance and seek reimbursement.

89. The case was assigned to IHO Mary Noe, who presided at an impartial hearing on May 16, 2013, June 6, 2013, and June 19, 2013.

90. Both the DOE and M.M. had attorney representation at the hearing.

91. The DOE presented the affidavits of two witnesses, and made the witnesses available for cross-examination: Ms. Alvarez, the special education teacher who worked at CSE Region 9; and Susan Naclerio, the IEP/Related Services Coordinator at McSweeney.

92. M.M. presented the affidavits of five witnesses in addition to herself, and made the witnesses available for cross-examination: Ms. Hibbard, the Head Teacher of Literacy and Mathematics at Cooke; Ms. Fowler, a counselor and administrative coordinator at Cooke; Mary Clancy, the Director of the Cooke Summer Academy; Ms. Ord, a consulting teacher at Cooke; and Dr. Tabone, the former Assistant Head of the Cooke Center Academy.

**The IHO's July 18, 2013 Decision**

93. On July 18, 2013, IHO Noe issued a Findings of Fact and Decision.

94. The decision failed to evaluate M.M.'s tuition claim under the three-prong test established in *Burlington*.

95. The IHO stated that because the CSE did not have the January 5, 2012 Stanford-Binet Report it was "at a disadvantage" and "therefore could not recommend an appropriate program," but the IHO did not specifically determine whether the DOE had offered J.S. a FAPE under *Burlington* Prong I.

96. The IHO did not determine whether Cooke was an appropriate placement for J.S. under *Burlington* Prong II.

97. The IHO only considered *Burlington* Prong III – whether the equities of the case favored M.M.'s claim.

98. IHO Noe determined that M.M. had failed to "comply with the third prong of Burlington by not informing the IEP team that the parent requested an additional evaluation, which was conducted on October 19, 2012 and a report was issued on January 5, 2012." Therefore, the IHO denied M.M.'s request for tuition payment.

**The SRO Appeal**

99. By a Verified Petition dated August 19, 2013, M.M. initiated an appeal of IHO Noe's decision to the SRO.

100. M.M. sought either reversal of IHO's Noe's decision or remand to a different IHO for a new decision that correctly applied the three-prong *Burlington* adjudicatory procedure.

101. The DOE filed a Verified Answer and Cross-Appeal, dated September 17, 2013,

**A17**

which responded to M.M.'s Verified Petition and set forth its own objections to IHO Noe's decision. Like M.M., the DOE asserted that IHO Noe erred in failing to follow the *Burlington* adjudicatory process.

102. M.M. filed a Verified Reply and Answer to Cross-Appeal, dated October 4, 2013.

**The SRO's November 8, 2013 Decision**

103. In decision number 13-157, dated November 8, 2013, SRO Justyn P. Bates partially sustained both Plaintiff's Appeal and the DOE's Cross-Appeal. The SRO ordered the case remanded to IHO Noe, or to a different IHO if IHO Noe was unavailable, to conduct additional administrative proceedings if necessary and to issue a new decision applying the three-prong *Burlington* adjudicatory scheme.

104. The SRO determined that the IHO's failure to make any findings regarding whether the DOE had provided J.S. with a FAPE was error requiring remand. The SRO held that under the *Burlington* analysis, a fact finder must first determine if a party has suffered harm before determining the relief or remedy required under the particular circumstances of the case.

105. On remand, the SRO ordered IHO Noe to decide the following issues:

   a. "whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of FAPE;"

   b. "whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not [an] appropriate educational placement;"

   c. "whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training;"

14

**A18**

    d.  "whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development;"

    e.  "whether the student was denied a FAPE because [the] May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training."

106. In a footnote, the SRO wrote: "As the student did not attend the assigned public school site, the IHO's determination regarding whether the district offered the student a FAPE for the 2012-13 school year is limited to the issues identified above."

**The Events Following the SRO Remand**

107. The case was reassigned to IHO Noe on remand.

108. On December 20, 2013, IHO Noe issued a new decision determining, contrary to her July 18, 2013 finding that the DOE "could not recommend an appropriate program," that the DOE had offered J.S. a FAPE for the 2012-2013 school year.

109. M.M. appealed IHO Noe's December 20, 2013 decision by Petition dated January 23, 2014.

110. The DOE responded to M.M.'s January 23, 2014 Petition in a Verified Answer dated February 7, 2014.

111. M.M. filed a Verified Reply dated February 12, 2014.

112. The appeal is currently pending before the SRO.

**CAUSE OF ACTION**

113. The SRO erred in barring the IHO from considering on remand the

15

**A19**

appropriateness of McSweeney, the DOE's recommended public school placement for J.S., for the 2012–2013 school year.

114. In order to satisfy its burden of proof on the first *Burlington* prong, the school district must demonstrate that it offered the student an appropriate public school placement. *See T.Y.*, 584 F.3d at 420 ("[A] school district does not have 'carte blanche to assign a child to a school that cannot satisfy the IEP's requirements'").

115. The SRO's decision to exclude the appropriateness of McSweeney from the issues to be considered on remand was legally erroneous, was not supported by the evidence of record, and was not thorough and careful. The SRO's decision should not be accorded deference by this Court, and should be vacated and remanded.

### RELIEF REQUESTED

WHEREFORE, M.M. respectfully requests that the Court:

1. Assume jurisdiction over this action;

2. Conduct an independent review of the administrative record and any additional evidence;

3. Annul the decision of the SRO to the extent that the SRO limited the issues on remand to exclude the appropriateness of McSweeney, the DOE's recommended school placement for J.S. for the 2012–2013 school year;

4. Enter judgment remanding this case to an IHO for a determination of whether McSweeney was an appropriate for placement for J.S. and was capable of implementing J.S.'s IEP for the 2012–2013 school year.

5. Award M.M. reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and

6. Grant such other and further relief as the Court deems just and proper.

16

**A20**

Dated: New York, New York
      March 6, 2014

THOMAS GRAY (TG 0880)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 246
Fax: (212) 683-5544
tgray@pfcr.org

17

**A21**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
M.M., on Behalf of and as Parent
of J.S., a student with a disability,                                    **AMENDED COMPLAINT**

                              Plaintiff,                                  Civil Action No. 14-1542 (GBD)

- against -

NEW YORK CITY DEPARTMENT                                                  ECF Case
OF EDUCATION,

                              Defendant.
-------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This action is authorized by the Individuals with Disabilities Education Improvement

Act of 2004 (IDEA), 20 U.S.C. § 1415(i)(2)(A), to review a final administrative decision of the

New York State Review Officer (SRO) regarding the provision of a free appropriate public

education (FAPE) to J.S., a student with a disability.

2. Plaintiff M.M. seeks an order vacating and reversing the SRO's November 8, 2013 and

March 18, 2014 decisions, which denied her claim for tuition funding for J.S.'s placement at the

Cooke Center for Learning and Development (Cooke), a private, not-for-profit school for

students with disabilities, for the 2012–2013 school year.

3. This action was timely commenced by a Complaint filed on March 6, 2014, which is

within four months after the date of the SRO's November 8, 2013 decision pursuant to 20 U.S.C.

§ 1415(i)(2)(B) and New York Education Law § 4404(3)(a). This Amended Complaint is timely

filed within four months of the SRO's March 18, 2014 decision.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. §

**A22**

1415(i)(2)(A), and 28 U.S.C. §§ 1331 and 1343.

5. The Court has supplemental jurisdiction to adjudicate state claims arising out of the same

facts as the asserted federal claims. 28 U.S.C. § 1367.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1)

as the judicial district in which defendant New York City Department of Education (DOE) has

its principal offices.

## PARTIES

7. M.M. is the mother of J.S.

8. J.S. was born in 1994 and is currently 20 years old.

9. J.S. is identified by his initials in the caption of this action and throughout the

Complaint consistent with the spirit of Federal Rule of Civil Procedure 5.2(a).[1]

10. M.M. and J.S. reside together in the Bronx, New York.

11. Defendant DOE is a municipal corporation whose principal offices are located at 52

Chambers Street, New York, New York 10007.

12. The DOE is responsible under the IDEA and the New York State Education Law for

providing a FAPE to New York City residents between the ages of three and 21 who have been

classified as students with disabilities in need of special education services and who have not yet

received a high school diploma.

---

[1] While J.S. is not a minor, this Complaint refers to him and his mother, M.M., by their initials
because the administrative litigation in this matter was commenced on J.S.'s behalf by his
mother pursuant to the IDEA. *See P.M. v. Evans–Brant Cent. Sch. Dist.*, No. 08–CV–168A, 2008
WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008) ("[I]n an action commenced by a parent or
guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to
proceed, as a matter of course, using initials in place of full names in public filings with the
Court"); *see J.M. ex rel. L.M. v. New York City Dep't of Educ.*, No. 12-CV-8504(KPF), 2013 WL
5951436, at *1 n.1 (S.D.N.Y. Nov. 7, 2013) (adopting the logic of *P.M.*).

## LEGAL FRAMEWORK

13. In enacting the IDEA, Congress created a comprehensive statutory framework for "ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

14. States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and must ensure that all children with disabilities are afforded a FAPE. 20 U.S.C. § 1412(a).

15. In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

16. School districts must have an Individualized Education Program (IEP) in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually. 20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i).

17. The IDEA further mandates that school districts reevaluate each student with a disability at least once every three years, unless the parent and the school district agree otherwise. 20 U.S.C. § 1414(a)(2)(B)(ii); *see also* 8 N.Y.C.R.R. § 200.4(b)(4) ("A committee on special education shall arrange for an appropriate reevaluation ... at least once every three years, except where the school district and the parent agree in writing that such reevaluation is unnecessary.")

18. Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). School districts must assess

students "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4).

19. In addition, school districts are required by the IDEA and New York State law to conduct age-appropriate assessments to support students in preparing to transition from school to post-school activities. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring that "beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"); *see also* 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring school districts to ensure that students who have reached age 12 "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests.")

20. A school district is required to seek input from a student's parents in determining whether additional data are needed as part of a reevaluation. 20 U.S.C. § 1414(a)(2)(B)(ii). If the school district determines that additional data are not needed, the district must notify the parents of that determination, including "the reasons for the determination" and "[t]he right of the parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs." 34 C.F.R. §§ 300.305(d)(i)-(ii).

21. School districts must also provide each student with a placement at a school capable of implementing the student's IEP and providing the student with an appropriate education for each school year. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) (stating that school districts do not have "carte blanche to assign a child to a school that cannot satisfy the

**A25**

IEP's requirements"); *M.H. v. New York City Dep't of Educ.*, 712 F.Supp.2d 125, 163 (S.D.N.Y.

2010) (finding that the "DOE substantively violated the IDEA" by recommending a student for

placement in a "school that could not fulfill his educational needs"), *aff'd*, 685 F.3d 217 (2d Cir.

2012); *B.R. v New York City Dep't of Educ.*, 910 F.Supp.2d 670, 678 (S.D.N.Y. 2012) (stating

that "the burden [is] on the *school district* to prove that the proposed placement was adequate")

(emphasis in original).

### Due Process Procedures

22. The IDEA provides "procedural safeguards that enable parents and students to challenge

the local educational agency's decisions," *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195,

197 (2d Cir. 2002) (citing 20 U.S.C. § 1415), including the right to file a due process complaint

"with respect to any matter relating to the identification, evaluation, or educational placement of

the child, or the provision of a free appropriate public education to such child," 20 U.S.C. §

1415(b)(6)(A).

23. In New York, IDEA due process complaints must be initially litigated in a hearing

conducted at the school district level before an impartial hearing officer (IHO). N.Y. Educ. L. §

4404(1); 8 N.Y.C.R.R. § 200.5(i)–(j).

24. New York State law places the burden of proof in impartial hearings on school

districts, "including the burden of persuasion and burden of production," "except that a parent or

person in parental relation seeking tuition reimbursement for a unilateral parental placement shall

have the burden of persuasion and burden of production on the appropriateness of such

placement." N.Y. Educ. L. § 4404(1)(c).

25. "In matters alleging a procedural violation, a hearing officer may find that a child did

not receive a free appropriate public education only if the procedural inadequacies -- (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I-III). Subject to this provision, the decision of an IHO "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i).

26. The decisions reached in impartial hearings are subject to administrative appeals to the SRO. 34 C.F.R. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

27. Once administrative remedies have been exhausted, either party may seek independent judicial review of the SRO's decision in the state or federal courts. 20 U.S.C. § 1415(i)(2)(A).

28. In an appeal to the federal district court under 20 U.S.C. § 1415(i)(2)(A), the court receives the record of the administrative proceedings and may accept additional evidence at the request of either party. 20 U.S.C. § 1415(i)(2)(C).

29. The district court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir.1997)).

30. The court gives "due weight" to administrative rulings based on educational policy. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

31. The court does not accord "due weight" when there are no administrative findings on an issue. *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F.Supp.2d 420, 432 (S.D.N.Y. 2008). Nor does a court accord "due weight" to administrative proceedings when

determining questions of law. *Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005).

32. Generally, a reviewing court's "analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012). "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.*

**Tuition Payment Remedy**

33. The IDEA grants courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

34. In *Burlington v. Department of Education*, 471 U.S. 359 (1985), the Supreme Court interpreted this statutory provision to "confer[] broad discretion on the court" to grant relief that is "'appropriate' in light of the purpose of the Act," *id.* at 369, including an award of tuition reimbursement to parents where (1) the services offered by the school district are inadequate or inappropriate; (2) the private school selected by the parents is an appropriate placement for the student; and (3) equitable considerations support the parent's claim (the three "*Burlington* prongs"), *id.* at 369–70, 374; *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12, 16 (1993).

35. The 1997 and 2004 reauthorizations of the IDEA include a tuition reimbursement provision stating: "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a

**A28**

court or a hearing officer may require the agency to reimburse the parents for the cost of that

enrollment if the court or hearing officer finds that the agency had not made a free appropriate

public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. §

1412(a)(10)(C)(ii); IDEA Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, 63 (1997).

### Direct Tuition Payment

36. The Supreme Court has held that 20 U.S.C. § 1412(a)(10)(C)(ii) is "best read as

elucidative rather than exhaustive" with respect to the tuition remedies available under the IDEA,

*Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2493 (2009), and that the equitable power of

courts under § 1415(i)(2)(C)(iii) is independent of, and broader than, the specific tuition

reimbursement provision in the Act. *Id.* at 2494–95.

37. Relying upon this analysis, this Court has held that the IDEA authorizes an award of

retroactive tuition payment directly to a private school where the three *Burlington* prongs are

satisfied, the "parents lack the financial resources to 'front' the costs of private school tuition,

and . . . a private school is willing to enroll the student and take the risk that the parents will not

be able to pay tuition costs." *Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769

F.Supp.2d 403, 428 (S.D.N.Y. 2011); *see also A.R. ex rel F.P. v. New York City Dep't of Educ.*,

No. 12-CV-4493(PAC), 2013 WL 5312537 at *8, (S.D.N.Y. Sept. 23, 2013) ("[I]t would be

grave error to conclude from the fact that Plaintiff did not have the means to pay for a private

placement that her daughter is precluded from receiving the *free* appropriate public education

that the IDEA is intended to guarantee") (emphasis in original).

### FACTS

#### J.S.'s Disability and Educational History

38. J.S. was 18 years old at the start of the 2012-2013 school year and turned 19 during the

course of the year.

39. Starting in May 2012, the DOE classified J.S. as a student with Autism.

40. Prior to May 2012, the DOE classified J.S. as a student with a Speech or Language Impairment.

41. J.S. began receiving early intervention services at age two and one-half. He did not begin to speak until he was four years old.

42. J.S. began attending Cooke in 2008, at age 14.

43. M.M. had J.S. evaluated at a private institution, the Kennedy Child Study Center (Kennedy Center), on March 19 and June 2, 2009. Following the testing conducted on those dates, the Kennedy Center produced a Comprehensive Psychoeducational Evaluation (Psychoeducational Evaluation).

44. The Psychoeducational Evaluation reported that J.S. scored in the extremely low to low average ranges on tests of his cognitive abilities.

45. Socially and emotionally, the Psychoeducational Evaluation indicated that J.S.'s general adaptive functioning, communication, daily living skills, and socialization were in the low range. J.S.'s affective and anxiety problem scores were in the borderline clinical range.

46. In or about the late summer of 2011, M.M. requested that Cooke conduct intellectual testing of J.S.

47. M.M. made this request in connection with a disability benefits application she had filed on behalf of J.S. as well as to support her effort to obtain a guardianship order.

48. Based on testing conducted on October 19, 2011, Cooke produced a Stanford-Binet Intelligence Scales, Fifth Edition, Narrative Report (Stanford-Binet Report), dated January 5, 2012.

49. The Stanford-Binet Report classified J.S.'s overall intelligence as mildly delayed.

50. M.M. did not obtain a copy of the Stanford-Binet Report until February or March 2013.

**The DOE's Failure to Engage in the Triennial Reevaluation Process Prior to the Start of the 2012–2013 School Year**

51. The IDEA required the DOE to reevaluate J.S. "at least once every 3 years," unless it came to an agreement with M.M. "that reevaluation [was] unnecessary," 20 U.S.C. § 1414(a)(2)(B)(ii).

52. J.S. was overdue for a triennial reevaluation in connection with the 2012-2013 school year.

53. The DOE did not engage in the triennial revaluation process of J.S. prior to the start of the 2012-2013 school year.

**The May 22, 2012 IEP**

54. The DOE convened a Committee on Special Education (CSE) meeting on May 22, 2012 to prepare J.S.'s IEP for the 2012–2013 school year.

55. The individuals present at the May 22, 2012 CSE meeting were: M.M.; Evelyn Alvarez, a special education teacher assigned to CSE Region 9; Aminah Lucio, a school psychologist assigned to CSE Region 9 who also served as the district representative; Sally Ord, a representative from Cooke; and Beth Sullivan, J.S.'s 2011-2012 language arts teacher at Cooke, who participated by telephone.

56. M.M., a Spanish speaker, was only able to communicate with the CSE through DOE employee Ms. Alvarez, who translated for her.

57. The May 22, 2012 CSE meeting relied upon the following documents: the Psychoeducational Evaluation and Cooke progress reports.

58. M.M. had not obtained the Stanford-Binet Report by the time of the May 22, 2012 CSE

meeting, and did not have the report to provide to the meeting.

59. The May 22, 2012 IEP prepared by the DOE recommended that J.S. be placed in a 12:1:1 program in a specialized "District 75" public school for a 12-month school year.

60. The IEP indicated that J.S. would participate in a "work study program," but did not specify the duration of the program, the nature of the work assignment, or whether the  location of the work assignment would be in a school or elsewhere.

61. The IEP did not offer J.S. transitional teacher support services to support him as he transferred from Cooke's small, highly supportive environment to a larger "District 75" public school setting.

62. The IEP reported that J.S. was reading at an approximately third grade level and that he was working at a math level equivalent to third to fourth grade. These functional levels were drawn from informal assessments conducted at Cooke.

63. The IEP offered no assessment or description of J.S.'s level of cognitive functioning.

64. The IEP changed J.S.'s disability classification from Speech or Language Impairment to Autism.

65. The IEP did not offer M.M. parent counseling or training to support her in addressing J.S.'s needs as a student with Autism.

66. The CSE team did not consider or discuss the provision of parent counseling or training during the May 22, 2012 meeting.

67. The IEP did not describe J.S.'s independent living skills or his vocational interests, abilities, or needs.

68. The IEP did not designate the party or parties responsible for providing J.S. with services to assist him in transitioning to post-school life during the 2012-2013 school year.

69. The IEP's goals included activities that had to be conducted in a community setting, such as participating "in [a] community leisure activity" and demonstrating accurate money handling in a community setting.

70. The IEP included a goal to "use [the] internet to research current events[,] articles and non-fiction information."

71. At the CSE meeting, Ms. Ord objected to the IEP's 12:1:1 program recommendation, indicating that it would not provide J.S. with as small and supportive a learning environment as he required.

72. Ms. Ord stated that it was important for J.S. to receive his related services of speech and language therapy and counseling integrated with one another and with his academic instruction.

73. Ms. Ord also stated that J.S. needed a program that was balanced to address his academic, transition, and vocational needs.

74. At the CSE meeting, M.M. voiced objections to the IEP program and stated that J.S.'s continued academic progress was of greatest importance to her.

**The DOE's Recommended Placement**

75. By a notice dated June 15, 2012, the DOE recommended P.S. 721X, the Stephen D. McSweeney School (McSweeney), for J.S. for the 2012-2013 school year.

76. M.M. visited McSweeney on June 20, 2012. M.M. was accompanied on that visit by Dr. Francis Tabone, an educator at Cooke.

77. During the visit, a McSweeney parent coordinator informed M.M. and Dr. Tabone that because of J.S.'s age, he would spend the entire school day at a worksite.

78. The parent coordinator also told M.M. and Dr. Tabone that students received only brief academic instruction at the work site, and spent most of the day engaged in vocational work.

**A33**

79. M.M. concluded that McSweeney's program was not appropriate for J.S. and would cause J.S. to regress academically during the 2012-2013 school year.

80. M.M. also concluded that McSweeney would not provide appropriate opportunities for J.S. to achieve his goals of using his academic skills in a community setting.

### Written Notice to the DOE of the Inappropriateness of its IEP and Recommended Placement

81. On June 21, 2012 and August 22, 2012, counsel for M.M. wrote to the DOE objecting to the DOE's May 22, 2012 IEP and recommended placement at McSweeney as inappropriate to address J.S.'s needs for the 2012-2013 school year.

82. The DOE did not respond to either the June 21, 2012 or August 22, 2012 letters.

83. The DOE never revised J.S.'s May 22, 2012 IEP or offered J.S. a placement other than McSweeney prior to the start of the 2012-2013 school year.

### J.S.'s Enrollment at Cooke

84. M.M. reenrolled J.S. in Cooke for the 12-month 2012-2013 school year, signing enrollment contracts with Cooke on June 25, 2012 for both the academic term and summer term.

85. The enrollment contracts afforded M.M. the flexibility to continue working with the DOE to identify a public school placement for J.S. and to withdraw J.S. from Cooke without financial penalty if the DOE offered J.S. an appropriate placement by July 30, 2012 for the summer term, and by October 31, 2012 for the academic term.

86. The enrollment contracts provided that J.S.'s tuition at Cooke was $7,275.00 for the summer term and $48,500.00 for the September to June academic term.

### J.S.'s Educational Program at Cooke

87. J.S. attended Cooke's summer program from July 2 to August 8, 2012.

88. Cooke's summer program was designed to help J.S. maintain skills he learned during the

**A34**

academic term.

89. During the September 2012 to June 2013 academic term at Cooke, J.S. participated in an internship two times per week for approximately two hours; a math class four times per week; a literacy class four times per week; individual counseling once a week; group counseling once a week; speech and language therapy two times per week; group occupational therapy three times per week; a current events class two times per week; a vocational skills class once a week; and an internship forum once a week.

90. During the academic term, J.S. was one of five students in his math and literacy classes.

91. The other students in his classes had similar academic and social needs.

92. J.S.'s math and literacy teacher, Katherine Hibbard, was a certified special education teacher.

93. J.S. received extensive instruction in community settings, including approximately three school trips into the community each week.

94. J.S. had an internship preparing and serving snacks to children in Cooke's grammar school. Through this internship J.S. learned both practical skills and "soft skills" such as using appropriate body language and problem solving.

95. While interning, J.S. received the 1:1 support of a Cooke inclusion assistant.

96. Victoria Fowler, a licensed school counselor, worked with the inclusion assistant to determine appropriate internship goals for J.S.

97. Ms. Fowler also taught two of J.S.'s classes, vocational skills and internship forum, where J.S. processed what he had learned at his internship and further developed his interpersonal skills related to working.

98. During the 2012–2013 school year, J.S. made progress in literacy and math, and he

**A35**

improved his ability to function in the community, his ability to travel, and his job skills.

### The Impartial Hearing

99. M.M., through counsel, filed a due process complaint on March 18, 2013.

100. The due process complaint alleged that the DOE denied J.S. a FAPE for the 2012-2013 school year because the DOE failed to adequately evaluate J.S., failed to prepare an appropriate IEP, and failed to offer an appropriate school placement.

101. The due process complaint requested an order directing the DOE to issue direct payment for J.S.'s $55,775.00 tuition at Cooke for the 12-month school year, as M.M. lacked the financial means to pay the tuition in advance and seek reimbursement.

102. The case was assigned to IHO Mary Noe, who presided at an impartial hearing on May 16, 2013, June 6, 2013, and June 19, 2013.

103. Both the DOE and M.M. had attorney representation at the hearing.

104. The DOE presented the affidavits of two witnesses, and made the witnesses available for cross-examination: Ms. Alvarez, the special education teacher who worked at CSE Region 9; and Susan Naclerio, the IEP/Related Services Coordinator at McSweeney.

105. M.M. presented the affidavits of five witnesses in addition to herself, and made the witnesses available for cross-examination: Ms. Hibbard, the Head Teacher of Literacy and Mathematics at Cooke; Ms. Fowler, a counselor and administrative coordinator at Cooke; Mary Clancy, the Director of the Cooke Summer Academy; Ms. Ord, a consulting teacher at Cooke; and Dr. Tabone, the former assistant head of Cooke's high school.

### The IHO's July 18, 2013 Decision

106. On July 18, 2013, IHO Noe issued a Findings of Fact and Decision.

107. The decision failed to evaluate M.M.'s tuition claim under the three prong test

established in *Burlington*.

108. The IHO noted that because the CSE did not have the January 5, 2012 Stanford-Binet Report it was "at a disadvantage" and "therefore could not recommend an appropriate program." However, the IHO did not specifically determine whether the DOE had offered J.S. a FAPE under *Burlington* Prong I.

109. The IHO did not determine whether Cooke was an appropriate placement for J.S. under *Burlington* Prong II.

110. The IHO only reached a determination on *Burlington* Prong III -- whether the equities of the case favored M.M.'s claim.

111. IHO Noe determined that M.M. had failed to "comply with the third prong of Burlington by not informing the IEP team that the parent requested an additional evaluation, which was conducted on October 19, 2012 and a report was issued on January 5, 2012." Therefore, the IHO denied M.M.'s request for tuition payment.

**The SRO Appeal**

112. By Verified Petition dated August 19, 2013, M.M. initiated an appeal of IHO Noe's July 18, 2013 decision to the SRO, seeking either reversal of the decision or remand to a different IHO for a new decision that correctly applied the three-prong *Burlington* adjudicatory procedure.

113. The DOE filed a Verified Answer and Cross-Appeal, dated September 17, 2013, which responded to M.M.'s Verified Petition and set forth the DOE's own objections to IHO Noe's decision. Like M.M., the DOE asserted that IHO Noe erred in failing to follow the *Burlington* adjudicatory process.

114. M.M. filed a Verified Reply and Answer to Cross-Appeal dated October 4, 2013.

**A37**

### The SRO's November 8, 2013 Decision

115. In decision number 13-157, dated November 8, 2013, SRO Justyn P. Bates partially sustained both M.M.'s Appeal and the DOE's Cross-Appeal. The SRO ordered the case remanded to IHO Noe, or to a different IHO if IHO Noe was unavailable, to conduct additional administrative proceedings if necessary and to issue a new decision applying the three-prong *Burlington* adjudicatory scheme.

116. The SRO determined that the IHO's failure to make any findings regarding whether the DOE had provided J.S. with a FAPE was error requiring remand. The SRO held that under the *Burlington* analysis, a fact finder must first determine if a party has suffered harm before determining the relief or remedy required under the particular circumstances of the case.

117. On remand, the SRO ordered IHO Noe to decide the following issues:

    a. "whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of FAPE;"

    b. "whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not [an] appropriate educational placement;"

    c. "whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training;"

    d. "whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development;"

**A38**

e.  "whether the student was denied a FAPE because [the] May 2012 CSE did not

consider or the IEP did not include transitional teacher support services or parent

counseling and training."

118. In a footnote, the SRO wrote: "As the student did not attend the assigned public school

site, the IHO's determination regarding whether the district offered the student a FAPE for the

2012-13 school year is limited to the issues identified above."

**IHO Noe's December 20, 2013 Decision Following the SRO Remand**

119. The case was reassigned to IHO Noe on remand.

120. On December 20, 2013, IHO Noe issued a new decision determining, contrary to

her July 18, 2013 finding that the DOE "could not recommend an appropriate program," that the

DOE had offered J.S. a FAPE for the 2012-2013 school year.

121. The IHO's December 20, 2013 decision did not make any determinations regarding

whether Cooke's program was appropriate for J.S. or whether the equities favored M.M.'s tuition

claim.

**The Second SRO Appeal**

122. M.M. appealed IHO Noe's December 20, 2013 decision to the SRO by a Petition dated

January 23, 2014.

123. The DOE responded to M.M.'s January 23, 2014 Petition in a Verified Answer dated

February 7, 2014.

124. M.M. filed a Verified Reply dated February 12, 2014.

**The SRO's March 18, 2013 Decision**

125. In decision number 14-018, dated March 18, 2013, the SRO dismissed M.M.'s appeal.

126. The SRO found that at the time of the May 2012 CSE meeting J.S.'s "most recent June

**A39**

2009 evaluation remained timely and the district was not obligated to proceed with a triennial reevaluation."

127. The SRO also found that the DOE's failure to conduct a vocational assessment did not result in a failure to offer J.S. a FAPE.

128. The SRO reasoned that the IEP's failure to state the amount of academic instruction versus vocational instruction J.S. would receive was not an error because M.M. "would learn that information from the public school" and McSweeney's IEP coordinator testified that the school "could implement both the academic and vocational components" of the IEP.

129. With regard to the 12:1:1 program that the DOE offered to J.S., the SRO determined that the record did "not contain sufficient evidence upon which to conclude that the recommendation was not appropriate to meet [J.S.'s] needs."

130. The SRO also determined that J.S.'s IEP was designed to facilitate his transition from Cooke to an "assigned public school site."

131. While noting that the DOE routinely disregarded "its legal obligation to include parent counseling and training on a student's IEP," the SRO held that the DOE's failure to recommend parent counseling and training did not deny J.S. a FAPE.

132. With regard to M.M.'s claim that J.S. needed his related services integrated with his academic instruction, the SRO determined that the IEP's recommendation that J.S. receive speech-language therapy and counseling at a separate location "would not have prevented [J.S.] from demonstrating progress."

133. Finally, the SRO determined that M.M.'s claims regarding McSweeney were speculative and not " an appropriate inquiry under the circumstances of his case."

134. The SRO did not reach determinations of whether Cooke was an appropriate placement

or whether equitable considerations supported an award of tuition funding.

## FIRST CAUSE OF ACTION

135. The SRO erred in finding that the DOE was not required to conduct a triennial evaluation of J.S. in connection with his IEP review for the 2012–2013 school year and in failing to find that the DOE's abdication of its responsibility to engage in the triennial evaluation process denied J.S. a FAPE.

136. The DOE's failure to engage M.M. in the process of deciding whether or not to reevaluate J.S. violated the primary purposes of the IDEA to (1) "to ensure that all children with disabilities have available to them a free appropriate public education," and (2) "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B).

137. The DOE violated the IDEA in failing to notify M.M. of its apparent decision not to reevaluate J.S. and in failing to notify M.M. of her right to request a reevaluation, thus significantly impeding M.M.'s opportunity to participate in the decision-making process regarding J.S.'s educational program, causing J.S. a deprivation of educational benefits, and denying J.S. a FAPE.

138. The DOE failed to meet its burden of proving that its failure to comply with the federal and state law triennial reevaluation requirements did not result in a denial of FAPE.

## SECOND CAUSE OF ACTION

139. The SRO misapplied the burden of proof and erred in finding that the DOE's May 22, 2012 IEP was appropriate and offered J.S. a FAPE for the 2012-2013 school year.

140. The IEP was inappropriate in that it failed to indicate how much academic versus

**A41**

vocational instruction J.S. would receive or the nature or extent of his "work study program," recommended an inappropriate 12:1:1 program, contained inappropriate provisions for related services and transitional support services, and failed to recommend parent counseling or training.

### THIRD CAUSE OF ACTION

141. The SRO erred in determining that M.M.s' claims regarding McSweeney, the public school placement, were speculative and in failing to consider the merits of those claims.

142. A school district bears the burden at *Burlington* Prong I of demonstrating that it offered the parent a school placement capable of implementing a student's IEP. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) ("[A] school district does not have 'carte blanche to assign a child to a school that cannot satisfy the IEP's requirements'").

143. The SRO erred in finding McSweeney was able to implement J.S.'s May 2012 IEP and provide J.S. an appropriate education.

144. The DOE failed to meet its burden to prove that McSweeney was an appropriate placement and could provide J.S. with a FAPE for the 2012-13 school year.

### FOURTH CAUSE OF ACTION

145. The SRO erred in failing to determine that Cooke was an appropriate placement for J.S. for the 2012-2013 school year.

### FIFTH CAUSE OF ACTION

146. The SRO erred in failing to determine that equitable considerations favored M.M.'s claim for tuition funding for the 2012-2013 school year.

### SIXTH CAUSE OF ACTION

147. The SRO erred failing to award direct payment of J.S.'s 2012-2013 school year tuition

at Cooke. A tuition award was appropriate in this case because all three *Burlington* prongs were satisfied:

     a.  the DOE failed to offer J.S. a FAPE for the 2012–2013 school year;

     b.  Cooke was an appropriate placement for J.S. for the 2012–2013 school year;

     c.  the equities favored M.M.'s tuition claim.

148. An award of direct tuition payment was appropriate, and fully consistent with this Court's decision in *Mr. and Mrs. A.*, because M.M. demonstrated that she was legally responsible for the Cooke tuition but lacked the financial means to pay the tuition in advance and seek reimbursement.

### SEVENTH CAUSE OF ACTION

149. The SRO's decision was affected by errors of law, was not supported by the evidence of record, and was not thorough and careful. The SRO's decision should not be accorded deference by this Court, and should be reversed.

### RELIEF REQUESTED

WHEREFORE, M.M. respectfully request that this Court:

1. Assume jurisdiction over this action;

2. Conduct an independent review of the administrative record and any additional evidence;

3. Vacate the two SRO decisions and enter a judgment finding that:

     a.  The DOE failed to offer J.S. a FAPE for the 2012–2013 school year;

     b.  Cooke was an appropriate placement for J.S. for the 2012–2013 school year; and

     c.  Equitable considerations support an award of direct tuition funding for J.S.'s placement at Cooke;

**A43**

4. Issue an order directing the DOE to make direct payment to Cooke for J.S.'s tuition for the twelve-month 2012–2013 school year in the amount of $55,775.00;

5. Award M.M. reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and

6. Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       May 14, 2014

THOMAS GRAY (TG 0880)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 246
Fax: (212) 683-5544
tgray@pfcr.org

**A44**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

M.M. on Behalf of and as Parent of J.S., a student with a
disability,

**ANSWER TO THE
AMENDED COMPLAINT**

Plaintiff,

14 Civ. 1542 (GBD)

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

----------------------------------------------------------------------- x

    Defendant New York City Department of Education ("DOE"), by its attorney,

Zachary W. Carter, Corporation Counsel of the City of New York, for its Answer to the

Amended Complaint, respectfully alleges as follows:

  1.  Denies the allegations set forth in paragraph "1" of the Amended Complaint, and

respectfully refers the Court to the statutory authority cited therein for a complete and accurate

statement of its contents.

  2.  Denies the allegations set forth in paragraph "2" of the Amended Complaint,

except admits that plaintiff purports to proceed as set forth therein, and respectfully refers to the

Court to the decisions of the State Review Officer ("SRO"), dated November 8, 2013, No. 13-

157 ("November 8, 2013 SRO Decision"), and March 18, 2014, No. 14-018 ("March 18, 2014

SRO Decision"), for a complete and accurate statement of their contents.

  3.  Admits the allegations set forth in paragraph "3" of the Amended Complaint.

  4.  Denies the allegations set forth in paragraph "4" of the Amended Complaint,

except admits that plaintiff purports to invoke the Court's jurisdiction as stated therein.

**A45**

5.      Denies the allegations set forth in paragraph "5" of the Amended Complaint, except admits that plaintiff purports to invoke the Court's jurisdiction as stated therein.

6.      Denies the allegations set forth in paragraph "6" of the Amended Complaint, except admits that plaintiff purport to lay venue in this judicial district as stated therein.

7.      Admits the allegations set forth in paragraph "7" of the Amended Complaint.

8.      Admits the allegations set forth in paragraph "8" of the Amended Complaint.

9.      Denies the allegations set forth in paragraph "9" of the Amended Complaint, except admits that J.S. is identified by his initials throughout the Amended Complaint, and respectfully refers the Court to the statutory and judicial authorities referenced therein for a complete and accurate statement of their contents and legal import.

10.      Admits the allegations set forth in paragraph "10" of the Amended Complaint.

11.      Denies the allegations set forth in paragraph "11" of the Amended Complaint, except admits that DOE has offices at 52 Chambers Street, New York, New York 10007.

12.      Denies the allegations set forth in paragraph "12" of the Amended Complaint.

13.      Denies the allegations set forth in paragraph "13" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

14.      Denies the allegations set forth in paragraph "14" of the Amended Complain, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

15.      Denies the allegations set forth in paragraph "15" of the Amended Complaint, and respectfully refers the Court to the statutory and judicial authorities cited therein for a complete and accurate statement of their contents and legal import.

**A46**

16.     Denies the allegations set forth in paragraph "16" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

17.     Denies the allegations set forth in paragraph "17" of the Amended Complaint, and respectfully refers the Court to the statutory and regulatory authorities cited therein for a complete and accurate statement of their contents.

18.     Denies the allegations set forth in paragraph "18" of the Amended Complaint, and respectfully refers the Court to the regulatory authorities cited therein for a complete and accurate statement of their contents.

19.     Denies the allegations set forth in paragraph "19" of the Amended Complaint, and respectfully refers the Court to the statutory and regulatory authorities cited therein for a complete and accurate statement of their contents.

20.     Denies the allegations set forth in paragraph "20" of the Amended Complaint, and respectfully refers the Court to the statutory and regulatory authorities cited therein for a complete and accurate statement of their contents.

21.     Denies the allegations set forth in paragraph "21" of the Amended Complaint, and respectfully refers the Court to the judicial authorities cited therein for a complete and accurate statement of their contents and legal import.

22.     Denies the allegations set forth in paragraph "22" of the Amended Complaint, and respectfully refers the Court to the statutory and judicial authorities cited therein for a complete and accurate statement of their contents and legal import.

**A47**

23.     Denies the allegations set forth in paragraph "23" of the Amended Complaint, and respectfully refers the Court to the statutory and regulatory authorities cited therein for a complete and accurate statement of their contents.

24.     Denies the allegations set forth in paragraph "24" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

25.     Denies the allegations set forth in paragraph "25" of the Amended Complaint, and respectfully refers the Court to the statutory authorities cited therein for a complete and accurate statement of their contents.

26.     Denies the allegations set forth in paragraph "26" of the Amended Complaint, and respectfully refers the Court to the statutory and regulatory authorities cited therein for a complete and accurate statement of their contents.

27.     Denies the allegations set forth in paragraph "27" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

28.     Denies the allegations set forth in paragraph "28" of the Amended Complaint, and respectfully refers the Court to the statutory authorities cited therein for a complete and accurate statement of their contents.

29.     Denies the allegations set forth in paragraph "29" of the Amended Complaint, and respectfully refers the Court to the judicial authorities cited therein for a complete and accurate statement of their legal import.

30.     Denies the allegations set forth in paragraph "30" of the Amended Complaint, and respectfully refers the Court to the judicial authority cited therein for a complete and accurate statement of its legal import.

31.     Denies the allegations set forth in paragraph "31" of the Amended Complaint, and respectfully refers the Court to the judicial authorities cited therein for a complete and accurate statement of their legal import.

32.     Denies the allegations set forth in paragraph "32" of the Amended Complaint, and respectfully refers the Court to the judicial authority cited therein for a complete and accurate statement of its legal import.

33.     Denies the allegations set forth in paragraph "33" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

34.     Denies the allegations set forth in paragraph "34" of the Amended Complaint, and respectfully refers the Court to judicial authorities cited therein for a complete and accurate statement of their legal import.

35.     Denies the allegations set forth in paragraph "35" of the Amended Complaint, and respectfully refers the Court to the statutory authorities cited therein for a complete and accurate statement of their contents.

36.     Denies the allegations set forth in paragraph "36" of the Amended Complaint, and respectfully refers the Court to the statutory and judicial authorities cited therein for a complete and accurate statement of their contents and legal import.

**A49**

37.     Denies the allegations set forth in paragraph "37" of the Amended Complaint, and respectfully refers the Court to the judicial authorities cited therein for a complete and accurate statement of their legal import.

38.     Denies the allegations set forth in paragraph "38" of the Amended Complaint, except admits that J.S. was 18 years old at the start of the 2012-2013 school year and turned 19 during the 2012-2013 school year.

39.     Denies the allegations set forth in paragraph "39" of the Amended Complaint, except admits that the CSE classified J.S. as a student with Autism at the May 22, 2012.

40.     Denies the allegations set forth in paragraph "40" of the Amended Complaint, except admits that prior to the May 22, 2012 CSE meeting, J.S. was classified as a student with a Speech or Language Impairment.

41.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the Amended Complaint.

42.     Admits the allegations set forth in paragraph "42" of the Amended Complaint.

43.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "43" of the Amended Complaint, except admits that the Kennedy Child Study Center produced a "Comprehensive Psychoeducational Evaluation" in 2009.

44.     Denies the allegations set forth in paragraph "44" of the Amended Complaint, and respectfully refers the Court to the "Comprehensive Psychoeducational Evaluation," contained in

the underlying administrative record as Exhibit 5,[1] for a complete and accurate statement of its contents.

45.     Denies the allegations set forth in paragraph "45" of the Amended Complaint, and respectfully refers the Court to the "Comprehensive Psychoeducational Evaluation," contained in the underlying administrative record as Exhibit 5, for a complete and accurate statement of its contents.

46.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "46" of the Amended Complaint.

47.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "47" of the Amended Complaint.

48.     Admits the allegations set forth in paragraph "48" of the Amended Complaint.

49.     Denies the allegations set forth in paragraph "49" of the Amended Complaint, and respectfully refers the Court to the Stanford-Binet Report, dated January 5, 2012 and contained in the underlying administrative record as Exhibit 15, for a complete and accurate statement of its contents.

50.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "50" of the Amended Complaint.

51.     Denies the allegations set forth in paragraph "51" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

52.     Denies the allegations set forth in paragraph "52" of the Amended Complaint.

---

[1] References to exhibits are to the exhibits entered into the underlying administrative record at the Impartial Hearing.  A certified copy of the entire administrative record will be provided to the Court should this action proceed to motion practice.

53.     Denies the allegations set forth in paragraph "53" of the Amended Complaint.

54.     Admits the allegations set forth in paragraph "54" of the Amended Complaint.

55.     Admits the allegations set forth in paragraph "55" of the Amended Complaint.

56.     Denies the allegations set forth in paragraph "56" of the Amended Complaint, except admits that Ms. Alvarez translated for M.M. at the May 22, 2012 meeting.

57.     Denies the allegations set forth in paragraph "57" of the Amended Complaint.

58.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "58" of the Amended Complaint, except admits that the Stanford-Binet Report was not provided to the CSE team at the May 22, 2012 meeting.

59.     Denies the allegations set forth in paragraph "59" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

60.     Denies the allegations set forth in paragraph "60" of the Amended Complaint, except admits that the May 22, 2012 IEP recommended that J.S. participate in a "work study program," and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

61.     Denies the allegations set forth in paragraph "61" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

62.     Denies the allegations set forth in paragraph "62" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

63.     Denies the allegations set forth in paragraph "63" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

64.     Denies the allegations set forth in paragraph "64" of the Amended Complaint, affirmatively states that the CSE reclassified J.S. at the May 22, 2012 IEP meeting as a student with autism, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

65.     Denies the allegations set forth in paragraph "65" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

66.     Denies the allegations set forth in paragraph "66" of the Amended Complaint.

67.     Denies the allegations set forth in paragraph "67" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

68.     Denies the allegations set forth in paragraph "68" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

69.     Denies the allegations set forth in paragraph "69" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

**A53**

70.     Denies the allegations set forth in paragraph "70" of the Amended Complaint, and respectfully refers the Court to the May 22, 2012 IEP, contained in the underlying administrative record as Exhibit 3, for a complete and accurate statement of its contents.

71.     Denies the allegations set forth in paragraph "71" of the Amended Complaint.

72.     Denies knowledge or information sufficient to forth a belief as to the truth of the allegations set forth in paragraph "72" of the Amended Complaint, except admits that Ms. Ord stated at the May 22, 2012 meeting that J.S. should continue to receive Speech and Language Therapy and Counseling.

73.     Denies knowledge or information sufficient to forth a belief as to the truth of the allegations set forth in paragraph "73" of the Amended Complaint.

74.     Denies knowledge or information sufficient to forth a belief as to the truth of the allegations set forth in paragraph "74" of the Amended Complaint.

75.     Admits the allegations set forth in paragraph "75" of the Amended Complaint.

76.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "76" of the Amended Complaint, except admits that M.M. visited McSweeney on June 20, 2012.

77.     Denies knowledge or information sufficient to forth a belief as to the truth of the allegations set forth in paragraph "77" of the Amended Complaint.

78.     Denies knowledge or information sufficient to forth a belief as to the truth of the allegations set forth in paragraph "78" of the Amended Complaint.

79.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "79" of the Amended Complaint.

80.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "80" of the Amended Complaint.

81.     Denies the allegations set forth in paragraph "78" of the Amended Complaint, except admits that on June 21, 2012 and August 22, 2012, counsel for M.M. wrote to the DOE, and respectfully refers the Court to these letters, contained in the underlying administrative record as Exhibit B and Exhibit C respectively, for a complete and accurate statement of their contents.

82.     Admits the allegations set forth in paragraph "82" of the Amended Complaint.

83.     Denies the allegations set forth in paragraph "83" of the Amended Complaint, except admit that the DOE did not revise the May 22, 2012 IEP or offer a placement other than McSweeney prior to the start of the 2012-2013 school year.

84.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "84" of the Amended Complaint, except admits that plaintiff unilaterally reenrollment J.S. at the Cooke Center for the 2012-2013 school year, and respectfully refers the Court to the Cooke Center enrollment contract, contained in the underlying administrative record as Exhibit E, for a complete and accurate statement of its contents.

85.     Denies the allegations set forth in paragraph "85" of the Amended Complaint, and respectfully refers the Court to the Cooke Center enrollment contract, contained in the underlying administrative record as Exhibit E, for a complete and accurate statement of its contents.

86.     Denies the allegations set forth in paragraph "86" of the Amended Complaint, and respectfully refers the Court to the Cooke Center enrollment contract, contained in the

**A55**

underlying administrative record as Exhibit E, for a complete and accurate statement of its contents.

87.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "87" of the Amended Complaint.

88.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "88" of the Amended Complaint.

89.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "89" of the Amended Complaint.

90.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "90" of the Amended Complaint.

91.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "91" of the Amended Complaint.

92.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "92" of the Amended Complaint.

93.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "93" of the Amended Complaint.

94.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "94" of the Amended Complaint.

95.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "95" of the Amended Complaint.

96.      Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "96" of the Amended Complaint.

97.     Denies knowledge or information sufficient to form a belief as to truth of the allegations set forth in paragraph "97" of the Amended Complaint.

98.     Denies the allegations set forth in paragraph "98" of the Amended Complaint.

99.     Admits the allegations set forth in paragraph "99" of the Amended Complaint.

100.     Denies the allegations set forth in paragraph "100" of the Amended Complaint, and respectfully refers the Court to the Due Process Complaint, dated March 18, 2013 and contained in the underlying administrative record as Exhibit 1, for a complete and accurate statement of its contents.

101.     Denies the allegations set forth in paragraph "101" of the Amended Complaint, and respectfully refers the Court to the Due Process Complaint, dated March 18, 2013 and contained in the underlying administrative record as Exhibit 1, for a complete and accurate statement of its contents.

102.     Admits the allegations set forth in paragraph "102" of the Amended Complaint.

103.     Admits the allegations set forth in paragraph "103" of the Amended Complaint.

104.     Admits the allegations set forth in paragraph "104" of the Amended Complaint.

105.     Admits the allegations set forth in paragraph "105" of the Amended Complaint.

106.     Admits the allegations set forth in paragraph "106" of the Amended Complaint.

107.     Denies the allegations set forth in paragraph "107" of the Amended Complaint, and respectfully refers the Court to the Impartial Hearing Officer ("IHO") Mary Noe's Findings of Fact and Decision, dated July 18, 2013, Case No. 143983 ("July 18, 2013 IHO Decision"), for a complete and accurate statement of its contents.

108.    Denies the allegations set forth in paragraph "108" of the Amended Complaint, and respectfully refers the Court to the July 18, 2013 IHO Decision for a complete and accurate statement of its contents.

109.    Denies the allegations set forth in paragraph "109" of the Amended Complaint, and respectfully refers the Court to the July 18, 2013 IHO Decision for a complete and accurate statement of its contents.

110.    Denies the allegations set forth in paragraph "110" of the Amended Complaint, and respectfully refers the Court to the July 18, 2013 IHO Decision for a complete and accurate statement of its contents.

111.    Denies the allegations set forth in paragraph "111" of the Amended Complaint, and respectfully refers the Court to the July 18, 2013 IHO Decision for a complete and accurate statement of its contents.

112.    Denies the allegations set forth in paragraph "112" of the Amended Complaint, except admits that plaintiff appealed the July 18, 2013 IHO Decision to the SRO, and respectfully refers the Court to the plaintiff's Verified Petition, dated August 19, 2013, for a complete and accurate statement of its contents.

113.    Denies the allegations set forth in paragraph "113" of the Amended Complaint, except admits that the DOE filed a Verified Answer and Cross-Appeal, dated September 17, 2013, and respectfully refers the Court to that Verified Answer and Cross Appeal for a complete and accurate statement of its contents.

114.    Admits the allegations set forth in paragraph "114" of the Amended Complaint.

115.    Denies the allegations set forth in paragraph "115" of the Amended Complaint, except admits that SRO Justyn P. Bates issued a decision, dated November 8, 2013,  No. 13-157,

and respectfully refers the Court to the November 8, 2013 SRO Decision for a complete and accurate statement of its contents.

116.    Denies the allegations set forth in paragraph "116" of the Amended Complaint, and respectfully refers the Court to the November 8, 2013 SRO Decision for a complete and accurate statement of its contents.

117.    Denies the allegations set forth in paragraph "117" of the Amended Complaint, and respectfully refers the Court to the November 8, 2013 SRO Decision for a complete and accurate statement of its contents.

118.    Denies the allegations set forth in paragraph "118" of the Amended Complaint, and respectfully refers the Court to the November 8, 2013 SRO Decision for a complete and accurate statement of its contents.

119.    Admits the allegations set forth in paragraph "119" of the Amended Complaint.

120.    Denies the allegations set forth in paragraph "120" of the Amended Complaint, except admits that IHO Noe issued a second Findings of Fact and Decision on December 20, 2013, Case No. 143983 ("December 20, 2013 IHO Decision"), and respectfully refers the Court to the December 20, 2013 IHO Decision for a complete and accurate statement of its contents.

121.    Denies the allegations set forth in paragraph "121" of the Amended Complaint, and respectfully refers the Court to the December 20, 2013 IHO Decision for a complete and accurate statement of its contents.

122.    Admits the allegations set forth in paragraph "122" of the Amended Complaint.

123.    Admits the allegations set forth in paragraph "123" of the Amended Complaint.

124.    Admits the allegations set forth in paragraph "124" of the Amended Complaint.

125.    Denies the allegations set forth in paragraph "125" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision, for a complete and accurate statement of its contents.

126.    Denies the allegations set forth in paragraph "126" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

127.    Denies the allegations set forth in paragraph "127" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

128.    Denies the allegations set forth in paragraph "128" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

129.    Denies the allegations set forth in paragraph "129" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

130.    Denies the allegations set forth in paragraph "130" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

131.    Denies the allegations set forth in paragraph "131" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

132.    Denies the allegations set forth in paragraph "132" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

133.    Denies the allegations set forth in paragraph "133" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

134.    Denies the allegations set forth in paragraph "134" of the Amended Complaint, and respectfully refers the Court to the March 18, 2014 SRO Decision for a complete and accurate statement of its contents.

135.    Denies the allegations set forth in paragraph "135" of the Amended Complaint.

136.    Denies the allegations set forth in paragraph "136" of the Amended Complaint, and respectfully refers the Court to the statutory authority cited therein for a complete and accurate statement of its contents.

137.    Denies the allegations set forth in paragraph "137" of the Amended Complaint.

138.    Denies the allegations set forth in paragraph "138" of the Amended Complaint.

139.    Denies the allegations set forth in paragraph "139" of the Amended Complaint.

140.    Denies the allegations set forth in paragraph "140" of the Amended Complaint.

141.    Denies the allegations set forth in paragraph "141" of the Amended Complaint.

142.    Denies the allegations set forth in paragraph "142" of the Amended Complaint, and respectfully refers the Court to the judicial authority cited therein for a complete and accurate statement of its legal import.

143.    Denies the allegations set forth in paragraph "143" of the Amended Complaint.

144.    Denies the allegations set forth in paragraph "144" of the Amended Complaint.

**A61**

145.    Denies the allegations set forth in paragraph "145" of the Amended Complaint.

146.    Denies the allegations set forth in paragraph "146" of the Amended Complaint.

147.    Denies the allegations set forth in paragraph "147" of the Amended Complaint.

148.    Denies the allegations set forth in paragraph "148" of the Amended Complaint.

149.    Denies the allegations set forth in paragraph "149" of the Amended Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE:

150.    The Amended Complaint fails to state a claim upon which relief can be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE:

151.    Defendant has not violated any rights, privileges, or immunities under the United States Constitution or laws of the United States, the State of New York, or any political subdivision thereof.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE:

152.    Defendant DOE offered J.S. a Free Appropriate Public Education for the 2012–2013 school year.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE:

153.    Plaintiff has not demonstrated that the Cooke Center program was appropriate for J.S.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE:

154.    Equitable considerations preclude an award of tuition reimbursement and/or other relief to plaintiff in whole or in part.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE:

155.    The Court lacks subject matter jurisdiction over any issues not identified by plaintiff in her Due Process Complaint, dated March 18, 2013.

**A62**

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE:**

156.   Plaintiff has failed to exhaust her administrative remedies.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE:**

157.   Plaintiff was not the prevailing party and thus is not entitled to attorneys' fees.


**WHEREFORE,** Defendant New York City Department of Education requests

judgment dismissing the Amended Complaint and denying all relief requested therein, together

with such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         June 12, 2014


ZACHARY W. CARTER
Corporation Counsel of the
   City of New York
Attorney for Defendant
100 Church Street, Room 2-305
New York, N.Y. 10007
(212) 356-0886
ngiovana@law.nyc.gov


By:   _____/s/_____
      Neil Giovanatti
      Assistant Corporation Counsel


cc:   THOMAS GRAY
      Partnership for Children's Rights.
      Attorney for Plaintiff
      (by ECF)


-19-


**A63**



**PARTNERSHIP FOR
CHILDREN'S RIGHTS**



JUN 16 2014

June 13, 2014

**SO ORDERED**

The conference is adjourned to
September 9, 2014 at 9:30 a.m.

*George B. Daniel*

**HON. GEORGE B. DANIELS**

Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

JUN 16 2014

Re: *M.M. o/b/o J.S. v. New York City Dept. of Educ.*, 14 CV 1542 (GBD)

Dear Judge Daniels:

I am the attorney at Partnership for Children's Rights who represents the Plaintiffs in the above referenced appeal brought pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"). The parties write jointly, in advance of the court conference presently scheduled for June 24, 2014, concerning the matters set forth below.

First, please find attached to this letter a proposed order that directs the State Education Department's Office of State Review ("OSR") to send the certified record on appeal to Defendant's counsel and to allow the Defendant's counsel to file the record under seal with the Court.

As noted above, this case is an appeal pursuant to the IDEA. The IDEA states that the Court "shall receive the records of the administrative proceedings," 20 U.S.C. § 1415(i)(2)(C)(i), but does not specify the mechanism to be used to provide the Court with the administrative record. One mechanism that has proved effective in recent cases has been for counsel to obtain the certified record from the OSR and to provide a copy to opposing counsel, and file such record with the Court. The parties therefore jointly request that the Court issue an order: (1) directing the OSR to provide a certified copy of the administrative record to Defendant's counsel and, (2) in order to protect the privacy of Plaintiff, J.S., directing that such record be filed under seal.

Second, parties jointly propose the following briefing schedule for the Court's review and approval:

Plaintiffs' motion for summary judgment:       August 12, 2014

Defendant's cross-motion and opposition:       September 12, 2014

Plaintiffs' opposition and reply:       September 26, 2014

271 MADISON AVENUE, 17ᵀᴴ FLOOR, NEW YORK, NY 10016 • 212.683.7999 • Fax: 212.683.5544 • Website: pfcr.org

**A64**

Case 15-1200, Document 35, 07/16/2015, 1556189, Page73 of 143

Case 1:14-cv-01542-GBD    Document 15    Filed 06/16/14    Page 2 of 2
Case 1:14-cv-01542-GBD    Document 13    Filed 06/13/14    Page 2 of 2

Defendant's reply:    October 10, 2014

In considering this proposed briefing schedule, please note that the parties will be relying on the record of the administrative proceedings below in making cross-motions for summary judgment and do not anticipate engaging in any discovery. Therefore, the parties are prepared to move directly into motion practice once the OSR provides the certified administrative record.

While IDEA cases are typically resolved via cross-motions for summary judgment, the Second Circuit has explained that "a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA and determining whether the [educational program offered by the school district] is reasonably calculated to enable the child to receive educational benefits." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225-6 (2d Cir. 2012) (internal quotations omitted). "Thus, though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a motion for summary judgment." *Id.* Accordingly, the Second Circuit has explicitly held that 56.1 statements are not required in IDEA cases. *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417-18 (2d Cir. 2009).

The parties believe that a 56.1 statement (whether joint or separate) would be of limited value in resolving the issues in the instant case and that a robust statement of facts in the parties' respective memoranda of law would be more helpful to the Court. The parties therefore respectfully request that in lieu of 56.1 statements, that each side be permitted to file moving briefs of 35 pages in this matter, instead of the 25 set forth in Your Honor's rules.

Finally, given the nature of this case, and because the parties do not have any outstanding issues at this time, we respectfully request that the court conference presently scheduled for June 24, 2014 be adjourned.

Thank you for your consideration of these joint requests.

Respectfully submitted,

Thomas Gray (tg0880)
Partnership for Children's Rights
271 Madison Ave, 17th Floor
New York, NY 10016
(212) 683-7999 ex. 246
tgray@pfcr.org

Enclosure (proposed order)

cc:    Neil Giovanatti, Esq. (attorney for Defendant / by ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
M.M. on Behalf of and as Parent and Guardian
of J.S., a student with a disability,

                                          Plaintiff,

        - against -

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                                          Defendant.
-------------------------------------------------------------------X

**ORDER**

14 CV 1542 (GBD)

       IT IS HEREBY ORDERED that the Office of State Review of the New York State

Education Department shall, within 30 days of receipt of this Order, mail a certified copy of the

administrative record in Office of State Review Appeal Nos. 13-157 and 14-018 to counsel for

Defendant, Neil Anthony Giovanatti, New York City Law Department, 100 Church Street Room

2-305, New York, New York 10007; and

       IT IS FURTHER ORDERED that upon receipt of the certified record from the Office of

State Review, Defendant's counsel shall provide a copy of such record to counsel for the

Plaintiff, and shall file the certified record with the Court under seal pursuant to Federal Rule of

Civil Procedure 5.2(d).

Dated: New York, New York
      JUN 16 2014

SO ORDERED:

JUN 16 2014

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge

**A66**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
M.M. on Behalf of and as Parent
of J.S., a student with a disability,                                    **NOTICE OF MOTION**

                        Plaintiffs,                     Docket No.
                                                14-CV-1542 (GBD)

            - against -

NEW YORK CITY DEPARTMENT                              ECF Case
OF EDUCATION,

                        Defendant.
------------------------------------------------------------X

      PLEASE TAKE NOTICE that upon the record of the administrative proceedings below,

and Plaintiff's Memorandum of Law, plaintiff will move this Court before District Judge, the

Honorable George B. Daniels, at the Daniel Patrick Moynihan United States Courthouse, located

at 500 Pearl Street, New York, New York, for an Order:

      1.      Receiving the records of the administrative proceedings below;

      2.      Granting summary judgment in favor of plaintiff;

      3.      Entering judgment declaring that (a) the DOE failed to offer J.S. a free

appropriate public education ("FAPE") within the meaning of the Individuals with

Disabilities Education Improvement Act of 2004 ("IDEA") for the 2012–2013 school

year; (b) the Cooke Center for Learning and Development ("Cooke") was an appropriate

placement for J.S. for the 2012–2013 school year; and (c) equitable considerations

support an award of direct, retroactive tuition funding for J.S.'s placement at Cooke for

the 2012–2013 school year;

**A67**

4.      Entering judgment vacating and annulling SRO decisions Nos. 13-157 and 14-018

to the extent that they found that defendant New York City Department of Education

offered J.S. a FAPE for the 2012–2013 school;

5.      Ordering defendant New York City Department of Education to issue payment to

Cooke for J.S.'s tuition for the 2012–2013 school year, in the amount of $55,775.00; and

6.      Granting such other and further relief as the Court deems just and proper.


Dated: New York, New York
         August 12, 2014

                              /s/ Thomas Gray_____
                              THOMAS GRAY (TG 0880)
                              PARTNERSHIP FOR CHILDREN'S RIGHTS
                              Attorney for Plaintiff
                              271 Madison Avenue, 17th Floor
                              New York, New York 10016
                              (212) 683-7999 ext. 246
                              Fax (212) 683-5544
                              tgray@pfcr.org


To:

Clerk of the Court
United States District Court for the Southern District of New York

Neil Anthony Giovanatti
Assistant Corporation Counsel
Corporation Counsel of the City of New York
Attorney for Defendant
100 Church Street, Room 2-305
New York, NY 10007
(212) 356-0886
(via ECF)


**A68**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

M.M. on Behalf of and as parent of J.S., a student with a disability,

**NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT**

                                            Plaintiff,

          -against-

14 Civ. 1542  (GBD)

New York City Department of Education,

                                            Defendant.

-------------------------------------------------------------------- x

   **PLEASE TAKE NOTICE,** that upon the Memorandum of Law in Support of Defendant's Cross-Motion For Summary Judgment And In Opposition To Plaintiff's Motion For Summary Judgment, dated September 12, 2014, the certified copy of the underlying administrative hearing record, and upon all the papers and proceedings had herein, Defendant will move this Court, before the Honorable George B. Daniels, at the Daniel Patrick Moynihan United States Courthouse for the Southern District of New York located at 500 Pearl Street, New York, New York, on a date and at a time to be designated by the Court, for an Order pursuant to Fed. R. Civ. P. 56 granting summary judgment in favor of Defendant, and awarding Defendant such other and further relief as the Court may deem just and proper.

**A69**

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's Order, dated

June 16, 2014, Plaintiff's opposition and reply papers are to be served by September 26, 2014,

and Defendant's reply papers are to be served by October 10, 2014.

Dated:   New York, New York
             September 12, 2014

                                        ZACHARY CARTER
                                        Corporation Counsel of the City of New York
                                        Attorney for Defendant
                                        100 Church Street, Room 2-301
                                        New York, New York 10007
                                        ngiovana@law.nyc.gov
                                        (212) 356-2624


                            By:   _____s/_____
                                        Neil Giovanatti
                                        Assistant Corporation Counsel


TO: Thomas Gray
       Partnership for Children's Rights
       Attorney for Plaintiff
       271 Madison Ave, 17th Floor
       New York, NY 10016
       (via ECF)


**A70**

1

EAEAMMAps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  M.M.,

4
                    Plaintiff,
5
               v.                          14-cv-1542 (GBD)
6  NEW YORK CITY
7  DEPARTMENT OF EDUCATION,

8                   Defendant.

9  ------------------------------x

10                                    New York, N.Y.
                                      October 14, 2014
11                                    10:15 a.m.

12
   Before:
13
                       HON. GEORGE B. DANIELS
14
                                        District Judge
15

16                    APPEARANCES

17 PARTNERSHIP FOR CHILDREN'S RIGHTS
   BY:  THOMAS C. GRAY, ESQ.
18

19 ZACHARY CARTER
        Corporation Counsel for
20      The City of New York
   BY:  NEIL A. GIOVANATTI, ESQ.
21      ERIC PORTER, ESQ.
        Assistant Corporation Counsel
22

23 Also Present:  Brian Reimels, Esq.
                  New York City Department of Education
24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**A71**

2

EAEAMMAps

1              (In open court)

2              THE CLERK:  Will the parties for M.M. on the Behalf of

3       and as Patient for a Student with a Disability v. New York City

4       Department of Education, Case No. CV 1542, will the parties for

5       plaintiff please set up at the front table.

6              Will the parties please rise and make their

7       appearances starting with the plaintiff.

8              MR. GRAY:  Good morning, your Honor.  Thomas Gray from

9       Partnership for Children's Rights on behalf of M.M., the

10      parent.

11             THE COURT:  Good morning.

12             MR. GIOVANATTI:  Good morning, your Honor.  Neil

13      Giovanatti on behalf of the Department of Education, along with

14      Eric Porter, also from Corporation Counsel's Office, and Brian

15      Reimels from the Department of Education.

16             THE COURT:  Good morning.

17             MR. PORTER:  Good morning, your Honor.

18             MR. REIMELS:  Good morning.

19             THE COURT:  All right then, why don't I see you -- I

20      guess I'll hear defendant.  Defendant's motion?

21             MR. GIOVANATTI:  It's a cross-motion, your Honor.

22             THE COURT:  All right.  The motion is a cross-motion.

23      So either way.  You want to be heard?

24             MR. GRAY:  I'll be heard first, your Honor, if that's

25      OK.

EAEAMMAps

1      Your Honor, this is a case where a parent was left in

2   the dark and her child was denied an appropriate education.

3   The Department of Education, the DOE, left the parent out of

4   the process of the information used to inform her child's

5   education plan.  As a result, the DOE provided her child with a

6   vague program and placed her child at an all-day job site.

7      Now, if I could respond to several points that the DOE

8   raised in its reply, which it filed on Friday, first of all,

9   there is the issue of the 2009 psycho-educational evaluation of

10  the record.  And it is the DOE's contention that that 2009

11  psycho-educational evaluation constitutes a triennial

12  evaluation.  And there are three reasons why that does not

13  equal a triennial evaluation.  The first one is that a

14  triennial evaluation is not a single test or a single

15  assessment.  The IDEA makes that clear and the guidance from

16  the United States Department of Education makes that clear.

17  It's not a single test or assessment.  Rather, a triennial

18  evaluation is an entire process.  And when I say the parent was

19  left in the dark in this case, it's that process that the

20  parent was left out of.

21      So one of the first steps in that process is the DOE

22  notifying the parent that a triennial review is due.  That

23  didn't happen in this case.

24      THE COURT:  Well, you say the dates are more fluid

25  than they're talking about, but you want to argue that they

4

EAEAMMAps

1     will be on the date.  I'm not sure on what basis you're arguing

2     that somehow they missed a deadline that you say applied in

3     this case.  What do you say is the deadline for them to have --

4             MR. GRAY:  That's correct.  I mean, it's a fluid

5     process.

6             THE COURT:  So when were they overdue?

7             MR. GRAY:  They had many things to do on the triennial

8     evaluation once every three school years, once every three

9     years.

10            THE COURT:  So what date do you say they should have

11    done?

12            MR. GRAY:  There is no evidence that the DOE engaged

13    in that process in the spring of 2009.

14            THE COURT:  I know.  But they weren't required to do

15    it before the date that the evaluation was done.  The

16    evaluation was done.  That's not your argument.  Your argument

17    is that, the day before, that time expired and therefore, when

18    they did the assessment, if they did the assessment on the 23rd

19    of July -- which, for example, their time expired on the 21st

20    of July.  You're not arguing that.  I'm trying to figure out,

21    at what point do you say that they missed the deadline?

22            MR. GRAY:  Well, certainly in the spring of 2009 --

23    excuse me -- in the spring of 2012, when the DOE should have

24    been engaging in this process, at that point at the latest the

25    DOE should have engaged in the triennial evaluation process.

**A74**

5

EAEAMMAps

1          THE COURT:  Where?

2          MR. GRAY:  Because there's no evidence of a prior

3    triennial evaluation --

4          THE COURT:  There was one.  There was one within two

5    years, right?

6          MR. GRAY:  No.  There are a couple of evaluations,

7    specific documents in the record.  The first one is the 2009

8    psycho-educational evaluation.  That is not a DOE document.

9    That is an evaluation that the parent went out and privately

10   obtained.

11         THE COURT:  That's my question when I read your

12   papers.  What didn't the parent know that this triennial

13   evaluation would have provided?  She already had an evaluation

14   done by the school where the kid was ultimately placed.  And

15   your argument is, that was totally adequate and complete

16   information to make an assessment that that school was the

17   appropriate placement.  Right?  And that the public school was

18   not the appropriate placement.  So what else did she need?  I

19   think it's a hyperbole to say she was kept in the dark.  She

20   was in this process from day one, right?  She wasn't denied

21   anything, was she?

22         MR. GRAY:  Basically the first step, right, in a

23   triennial evaluation process is for the school district to

24   engage with the parent.

25         THE COURT:  They did engage with the parent.  You're

6

EAEAMMAps

1  just saying they didn't do the evaluation.  You're not claiming

2  that they did something without the parent's either knowledge

3  or notification.  You're not claiming that.  You're not

4  claiming that the parent wasn't involved in the process from

5  day one.  You're just saying that the definition of being

6  involved in the process is that, if they didn't do the

7  evaluation, that translates into her being kept in the dark.

8  But you said you had a full evaluation by the school.

9        There are two arguments that you have that I want to

10  keep separate.  You sort of have a technical argument, OK, and

11  you sort of have a substantive argument.  Your technical

12  argument deals with process.  Your substantive argument has to

13  deal with whether or not the school that they chose and the

14  program they chose was an appropriate placement.  I'm more

15  concerned about that argument, I think, than the argument that

16  they missed a deadline so that means they kept her in the dark.

17  She had a full report that she thought was sufficient for her

18  to make a decision -- he or she -- to make a decision about

19  whether or not the school that the child attended was an

20  appropriate placement and whether or not the school that the

21  DOE chose was an inappropriate placement.  What else, tell me

22  what she would have known today had she gotten that evaluation,

23  which you say, because of the fluid nature of the time frame,

24  that they should have done at some point in the process?

25        MR. GRAY:  Let me sort of skip -- you know, the parent

EAEAMMAps

1   in this case did not have the evaluation, the 2011 evaluation.

2   So that's not something the parent had.

3         THE COURT:  Which evaluation?

4         MR. GRAY:  The Stanford-Binet evaluation, which I

5   think your Honor was referring to, the school's evaluation.

6         THE COURT:  What's the name of the school the child

7   attended?

8         MR. GRAY:  The Cooke school.

9         THE COURT:  The Cooke school.

10        MR. GRAY:  She didn't have that evaluation.  But

11  skipping ahead --

12        THE COURT:  Well, she did have that evaluation before

13  the child was fully evaluated by the school and before the

14  child was put in Cooke, right?

15        MR. GRAY:  She had that evaluation in 2013, in the

16  spring of 2013.  So she didn't have it before she placed the

17  child for the school near for the 2012, 2013 school year.

18        But the other way, the dark metaphor that I'm using

19  here, the other way she was kept in the dark is that, you know,

20  the IEP in this case was vague.  It didn't indicate to her or

21  to anybody whether the child would be in a primarily academic

22  program or primarily a vocational program or what percentage of

23  the day or the duration --

24        THE COURT:  Your arguments are that there's stuff that

25  she didn't know, so therefore that's should be a basis to rule

EAEAMMAps

1   in her favor.  What I'm trying to figure out is, what else was

2   out there, what was the consequence of this, what else was out

3   there that you say now you've exposed that you realized, OK, it

4   was vague then, now we know what the real true facts are, so

5   therefore that's why it's an inappropriate placement?  I mean,

6   this isn't the most egregious process that I've seen, you know,

7   in terms of a parent being involved in the placement of a

8   child.  I mean, there may have been some deficiencies and there

9   are some deficiencies.  Some are fatal, some are not.  You

10  claim the deficiencies here were fatal.  But here, I can't say

11  that I am compelled to simply -- how she was handled in the

12  process, or what information they had at the time, in and of

13  itself, regardless of whether it would have been appropriate

14  placement or not, somehow negates the placement.

15          MR. GRAY:  If I can go back into the structure of the

16  IDEA with regard to procedural violations that result in denial

17  of a FAPE right, did IDEA laid out three -- I don't think there

18  is any disagreement between the parties on this, at least as

19  far as the language of the IDEA is concerned.  But the IDEA

20  lays out three instances in which a procedure can result in a

21  denial the FAPE.  Right.  The first one is it impeded the

22  child's right to a FAPE.  The second one is it significantly

23  impeded the parental participation.  And the third one is it

24  resulted in the denial of educational benefits.

25          THE COURT:  So which are you arguing?

9

EAEAMMAps

1    MR. GRAY:  Well, I'm not arguing all three, but I

2    think, to your point, the first one is it impeded the child's

3    right to a FAPE.

4    THE COURT:  How?

5    MR. GRAY:  Well, there's a triennial reevaluation

6    process, right, that's not engaged in.  For example, there's no

7    vocational assessment.

8    THE COURT:  So somehow did that impede the process?

9    If you had a Cooke assessment and all the other information,

10   they still say they had enough information to determine that

11   the placement at the school -- I forget the name of the school,

12   I forget the name of the public school -- that they say all the

13   information that was provided gave them a sufficient basis to

14   make a determination that that was the appropriate school for

15   the child to be in.  You argue that the information -- that

16   they had made it an inappropriate placement.  I don't think

17   we'll really arguing a lot about whether Cooke is an

18   appropriate placement.  If they want to argue that -- usually

19   that's not the debate.  The debate is, everybody wants, you

20   know, it's usually standard argument that I'd rather have my

21   kid in a private school that costs me, or the city and state,

22   50,000 than have my kid in a public school if I had a choice.

23   Everybody needs that choice.  Whether they have special needs

24   or not, most people would say, given the choice of sending my

25   kid to prep school instead of sending my kid to public school,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A79**

10

EAEAMMAps

1 I'll send my kid to prep school.

2 MR. GRAY: This kid is not a prep school student.

3 THE COURT: I understand that. I'm just saying that

4 obviously, look, it's not the comparative argument that we're

5 making here. And I have nothing, unless they can argue, I'm

6 not sure anything jumped out at me that Cooke was an

7 inappropriate placement and that the child was not, is not

8 advancing on a road to success at Cooke. I don't think that's

9 their argument. Their argument, the determinative factor is

10 whether or not the placement itself that the school offered was

11 an appropriate placement.

12 Now, if it was an appropriate placement, all your

13 procedural arguments don't matter, do they?

14 MR. GRAY: Let me take it back to, I think, your

15 Honor's, if I might, I think the prior question, which is, what

16 exact harm did the child suffer in this case, right? And there

17 is no vocational assessment. The DOE, amongst other

18 assessments, there's indication for a vocational assessments.

19 and the IEP that was created was vague. It said something to

20 do with the work study program but didn't say what portion of

21 the day.

22 THE COURT: So how did the child suffer from that?

23 MR. GRAY: So that IEP meeting happens in May 2012 and

24 mom says, look, my main concern is -- she's not an

25 English-speaking person so she's not articulating too much at

EAEAMMAps

1    that meeting -- but she says, look, my main concern is that he

2    continue to grow academically.

3            THE COURT:  Right.  That's my main concern also.

4            MR. GRAY:  So he can be an independent person, as an

5    adult.

6            THE COURT:  Everybody agrees with that.

7            MR. GRAY:  And then she gets the final notice and

8    recommendation, right, saying the child is placed in --

9    McSweeney is the name of public school, right?

10           THE COURT:  Right, McSweeney.

11           MR. GRAY:  So she shows up at the McSweeney and she

12   shows the parent coordinator at McSweeney the IEP and she's

13   told, oh, your child is going to be placed in a full-day work

14   setting.  He's going to spend the entire day at a working

15   setting.  And that was her primary concern.  And all the

16   evidence in the case indicates, you know, all the evidence from

17   Cooke, and all the evidence from the mom, indicates that having

18   the child in a full-day work site, basically working all day,

19   is not going to allow him to progress and not going to allow

20   him to meet the academic goals.

21           THE COURT:  I don't hear from them, and I'm not sure I

22   disagree with you, that that was the placement that they chose

23   for the child, that that would have been an inappropriate

24   placement.  But other than your sort of conversation between

25   the parent and someone at McSweeney, there is nothing about

EAEAMMAps

1    this placement that says that this child is going to be in an
2    all-day work site.  There's nothing in the placement at all
3    that says that.  I can't use that.  I mean, is she going to
4    talk to the principal, the teacher, or the janitor who might
5    have given her that information.  The question is not whether
6    or not she was hesitant to do that because somebody at the
7    school told her that that's the way the child was going to be
8    handled.  The appropriate thing would have been, if that's the
9    information she got, she would have gone back to the DOE and
10   said, wait a minute, you said in this that there was going to
11   be both an academic setting, an appropriate proportion of
12   academic setting and work setting, and we all agreed to that,
13   is that what my child going to have.  And they would have said,
14   of course that's what your child is going to have, or they
15   would say, no, we decided not to give the child any academics,
16   we've decided just to keep him at the work site all day long.
17   There's nothing in this IEP that says the child is going to be
18   in a full-day work setting, is there?
19          MR. GRAY:  The parent did write to the DOE right after
20   she went to the school and said, this is inappropriate, he is
21   going to be in a full-day vocational program.
22          THE COURT:  And they said, that's not true.
23          MR. GRAY:  No, they didn't.  They didn't respond.  I
24   agree with you, if there was this actual communication going on
25   between the DOE and the parent, it would be a much different

13

EAEAMMAps

1   situation.

2           THE COURT:  I know, but the program that they chose

3   for the child was not a program which said that it was going to

4   be an all-day work site.  That's not the program that was

5   chosen for the child.

6           MR. GRAY:  The only communication, in paper, that came

7   from the school was the final notice of recommendation which

8   was sent to the parent.  The parent then showed up and she

9   talked to the coordinator of the job at the school to discuss

10  with the parent what their child's education is going to look

11  like at that school.  I don't know the name of that individual.

12  But actually the DOE, if they had gone to the record and said

13  who is the parent coordinator for the 2012, 2013 school year at

14  McSweeney, they know who that individual is.

15          THE COURT:  I don't have anything in this record that

16  gives me any indication of, there was somebody who was in

17  authority who was going to either administer the program or

18  created a program that made a determination this child would

19  not -- I mean, I don't even know what that means.  When you say

20  "all-day work site," I'm sure you can't believe that that means

21  the child would get no academic classes.

22          MR. GRAY:  I think the evidence was that the child

23  receive like an hour or something like that of academic

24  instruction at the work site.  And the evidence that --

25          THE COURT:  Well, where is that evidence?  I didn't

14

EAEAMMAps

1   see that.

2           MR. GRAY:  That's in the affidavit of the mother,

3   which was Exhibit X.  And that's the affidavit of Francis

4   Tabone, who went with her to the work site, which is Exhibit N,

5   I believe.

6           THE COURT:  Say who is the second?

7           MR. GRAY:  Francis Tabone, who is the educator from

8   Cooke who went to visit the public school along with the

9   parent.

10          THE COURT:  I haven't looked at every piece of paper,

11  but I don't remember a person from Cooke indicating that the

12  placement was inappropriate because the child was only going to

13  get one hour of academic --

14          MR. GRAY:  That, I believe, is in the affidavit of

15  Francis Tabone, which my belief is -- I don't have the entire

16  record memorized -- that's Exhibit N.  And the affidavit of

17  Ms. ████, the parent, which is Exhibit X.  And both those

18  affidavits, I can't name the paragraph, but it's someplace

19  around paragraph 12 in Francis Tabone's affidavit.  He states

20  that they talked to the parent coordinator at that school.  The

21  parent coordinator told them, your child is going to be placed

22  at an all-day work site and only going to receive limited

23  academic instruction, maybe two hours, I forget the exact

24  amount, but a limited academic instruction.  And then the

25  mother wrote to the DOE, said, this placement isn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A84**

EAEAMMAps

1   appropriate, give me another educational plan, because she

2   wasn't happy with the educational plan, but she for sure was

3   not happy with the educational placement.  She didn't want to

4   have her child placed at a work site all day when he was still

5   capable of learning and growing.

6           THE COURT:  But you agree that's not -- placing a

7   child at an all-day work site -- and I think both sides would

8   agree, maybe not -- all-day work site with only an hour or less

9   of academic classroom education, wouldn't we all agree that

10  that would be inconsistent with the program that was designed

11  for the child?

12          MR. GRAY:  I would certainly agree, yes.

13          THE COURT:  The program that was designed for the

14  child was not that.  And clearly they did not say the choice is

15  between going to Cooke or going to the program that we've set

16  up for you, which is an all-day work site with an hour or less

17  of classes.  That's not what they designed for the child.  They

18  don't even agree that that's appropriate, I assume, for the

19  child.

20          MR. GRAY:  I would hope so.

21          THE COURT:  So it's not the program itself that they

22  designed, on this point, that you're arguing about.  That

23  wasn't designed in the program.

24          MR. GRAY:  Well, that's an element of my argument,

25  your Honor, because the program is vague.  The program doesn't

EAEAMMAps

1    state exactly what's going to happen at the school.  If the

2    IEP -- the educational program is supposed to indicate the

3    frequency and duration and location of all this teaching, this

4    academic teaching, this vocational teaching.  The IEP, the

5    15-page educational plan, doesn't articulate any of that.  So

6    that created a situation where the parent shows up and she

7    finds out -- even I can't understand this -- even if she spoke

8    perfect English, to be honest I had trouble interpreting this

9    plan.  So she shows up, and she talks to somebody face to face,

10   the parent coordinator.  And the parent coordinator tells her,

11   look, what's going to happen in July, when the 12-month school

12   year starts, is, your child is going to be placed in a work

13   site all day.

14          THE COURT:  I find it hard to believe that they would

15   have said that.  I mean, that would be so inconsistent with any

16   educational standard that I can't imagine that anybody who was

17   in the know of any authority at the school would have said to

18   her that you're going to have -- I mean, who said this?

19          MR. GRAY:  Your Honor, I don't think in the realm of

20   special education it is that unbelievable because special

21   education goes up until 21, right.  A disabled has got a right

22   to receive educational services.

23          THE COURT:  But what all-day work site without

24   classroom instruction is education?  Nobody would agree that

25   that's education.  They can go to -- they don't need to go to

**A86**

17

EAEAMMAps

1    school.  They go get a job, you know, for an all-day work site.

2            MR. GRAY:  I think the philosophy is when a child is

3    20, a disabled child is 20, or 19 or whatever, on the cusp of

4    actually going and getting a job, that's a time when it's

5    appropriate for a student to receive more or less an entirely

6    vocational instruction.

7            THE COURT:  But when she got this information, or even

8    if Cooke got this information, no one went with that to DOE and

9    said, is that true, tell me whether or not that's the case, and

10   got verification one way or the other whether that was true.

11           MR. GRAY:  The parent wrote, I believe in July -- I

12   don't have the date of the record, but it's one of the early

13   parent exhibits -- she wrote the DOE and said, this placement

14   that you put my child at is not appropriate for him.

15           THE COURT:  No, I understand she says that.  All the

16   parties that I see in this court say that.  So that doesn't

17   give me the details of, you know, what she engaged -- because

18   you remember, you first started out, they kept her in the dark.

19   I'm trying to figure out how they kept her in the dark.  She

20   had the program.  She went to the school.  She spoke to

21   somebody.  Somebody, we don't know who --

22           MR. GRAY:  The parent coordinator.

23           THE COURT:  Well, is that person deposed on this

24   issue?

25           MR. GRAY:  No, no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A87**

EAEAMMAps

1          THE COURT:  I mean, is that person even identified?

2          MR. GRAY:  Well, the problem is, the DOE had the

3    opportunity to call that witness at the hearing, right.  The

4    DOE -- this is all laid out in the due process complaint,

5    right.  The DOE had the opportunity to say, OK, well, what

6    communication happened between Mr. Tabone and the parent and

7    this parent coordinator at the public school.  And the DOE had

8    the opportunity to call that person.  They knew who that person

9    was.  It's not that hard to have that meeting -- all these

10   people are DOE employees -- have them show up at the hearing.

11         THE COURT:  Did they take the position that that was

12   not going to be the nature of the placement?

13         MR. GRAY:  Well, they took the position at the

14   hearing, which I think is one of the problems in this case with

15   the way the DOE tried the case, as far as *R.O.E.* and

16   retrospective evidence goes, they basically put a witness on

17   from the school, Ms. Naclerio, and she said, oh, you know, we

18   could have done whatever the child needed, this IEP is flexible

19   enough to give -- you know that, we could have shifted the

20   program, the child needed one thing or shifted the program if

21   the child needed another thing.  And *R.O.E.*, the cases that

22   come after *R.O.E.* are very clear that a parent needs to have

23   all that information, what the plan is going to be, what the

24   plan is going to be when she makes the placement choice.

25   Because nine months later doesn't do anything for her, right?

EAEAMMAps

1          THE COURT:  I'm not sure what the level of detail is

2    that you're arguing in terms of what she needed to know.  I

3    don't -- I mean, there are two extremes.  You know, maybe

4    you're both arguing the other extreme.  You can't say to me

5    that the parent has got to know exactly where the kid is going

6    to be and what the kid is going to be doing every minute of

7    every day before it can qualify as appropriate placement.  I'm

8    sure you're not arguing that.  And obviously, in any

9    educational setting, there's got to be some room for some

10   flexibility depending on whether or not things turn out to be

11   more advantageous to a particular student or less advantageous

12   to a particular student when they get there.  So the question

13   really is not whether or not they said that there was

14   flexibility in the setting.  The question is whether or not

15   there was such flexibility in the setting that it goes outside

16   of the realm of what would be appropriate for the child.

17   You're sort of saying, this part of the argument is sort of

18   dependent on, they would get -- she didn't know how much

19   academic teaching that the child would get, and since they

20   weren't clear about it, we're going to assume that the child

21   would get there and would have inadequate academic teaching.

22          MR. GRAY:  Well, I don't think there is any

23   assumption.  Now, it's not the parent coordinator, the primary

24   witness from the DOE could have called and said, this is

25   exactly what I said -- or corroborate the parent's and

EAEAMMAps

1  Mr. Tabone's, Dr. Tabone's statements, but there is evidence

2  that the child was going to be placed in a full-day vocational

3  program.

4       And as far as the IEP, if I can just address that

5  briefly, the IDEA is clear that -- and I outlined this on page

6  14 of our opposition memorandum -- that the duration, location,

7  and frequency of the special education, the related services,

8  and any supplementary aid and services need to be articulated

9  in that IEP.  And so the nature, duration, frequency of the

10  core educational plan in this case was not articulated in that

11  IEP.

12       THE COURT:  What do you say was missing?

13       MR. GRAY:  For example, what percentage -- how many

14  hours a day was the child going to be in a vocationally

15  program, who type of instruction that child was going to see,

16  where that vocational instruction was going to occur, was it

17  going to occur at a business, was it going to occur at a

18  school, was it going to occur at a work site, the nature of

19  that vocational instruction, and the nature of that academic

20  instruction for that matter, because there's no vocational

21  assessment in this record, or the DOE never engaged in a

22  vocational assessment.  We don't know whether this kid's

23  particular skills --

24       THE COURT:  Well, we do.

25       MR. GRAY:  -- what vocational future the child has.

EAEAMMAps

1          THE COURT:  We do.  Cooke knows that.  The parent

2     knows that now and believes, is very confident that Cooke

3     assessed that appropriately, and therefore Cooke is an

4     appropriate placement.  So you can't have it both ways.  You

5     can't say, she has enough information to make a decision that

6     Cooke is an appropriate placement for the child in terms of the

7     child's evaluation and not have enough information about the

8     child's evaluation to determine whether or not McSweeney is the

9     placement.  Now, you may be able to argue that we don't have

10    enough information about McSweeney.  I understand that

11    argument.  But you can't argue that we had enough information

12    about the child and the child's assessment and the child's

13    needs and ability to determine that Cooke was an appropriate

14    placement but didn't know enough about the child to know what

15    the needs were that McSweeney had to accommodate.  As I say,

16    you can argue that we didn't know how McSweeney was going to

17    accommodate it or we didn't know whether they were able to

18    accommodate it or we determine that they weren't able to

19    accommodate it.  But mostly your argument is that -- not that

20    they weren't able to accommodate him, but you didn't know, they

21    couldn't tell you, exactly how they were going to accommodate

22    him.

23          MR. GRAY:  That's right.  I think that the prong two

24    issue and the prong one issue are separate issues.  When I say

25    prong two, I mean, you know, the second step, after you've had

EAEAMMAps

1  the first step, after the parent gets past the first step.

2          THE COURT:  Slow down.

3          MR. GRAY:  I'm sorry.  I apologize.

4          After the first step, where the school has to prove --

5  the school district has to prove that their placement, or their

6  school and their program was appropriate, then you get to the

7  second step and the parent has to prove if the private school

8  was appropriate.

9          THE COURT:  Right.

10          MR. GRAY:  And those are different, those are

11  different assessments.

12          THE COURT:  Right.  And they're not different

13  assessments of the child.  They're different assessments of the

14  ability of the school to provide for the needs of the child.

15          MR. GRAY:  That's right.  And a private school isn't

16  held to the same high standards that a school district is.  And

17  that makes sense, right, because Cooke, right, they're working

18  with, if they're, you know, if the child is placed or a child

19  is placed in a prior year, they're working with the child and

20  they are making day-to-day decisions with the child and they

21  are scoping that education in the context of their school.

22          THE COURT:  Right.

23          MR. GRAY:  The DOE has to be able to scope a program

24  in the context of DOE schools.  So that's a separate issue.

25  And the information that's coming from Cooke is, you know,

EAEAMMAps

1   relevant to the child's education at Cooke and how he's

2   functioning at Cooke. But what the DOE is --

3          THE COURT: Well, it's also relevant to McSweeney.

4   You even argued from the Cooke evidence that Cooke's assessment

5   of the needs demonstrate that McSweeney was not payable to meet

6   those needs.

7          MR. GRAY: No, I think those -- I mean, I apologize if

8   that came off as our argument. Our argument was that the

9   evaluative information that was in the record, which was -- was

10  the CSE, that's for 2009 -- even functioning in a world where

11  there was still a timely psycho-educational and that was the

12  still timely information, taking the child's deficiencies as

13  articulated in that 2009 evaluation, it is very unlikely that

14  this child would have been able to make progress in a group of

15  12 students. He's functioning in the, you know, first and

16  second percentile of a million two --

17         THE COURT: Where do you get that? Where is the

18  evidence of that? I saw you say that, but I wasn't -- who says

19  that a setting of 12 is inappropriate?

20         MR. GRAY: Well, all the Cooke educators, and the only

21  person who says that a setting of 12 is appropriate, right, all

22  the evidence is that -- and I don't think there is any real

23  disagreement on the broader point that this child needed

24  small-group instruction.

25         THE COURT: But "small group" could mean --

EAEAMMAps

1          MR. GRAY:  It's a vague term.

2          THE COURT:  -- 11, it could mean 5, it could mean 13.

3     And that's why I said, that's why I started with, you said you

4     know enough information about what Cooke assessed to say that

5     Cooke says that the child needs a small setting, and Cooke says

6     that the child needs -- and I don't remember that specifically

7     but I'll accept it for now, argument's sake -- that the child

8     needs a smaller setting than 12.  And since McSweeney is only

9     providing 12, that is inadequate because the child needs ten.

10    But I don't remember Cooke saying that.  I don't remember --

11         MR. GRAY:  It's a slightly different argument.  There

12    are two instructions in a Cooke classroom, right, so there are

13    two teachers, two instructors for every 12 students.  That's

14    the nature of the program.  In this specific case, I think the

15    child had like nine or ten or two instructors in most of his

16    class.

17         THE COURT:  Say again?

18         MR. GRAY:  There were nine or ten children in his

19    class at Cooke and two instructors.

20         THE COURT:  But you said that the standard, even for

21    Cooke, is 12 and two.

22         MR. GRAY:  That's the standard program.  But the

23    reality of what he actually received in 2012, 2013 was smaller

24    than that.

25         THE COURT:  If Cooke's program is, the standard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A94**

EAEAMMAps

1 program is 12 for two, and McSweeney's is 12 and two, what

2 makes that inadequate?

3          MR. GRAY:  Well, those two programs are very

4 different.

5          THE COURT:  I know that.  But in terms of the numbers,

6 you're telling me 12 is too big.  And you just told me that

7 Cooke, standard, is 12.

8          MR. GRAY:  Let me concentrate on the other side of

9 that evaluation, which are the two instructors at Cooke.  And

10 at DOE you have one teacher and one paraprofessional.  And

11 paraprofessionals -- I apologize for not having the New York

12 State regulation on me today -- but paraprofessionals, under

13 New York State law, cannot give instruction.  Right.  A

14 paraprofessional can be anything from somebody who assists in

15 various ways in the classroom to somebody who is assigned a

16 particular student so the student doesn't run out of the school

17 building.  So that is not the same thing as having an

18 instructor.

19          THE COURT:  But I'm not sure I'm aware, in most cases

20 under the DOE's plan, that most of their classes, if any of

21 their classes, have two instructors.  Most of them have one

22 instructor and a paraprofessional.

23          MR. GRAY:  And a smaller ratio, right, so the DOE has

24 standard plans like six to one and eight to one, and this was a

25 12 to one.  There was also a 15 to one.

EAEAMMAps

```
1              THE COURT:  That's why I'm saying, it sounds in the
2    abstract that it makes more sense that you're better off if you
3    have two teachers than if you have one.  But where is the
4    evidence that that in and of itself is some kind of deficiency
5    in the plan?
6              MR. GRAY:  Well, you know, I guess there is a gap in
7    the evidence.  That goes back to our primary point, which is
8    that there needed to be evaluative information built on this
9    case because the DOE's burden -- it's not the parents' burden
10   to prove that the DOE's school was inappropriate.  It's the
11   DOE's burden to prove that their school was appropriate for the
12   child.  So I think that the real question is --
13             THE COURT:  They have experts who said 12 to one is
14   good enough.
15             MR. GRAY:  Where is the evidence that that's
16   appropriate?  Where is the evidence that a full-day vocational
17   program is appropriate for this child?  There is no evidence in
18   the record to support the DOE's program.
19             And I think you can see that in the SRO decision,
20   because the SRO decision confuses the burden.  The SRO decision
21   says, oh, there's no evidence that this was inappropriate for
22   the child.  Well, that's not the parent's burden.  It is the
23   DOE's burden to say so.  So where is that evidence, is what I
24   would ask.
25             THE COURT:  Although that would make it easier for you
```

EAEAMMAps

1    to prevail, if you could identify if you could identify -- and

2    I assume you're not here to identify in what ways that this

3    placement was inappropriate.  I mean, I thought you were

4    arguing some of that.  You were saying -- I thought you were

5    saying it was inappropriate -- or I guess you're not -- you're

6    saying that nobody proved that that was appropriate.  You're

7    not arguing that it's necessarily inappropriate that there were

8    12 kids in the class.

9            MR. GRAY:  The primary argument is that there is no

10   evidence -- our primary argument is, there is no evidence that

11   the DOE even presented any evidence that their program was

12   appropriate.

13           And my sort of secondary argument is that looks, the

14   evidence that is in there is highly suggestive that the child

15   is not going to learn.  But that's a secondary argument.  The

16   primary argument is that there is no evidence that supports

17   that program.  The DOE's burden was to present evidence at the

18   hearing.  And they failed to do that.

19           THE COURT:  So is there anything that you can identify

20   specifically that was inappropriate about this placement?

21           MR. GRAY:  About the placement, McSweeney?

22           THE COURT:  Yes.

23           MR. GRAY:  For sure.  The vocational -- I mean, the

24   heart of our argument is that a child placed in -- there's no

25   contrary evidence -- the child was going to be placed in a

EAEAMMAps

1  full-day work site.  That is absolutely inappropriate.  I think

2  your Honor agrees that that is absolutely inappropriate.  And

3  that is what ended up happening in this case.

4        THE COURT:  OK.  Full-day work study.  Anything else

5  that would be identified as inappropriate in terms of the

6  program that was designed for the child?

7        MR. GRAY:  Well, I would say that the 12 and one to

8  one program was also inappropriate.  And I agree with your

9  Honor that there is not definitive evidence -- and we wouldn't

10  be here, obviously, if there was more definitive evidence in

11  the case.  There's no definitive evidence saying like yes or

12  no.  The only evidence that supports the 12 to one program in

13  this case, right, the DOE's 12 to one program, is the testimony

14  from the DOE rep at the CSE meeting, at the Committee on

15  Special Education meeting who says -- who has never met the

16  child, who has never interacted with the child, who says,

17  contrary to everybody else's opinion, oh, I think that the DOE

18  could have provided appropriate instruction in this 12-to-one-

19  to-one classroom.  That is the only evidence -- and that's an

20  opinion evidence.  That's not based on any documentation.  She

21  doesn't cite to any other evidence to corroborate her opinion.

22  That's all they presented.

23        THE COURT:  How would somebody demonstrate that?

24        MR. GRAY:  Well, for example, having conducted up-to-

25  date evaluations and being able to say -- you know, you can

EAEAMMAps

1    say, oh, look, the child is functioning at this percentile or

2    this intellectual functioning or has this particular cognitive

3    functioning or has this particular -- right, you can look at an

4    evaluation, you can look at some data and say children with

5    similar deficiencies perform OK or perform adequately or

6    perform well in certain groups or in certain placements.  That

7    just doesn't exist in this case.

8          THE COURT:  You're saying that there should have been

9    a DOE-wide study of the appropriateness of -- I'm not quite

10    sure what exactly is the evidence that you say is necessary to

11    prove that 12 to one is good enough, as opposed to six to one,

12    as opposed to 18.

13          MR. GRAY:  Well, you know, let's take another -- this

14    is sort of hypothetical, and I apologize for, you know,

15    engaging in hypotheticals here, but let's take the concept that

16    there is a vocational evaluation and the child said, I am --

17    there had been information that the child is going to function

18    well as a chef or wanted to be a chef, right.  And then the

19    person at CSE meeting, the DOE representative should say, look,

20    I reviewed this evaluation, it said the child would function

21    well as a chef and had an interest in a chef so we're going to

22    put him in a program that allows him to become a chef.  Now,

23    that's a hypothetical.  The same thing applies in any case or

24    when you're making any argument or when you're assessing the

25    testimony from any witness, right.  Obviously the witness's

EAEAMMAps

1   opinion.  But what is out there that corroborates the witness's
2   opinion.

3              THE COURT:  But I just don't know in terms of, even in
4   your chef example, it still doesn't tell me whether or not he
5   wants to be a chef, he could be put in a chef's class of six,
6   12, or 18.  It still doesn't tell me whether or not, which one
7   is inappropriate and which one is appropriate, the number of
8   students in this class.

9              MR. GRAY:  That's right.  I apologize for the
10  hypothetical, which was maybe not the most on point.  But like
11  with regard to the size of the classroom, there needs to be
12  some evaluative or some, some vaguely at least objective
13  evidence, right, that corroborates that this child needs to be
14  placed in a certain setting or in a 12-to-one setting.

15             THE COURT:  I don't know what that evidence -- in all
16  the cases that I've seen, in the arguments that are made about
17  size, I'm not sure what that evidence is.  I mean, I'm not --
18  I've yet to hear -- I mean, I've heard people say that, you
19  know, it should be a smaller classroom, we've determined that
20  this size is an appropriate number, we believe the child can
21  progress in this number.  But I'm not sure beyond that how
22  there's going to be some guarantee that a certain number is the
23  appropriate number for this child, unless there is some
24  contrary evidence demonstrating the child was in such a setting
25  and could not advance.

EAEAMMAps

1        MR. GRAY:  Well, we know that the child was advancing

2    and progressing in the Cooke setting, right.  There's no

3    question about that.

4        THE COURT:  And the size of that class was what?

5        MR. GRAY:  That was with -- it varied.  But it was

6    generally two instructors for about 12 students.  So basically

7    half the size of what the DOE's program was.

8        THE COURT:  No, it wasn't half the size.  It was the

9    same number of students.  It was twice as many instructors.

10       MR. GRAY:  I'm sorry.  I meant -- half the ratio.  I'm

11   sorry.  Half the ratio is what I meant to say.

12       THE COURT:  So you're not arguing number of students

13   in a class.

14       MR. GRAY:  That's right.

15       THE COURT:  There's nothing wrong with 12 students in

16   a class.  Cooke had 12 students in a class.  That's not, in the

17   abstract, that's not the problem.  You're saying that the

18   problem is the ratio of licensed professional teachers to

19   students.  And you're saying that they didn't demonstrate that

20   they could do 12 in a class appropriately with only one teacher

21   because you don't argue that they couldn't do 12 in a class if

22   they had two teachers.  You're not arguing that.

23       MR. GRAY:  I agree.

24       THE COURT:  You say that's a perfectly appropriate

25   setting.  That is the Cooke setting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A101**

EAEAMMAps

| 1 | MR. GRAY: In the context of Cooke that's appropriate.
| 2 | I mean, I guess when we're talking about ratios -- I apologize
| 3 | for misspeaking -- but if there were 12 students and 12
| 4 | instructors in a class, that would be the same thing as one to
| 5 | one tutoring all day. So you have the opportunity with two
| 6 | instructors for one --
| 7 | THE COURT: It would be similar to that, but it
| 8 | wouldn't be equivalent to that. I mean, there is a dynamic,
| 9 | plus and minus, to being in a group setting. OK. So it's not
| 10 | like one-to-one tutoring. One-to-one tutoring might be
| 11 | appropriate for some children and totally inappropriate for
| 12 | other children because they need a socialized setting.
| 13 | MR. GRAY: I guess what I was trying -- the point I
| 14 | was trying to make is that the, you know, I think we would all
| 15 | agree, I hope your Honor agrees with me, at least this far,
| 16 | that the opportunity for small-group instruction and
| 17 | individualized attention is greater in a class with 12 students
| 18 | and two instructors rather than a class with 12 students and
| 19 | one instructor.
| 20 | THE COURT: That's always true, but that's not the
| 21 | standard to be used here. That's not the standard. I mean,
| 22 | you know, you're right.
| 23 | MR. GRAY: OK.
| 24 | THE COURT: I'd rather, you know, that -- that may
| 25 | be -- you know, there are a lot of things that you tell me

EAEAMMAps

1  you're sure about Cooke that make it a preferable place than a

2  public school but that's not the standard here.  That standard

3  isn't that the ratio -- that the more teachers you have, the

4  greater ratio you have, the more opportunity you have for

5  learning and teaching.  In the abstract, everybody has to

6  accept that.  But that doesn't tell me about whether or not --

7  you know, what they propose as an adequate setting.  The two

8  things that you argue are that, one, the 12-to-one teacher

9  ratio was inappropriate; and, two, that even though the plan

10  didn't call for all-day work site, the fact that they went

11  there and spoke to someone and they said in fact it was going

12  to be an all-day work site is inappropriate for the child.

13  Those are the two things that make me say, no, this child

14  should not be in the setting.

15        Your other arguments are, well, they didn't really

16  convince, they didn't have the evidence to convince us that

17  this was an appropriate setting.  That's primarily your

18  argument.  That's a different argument than, you know, they

19  told me that my child was going to -- my child needed some, you

20  know, needed some specific treatment or setting.  They said

21  they couldn't provide that setting.  And they said that's not

22  necessary.  We'll go without it.  That's not your argument

23  here.

24        MR. GRAY:  I agree.  The primary argument is that the

25  IEP with regard to vocational and academic instruction was

EAEAMMAps

1   vague and resulted in the child being placed at an all-day work
2   side.  And that is a much more straightforward argument.  I
3   agree with your Honor.  The 12-to-one argument, the ratio
4   argument, is more based on the burden.  The DOE has the burden
5   to prove that that was appropriate.  And our contention is that
6   there is no evidence in the record that allows them to meet
7   that burden.  But I agree with your Honor that the vocational
8   aspects of this program is a little more straightforward
9   because the parent, you know, had this vague IEP, didn't know
10  what exactly was being recommended for her child.  She looks up
11  at the school.  She's told that the child would be in a
12  full-day work site and she says, that's exactly, that is the
13  very thing that I do not want in this, for my child.  That is
14  my fear.  She articulated at the CSE meeting that her primary
15  concern was in academic growth.  That was one of the few things
16  she was able to articulate.  And the DOE did not provide a
17  placement that either met the parent's desire or could even
18  meet the, you know, academic goals and aspects that were in the
19  IEP, that were in the plan.  So my primary argument is the
20  vocational aspect.
21          THE COURT:  My recollection is that the only thing
22  that she raised of concern specifically at the time was, as you
23  say, the full-day work plan.
24          MR. GRAY:  She says that her primary concern -- I
25  believe this is other affidavit, as well as in the meeting

EAEAMMAps

1   minutes that are in the record -- was that her primary concern

2   was that he continue to receive academic instruction.

3        THE COURT:  I don't have a recollection if Cooke

4   identified any further concern with regard to the placement and

5   the program at the time.

6        MR. GRAY:  Cooke didn't articulate any concern.

7        THE COURT:  But she did not give any other concern,

8   other than the fact that when she got to the site they said

9   there would it would be an all-day work site.  And she raised

10  that concern.  You have said they didn't respond to that.

11       MR. GRAY:  The DOE didn't respond to either of the

12  letters that the parent mailed in to the DOE for placing her

13  child at Cooke.

14       THE COURT:  But that was the only thing she

15  articulated that was of concern to her at the time.

16       MR. GRAY:  I forget the exact details.  All of them

17  are not before this Court.  They were, you know, she would

18  concern about some of the environment stuff at the school.  She

19  had concerns about the ratio.  I can't -- I'd have to review

20  the letter.  That was among the concerns, yes.

21       THE COURT:  All right.  Well then, let me hear from

22  the DOE.  See what they have to say.  Yes.

23       MR. GIOVANATTI:  Thank you, your Honor.  First, your

24  Honor, what I feel was lost in plaintiff's argument is that

25  there are two administrative decisions already addressing this

EAEAMMAps

1   case.  All the issues that plaintiff raises in this matter,

2   both administrative decisions, found that the DOE offered the

3   student in this case a free and appropriate public education

4   for the 2012-2013 school year.  Under the Second Circuit, the

5   Court should defer to these decisions, especially when they are

6   well reasoned.  And in particular, substantive issues like

7   whether the 12 to one, one program was appropriate and

8   placement issues are particularly issues that the Court should

9   defer to SRO's educational expertise.

10          Under *M.H.*, which is a Second Circuit case and as

11  articulated by your Honor earlier this year in *E.H.*, another

12  IDEA case, it's plaintiffs's burden to demonstrate why the

13  Court should not defer to the SRO decision.  In this case the

14  SRO decision is very thorough.  It's well reasoned.  It's

15  supported by the record in all of its decisions.  And for that

16  reason, your Honor, we believe that the Court should defer to

17  the SRO decision.

18          THE COURT:  Well, what do you say the record

19  demonstrates with regard to all-day work site and whether or

20  not that would be appropriate?

21          MR. GIOVANATTI:  Regarding the placement, your Honor,

22  the SRO found that all issues related to the placement,

23  McSweeney in this case, were speculative.  Specifically, this

24  issue that plaintiff raises regarding whether or not the child

25  would be placed in a full-day vocational program is in and of

1   itself speculative.  The testimony --

2           THE COURT:  Well, it's not speculative if that's what

3   the DOE told her.

4           MR. GIOVANATTI:  Well, it's speculative because what

5   the DOE informed the parent is that based on the student's age,

6   he probably would be in this program.  That in and of itself is

7   speculative.  There is no hard evidence in the record

8   whatsoever that the opportunity would actually be placed in a

9   full-day work site.

10          THE COURT:  So what should the parent have expected

11  with regard to this placement?  What should -- what's the

12  detail, to what detail should the parent have understood what

13  the child's academic and work-site day is going to be.

14          MR. GIOVANATTI:  Well, your Honor, with regard to the

15  placement and with regard specifically to work study programs

16  at the placement, it's impossible to know what work program the

17  student would have been enrolled in had he actually attended

18  the school, because he didn't attend the school.  There is

19  testimony in the record --

20          THE COURT:  Well, that's not impossible.  You can tell

21  me what they would have done when he got there.  What was

22  planned for the child?  Was that ever -- I don't have anything

23  strong in this regard that indicates to me what was planned for

24  the child's academic day, what proportions that they were going

25  to start with, you know, whether or not they were even going to

EAEAMMAps

1  put him in a classroom.  What is it that you say she should

2  have understood about how his day was going to unfold on his

3  first day of school?

4          MR. GIOVANATTI:  Your Honor, this is regarding whether

5  or not the IEP itself is vague regarding the vocational

6  program.  The IEP is not vague.  It specified specific goals

7  that the student would -- or that the teachers would help the

8  student learn in a vocational program.  And it also contains

9  something called a coordinated set of transitional activities

10  which specifically laid out a vocational program for the

11  student.

12          THE COURT:  So what was the program?

13          MR. GIOVANATTI:  The program is a work study program

14  and other small-group vocational programs.  This, the IEP

15  cannot contain things like duration and frequency.  That's not

16  something that an IEP contains.  That's something for a school

17  to determine.  And that's the direct testimony from

18  Ms. Alvarez, who is 20 years on at the DOE, has created over

19  200 IEPs.  That's not something that the IEP will contain.

20          Plaintiff argues that the statute which requires

21  related services to include things like frequency and duration,

22  location, also applies to a vocational program.  That's simply

23  not the case.  There's a whole separate section of the, I

24  believe it's Section 1415 of the IEP -- or IDEA, which relates

25  to the vocational program as opposed to related services.  In

EAEAMMAps

1    our papers, your Honor, we attempt to analogize a vocational

2    program more to an academic program representation as opposed

3    to a related services recommendation.  A vocational program,

4    like an academic program recommendation contained in the IEP,

5    will contain goals and skills that the child will learn through

6    the program and a general overview of the program.  Then the

7    school has the decisions of how to implement that program and

8    how to actually make the child learn those particular goals and

9    skills, right.  And our comparison in our papers, we compare

10   this to, an academic program, we outline the general program,

11   but it's for the teacher to determine what methodologies she

12   actually will teach the children.

13           THE COURT:  Yes.  But the program has got to lay out

14   some measure of detail so that one can evaluate whether the

15   program is appropriate to meet the goal.

16           MR. GIOVANATTI:  Yes, your Honor.  And in this case

17   the IEP does contain sufficient information to demonstrate what

18   vocational program would have been had at McSweeney.  The exact

19   duration, that's for McSweeney to determine.  That's precisely

20   what Ms. Alvarez testified and to Ms. Naclerio testified, who

21   is actually an employee of McSweeney.  Ms. Naclerio testified

22   that the student will not be assigned a particular vocational

23   program until you enroll at that program.  This student was

24   never enrolled at the program.  So it's impossible to know what

25   vocational program he would have actually been in at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A109**

EAEAMMAps

1    school.  Right.

2           In addition, your Honor, we know that the vocational

3    program at the school would not have been a hundred percent

4    vocational, as plaintiff seems to assert, because the IEP

5    itself contains a recommendation for a 12-to-one-to-one

6    classroom program.  It contains goals that relate to an

7    academic -- that are required to be implemented in an academic

8    setting.  That in and of itself demonstrates that at least a

9    portion of the program, no matter the placement, will be

10   academic in nature.

11          THE COURT:  But you would agree that the information

12   provided to the parent was insufficient for her to determine

13   whether he was going to have full-day work site or what

14   percentage or amount of time would be -- the child would be in

15   an academic teaching setting.

16          MR. GIOVANATTI:  Yes, your Honor.  The IEP does not

17   specifically say the student will be in vocational for half a

18   day and in academic for half a day.  It does not say that.

19   But, again, it contains a vocational element and an academic

20   element.  So the parent, it's clear from the face of the IEP,

21   that there will be two components of his program, no matter the

22   placement that he is -- or the student would eventually be

23   placed at.

24          Going to the 12-to-one-to-one issue, your Honor,

25   again, the SRO found that the program in the IEP, the

EAEAMMAps

1    12-to-one-to-one academic program was appropriate for the

2    student.  That decision is supported by the record.

3    Specifically, Ms. Alvarez, who, again, is a very experienced

4    DOE educator -- she's has 20 years of experience, she's

5    actually taught in a 12-to-one-to-one program -- determined

6    that the program in the IEP was appropriate for the student

7    based on the evaluations that she had.

8         Regarding Ms. Alvarez's opinion that the program would

9    be appropriate, the SRO used that recommendation to determine

10   that the program was appropriate.  And *R.E.*, a Second Circuit

11   case, determined that it's not for the courts or for the

12   administrative bodies to choose when what the Cooke educators

13   say versus what the DOE educators said.  The court is supposed

14   to defer to the SRO, which in this case found that

15   Ms. Alvarez's testimony was supported by the evaluative

16   material.

17        THE COURT:  Articulate in what way it was supported by

18   the evaluative material.

19        MR. GIOVANATTI:  Well, specifically, your Honor, one

20   thing that the SRO points out is that the student was

21   previously, at Cooke, in a 12-to-one-to-one setting.  Plaintiff

22   argues that it's a 12-to-two versus a 12-to-one-to-one.  Either

23   way, the student is in a classroom with 12 kids and there are

24   two adults, in both the DOE setting and at Cooke.  It's a

25   negligible difference if there's a teacher versus not a

EAEAMMAps

1   teacher.

2           THE COURT:  Well, I wouldn't accept that it's a

3   negligible difference simply because he's in the classroom with

4   two adults.  That's not the same as being in the classroom with

5   two teachers.  You're in a classroom with two

6   paraprofessionals, is not the same as being in a classroom with

7   two teachers.

8           MR. GIOVANATTI:  At a DOE placement the opportunity

9   would be placed in a class that has a maximum of 12 students

10  and at least one certified special education and a certified

11  classroom paraprofessional.  So the classroom paraprofessional

12  is not, as plaintiff alluded to, just specifically following

13  around one student who is asking for help.  The classroom

14  paraprofessional is there to help all the opportunities just

15  like the teacher is.

16          THE COURT:  Well, although my recollection -- and you

17  can correct me if I'm wrong -- but my recollection in

18  particular from the last case that I just dealt with is that,

19  in a different setting, it is not appropriate to leave a

20  classroom with only -- for a period of time -- with only the

21  paraprofessional in a classroom.

22          MR. GIOVANATTI:  Your Honor, I cannot speak to that

23  point.  I don't know the law on that particular issue.  But,

24  again, they're both adults.  They both can take care of their

25  kids to some extent.  Whether or not the certified classroom

EAEAMMAps

1  paraprofessional can actually do instruction, it's not really

2  clear, from the law or from the record, your Honor.

3          But in addition, your Honor, the management records in

4  the IEP also indicate that the student would receive more

5  personal attention, whether it be from the certified teacher or

6  the certified classroom paraprofessional.  The management needs

7  state specifically that the student excels in small-group

8  instruction, one-to-one review and direct teacher modeling.

9  These recommendations in the IEP are things that would have

10  been implemented in the academic program at the placement.

11          THE COURT:  Well, how -- I mean, in the abstract that

12  sounds appropriate.  But, as I say, you have both a goal and a

13  plan.  I understand what the goal is.  I'm just not sure I can

14  get my hands around what the plan is.  How is that going to be

15  accomplished?

16          MR. GIOVANATTI:  Your Honor, how the plan is actually

17  implemented at the school is entirely speculative in this case

18  because the child was never enrolled at the school.  Because

19  the child never enrolled, we have no idea how he would have

20  functioned at McSweeney or in any respect like that.

21          Specifically, your Honor, the Second Circuit has held

22  that if there is a challenge to the placement itself and how

23  the IEP is implemented, that should occur in another forum,

24  separate forum.  That's from *R.E.* and *F.L.*, both Second Circuit

25  decisions.

44

EAEAMMAps

1        In addition, your Honor, there is a litany of district

2    court decisions that determined that issues regarding how the

3    IEP would have been implemented at the particular placement are

4    speculative, particularly in a decision that occurred recently,

5    *E.E.* and *P.S.*, both from the Southern District, determined that

6    all issues about placement are inherently speculative because

7    the student was never enrolled at the program.

8        Going back to the procedural issue regarding the

9    evaluations, as your Honor stated, there is significant

10   evaluative material in the record.  Plaintiff indicated that

11   there was no vocational evaluation.  There was a vocational

12   evaluation.  It was conducted by Cooke.  But it was present at

13   the CSE meeting and the CSE team relied on it to make the

14   vocational recommendation.  The vocational evaluation is

15   contained in the record as Exhibit 6.

16       The IEP team not only had the 2009 Kennedy evaluation,

17   which, as your Honor seemed to indicate, was timely at the time

18   of the CSE meeting -- it was within the three years -- but the

19   DOE was under no obligation to create a new evaluation.  In

20   addition to the 2009 Kennedy evaluation, there was a Cooke

21   progress report from the previous school year which

22   demonstrated the student's up-to-date educational needs.

23       In addition to those two reports and the transitional

24   report, there were two Cooke educators at the CSE meeting who

25   further discussed the opportunity's educational needs.  One of

**A114**

EAEAMMAps

1    the individuals was Ms. Sullivan, who was actually his teacher

2    the previous year, who informed the individuals at the meeting

3    about how the student actually functioned in a classroom.  And

4    the other Cooke individual who was at the CSE meting was

5    Ms. Sally Ord, O-r-d, who had conducted an evaluation that

6    plaintiff alluded to, plaintiff's counsel alluded to, which was

7    given to plaintiff in 2013, which is a Stanford-Binet test.

8    It's contained in the record as Exhibit 15.  Plaintiff

9    testified she didn't get the report until 2013.  But

10    regardless, Ms. Ord at the CSE meeting discussed the actual

11    evaluation, which contains specific things about like this

12    student is at this percentile in that and the student is at

13    this percentile in English.

14        In using those evaluations, the CSE team was able to

15    develop an appropriate IEP for the student.  And with all those

16    evaluations, Ms. Alvarez was specifically able to determine

17    that the IEP that was created for the student, the 12-to-one-

18    to-one program, the vocational program, and the related

19    services contained in the IEP were appropriate for the student

20    to make progress in the 2012, 2013 school year.  Thank you,

21    your Honor.

22        THE COURT:  All right.  Mr. Gray, did you to have

23    anything to had?

24        MR. GRAY:  I would just make two points, your Honor.

25    The first is with regard to the -- DOE's argument in this case

EAEAMMAps

1    really relies on this Court finding that everything at the

2    placement school was speculative.  There is a split in the

3    district courts.  Our position is that -- and I think it's

4    pretty clear -- the Second Circuit considers placement schools

5    a part of the educational program.  The last decision, which is

6    cited in our brief, is the *Reyes* decision from the Second

7    Circuit, which indicates that what's going on in the placement

8    school is relevant, especially at the time that the parent is

9    making the decision whether to place the child there or not.

10   So the Courts that hold that any information about the

11   placement school are speculative, I think, don't really

12   appropriately consider the reality of how these plans get

13   reported to a parent.  And this is a very -- this specific case

14   is a good example, because the IEP was vague.  She didn't know

15   what was going on in other child's education until -- the

16   parent didn't know what was going on in her child's education

17   until she got to the placement school.

18        The second point, your Honor, I would draw your

19   attention to page 14 of our opposition brief, if you could pay

20   special attention to that.  That is the core of our argument

21   with regard to the IEP, which was vague.  And I'm going to --

22   it's going to be written in a much more, I think, persuasive

23   way than I'm going to say it today to your Honor's, but the

24   IDEA requires that an IEP include a statement of special

25   education and related services and supplementary aids and

EAEAMMAps

1    services.  And the IDEA also states that the IEP must state the

2    anticipated frequency, duration, and location of the

3    recommended services and modification.  So the anticipated

4    frequency, location, and duration of the academic and

5    vocational programs are just not in this IEP.  And that's the

6    core of our argument.  Thank you.

7            THE COURT:  All right.  Let me go back to the papers

8    with this focus.  That's helpful.

9            MR. GRAY:  Thank you.

10           THE COURT:  I will get back to you as quickly as

11   possible on that.  Thank you both.

12           MR. GIOVANATTI:  Thank you, your Honor.

13           MR. GRAY:  Thank you, your Honor.

14                               o0o

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
M.M. on Behalf of and as parent of J.S., a student    :
with a disability,

                                    Plaintiff,    :

           -against-                              :

NEW YORK CITY DEPARTMENT OF                       :
EDUCATION,                                        :

                                    Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 1 8 2015

MEMORANDUM DECISION AND
ORDER

14 Civ. 1542 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff M.M. ("Plaintiff"), on behalf of her child J.S., brings this action against the New

York City Department of Education ("DOE"), seeking reversal of the New York State Review

Officer's ("SRO") decision to deny Plaintiff a tuition reimbursement for unilaterally placing J.S.

in a private school. The SRO affirmed the Impartial Hearing Officer's ("IHO") decision to deny

tuition reimbursement to Plaintiff, finding that the DOE satisfied its obligation under the

Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") to provide J.S. with a

free and appropriate public education ("FAPE") for the 2012–2013 school year.

The parties cross-moved for summary judgment. ECF Nos. 18 and 21. Plaintiff's Motion

for Summary Judgment is DENIED. Defendant's Cross-Motion for Summary Judgment is

GRANTED.

I.    **BACKGROUND**[1]

J.S. is a student with autism. At the start of the 2012–2013 school year, J.S. was eighteen

---

[1] The following facts derive from Plaintiff's and the DOE's recitations of the facts submitted in their respective briefs
for summary judgment, and the certified administrative record. The following facts are undisputed unless otherwise
indicated. A Rule 56.1 statement is not required in IDEA cases. See T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412,
417–418 (2d Cir. 2009).

1

**A118**

years old, and attending a private school called the Cooke Center for Learning and Development
("Cooke"). He attended Cooke beginning in 2008.

On May 22, 2012, a Committee on Special Education ("CSE") convened to develop an
individualized educational program ("IEP") for J.S. for the 2012–2013 school year.[2] The CSE
team consisted of Plaintiff, J.S.'s mother, a DOE special education teacher, a DOE school
psychologist who also served as the district representative, a Cooke educator who was J.S.'s
English or language arts teacher, and a Cooke representative. In developing J.S.'s IEP, the CSE
team relied on several reports: a Comprehensive Psychoeducational Evaluation conducted by a
private institution in 2009 (the "2009 Psychoeducational Evaluation"), a Cooke Progress Report
from 2011–2012, and a transitional report developed by Cooke. The DOE did not conduct a
triennial reevaluation of J.S. pursuant to the IDEA, nor did it conduct a vocational assessment of
J.S. The CSE team instead relied on the 2009 Psychoeducational Evaluation, which was privately
obtained by Plaintiff. DOE Ex. 22 ¶¶ 16–18.

During the meeting, the CSE team discussed the contents of the reports and the evaluation
to determine J.S.'s needs and educational services. Plaintiff stated at the meeting that J.S.'s
academic progress mattered the most to her, and that she wanted academic instruction to take top
priority in determining J.S.'s IEP. Pls. Ex. X ¶ 8.[3] Based on their discussions, the CSE team
recommended that J.S. be placed in a twelve-month program in a special education class with a
classroom ratio of up to twelve students to one special education teacher and one paraprofessional
("12:1:1") at a specialized school. The CSE team also recommended that J.S. receive three forty-

---

[2] An IEP is a "'written statement that sets out the child's present educational performance, establishes annual and
short-term objectives for improvements in that performance, and describes the specially designed instruction and
service that will enable the child to meet those objectives.'" R.E. v. N.Y. City Dep't of Educ., 694 F.3d 167, 175
(2012). In New York, the CSE is responsible for developing the IEPs. Id.

[3] Exhibit X is attached to Plaintiff's Aug. 19, 2013 SRO Verified Petition as "Appeal Exhibit 4."

2

**A119**

five minute sessions per week of speech language therapy, one forty-five minute session of individual counseling, and one forty-five minute session of group counseling. DOE Ex. 22 ¶ 41. J.S.'s IEP also contained measurable postsecondary goals to assist J.S. with transition from school to adulthood. DOE Ex. 3-3.

At the meeting, the Cooke representative objected to the CSE's recommendation of a 12:1:1 classroom ratio, stating that J.S. "needs a small student-to-teacher ratio, smaller than 12:1+1." Pls. Ex. M ¶ 18; IHO Hearing Transcript ("Tr.") at 188:7–194:17. The Cooke representative specifically objected to a classroom ratio of twelve students with one teacher and a paraprofessional because J.S.'s classes at Cooke had a classroom of twelve students but with two special education teachers, a teacher and an assistant teacher. Id. ¶ 19; see Oct. 14, 2014 Oral Arg. at 24–25. The DOE staff disagreed with the Cooke representative, finding that the recommendation was appropriate given J.S.'s evaluation. DOE Ex. 22 ¶¶ 48–49.

On June 15, 2012, the DOE sent a notice to Plaintiff recommending P.S. 712X, the Stephen D. McSweeney School ("McSweeney"), as J.S.'s placement. On June 20, 2012, Plaintiff and another Cooke educator who was not presented for the CSE meeting visited the school. They claim that during the visit a parent coordinator at the school told them that because of J.S.'s age, he would be placed at a full-day work site. Plaintiff objected to the school placement for J.S., and wrote the DOE two letters objecting to McSweeney as an appropriate placement for J.S.'s needs. Plaintiff received no response from the DOE. Plaintiff decided to unilaterally reenroll J.S. at Cooke for the 2012–2013 school year, with the plan of seeking reimbursement from the DOE for tuition costs.

**A120**

a. *The Due Process Complaint and the Administrative Hearings*

On March 18, 2013, Plaintiff filed a due process complaint against the DOE.[4] Plaintiff alleged that the DOE committed several violations under the IDEA namely that: the DOE failed to conduct a triennial reevaluation of J.S. before the CSE meeting; the DOE failed to conduct a vocational assessment of J.S.; the CSE's recommendation of the 12:1:1 class placement was inappropriate; and the CSE team did not appropriately balance academic instruction and vocational training.[5] Plaintiff also alleged that McSweeney was an inappropriate placement because the school focused more on vocational training than on academic instruction. As relief, Plaintiff requested reimbursement for J.S.'s tuition at Cooke for the school year.

On December 20, 2013, the IHO denied Plaintiff's request for tuition reimbursement, finding that the IEP appropriately addressed J.S.'s particular disability. Findings of Fact and Decision, Case No. 143983, dated Dec. 20, 2013 ("IHO Dec."), at 8.[6] The IHO found that the DOE did not violate the IDEA by failing to conduct a triennial reevaluation of J.S. because the 2009 Psychoeducational Evaluation relied upon for developing J.S.'s IEP was within the three-year statutory period. Id. at 6. The IHO also found that the 12:1:1 classroom placement was appropriate, and that the IEP had a proper balance of academic instruction and vocational training,

---

[4] Pursuant to the IDEA, each state receiving federal funding under the Act must establish procedural safeguards to review administrative decisions. See generally 20 U.S.C. § 1415 (2012). New York has adopted a two-tiered administrative review process. The parent must initiate the process by filing a due process complaint, which will be reviewed by an IHO. See id. § 1415(f); N.Y. Educ. Law § 4404(1) (McKinney 2012). Either party could appeal the IHO's decision to a SRO. Then either party, the child's parent or the DOE, could appeal the SRO's decision to a federal or state court in a civil action. See 20 U.S.C. § 1415(i)(2)(A); see also R.E., 694 F.3d at 175.

[5] Plaintiff also raised the issue that the DOE did not recommend parent training in violation of 8 NYCRR 200.13(d), but this issue was not raised here.

[6] Prior to this decision, the IHO issued another decision denying tuition reimbursement. Findings of Fact and Decision, Case No. 143983, dated July 18, 2013, at 9. That decision was remanded by the SRO because the IHO did not apply the controlling three-prong test known as the Burlington-Carter test. See Application of a Student with a Disability, Appeal No. 13-157, at 10–11; infra p. 7. The IHO's decision dated December 20, 2013 is the IHO's decision after remand.

which could have been implemented at McSweeney. Id. M.M. subsequently appealed the IHO's decision to the SRO.

### b. *The SRO's Decision*

On March 18, 2014,[7] the SRO affirmed the IHO's decision that the DOE provided J.S. with a FAPE for the 2012–2013 school year. See Application of a Student with a Disability, Appeal No. 14-018, dated Mar. 18, 2013 at 14 ("SRO Dec."). The SRO agreed with the IHO that the 2009 Psychoeducational Evaluation was timely, that the CSE had sufficient evaluative materials to develop J.S.'s IEP, and that the lack of a vocational assessment and transition plan did not render J.S.'s IEP inappropriate. The SRO also found that there was sufficient information in the hearing record to establish that a 12:1:1 placement was an appropriate placement for J.S.'s needs. The SRO rejected Plaintiff's challenge that McSweeney was an inappropriate school placement for J.S. The SRO found that Plaintiff's challenge to the school was "speculative" given that J.S. never attended the recommended placement. Id. at 20. Citing the Second Circuit in R.E. v. New York City Department of Education, the SRO stated, "'speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement[.]'" Id. The SRO concluded that the DOE sustained its burden of establishing that it offered a FAPE to J.S. for the 2012–2013 school year, and thus, inquiry into the other two prongs of the Burlington-Carter test[8] was unnecessary. Id. at 22.

---

[7] The SRO's decision is dated March 18, 2013, but the Court will assume that this date is a typographical error because the decision was written after the remand from the SRO.

[8] See infra p. 7.

5

**A122**

## II.   LEGAL STANDARDS

a.   *The Summary Judgment Standard in Cases Brought Under the IDEA*

Under the IDEA, a party may appeal a SRO's decision to a federal district court in a civil action.   See 20 U.S.C. § 1415(i)(2)(A); supra note 4.   Although parties petitioning for administrative review under the IDEA may title their motions as a motion for summary judgment, "'a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.'"   M.H. v. N.Y. City Dep't of Educ., 685 F.3d 217, 225 (2d Cir. 2012) (citing Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)).   Rather, the motion functions as a "procedural mechanism for reviewing a state's compliance" with the procedural and substantive mandates under the IDEA.   M.H., 685 F.3d at 225–26.

When reviewing the motion, the district court must determine whether the SRO's decision is supported by a "'preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before [the court] by the parties."   Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003); see also T.Y., 584 F.3d at 418 ("[T]he court is . . . empowered to conduct an independent review of the record as a whole and even hear additional evidence.").   However, this determination does not "invit[e] . . . the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."   Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).   The district court must give "due weight" to the findings of a state administrative proceeding.   Id.   "Deference is particularly appropriate when . . . the state hearing officer's review has been thorough and careful."   Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

6

**A123**

**b.** *Plaintiff's Eligibility for Tuition Reimbursement*

To grant tuition reimbursement to a parent who has unilaterally placed the student in a private school, the court must consider "(1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." C.F. ex rel. R.F. v. N.Y. City Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014). This inquiry is known as the Burlington-Carter test; a test articulated in School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985) and Florence County School District Four v. Carter, 510 U.S. 7 (1993). The school district bears the burden of establishing the appropriateness of an IEP; however, when a parent is seeking tuition reimbursement for a unilateral placement, the parent bears the burden of establishing the appropriateness of the private placement. See N.Y. Educ. Law § 4404(1)(c). If the court determines that the IEP was appropriate, the inquiry ends there. See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000). "Only if a court determines that a challenged IEP was inadequate should it proceed to the second [prong]." Id.

In determining whether an IEP complies with the IDEA, the court must delve into a two-part inquiry, which is "first, procedural, and second, substantive." See R.E., 694 F.3d at 190. A procedural violation does not automatically entitled a parent to reimbursement; however, multiple violations in the aggregate may result in a denial of a FAPE. Id. Procedural violations only entitle a parent to reimbursement if the violations "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" Id. (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). In determining whether an IEP is substantively adequate, the court must determine whether the IEP was "reasonably calculated to enable the child to receive education benefit[s]." R.E., 694 F.3d at 190.

7

**A124**

Unlike a procedural violation, "[s]ubstantive inadequacy automatically entitles the parent to reimbursement." Id.

## III.   THE DOE PROVIDED J.S. WITH A FREE AND APPROPRIATE PUBLIC EDUCATION

Plaintiff attacks both the procedural and substantive adequacy of the IEP.  First, Plaintiff argues that the DOE's failure to conduct a triennial reevaluation and a vocational assessment of J.S. were procedural violations that impeded Plaintiff's opportunity to participate in the decision-making process, and deprived J.S. of educational benefits.  Second, Plaintiff argues that the IEP is substantively inadequate because the CSE's recommendation of the 12:1:1 program is inappropriate.  Plaintiff also attacks McSweeney as an improper school placement.

Based on a thorough, independent review of the record, the SRO's well-reasoned decision warrants deference and affirmance.

### a.  *Procedural Adequacy*

#### i.  *The DOE's failure to conduct a triennial reevaluation did not result in a denial of a FAPE.*

For developing J.S.'s IEP, the CSE team relied on a 2009 Psychoeducational Evaluation, which was privately obtained by Plaintiff.  The SRO found that the DOE was not obligated to conduct a triennial reevaluation of J.S. given that the 2009 Psychoeducational Evaluation, conducted in June 2009, fell within the three-year statutory period.  SRO Dec. at 10.  In addition, the SRO found that the CSE team had sufficient evaluative information to develop J.S.'s IEP. Id.

Under the IDEA, "[a] reevaluation . . . [must] occur . . . not more frequently than once a year, unless the parent and the local educational agency agree otherwise; and . . . at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary."  20 U.S.C. § 1414(a)(2)(B)(i)–(ii); N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8 § 200.4(b)(4).  Plaintiff argues that the SRO erred in finding that the DOE was not obligated to

8

**A125**

conduct a triennial reevaluation because the plain language of the applicable statutory provision puts the responsibility of conducting reevaluations on the DOE; not a private agency. Plaintiff also argues that the DOE's failure to conduct a reevaluation deprived her of an opportunity to participate in J.S.'s evaluative process. Part of the evaluative process seeks input from the parent in gathering pertinent information about the student's needs. See 34 C.F.R. § 300.305(a)(1)–(2) (2014) ("[T]he IEP Team . . . as appropriate, must [r]eview existing evaluation data on the child, including . . . input from the child's parents . . . ."). Because no reevaluation was conducted, Plaintiff claims she was deprived of the opportunity to contribute and advocate for J.S.'s educational needs.

Although the applicable statutory provision does mandate the DOE to conduct a triennial reevaluation of a student at least every three years, the lack of such a reevaluation in this case did not render the IEP inappropriate. See D.B. v. N.Y. City Dep't of Educ., 966 F. Supp. 2d 315, 330–31 (S.D.N.Y. 2013) (holding that the DOE's failure to conduct the statutorily-mandated psychological reevaluation of the child did not render the IEP procedurally defective); N.K. v. N.Y. City Dep't of Educ., 961 F. Supp. 2d 577, 586 (S.D.N.Y. 2013) (holding that the CSE team had sufficient evaluative data despite the CSE's failure to conduct an evaluation). This Court defers to the SRO's finding that the CSE had sufficient evaluative materials to conduct J.S.'s IEP. In developing J.S.'s IEP, the SRO highlighted that the evaluators of the 2009 evaluation used several formal and informal assessments to measure J.S.'s ability in cognitive, adaptive behavior, and academics. SRO Dec. at 10–11. The progress report that the CSE team relied on provided relevant information about J.S.'s "academic and social/emotional functioning and related goals[,]" and the transition report provided adequate post-secondary and vocational related information to develop a comprehensive transition plan for the IEP. Id. at 11–12. The CSE team

9

**A126**

also considered input from Plaintiff, J.S.'s English/language arts teacher, and a Cooke consulting teacher. Id. at 10

Additionally, Plaintiff's contention that the lack of an evaluation deprived her of the opportunity to participate in the decision-making process regarding J.S.'s educational needs is unsupported by the record. Plaintiff was present at the CSE meeting; the CSE relied on an independent evaluation obtained by her in developing the IEP; she voiced her concern about J.S.'s academic progress during the CSE meeting; she visited the placement school with a Cooke representative; and she had her counsel write the DOE a letter explaining why she believed that the placement school was inappropriate. This level of involvement shows that Plaintiff had significant opportunities to participate in the decision-making process. Cf. N.K., 961 F. Supp. 2d at 586 (holding that the parent's level of involvement in the development of the IEP—commissioning an independent evaluation, and visiting the recommended placement—was sufficient opportunity for the parent to participate in the decision-making process). Moreover, Plaintiff had sufficient information to participate in the decision-making process for J.S.'s education needs. See M.W. ex rel. S.W. v. N.Y. City Dep't of Educ., 869 F. Supp. 2d 320, 334 (E.D.N.Y. 2012), aff'd, 725 F.3d 131 (2d Cir. 2013) (holding that because the CSE team and the parents had substantial background information about the student during the CSE meeting, any failure to conduct an additional evaluation did not impede the parents' opportunity to participate in the development of the IEP). The DOE has demonstrated that not conducting a reevaluation of J.S. did not significantly impede Plaintiff's opportunity to participate in the decision-making process or deprive J.S. of a FAPE.[9]

---

[9] Plaintiff also argues that even if the 2009 Psychoeducational Evaluation replaced the DOE's triennial reevaluation, the evaluation was insufficient under the IDEA because it constituted only one single assessment of J.S. See 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(1) (mandating that the school district utilize more than one assessment in the evaluative process). Plaintiff also argues that the evaluation was not current because the evaluation would have

10

ii.  *The lack of a vocational assessment did not impede J.S.'s right to a FAPE.*

It is undisputed that the DOE did not conduct a vocational assessment of J.S.  SRO Dec. at

12.  Pursuant to the IDEA and New York state regulations, the IEPs for students fifteen or older

must include "appropriate measurable postsecondary goals based upon age appropriate transition

assessments related to training, education, employment, and, where appropriate, independent

living skills; [and] the transition services (including courses of study) needed to assist the child

in reaching those goals . . . ."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)–(bb); 8 NYCRR

200.4(d)(2)(ix).  Despite the DOE's failure to conduct a vocational assessment, the SRO found

that this procedural inadequacy alone did not render J.S.'s IEP inappropriate.  SRO Dec. at 13.

The SRO found that the CSE team had sufficient information about J.S.'s transition needs to

enable the CSE team to develop his IEP.  Id.

Plaintiff does not argue that the lack of a vocational assessment resulted in insufficient

information to develop J.S.'s IEP.  Rather, Plaintiff argues that the lack of a vocational assessment

caused the IEP to be vague, preventing her from participating in the decision-making process

regarding J.S.'s education.  Plaintiff's argument is three-fold.  First, Plaintiff argues that parents

must have "sufficient information about the IEP to make an informed decision as to its adequacy

prior to making a placement decision."  Pls.' Mem. Summ. at 22 (citing R.E., 694 F.3d at 186).

Here, Plaintiff contends that the IEP failed to provide any information about how J.S.'s

transitional and academic goals would be implemented at the placement school.  Second, Plaintiff

expired two months before the CSE meeting, allowing another year to pass before J.S. is reevaluated for the next
school year.  Plaintiff warns that this practice will turn IDEA's triennial reevaluation requirement into a quadrennial
reevaluation requirement.  Plaintiff's arguments are without merit.  As the SRO noted, the evaluators of the 2009
Psychoeducational Evaluation utilized a variety of formal and informal assessments of J.S.  See SRO Decision at 10–
12; DOE Ex. 5-1 to -18.  Regarding the quadrennial argument, the IDEA gives the school district the discretion within
the three-year period to conduct an evaluation of the student if it deems necessary or if a parent requests one.  See 20
U.S.C. § 1414(a)(2)(A)(i)–(ii); 34 C.F.R. § 300.303(a)(1)–(2).  Here, the school district believed that it had sufficient
evaluative information to move forward with developing J.S.'s IEP.  There is no evidence in the record that at the time
of the meeting Plaintiff requested that a further evaluation to conducted.  See DOE Ex. 22 ¶ 18.

11

**A128**

argues that the DOE was mandated to send a written notice to Plaintiff with specific information about the school placement. See 34 C.F.R. § 300.503(a) (requiring the public agency to send a written notice to the parent of the child if the public agency proposes to initiate or change the placement or the IEP). Here, Plaintiff contends that she did not receive any notice from the DOE that J.S. would be attending a full-time day work program at the placement school until she visited the school, which is different from what she understood from the CSE meeting. Third, Plaintiff argues the IEP directly contradicts the IDEA's requirement that the IEP should include the "'anticipated frequency, location, and duration' of all recommended services." See 20 U.S.C. § 1414(d)(1)(A)(i)(VII). Here, Plaintiff contends that the IEP contains "generic" goals related to his transition to post-school life.

The SRO found that the IEP was not vague because the IEP contained both an academic and post-secondary component and annual goals related to academics and post-secondary transitions. SRO Dec. at 15. The SRO also relied on the testimony of the IEP coordinator who testified that the placement school could address all of J.S.'s goals and fully implement the IEP. Id.; Tr. 13:20–14:5. Plaintiff argues that the SRO erred in relying on the IEP coordinator's testimony because such testimony was impermissible retrospective evidence—a type of evidence that the Second Circuit cautioned the lower courts from considering when evaluating the appropriateness of a deficient IEP. See R.E., 694 F.3d at 186 (holding that retrospective testimony may not be considered in a Burlington-Carter proceeding).

A review of the administrative record shows that the IEP was not vague regarding J.S.'s transitional and vocational goals. As the SRO highlighted, the IEP contained annual goals and services related to academics and post-secondary transition. SRO Decision at 15; Pls. Ex. X. Plaintiff received notice from the DOE that the recommended placement school was McSweeney.

**A129**

Regarding how these goals would be implemented in the placement school, the IEP coordinator testified that a school counselor from McSweeney would meet with the student and the student's parents to discuss J.S.'s needs and abilities.  DOE Ex. 21 ¶ 15.  There is nothing in J.S.'s IEP to suggest that he would be placed in an all-day work site program.  The assertion of Plaintiff and the Cooke educator regarding statements made by the parent coordinator is not sufficient evidence to conclude that the student's goals and needs would not be met.

Additionally, the SRO properly relied on the IEP coordinator's testimony because this testimony was not retrospective evidence.  The Second Circuit defined retrospective testimony as testimony that seeks to remedy the deficiencies of a defective IEP by a school representative testifying that the school would have implemented the IEP.  R.E., 694 F.3d at 185–86.  However, testimony that explains or justifies the services in the IEP is permissible.  Id. at 186.  The IEP coordinator's testimony was not retrospective because the IEP coordinator testified as to how the school would implement the IEP.  This testimony did not seek to implement a different IEP or to remedy a defective IEP.

  b.  *Substantive Adequacy*

        i.  ***The recommended 12:1:1 program was reasonably calculated to meet J.S.'s educational needs.***

This Court must defer to the expertise of the SRO that the CSE team's recommendation of a 12:1:1 program was appropriate for J.S.'s educational needs.  Plaintiff highlights evidence in the record to prove that there was conflicting support for whether the 12:1:1 program was appropriate.  At the CSE meeting, the Cooke representative objected to the 12:1:1 recommendation, and testified that J.S. "needs a small student-to-teacher ratio, smaller than 12:1+1."  Pls. Ex. M ¶ 18.  In addition, J.S.'s English and language arts teacher testified that J.S. needed "frequent check-ins and regular teacher prompting to ensure that he is committing new information to long-term memory."  Pls.

Ex. ¶ 7; Pls.' Mem. Summ. J. at 27.  On the other hand, the DOE staff disagreed with the Cooke representative, and the DOE points to other evidence in the record to show that J.S. made educational progress working in similar 12:1:1 classroom settings.

When there is conflicting evidence regarding an educational placement, it is appropriate for this Court to defer to the expertise of the SRO.  "[T]he judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  See A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007)) (internal quotation marks omitted).  Here, the SRO determined that the 12:1:1 special class placement was appropriate given J.S.'s educational needs, skills, and performance levels because the special class placement is designed for students "whose management needs interfere with the instructional process . . ."  SRO Dec. at 14 (citing 8 NYCRR § 200.6(h)(4)).  The SRO also found that the recommended related services to support J.S. in his 12:1:1 special class placement were appropriate and consistent with the frequency and duration of the related services he received at Cooke.[10]  SRO Dec. at 14.

**c.  *Because the IEP was Appropriate, Reimbursement for a Unilateral Placement Cannot Be Granted***

The SRO did not erred in finding that a challenge to the placement school would be speculative given that J.S. never attend McSweeney.  It is well-established that when determining whether a unilateral placement was appropriate, the court must focus on the written IEP.  See R.E., 694 F.3d at 195; accord K.L. ex rel. M.L. v. N.Y. City Dep't of Educ., 530 F. App'x 81, 87 (2d

---

[10] Plaintiff also argues that the 12:1:1 recommendation was inappropriate because the recommended classroom setting would consist of a teacher and a paraprofessional.  At Cooke, a 12:1:1 class would consist of two certified teachers.  Again, this Court is not an expert in special education to determine whether a class placement with a teacher and a paraprofessional is inappropriate where the student is familiar with a classroom setting of two teachers.  See R.E., 694 F.3d at 192 ("The adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence . . . .").

14

**A131**

Cir. 2013).  "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  R.E., 694 F.3d at 195.  The SRO correctly found that Plaintiff's challenge to McSweeney as a placement school was speculative given that J.S. did not attend McSweeney.

Because the IEP was appropriate, there is no need to further inquire as to the other two prongs of the Burlington-Carter test regarding whether Cooke was an appropriate placement and if equities favor reimbursement.  See M.C. ex rel. Mrs. C., 226 F.3d at 67.


## CONCLUSION

Plaintiff's Motion for Summary Judgment is DENIED.  Defendant's Cross-Motion for Summary Judgment is GRANTED.  The Clerk of Court is directed to close the motions at ECF Nos. 18 and 21.


Dated: March 17, 2015
        New York, New York

                                          SO ORDERED.

                                          *George B. Daniels*
                                          GEORGE B. DANIELS
                                          United States District Judge

15

**A132**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
M.M. on Behalf of and as parent of J.S., a student
with a disability ,

                              Plaintiff,                    14 **CIVIL** 1542(GBD)


               -against-                                    **JUDGMENT**


NEW YORK CITY DEPARTMENT OF
EDUCATION,
                              Defendant.
-----------------------------------------------------------X


      Plaintiff M.M. having moved for summary judgment and Defendant New York City

Department of Education having cross-moved for summary judgment pursuant to Fed. R. Civ. P.

56, and the matter having come before the Honorable George B. Daniels, United States District

Judge, and the Court, on March 18, 2015, having rendered its Memorandum Decision and Order

(Doc. 25) denying Plaintiff's motion for summary judgment,  granting Defendant's cross-motion

for  summary judgment, directing the Clerk of Court to close the motions at ECF Nos. 18 and 21,

it is,

      **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Memorandum Decision and Order dated March 18,  2015, Plaintiff's motion for summary

judgment is denied; Defendant's cross-motion for summary judgment is granted.

**Dated:**  New York, New York
       March 19, 2015

                                                            **RUBY J. KRAJICK**
                                              _____
                                                            **Clerk of Court**

                              **BY:**

                                              _____
                                                            **Deputy Clerk**


**A133**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
M.M., on Behalf of and as Parent of
J.S., a student with a disability,

                     Plaintiff,

          - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                   Defendant.
-----------------------------------------------------X

**NOTICE OF APPEAL**

Docket No.
14-CV-1542 (GBD)

ECF Case

       PLEASE TAKE NOTICE that Plaintiff M.M., on Behalf of and as Parent of J.S., a student with a disability, hereby appeals to the United States Court of Appeals for the Second Circuit from the Memorandum Decision and Order in this action dated March 17, 2015 and entered March 18, 2015, and the final judgment entered March 19, 2015, denying Plaintiff's motion for summary judgment and granting Defendant's cross-motion for summary judgment.

Dated:     New York, New York
            April 15, 2015

                             /s/ Thomas Gray
                             THOMAS GRAY (TG 0880)
                             PARTNERSHIP FOR CHILDREN'S RIGHTS
                             Attorney for Plaintiff
                             271 Madison Avenue, 17th Floor
                             New York, New York 10016
                             (212) 683-7999 ext. 246
                             Fax (212) 683-5544
                             tgray@pfcr.org

To:

Clerk of the Court
United States District Court for the Southern District of New York

**A134**

Neil Anthony Giovanatti
Assistant Corporation Counsel
Corporation Counsel of the City of New York
Attorney for Defendant
100 Church Street, Room 2-305
New York, NY 10007
(212) 356-0886
(via ECF)

**A135**