# 15-1200

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

————————·‌·‌·————————

M.M., on behalf of and as Parent of J.S.,
a student with a disability,

*Plaintiff-Appellant*,

–v.–

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee*.

————————·‌·‌·————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT M.M.
## AND SPECIAL APPENDIX

ERIN MCCORMACK-HERBERT
THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
*Attorneys for Plaintiff-Appellant*
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 exts. 229, 246

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .........................................................................iv

JURISDICTIONAL STATEMENT ..............................................................1

ISSUES PRESENTED FOR REVIEW .........................................................1

STATEMENT OF THE CASE.......................................................................2

STATEMENT OF FACTS .............................................................................5

     A.     J.S.'s Disability and Educational History ....................................5

     B.     IEP Meeting for the 2012–2013 School Year ...........................6

     C.     Recommended Public School Placement for the
            2012–2013 School Year ...............................................................9

     D.     Reenrollment in the Cooke Center ............................................9

     E.     J.S.'s 2012–2013 Educational Program at the
            Cooke Center .............................................................................10

     F.     The Impartial Hearing ..............................................................14

     G.     First SRO Appeal .....................................................................16

     H.     Remand to the IHO....................................................................17

     I.      Second SRO Appeal..................................................................19

     J.      Proceedings in the District Court ..............................................21

SUMMARY OF ARGUMENT ....................................................................23

STATUTORY FRAMEWORK....................................................................24

STANDARD OF REVIEW ........................................................................28

ARGUMENT ..........................................................................................28

POINT I

THE DOE VIOLATED THE MANDATES
OF THE IDEA AND DENIED J.S. A FAPE ......................................28

A.    The DOE Failed to Determine with M.M. at J.S.'s IEP
      Meeting and to Specify in His IEP the Frequency,
      Duration, and Location of His Mandated Transition
      Services.  The DOE Instead Impermissibly Left the
      Decision Regarding This Critical Component of J.S.'s
      Educational Program to His Assigned Public School ...............29

B.    The DOE's Failure to Conduct a Mandated Triennial
      Evaluation of J.S., Including Required Vocational and
      Transition Assessments, Contributed to the Inadequacy
      of the IEP Transition Plan and Constituted an Independent
      Impediment to M.M.'s Participation in the Provision of
      FAPE to J.S. ...........................................................................35

C.    Cumulatively, the DOE's Procedural Violations
      Resulted in a Denial of FAPE to J.S. ........................................ 44

POINT II

THE SRO IGNORED THE MANDATES OF THE
IDEA IN FINDING THAT THE DOE OFFERED J.S.
A FAPE.  THE SRO'S DECISION IS NOT ENTITLED
TO DEFERENCE, AND THE DISTRICT COURT'S
DECISION TO UPHOLD IT MUST BE REVERSED ......................46

CONCLUSION .......................................................................................54

CERTIFICATE OF COMPLIANCE ...........................................................55

ii

SPECIAL APPENDIX (annexed)

Memorandum Decision and Order of Hon. George B. Daniels,
March 17, 2015 ......................................................................................SPA1

Judgment, March 19, 2015 ................................................................SPA16

20 U.S.C. § 1414..................................................................................SPA17

# TABLE OF AUTHORITIES

## Cases

A.C. ex rel. M.C. v. Bd. of Educ.,
    553 F.3d 165 (2d Cir. 2009) ...............................28

Bd. of Educ. v. Rowley,
    458 U.S. 176 (1982)...........................................25

Briere v. Fair Haven Grade Sch. Dist.,
    948 F. Supp. 1242 (D. Vt. 1996) ........................47

Carrie I. ex rel. Greg I. v. Dep't of Educ.,
    869 F. Supp. 2d 1225 (D. Haw. 2012)................45

Cerra v. Pawling Cent. Sch. Dist.,
    427 F.3d 186 (2d Cir. 2005) ...............................28

C.U. ex rel. G.U. v. New York City Dep't of Educ.,
    23 F. Supp. 3d 210 (S.D.N.Y. 2014) ..................52, 53

Davis v. Wappingers Cent. Sch. Dist.,
    431 F. App'x 12 (2d Cir. 2011) (summary order)..............53

Dracut Sch. Comm. v. Bureau of Special Educ. Appeals,
    737 F. Supp. 2d 35 (D. Mass. 2010)...................45

Entergy Corp. v. Riverkeeper, Inc.,
    556 U.S. 208 (2009)...........................................31

Florence County Sch. Dist. Four v. Carter,
    510 U.S. 7 (1993)...............................................26

Forest Grove Sch. Dist. v. T.A.,
    557 U.S. 230 (2009)...........................................25

Gagliardo v. Arlington Cent. Sch. Dist.,
    489 F.3d 105 (2d Cir. 2007) ...............................27, 46

iv

Gibson v. Forest Hills Sch. Dist.,
    No. 1:11-cv-329, 2013 WL 2618588
    (S.D. Ohio June 11, 2013) ...................................................45

Honig v. Doe,
    484 U.S. 305 (1988)............................................................53

Jefferson County Bd. of Educ. v. Lolita S. ex rel. M.S.,
    977 F. Supp. 2d 1091 (N.D. Ala. 2013) ..............................45

M.H. ex rel. P.H. v. New York City Dep't of Educ.,
    685 F.3d 217 (2d Cir. 2012) ...........................................27, 46

R.E. ex rel. J.E. v. New York City Dep't of Educ.,
    694 F.3d 167 (2d Cir. 2012) .................................44, 49, 53

Sch. Comm. of Burlington v. Dep't of Educ.,
    471 U.S. 359 (1985)........................................................16, 26

Schaffer v. Weast,
    546 U.S. 49 (2005)..............................................................25

T.P. v. Bryan County Sch. Dist.,
    No. 14-11789, 2015 WL 4038715
    (11th Cir. July 2, 2015)...................................................38, 50

**Statutes**

20 U.S.C.

    § 1400(d)(1)(A) ..................................................................24

    § 1400(d)(1)(B)..............................................................25, 40

    § 1401(9)........................................................................25, 32

    § 1402(a) .............................................................................31

    § 1414(a)(2)(B)(ii) .........................................................35, 50

§ 1414(b)(1) ...................................................................... 36, 52

§ 1414(c)(1)(B) ............................................................. 37, 40, 52

§ 1414(c)(4)(A) ............................................................. 37, 40, 52

§ 1414(d) ............................................................................ 25

§ 1414(d)(1)(A)(i) ............................................................... 31

§ 1414(d)(1)(A)(i)(III) ......................................................... 39

§ 1414(d)(1)(A)(i)(IV) .................................................... 25, 29

§ 1414(d)(1)(A)(i)(VII) ........................................................ 29

§ 1414(d)(1)(A)(i)(VIII) ....................................................... 30

§ 1414(d)(1)(A)(i)(VIII)(aa) .......................................... 30, 36, 39

§ 1414(d)(1)(A)(i)(VIII)(bb) ................................................ 34

§ 1414(d)(1)(B)(i) ........................................................ 26, 31, 52

§ 1414(d)(3)(A)(ii) ........................................................ 26, 52

§ 1414(d)(4)(A)(i) ............................................................... 25

§ 1414(d)(4)(A)(ii)(II) ......................................................... 51

§ 1414(e) ............................................................................ 26

§ 1415(b)(3) ........................................................................ 26

§ 1415(f)(3)(E)(i) ................................................................. 26

§ 1415(f)(3)(E)(ii) ........................................................... 26, 27

§ 1415(i)(2)(A) ..................................................................... 1

28 U.S.C. § 1291 ........................................................................... 1

N.Y. Educ. L. § 2(15) .................................................................. 50

N.Y. Educ. L. § 4404(1)(c) ................................................... 26, 37

## **Regulations**

34 C.F.R.

§ 300.39(a)(2)(ii) ................................................................ 34

§ 300.39(a)(2)(iii) ............................................................... 30

§ 300.39(b)(4) ..................................................................... 34

§ 300.43(b) .......................................................................... 30

§ 300.304(b)(1) ................................................................... 39

§ 300.304(c)(4) .............................................................. 36, 50

§ 300.304(c)(6) .............................................................. 36, 50

§ 300.507–13 ....................................................................... 26

§ 300.514(b) ........................................................................ 27

§ 300.516 ............................................................................. 27

§ 300.516(a) ........................................................................ 26

N.Y. Comp. Codes R. & Regs. tit. 8

§ 200.4(b)(6)(vii) ............................................................ 36, 39

§ 200.4(b)(6)(viii) ...................................................... 36, 39, 40

§ 200.4(d)(2)(ix) ....................................................................30

§ 200.4(d)(2)(ix)(e) .............................................................43

§ 200.5(k)..............................................................................27

**Other Authorities**

U.S. Dep't of Educ., Assistance to States for the Education
    of Children with Disabilities and Preschool Grants
    for Children with Disabilities; Final Rule,
    71 Fed. Reg. 46,540 (Aug. 14, 2006) ...................................29, 31, 38, 50

Letter from Melody Musgrove, Ed.D., Director, Office of
    Special Educ. Programs, U.S. Dep't of Educ., to
    Spitzer-Resnick et al. (June 22, 2012)..................................30, 31

**JURISDICTIONAL STATEMENT**

The underlying district court action was authorized by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), to review a final administrative decision of a New York State Review Officer ("SRO") regarding the provision of a free appropriate public education ("FAPE") to J.S., a student with a disability.  A22, A118.[1]  The basis of this Court's appellate jurisdiction is 28 U.S.C. § 1291, as the appeal is from a final order of the United States district court disposing of all parties' claims.

The appeal to this Court is timely.  The judgment appealed from was filed on March 19, 2015.  A133.  The Notice of Appeal was timely filed in the district court on April 12, 2015.  A134–35.

**ISSUES PRESENTED FOR REVIEW**

1.    Did the district court err in finding that the New York City Department of Education ("DOE") offered J.S. a FAPE where:  (a) the DOE failed to conduct a mandated triennial evaluation of J.S., including required vocational and transition assessments; (b) the DOE failed to determine with M.M. at J.S.'s Individualized Education Program ("IEP") meeting and to specify in J.S.'s IEP the mandated frequency, location, and duration of J.S.'s transition services, including the frequency and duration of his placement at a work site and the location of the

---

[1]  "A" references are to pages of the Joint Appendix.

work site; and (c) hearing testimony from J.S.'s proposed DOE placement school demonstrated that the IEP gave full discretion to the school to decide whether J.S. would be placed in a full-time or part-time vocational program?

2.     Did the SRO and the district court rely on prohibited retrospective evidence offered by the DOE to cure the deficiencies in J.S.'s IEP?

3.     Did the district court erroneously defer to and uphold the SRO's decision notwithstanding legal and factual errors committed by the SRO?

## STATEMENT OF THE CASE

This is an appeal from the Memorandum Decision and Order of the U.S. District Court for the Southern District of New York (Hon. George B. Daniels, U.S. District Judge) dated March 17, 2015 and entered March 18, 2015, and from the district court's Judgment dated and entered March 19, 2015 denying Plaintiff-Appellant M.M.'s motion for summary judgment and granting the DOE's cross-motion for summary judgment. A134–35.

The district court action was brought to seek review of a final New York State administrative decision on M.M.'s IDEA due process claim for the 2012–2013 school year. A22. M.M. initiated due process proceedings under the IDEA by filing a due process complaint with the DOE's Impartial Hearing Office on March 18, 2013. A616–20. The due process complaint alleged that the DOE failed to offer J.S. a FAPE for the 2012–2013 school year and requested payment

2

for J.S.'s tuition at the Cooke Center for Learning and Development ("Cooke Center"), a private school for students with disabilities, for that school year.  Id.

A hearing was conducted before Impartial Hearing Officer ("IHO") Mary Noe on May 16, 2013, June 6, 2013, and June 19, 2013.  A178.  On July 18, 2013 IHO Noe issued a decision denying M.M.'s tuition claim.  A178–88.  The IHO's decision rested solely on her assessment of equitable considerations.  A185–87.  The IHO did not assess whether the DOE offered J.S. a FAPE or whether the Cooke Center was an appropriate placement for J.S.  Id.

M.M. appealed the IHO's July 18, 2013 decision to the SRO.  A207–28.  By decision dated November 8, 2013, the SRO remanded the case to the IHO with instructions to assess whether the DOE offered J.S. a FAPE and, if necessary, whether the Cooke Center was an appropriate placement for J.S. and equitable considerations supported M.M.'s claim.  A154–55.

On December 20, 2013 IHO Noe issued a second decision that again denied M.M.'s tuition claim, this time on the ground that J.S.'s IEP was appropriate and that the DOE did not deny J.S. a FAPE.  A197–200.  The IHO did not determine whether the Cooke Center was an appropriate placement for J.S. or whether equitable considerations supported M.M.'s tuition claim.  Id.

3

M.M. appealed the IHO's December 20, 2013 decision to the SRO. A317–38. In a decision issued on or about March 18, 2014,[2] the SRO dismissed M.M.'s appeal, finding that the DOE offered J.S. a FAPE for the 2012–2013 school year. A156–77. Like the IHO, the SRO did not reach a determination as to whether the Cooke Center was an appropriate placement for J.S. or whether equitable considerations supported M.M.'s tuition claim. A177.

M.M. timely sought judicial review of the SRO's decisions by filing a Complaint in the United States Court for the Southern District of New York on March 6, 2014 and an Amended Complaint on May 14, 2014. A5–44. The DOE filed its Answer to the Amended Complaint on June 12, 2014. A45–63. The parties thereafter cross-moved for summary judgment. A67–70. The district court heard oral argument on the parties' motions on October 14, 2014. A71–117.

By Memorandum Decision and Order dated March 17, 2015, the district court granted the DOE's motion and denied M.M.'s motion. A118–32. Judgment for the DOE was entered on March 19, 2015. A133. The district court's Memorandum Decision and Order is available on Westlaw at 2015 WL 1267910.

By Notice of Appeal filed April 15, 2015, M.M. timely appealed to this Court from the district court's Memorandum Decision and Order and Judgment. A134.

---

[2] The SRO's decision was incorrectly dated March 18, 2013. As the district court noted, the correct decision date is March 18, 2014. A122.

4

# STATEMENT OF FACTS

**A.    J.S.'s Disability and Educational History**

J.S. is an individual with Autism.  A656.  He is currently 21 years old and was 18 years old at the start of the 2012–2013 school year – the school year at issue in this action.  A625.

J.S. began receiving special education services when he was in preschool. A656.  He first enrolled in the Cooke Center for the 2008–2009 school year, when he was age 14.  See A566, A610.  J.S. completed the twelfth grade at the Cooke Center Academy in June 2012 and attended the school's Skills and Knowledge for Independent Living & Learning ("SKILLs") Program, designed for students ages 18 through 21, for the 2012–2013 school year.  A465 (Tr. 162–63),[3] A566, A683, A760.

J.S.'s disability encompasses impairments in cognitive functioning, delays in receptive and expressive language skills, difficulties with social communication, and academic functioning significantly below age and grade level.  A583, A659–63, A656–58, A667–68, A700–08.  Notwithstanding these challenges, J.S. proved to be a hard-working student with a strong interest in academics who was capable

---

[3] The Appendix contains a condensed version of the hearing transcript, with two transcript pages appearing on each Appendix page.  For ease of reference, "Tr." cites to the relevant pages of the transcript are included in parentheses after the Appendix page citations.

of participating actively in the classroom environment when provided with appropriate support.  <u>See</u> A669–70, A684–99, A709, A711–47.

## B. <u>IEP Meeting for the 2012–2013 School Year</u>

On May 22, 2012, the DOE's Committee on Special Education ("CSE") convened a meeting to prepare an IEP for J.S. for the 2012–2013 school year.  A625, A636.  The individuals present at the IEP meeting were M.M., CSE psychologist and district representative Aminah Lucio, CSE special education teacher Evelyn Alvarez, and Cooke Center representative Sally Ord.  A583–84, A639, A679, A754.  Cooke Center English Language Arts teacher Beth Sullivan participated by telephone.  <u>Id.</u>

In developing the IEP, the CSE representatives relied on the following documents:  (1) a psychoeducational evaluation of J.S. reflecting the results of testing conducted on March 19, 2009 and June 2, 2009, privately obtained by M.M. from the Kennedy Child Study Center; (2) a March 2012 Cooke Center progress report; and (3) a transition document prepared by the Cooke Center.  A754; <u>see</u> A640–66.  The DOE did not conduct a vocational assessment of J.S. prior to the IEP meeting, A167, and there is no evidence that the DOE conducted a triennial evaluation of J.S. within the three years preceding the meeting, <u>see</u> A421–22 (Tr. 83–85), A426–27 (Tr. 93–96), A433–34 (Tr. 108–09).

At the time of the IEP meeting J.S. was completing the twelfth grade at the Cooke Center Academy.  <u>See</u> A683.  Cooke Center representative Sally Ord

expressed concern to the CSE that going forward J.S. needed a program that offered an appropriate balance between academic instruction – taught in the classroom and reinforced in a community setting – and vocational training.  A485 (Tr. 203), A584–85, A678.  Ms. Ord expressed concern that J.S. would not receive the appropriate balance in a standard DOE District 75 program[4] and asked for the IEP to address J.S.'s individual needs in this regard.  A585, A678, A682.  M.M., in turn, informed the CSE that her primary concern for J.S. was his academic development, which was critical to his ability to become independent and find a job.  A586, A611.

Following the May 22, 2012 meeting, the CSE produced an IEP recommending J.S. for twelve-month placement in a 12:1:1 special class in District 75 with related services of speech-language therapy and counseling.  A633.

The IEP mandated that J.S. participate in "a work study program to develop job work skills," A635, but did not specify what type of work J.S. would engage in, where J.S.'s work study program would take place, or what the frequency and duration of his work placement would be, see A633–35.

The IEP stated that J.S. should receive instruction and practice in "travel readiness skills," but did not mandate a frequency or duration for travel training.

---

[4] District 75 is a part of the DOE that "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled."  NYC Dep't of Educ., About D75, at http://schools.nyc.gov/Academics/SpecialEducation/D75/AboutD75/default.htm.

A635.  The IEP noted J.S.'s need for community-based instruction but did not specify the frequency or duration of the time he would spend in the community. A634–35.  All periods of instruction listed in the IEP were designated to take place in the special education classroom or a related service provider's location.  A633.

The IEP omitted a statement of J.S.'s transition needs – his needs, focusing on his "courses of study," related to "transition from school to post-school activities," A627, and did not identify the party or parties responsible for providing J.S. with transition services, A168, A634–35.

The IEP included post-secondary goals for J.S. that were not discussed with M.M. or the Cooke Center representatives during the IEP meeting.  See A585–86, A627, A681.  The post-secondary goals indicated that J.S. – a student with a reported IQ score of 60, in the extremely low rage, A657 – should seek to "gain a qualification as a teacher's assistant," and that a "two-year community college" was a possible post-secondary educational option for him.  A627.  The CSE's meeting minutes made no reference to these goals or where they came from.  A585–86.

## C.  <u>Recommended Public School Placement for the 2012–2013 School Year</u>

By notice dated June 15, 2012, the DOE informed M.M. that J.S.'s recommended school placement for the 2012–2013 school year was P721X @ Stephen D. McSweeney School ("McSweeney"), located at 2697 Westchester Avenue, Bronx, New York 10461.  A710.

8

M.M. visited McSweeney on June 20, 2012, accompanied by Cooke Center Academy Assistant Head of School Francis Tabone.  A587–88, A611.  They met with McSweeney's parent coordinator, who provided them with information about the school.  A588; see A611.  The parent coordinator stated that due to J.S.'s age, he would be placed at a work site for the full school day and would receive only limited academic instruction.  A588, A611; see also A496 (Tr. 225), A502 (Tr. 236–37).  M.M. concluded that this type of placement would not be appropriate for J.S.  A611.

## D.    Reenrollment in the Cooke Center

On June 22, 2012 and August 22, 2012, counsel for M.M. sent letters to the DOE objecting to the May 22, 2012 IEP and recommended placement at McSweeney as inappropriate to address J.S.'s needs.  A545–49.[5]  The letters informed the DOE of the inappropriateness of its proposal to place J.S. in a program focusing primarily on job placements and noted J.S.'s need for a "balanced program of academics, transition services, and vocational training."  A545, A548.

The letters provided notice that absent an offer of FAPE, M.M. would reenroll J.S. in the Cooke Center for the twelve-month 2012–2013 school year and seek

---

[5] The first letter is dated June 21, 2012 but was faxed on June 22, 2012.  A545–46.

payment of J.S.'s tuition from the DOE.  Id.  The DOE did not respond to either letter.  A34 (¶ 82), A55 (¶ 82).

M.M. reenrolled J.S. in the Cooke Center for the twelve-month 2012–2013 school year, signing enrollment contracts with the school on June 25, 2012 for the summer and academic terms.  A550–53.  The contracts allowed M.M. to withdraw J.S. from the Cooke Center without financial penalty if the DOE offered him an appropriate placement by July 30, 2012 for the summer, or October 31, 2012 for the academic term.  A551, A553.

E.      **J.S.'s 2012–2013 Educational Program at the Cooke Center**

J.S. attended the Cooke Center's summer program from July 2, 2012 to August 8, 2012.  A573.  The summer program was designed to help J.S. maintain skills he learned during the previous academic term.  A573.  J.S. received instruction in literacy, math, social studies, and science in a class with twelve students and two instructors – a certified special education teacher and an assistant teacher.  A443–44 (Tr. 118–20), A448–49 (Tr. 128–30), A573–74, A768.  He received speech-language therapy once per week and counseling twice per week, both in a group of three, as well as push-in support from counselors and speech-language therapists during a daily advisory period.  A574–75.

During the summer session, J.S. participated in an internship once per week in a group with three other students, supervised by a job coach.  A445 (Tr. 122–

10

23), A575.  Based on interests J.S. expressed during a vocational survey administered by the Cooke Center at the beginning of the summer program, he was placed at Stuyvesant Park doing outdoor maintenance work.  A445–46 (Tr. 122–25), A575–76.  J.S. worked at the park for approximately one hour per week, completing tasks such as weeding, raking, and general park maintenance.  A445–46 (Tr. 123–24).  The Cooke Center provided J.S. with travel training on subway trips to and from the internship.  A445–47 (Tr. 123–24).  J.S. also received travel training in connection with community trips conducted each Friday during the summer program.  A574.

During the September 2012 to June 2013 academic term, J.S. was enrolled in the Cooke Center's SKILLs Program, designed for students ages 18 through 21.  A566, A760.  J.S.'s weekly schedule included instruction in literacy, math, and current events; speech-language therapy; occupational therapy; counseling; an internship placement and internship forum; a vocational skills class; and regularly scheduled community trips.  A566–70.

J.S.'s literacy and math instruction was provided in a class of five to six students taught by a certified special education teacher.  A389–90 (Tr. 19–21), A558–60.  Due to the class's small size, the teacher was able to provide J.S. with one-to-one conferencing during each class period and to offer him immediate feedback on his learning.  A390–91 (Tr. 22–23), A561.

11

J.S.'s literacy instruction focused on engaging with contemporary literature and real-life texts; inferencing; annotating texts to ensure understanding; and creative and pragmatic writing, including editing for punctuation and grammar. A561–62. J.S.'s math instruction focused on money, including banking, financial planning, budgeting, and saving; estimation and mental math; kitchen measurement, grocery shopping, and cooking; and time management. A563.

J.S.'s literacy and math instruction included regularly scheduled trips into the community with the special education teacher to practice academic skills in a real-life setting. A563–64. These trips were supplemented by an additional three weekly community-based trips for offsite education, physical education, and student-planned leisure activities. A464 (Tr. 160–61), A569, A769.

J.S. received speech-language therapy, occupational therapy, and counseling three times per week each during the academic term. J.S.'s speech-language therapy was provided by a certified speech-language pathologist in a group of four to six students. A570. The sessions focused on receptive and expressive language skills, conversational skills, problem solving, and perspective-taking. A570. J.S. received occupational therapy in an Adaptive Skills class of four to five students taught by a certified occupational therapist; the class focused on skills related to transition, including daily living skills and effective utilization of community resources. A461 (Tr. 155), A570. J.S.'s three weekly counseling sessions were

12

provided by a school psychologist, with one session provided individually and two in a group. A459 (Tr. 150–51), A569. J.S.'s individual counseling focused on improving his social interactions and frustration tolerance. A569. The first group session, entitled Self-Determination, focused on independent decision-making and future planning; the second, entitled Men's Forum, focused on young adult issues specific to males. A569.

J.S.'s academic term internship took place twice per week for approximately two hours per session, for a total of four hours per week. A459–60 (Tr. 151–52). Based on his expressed interests in food service and in working with children, J.S. was assigned to a food preparation internship at the Cooke Center Grammar School. A460 (Tr. 153), A568. His internship responsibilities involved preparing snacks for the grammar school students – including cleaning, cutting up, and apportioning the food – delivering the food to students in their classrooms, and cleaning up the kitchen. A568. J.S. was supported in this internship by a Cooke Center inclusion assistant, who worked with J.S. in a 2:1 ratio. A567–68. The inclusion assistant monitored J.S.'s safety precautions, supported him in appropriately interacting with the students, and assessed his progress using a weekly vocational skills scale. A568. J.S. received travel training from the inclusion assistant during subway trips to and from the internship. A567–69; see A460 (Tr. 152).

13

In addition to his internship placement, J.S. participated in a once weekly internship forum and a once weekly vocational skills class, both taught by a school counselor. A456 (Tr. 144), A565–67. The internship forum and vocational skills class each had five students. A566. The internship forum focused on a discussion of issues that arose in the students' workplaces and provided an opportunity for students to practice work-related conversational skills and group-based problem solving. A567. The vocational skills class focused on identifying vocational interests, exhibiting professional behavior and appropriate communication skills in the workplace, and understanding earnings documentation. A566–67.

During the 2012–2013 school year, J.S. made progress in literacy and math, and he improved his ability to function in the community, his ability to travel, and his job skills. A562, A564, A570–71, A712–47.

## F.   **The Impartial Hearing**

M.M., through counsel, filed a due process complaint on March 18, 2013. A616–20. The due process complaint alleged that the DOE denied J.S. a FAPE for the 2012–2013 school year and requested an order directing the DOE to issue direct payment for J.S.'s tuition at the Cooke Center for the twelve-month 2012–2013 school year. A620.

A hearing was conducted before IHO Noe at which both the DOE and M.M. were represented by legal counsel. A178, A181. Pursuant to the IHO's order,

14

direct testimony was presented by affidavit, and the parties' witnesses appeared live for cross-examination, either in person or telephonically.  A770–72.

The DOE presented the testimony of two witnesses:  CSE special education teacher Evelyn Alvarez and McSweeney IEP/Related Services Coordinator Susan Naclerio.  A179–80, A382–87, A406–34, A748–59.  M.M. testified on her own behalf and presented the testimony of five witnesses from the Cooke Center:  Sally Ord;  Francis Tabone;  SKILLS literacy and math teacher Katherine Hibbard;  SKILLS administrative coordinator Victoria Fowler; and Cooke Summer Academy Director Mary Clancy.  A179–80, A388–403, A441–504, A558–90, A610–13.

By Findings of Fact and Decision dated July 18, 2013, the IHO denied M.M.'s tuition claim.  A178–88.  The IHO did not assess whether the DOE offered J.S. a FAPE.  A187.  Rather, the IHO determined that M.M.'s tuition claim should be denied regardless of whether the DOE offered J.S. a FAPE because M.M. requested an evaluation from the Cooke Center to support J.S.'s Social Security Disability application and her efforts to secure guardianship of him, but did not inform the May 22, 2012 IEP team about that evaluation request.  A186–87.  As a result of M.M.'s request, a Cooke Center psychologist tested J.S. on October 19, 2011 using the Stanford-Binet Intelligence Scales, Fifth Edition and produced a report of the IQ testing results dated January 5, 2012; however, neither M.M. nor

15

Sally Ord had received the report at the time of the May 22, 2012 IEP meeting. A487–88 (Tr. 206–08), A502–04 (Tr. 237–40), A707–08.

The IHO concluded: "[T]he IEP team was at a disadvantage without this updated evaluation, and therefore could not recommend an appropriate program." A187. The IHO noted M.M.'s testimony that she did not receive the Stanford-Binet report until long after the IEP meeting, yet found that her failure to inform the IEP team about the evaluation equitably precluded her from prevailing in her tuition claim. A187.

## G.   First SRO Appeal

By Verified Petition dated August 19, 2013, M.M. appealed the IHO's decision to the SRO. A209–28. On appeal M.M. argued, *inter alia*, that reversal was warranted because the IHO failed to analyze M.M.'s tuition claim under the appropriate analytical framework mandated by School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985). A218–19. In its Verified Answer and Cross-Appeal, the DOE likewise argued that the IHO failed to comply with the Burlington analytical framework and committed "error as a matter of law." A288.

By decision dated November 8, 2013, the SRO sustained M.M.'s appeal in part, holding that the IHO erred by conducting an equitable analysis without first assessing whether the DOE offered J.S. a FAPE. A153–55. The SRO remanded the case to the IHO "for determinations regarding whether the district offered the

16

student a FAPE for the 2012-13 school year, and if necessary, the appropriateness of the parent's unilateral placement of the student at Cooke and whether equitable considerations weigh in favor of an award of tuition reimbursement." A154.

The SRO articulated a list of five FAPE-related issues to be addressed by the IHO on remand. A154–55. Those issues included "whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of FAPE" and "whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training." A154.

## H.    Remand to the IHO

The case was reassigned to IHO Noe on remand, and she issued a new Findings of Fact and Decision on December 20, 2013. See A192–203. The IHO again denied M.M.'s tuition claim, this time determining that the May 22, 2012 IEP was appropriate for J.S. and that the DOE did not deny J.S. a FAPE. A197–200.

With respect to the triennial evaluation/vocational assessment issue, the IHO offered a one-sentence conclusion: "I find that at the time of the IEP meeting the Psychoeducational Evaluation dated March 19, June 2, 2009 and the Stanford-Binet Intelligence Scales dated October 19, 2011 are within the statutory period." A197. The IHO did not explain how or why these assessments constituted a

17

triennial evaluation as defined by the IDEA. A197. The IHO did not acknowledge that both assessments were secured by the parent, instead finding that "[t]he district conducted" both assessments. A197. The IHO concluded that the Stanford-Binet report was available to the May 22, 2012 IEP team, even though both parties agreed that it was not and the IHO so found in her prior decision. Compare A195–97 with A186–87, A487–88 (Tr. 206–08), A502–04 (Tr. 237–40), A755. Despite the explicit directive of the SRO, the IHO did not make any findings regarding the presence or absence of a vocational assessment or what impact that had on the offer of FAPE to J.S. See A197.

With respect to the academic/vocational balance offered in J.S.'s IEP, the IHO concluded: "There is nothing in his IEP that would prevent him from being in a part time or full time vocational program." A198. "The program . . . was flexible to meet the specific needs of this particular student and balanced both an academic and vocation program." A199. The IHO based these findings primarily on the testimony of McSweeney IEP Coordinator Susan Naclerio regarding the programing options offered at that school. A198–99.

The IHO did not reach a determination regarding the appropriateness of J.S.'s placement at the Cooke Center or the equities of the case. A197–200.

18

## I.     Second SRO Appeal

By Verified Petition dated January 23, 2014, M.M. appealed IHO Noe's December 20, 2013 decision to the SRO.  A319–38.  In a decision issued on or about March 18, 2014,[6] the SRO dismissed M.M.'s appeal, upholding the IHO's determination that the DOE offered J.S. a FAPE.  A156–77.  As relevant to this appeal, the SRO's findings on the issue of FAPE were as follows:

The SRO held that the DOE was not required to conduct a triennial evaluation of J.S., concluding that "the student's most recent June 2009 evaluation remained timely and the district was not obligated to proceed with a triennial reevaluation" at the time of the May 22, 2012 IEP meeting.  A164.  The SRO further concluded that the CSE "had sufficient evaluative information to develop the May 2012 IEP," citing the June 2009 Kennedy Child Study Center evaluation, the March 2012 Cooke Center progress report, the Cooke Center transition report, and the participation of the individuals at the IEP meeting.  A165.

The SRO found it "undisputed that the May 2012 CSE did not conduct a vocational assessment prior to developing the transition plan in the May 2012 IEP," A167, but concluded that this was merely a "technical defect[]" that did not result in a denial of FAPE, A168.  The SRO likewise deemed a mere technical

---

[6] See supra note 2 (addressing the date of the SRO decision).

defect the CSE's failure to identify in the IEP the party or parties responsible for providing J.S. with transition services.  A168.

The SRO deemed it permissible that J.S.'s IEP "did not specifically break down how much time the student would receive academic instruction compared to how much time the student would receive vocational instruction" because "the parent would learn that information from the public school the student attended." A170.

The SRO then concluded that McSweeney "could have been [*sic*] implemented the academic and vocational components in the student's May 2012 IEP in such a way as to provide the student with an adequate balance of academic programs and vocational programs."  A171.   The SRO did not specify what this "way" was, instead noting the many different academic/vocational programming combinations McSweeney offered and citing the testimony of McSweeney IEP Coordinator Susan Naclerio that "nothing in the student's May 2012 IEP precluded his participation in either a part-time or a full-time vocational work placement." A171.

Having found that the DOE offered J.S. a FAPE, the SRO deemed it unnecessary to reach determinations regarding the appropriateness of J.S.'s placement at the Cooke Center and equitable considerations.  A177.

20

**J.**     <u>**Proceedings in the District Court**</u>

M.M. brought a civil action in the U.S. District Court for the Southern District of New York seeking reversal of the SRO's November 8, 2013 and March 18, 2014 decisions and the SRO's finding that the DOE offered J.S. a FAPE for the 2012–2013 school year.  A5–44.

The parties cross-moved for summary judgment, and the district court heard oral argument on October 14, 2014.  A67–71.  By Memorandum Decision and Order dated March 17, 2015, the district court granted the DOE's motion and denied M.M.'s motion.  A118–32.  The district court deemed the SRO's decision "well-reasoned" and entitled to deference.  A125.  As relevant to this appeal, the district court's findings on the issue of FAPE were as follows:

The district court held that "[t]he DOE did not conduct a triennial reevaluation of J.S. pursuant to the IDEA" in connection with J.S.'s May 2012 IEP meeting, instead relying on the 2009 Kennedy Child Study Center evaluation obtained by M.M.  A119.  However, the court found that this failure "did not render the IEP inappropriate," deferring to "the SRO's finding that the CSE had sufficient evaluative materials to conduct J.S.'s IEP."  A126.  The court further found that the lack of a reevaluation did not significantly impede M.M.'s opportunity to participate in the decision-making process regarding FAPE because she had "significant opportunities to participate" in the IEP meeting and in visiting

the DOE's recommended placement school, and the information the CSE did have was "sufficient" for her to "participate in the decision-making process for J.S.'s education needs." A127.

The district court also found no denial of FAPE with respect to the lack of a vocational assessment and the contents of the IEP transition plan. A128–30. The court concluded that "the IEP was not vague" with respect to J.S.'s transition plan because it "contained annual goals and services related to academics and post-secondary transition," M.M. "received notice from the DOE that the recommended placement school was McSweeney," and a McSweeney school counselor would have met with J.S. and his parents to determine how the goals in the IEP would have been implemented. A129–30.

The district court rejected M.M.'s objections "that she did not receive any notice from the DOE that J.S. would be attending a full-time day work program at the placement school until she visited the school" and that "the IEP failed to provide any information about how J.S.'s transitional and academic goals would be implemented," including the frequency, location, and duration of his work placement. A128–29. The court reasoned that there was "nothing in J.S.'s IEP to suggest that he would be placed in an all-day work site program." A130.

The district court rejected M.M.'s testimony about her visit to McSweeney in June 2012, when she was told that the school would place J.S. at a full-time

work site, deeming it "not sufficient evidence to conclude that the student's goals and needs would not be met." A130. The court did not acknowledge the testimony of McSweeney IEP Coordinator Susan Naclerio that J.S.'s IEP permitted placement in a full-time vocational program and that J.S. could have been placed in such a program at the school. See A128–30, A385 (Tr. 11), A386 (Tr. 14).

Without addressing the specifics of Ms. Naclerio's testimony, the court broadly endorsed the SRO's reliance on it to find that the DOE offered J.S. a FAPE. A130. According to the district court, Ms. Naclerio's testimony was permissible and not retrospective because she "testified as to how the school would implement the IEP" and "did not seek to implement a different IEP or to remedy a defective IEP." A130.

Because the district court upheld the SRO's determination that J.S. was offered a FAPE, the court did not reach a determination as to whether the Cooke Center was an appropriate placement for J.S. or whether equitable considerations supported M.M.'s tuition claim. A132.

The district court entered judgment for the DOE on March 19, 2015. A133. This appeal followed. A134–35.

## SUMMARY OF ARGUMENT

This Court should vacate the district court's grant of summary judgment to the DOE, find that the DOE denied J.S. a FAPE for the 2012–2013 school year,

23

and remand the case to the district court to reach a determination regarding the appropriateness of J.S.'s placement at the Cooke Center and equitable considerations.

The district court inappropriately deferred to the SRO's findings on the issue of FAPE, which were legally and factually erroneous. The DOE denied J.S. a FAPE by (1) failing to determine with M.M. at J.S.'s IEP meeting and to specify in J.S.'s IEP the mandated frequency, location, and duration of J.S.'s transition services; and (2) failing to conduct a mandated triennial evaluation of J.S., including required vocational and transition assessments. Cumulatively, the DOE's procedural violations impeded J.S.'s right to a FAPE, significantly impeded M.M.'s opportunity to participate in the decision-making process regarding the provision of FAPE, and deprived J.S. of educational benefits.

## STATUTORY FRAMEWORK

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To this end, the IDEA requires school districts to create for each student with a disability, and review no less than annually, an IEP that sets forth the special education, related and supplementary services, and program

24

modifications and supports that will be provided to the student. § 1414(d)(1)(A)(i)(IV), (d)(4)(A)(i).

The creation of an appropriate IEP is central to the provision of a FAPE under the IDEA. See 20 U.S.C. §§ 1401(9), 1414(d). The IEP must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). A school district that fails to prepare an IEP for a student with a disability or fails to prepare an IEP appropriate to address the student's individual needs has violated its fundamental obligations under the IDEA and denied the student a FAPE. 20 U.S.C. §§ 1401(9), 1414(d); Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 238–39 (2009).

The IDEA places a strong emphasis on parental participation in the IEP process. Schaffer v. Weast, 546 U.S. 49, 53 (2005). One of the central purposes of the IDEA is "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard." Rowley, 458 U.S. at 205–06 (citation omitted).

Parents are required members of the IEP team and "any group that makes decisions on the educational placement of their child." 20 U.S.C.

25

§§ 1414(d)(1)(B)(i), 1414(e).  Parental concerns must be considered in formulating the student's IEP.  § 1414(d)(3)(A)(ii).  Whenever the school district proposes or refuses to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child," it must provide prior written notice to the child's parents.  § 1415(b)(3).

If parents determine that the school district has denied their child a FAPE, they may secure an appropriate private school placement for the student and invoke the IDEA's due process procedures to seek payment of the tuition.  The school district may be required to pay for the private school placement upon findings that:  (1) the school district denied the student a FAPE ("Prong I"); (2) the private school placement was appropriate ("Prong II"); and (3) equitable considerations support the parents' claim ("Prong III").  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12, 16 (1993); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369, 374 (1985).

The parents' claim is initially litigated in a due process hearing.  34 C.F.R. §§ 300.507–13, 516(a).  New York State places the burden of proof in such hearings on school districts with respect to all issues other than the appropriateness of a private school placement selected by the parents.  N.Y. Educ. L. § 4404(1)(c).

In a due process hearing, a Hearing Officer may find a denial of FAPE on either substantive or procedural grounds.   20 U.S.C. § 1415(f)(3)(E)(i)–(ii).

26

Procedural inadequacies result in a denial of FAPE where they "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a deprivation of educational benefits." § 1415(f)(3)(E)(ii).

In two-tiered states such as New York, in which hearings are conducted at the school district level, the decisions reached in these hearings are subject to State-level appeals – in New York, appeals to the SRO. 34 C.F.R. § 300.514(b); N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(k).

Once these administrative remedies have been exhausted, either the parent or the school district may seek independent judicial review in the state or federal courts. 34 C.F.R. § 300.516. "[T]he district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" giving "due weight" to the administrative proceedings. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007). An administrative decision "must be 'reasoned and supported by the record'" in order to warrant deference. M.H. ex rel. P.H. v. New York City Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012) (quoting Gagliardo, 489 F.3d at 114).

## STANDARD OF REVIEW

This Court "review[s] *de novo* the district court's grant of summary judgment in an IDEA case." <u>A.C. ex rel. M.C. v. Bd. of Educ.</u>, 553 F.3d 165, 171 (2d Cir. 2009). "Whether the district court correctly applied the IDEA's statutory and regulatory provisions to the facts of a particular case is a mixed question of law and fact" which the Court "review[s] *de novo*." <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 191 (2d Cir. 2005).

## ARGUMENT

### POINT I

### THE DOE VIOLATED THE MANDATES OF THE IDEA AND DENIED J.S. A FAPE

In plain violation of the IDEA, the DOE failed to determine with M.M. at J.S.'s IEP meeting and to specify in his IEP the mandated frequency, location, and duration of his transition and vocational services. The DOE left it to J.S.'s assigned public school to fill in these missing components of his educational program, including the critical issue of what portion of J.S.'s educational program would be dedicated to placement at a work site. The DOE's failure to conduct a mandated triennial evaluation of J.S., including required vocational and transition assessments, paved the way for the creation of this vague and deficient IEP.

The DOE impeded J.S.'s right to a FAPE, significantly impeded M.M.'s opportunity to participate in the decision-making process regarding the provision

28

of FAPE, and deprived J.S. of educational benefits. The cumulative impact of the DOE's multiple procedural violations was the denial of FAPE for the 2012–2013 school year.

**A.**   **The DOE Failed to Determine with M.M. at J.S.'s IEP Meeting and to Specify in His IEP the Frequency, Duration, and Location of His Mandated Transition Services. The DOE Instead Impermissibly Left the Decision Regarding This Critical Component of J.S.'s Educational Program to His Assigned Public School.**

The IDEA requires that each IEP developed for a student with a disability include "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child" and "the anticipated frequency, location, and duration of those services." 20 U.S.C. § 1414(d)(1)(A)(i)(IV), (VII). As the U.S. Department of Education has explained:

> What is required is that the IEP include information about the amount of services that will be provided to the child, so that the level of the agency's commitment of resources will be clear to parents and other IEP Team members. The amount of time to be committed to each of the various services to be provided must be appropriate to the specific service, and clearly stated in the IEP in a manner that can be understood by all involved in the development and implementation of the IEP.

U.S. Dep't of Educ., Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities; Final Rule, 71 Fed. Reg. 46,540, 46,667 (Aug. 14, 2006).

"[B]eginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," the IEP also must include "the transition services

29

(including courses of study) needed to assist the child in reaching" appropriate post-secondary goals.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).[7]  The student's post-secondary goals must be specified in the IEP, must be measurable, and must be created based on "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills." § 1414(d)(1)(A)(i)(VIII)(aa).

Transition services "may be special education, if provided as specially designed instruction, or a related service, if required to assist a child with a disability to benefit from special education."  34 C.F.R. § 300.43(b).  The IDEA regulations explicitly define special education to include "[v]ocational education." § 300.39(a)(2)(iii).

"If an IEP team determines that work placement is an appropriate transition service for a child, it must be included in the child's IEP"; it then "becomes part of the student's educational program and part of the provision of FAPE to the student."  Letter from Melody Musgrove, Ed.D., Director, Office of Special Educ. Programs, U.S. Dep't of Educ., to Spitzer-Resnick et al., at 2 (June 22, 2012).[8]

---

[7] New York State law requires the inclusion of transition services no later than the first IEP to be effect when the student turns 15, rather than 16.  N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(d)(2)(ix).  This distinction is not relevant here, as J.S. was 18 years old at the start of the 2012–2013 school year.

[8] Dr. Musgrove's letter is available at http://www2.ed.gov/policy/speced/guid/idea/ memosdcltrs/062212workplacelre2q2012.pdf and appears in the Appendix at A339–43.  The letter represents an interpretation of the IDEA by the U.S.

The placement decision concerning the student's work site must be based on least restrictive environment principles and "made by the IEP team." Id. at 3. If the school district proposes or refuses "to initiate or change a work placement that is part of a child's transition services," it must "provide the parent with written notice." Id. at 2.

Whether designated as special education or related services, transition services are subject to the IDEA's "frequency, location, and duration" requirement, no less than any other services mandated for the student. The student's IEP team must reach a determination as to the appropriate frequency, location, and duration for each transition service and include that information in the student's IEP. See 20 U.S.C. § 1414(d)(1)(A)(i), (d)(1)(B)(i) (defining an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised" by the "IEP team," including the "parents of a child with a disability"); 71 Fed. Reg. at 46,579 ("*As with all special education and related services*, the student's IEP Team determines the transition services that are needed to provide FAPE to a child with a disability based on the needs of the child . . . ." (emphasis added)).

---

Department of Education's Office of Special Education Programs, the "principal agency" charged with responsibility for "administering and carrying out" the statute. 20 U.S.C. § 1402(a). The agency's interpretation "governs if it is a reasonable interpretation of the statute"; it need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009) (emphasis in original).

31

The DOE flouted that requirement here. The DOE treated J.S.'s transition services as exempt from the "frequency, location, and duration" requirement, neglected to discuss or decide with M.M. at J.S.'s IEP meeting the appropriate time allocation and location for J.S.'s individual transition services, and left it to J.S.'s assigned public school to decide what his transition program actually would be.

A comparison of the May 22, 2012 IEP's related service mandates and its "work study" designation amply illustrates this point. The IEP mandated two related services for J.S. – speech-language therapy and counseling. A633. For each service, the IEP specified a precise frequency and duration – 3 times per week for 45 minutes for speech-language therapy and 2 times per week for 45 minutes for counseling. A633. M.M. could know from the IEP that J.S.'s educational program would include 135 minutes per week of speech-language therapy and 90 minutes per week of counseling, and could hold J.S.'s assigned school responsible for providing precisely that amount of related services. See 20 U.S.C. § 1401(9) (requiring that "special education and related services" be "provided in conformity" with the IEP).

By contrast, the IEP mandated that J.S. participate in "a work study program" without offering any indication as to what the frequency, location, or duration of his work placement would be. A634–35. When asked if J.S.'s IEP specified the amount of time allocated to vocational training, CSE special education teacher Evelyn

32

Alvarez testified: "Absolutely not. No." A408–09 (Tr. 58–59). Despite the IDEA's mandate for an IEP to specify the frequency and duration of all mandated special education and related services, Ms. Alvarez testified, "I don't think an IEP can do that." A408 (Tr. 58).

This was not a mere defect in the written document, where all parties in fact knew what J.S.'s work placement and its frequency and duration would be. The IEP team made no determination on that critical issue; it was left entirely to the discretion of J.S.'s assigned public school. Ms. Alvarez's testimony made it clear that M.M. would not have knowledge of this information from the IEP or the discussions held during the IEP meeting. Ms. Alvarez testified: "The school the child was placed in would provide that information." A409 (Tr. 59). "[O]nce the child's at the school, you know, then the parent would know what's going on." A409 (Tr. 60) (emphasis added).

The testimony of McSweeney IEP Coordinator Susan Naclerio further illustrates the deficiently vague nature of J.S.'s IEP and the crucial lack of information it provided to M.M. about the nature of J.S.'s proposed educational program and services. Ms. Naclerio testified that the work placements offered through McSweeney could be "on-site" or "off-site" and could be "full time or part-time depending on the student's needs *and the IEP mandates*." A750 (emphasis added). However, Ms. Naclerio made it clear that J.S.'s IEP did not include any

33

mandates that limited the school's discretion in this regard. To the contrary, she testified that there was nothing in J.S.'s IEP that precluded his placement in either a full-time or part-time vocational program. A386 (Tr. 13–14).

Likewise, Ms. Naclerio's testimony demonstrated that there was nothing in the IEP that limited the school's discretion with respect to J.S.'s vocational course of study. She testified that McSweeney offered various different vocational programs, with courses of study ranging from culinary arts to industrial arts, retail training, and woodshop. A750–51. She stated, however, that because J.S. did not enroll at McSweeney "there is no way to determine which specific vocational opportunity he would have participated in." A750. As Ms. Naclerio's testimony reveals, J.S.'s IEP included no vocational course study designation. <u>Cf.</u> 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(bb) (requiring the IEP to designate the appropriate "courses of study" related to the student's transition services).

Ms. Naclerio's testimony about the IEP travel training mandate is similarly illuminating. The May 22, 2012 IEP stated that J.S. should receive instruction and practice in "travel readiness skills," i.e., travel training.[9] A635. As with J.S.'s work

---

[9] Travel training is a form of special education under the IDEA. 34 C.F.R. § 300.39(a)(2)(ii). It is defined as instruction provided "to children with significant cognitive disabilities, and any other children with disabilities who require this instruction, to enable them to – (i) Develop an awareness of the environment in which they live; and (ii) Learn the skills necessary to move effectively and safely from place to place within that environment (e.g., in school, in the home, at work, and in the community)." § 300.39(b)(4).

34

study mandate, the IEP did not mandate a frequency or duration for travel training. A633–35. This allowed Ms. Naclerio to claim that "McSweeney could have implemented the IEP in its entirety," A752, while simultaneously admitting that McSweeney had a waiting list for travel training, A751. The IEP did not mandate that J.S. receive travel training every week or even every month, nor did it specify the total number of hours of travel training J.S. would receive over the course of the school year. A633–35. As a result, Ms. Naclerio was able to allege full IEP compliance simply because the school's travel training waiting list did not extend beyond a full school year – i.e., because J.S. could have received travel training in any amount, starting at any point in the school year. A751–52.

**B. The DOE's Failure to Conduct a Mandated Triennial Evaluation of J.S., Including Required Vocational and Transition Assessments, Contributed to the Inadequacy of the IEP Transition Plan and Constituted an Independent Impediment to M.M.'s Participation in the Transition Planning Process and the Provision of FAPE to J.S.**

The DOE's failure to conduct a triennial evaluation of J.S., including mandated vocational and transition assessments, was a contributing factor to the inadequacy of the IEP's transition plan and further impeded M.M.'s participation in the educational planning process and the provision of FAPE to J.S.

After a child is initially evaluated and determined to be disabled, the school district must conduct a reevaluation "at least once every 3 years" absent parental agreement to the contrary. 20 U.S.C. § 1414(a)(2)(B)(ii). A reevaluation is not

35

simply a single assessment or test.  Rather, reevaluation is a process that must be "sufficiently comprehensive to identify all of the child's special education and related services needs."  34 C.F.R. § 300.304(c)(6).  Students must be "assessed in all areas related to the suspected disability."  § 300.304(c)(4).

Transition assessments must be conducted for students who have reached or are approaching transition planning age.  The IDEA requires "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" to support the creation of the student's post-secondary goals.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa).  New York State law identifies "vocational skills" as one area to be addressed, as appropriate, in reevaluations, N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(b)(6)(vii), and requires school districts to ensure that upon reaching age twelve, students with disabilities "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests," § 200.4(b)(6)(viii).

A school district is required to engage with a child's parents throughout the reevaluation process.  Districts are required to provide notice to parents prior to conducting any evaluation procedures.  20 U.S.C. § 1414(b)(1). Only after reviewing the student's existing evaluative data "and input from the child's parents" may a school district identify what additional data, if any, are needed as

36

part of the reevaluation.  § 1414(c)(1)(B).  If the district decides that no additional data is needed "to determine the child's educational needs," the district must "notify the child's parents of – (i) that determination and the reasons for the determination; and (ii) the right of such parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs."  § 1414(c)(4)(A).

The record demonstrates that the DOE did not conduct a triennial evaluation of J.S. within the three years preceding his May 22, 2012 IEP meeting.  The due process complaint alleged a violation of the IDEA's triennial evaluation mandate, and the DOE bore the burden of proving at the hearing that a timely triennial evaluation was conducted.  A617–18; N.Y. Educ. L. § 4404(1)(c).  The DOE produced no documentary evidence of a triennial evaluation having been completed, see A614–768 (DOE hearing exhibits), and CSE special education teacher Evelyn Alvarez testified that she did not know when J.S.'s last triennial evaluation was conducted, A421 (Tr. 83–84); see also A426–27 (Tr. 93–96), A433–34 (Tr. 108–09).

Ms. Alvarez and CSE psychologist Aminah Lucio relied on three documents in preparing J.S.'s IEP:  the 2009 Kennedy Child Study Center psychoeducational evaluation; J.S.'s March 2012 Cooke Center progress report; and a Cooke Center transition document.  A754; see A640–66.

None of these documents demonstrates the DOE's compliance with the triennial evaluation mandate. An evaluation "is a process during which assessments occur," including "not only the completion of diagnostic assessments, but also the review of existing data, and determinations of eligibility and educational needs on the basis of the results of assessments and other evaluation materials." T.P. v. Bryan County Sch. Dist., No. 14-11789, 2015 WL 4038715, at *5 n.13 (11th Cir. July 2, 2015) (citations omitted). An independent assessment obtained by a parent is "a potential source of additional information that the public agency and parent could consider in determining whether the educational or related services needs of the child warrant a reevaluation," but "would not be considered a reevaluation" in itself. 71 Fed. Reg. at 46,641.

In any event, the DOE did not conduct a vocational assessment or any other age-appropriate transition assessments for J.S. related to training or employment prior to the May 22, 2012 IEP meeting. It is undisputed that the DOE conducted no vocational assessment, even though J.S. had reached age twelve more than six years before the IEP meeting. A167, A362. In addition, the 2009 Kennedy Child Study Center evaluation – the only formal assessment relied on by the CSE – was conducted when J.S. had just reached age 15 and did not assess J.S. in these transition-related areas. A656–63.

The Cooke Center reports likewise did not satisfy the DOE's transition assessment obligations. The March 2012 report is a statement of J.S.'s progress in his classes at the Cooke Center, akin to a report card or a statement of progress toward annual goals such as would be required under an IEP. See A640–55; 20 U.S.C. § 1414(d)(1)(A)(i)(III) (requiring IEPs to address the issuance of "periodic reports on the progress the child is making toward meeting the annual goals"). The transition report, meanwhile, is a "discussion document" that Cooke Center representative Sally Ord prepared for use at J.S.'s IEP meeting, to guide her participation in the transition discussion. A482–83 (Tr. 196–98), A664–66.

The Cooke Center reports constitute the type of "school records and teacher assessments" that the DOE should have reviewed – in addition to "parent and student interviews" – as part of an initial vocational assessment. N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(b)(6)(viii). They do not satisfy the DOE's comprehensive transition assessment obligations under the IDEA and New York State law. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(b)(6)(vii)–(vii); see 34 C.F.R. § 300.304(b)(1) (requiring school districts to "[u]se a variety of assessment tools and strategies" when conducting evaluations).

Had the DOE undertaken the mandated triennial evaluation of J.S. in connection with the 2012–2013 school year, the evaluation would have been

required to include the vocational and transition assessments it neglected to conduct for J.S. during all of his prior transition planning years. The DOE would have been required to review J.S.'s existing evaluative data and seek input from M.M. about the nature and scope of the transition assessments that should be conducted to plan for J.S.'s education going forward. 20 U.S.C. § 1414(c)(1)(B). As a matter of New York State law, the required additional assessments minimally would have included a parent interview of M.M. and a student interview of J.S. to assess J.S.'s "vocational skills, aptitudes and interests." N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(b)(6)(viii). And even if the DOE determined – erroneously – that no additional assessments were needed as part of the reevaluation, it would have been required to inform M.M. of that determination, including "the reasons for the determination," and of her right to request additional assessments to determine J.S.'s educational needs. 20 U.S.C. § 1414(c)(4)(A).

All of these procedural safeguards, designed to ensure M.M.'s full participation in the educational planning process, were neglected by the DOE. One of the central purposes of the IDEA is "to ensure that the rights of children with disabilities *and parents of such children* are protected." 20 U.S.C. § 1400(d)(1)(B) (emphasis added). M.M.'s rights were not protected here.

Furthermore, the lack of comprehensive vocational and transition assessments impeded the creation of an appropriate IEP transition plan for J.S.

Sally Ord testified that transition was only "briefly discussed" during J.S.'s IEP meeting. A585. The IEP meeting minutes prepared by CSE special education teacher Evelyn Alvarez do not even mention transition, except to note Ms. Ord's expressed concern about J.S.'s need for an appropriately balanced academic and vocational program. A676–78. Ms. Ord's IEP meeting notes indicate that with respect to J.S.'s transition activities and needs, Ms. Alvarez simply "read through" the Cooke Center transition document. A681.

The Cooke Center transition document did not list post-secondary goals, and it is not clear how the CSE representatives created the post-secondary goals in J.S.'s IEP. See A586, A627, A664–66, A758. The first goal stated that J.S. should seek to "gain a qualification as a teacher's assistant" and that a "two-year community college" was a possible post-secondary educational option for him. A627. Yet the Kennedy Child Study Center evaluation relied on by the CSE reported that J.S. had an IQ score of 60, in the extremely low rage. A657. Ms. Ord testified that neither M.M. nor anyone from the Cooke Center stated at the IEP meeting that J.S. "should attend a two-year college or become a teacher's assistant" and that she believed those goals were inappropriate for J.S. A586.

The remaining two post-secondary goals in the IEP were vague and generic, stating: "After graduation from high school, [J.S.] will gain experience in a part-time job related to the career of his choice. . . . Within one year of graduating from high

school, [J.S.] will have accessed relevant services from the Developmental Disabilities Program and maintain contact with his case worker." A627. Stating that J.S. should seek part-time employment in an unspecified area and "relevant" disability services was hardly sufficient to guide his educational planning or determine what specific transition services he should receive.

Perhaps most importantly, the CSE's substitution of the Cooke Center reports for a comprehensive set of transition assessments contributed to its failure to create an IEP transition program for J.S. with sufficient specificity to guide implementation in a *DOE school*. As discussed above, the DOE mandated J.S. for placement in a "work study program" in connection with his District 75 placement but failed to decide with M.M. and to specify in J.S.'s IEP the nature, frequency, and duration of the work placement. Point I.A supra. The Cooke Center reports did not address these IEP programming elements – understandably, as the DOE was not recommending J.S.'s placement in the Cooke Center and the Cooke Center would not be responsible for writing or implementing J.S.'s IEP. A650–55, A664–66.

The CSE representatives were responsible for discussing these crucial programming elements during the IEP meeting and reducing them to concrete specifications in the IEP. Instead, CSE special education teacher Evelyn Alvarez "read through" the Cooke Center transition report and copied Cooke's list of suggested transition activities into the IEP. See A681; compare A664–66 with

A634–35.  Ms. Alvarez left blank the IEP's required designation of the parties responsible for providing J.S. with transition services, attributing that omission to the fact that "Sally [Ord] didn't provide it."  A415 (Tr. 71); see N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.4(d)(2)(ix)(e) (requiring the inclusion of this information in the IEP).  This explanation is entirely illusory, as the Cooke Center was not J.S.'s DOE-recommended placement and was not responsible for providing or arranging any transition services under the IEP.

Ms. Alvarez's testimony does, however, illustrate the DOE's deficient approach to creating J.S.'s IEP transition services plan.  The DOE took the information the Cooke Center provided not as a starting point for discussion, but as something to be mechanically copied into the IEP.  The DOE did not take responsibility for supplementing the information the Cooke Center provided with the additional information needed to create concrete transition service mandates for J.S. adapted to the requirements of the IDEA and to implementation in the recommended public school setting.

Had the DOE conducted comprehensive vocational and transition assessments for J.S., it would have had additional information and insight concerning J.S.'s skills and interests and his individual transition needs.  The absence of such assessments impeded J.S.'s right to a FAPE and contributed to the DOE's failure to create an appropriate transition plan for him.

**C.** **Cumulatively, the DOE's Procedural Violations Resulted in a Denial of FAPE to J.S.**

A procedural violation results in a denial of FAPE where it "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

When a school district has committed multiple procedural violations with respect to a student's educational planning, the cumulative effect of those violations must be considered in determining whether FAPE was denied. R.E. ex rel. J.E. v. New York City Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012) ("Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."); id. at 191 ("[E]ven minor violations may cumulatively result in a denial of a FAPE.").

Here, the DOE committed multiple procedural violations with respect to J.S.'s educational planning. The DOE failed to conduct a mandated triennial evaluation for J.S., including required vocational and transition assessments; failed to determine with M.M. at J.S.'s IEP meeting and to specify in his IEP the mandated frequency, location, and duration of his transition services; and overall failed to prepare an appropriate transition plan for J.S. in accordance with the mandates of the IDEA and New York State law. Point I.A–B supra.

For the reasons set forth above, the cumulative impact of the DOE's procedural violations was the denial of FAPE to J.S.  Cf. Jefferson County Bd. of Educ. v. Lolita S. ex rel. M.S., 977 F. Supp. 2d 1091, 1121 (N.D. Ala. 2013) ("If the IDEA requires IEPs to include 'appropriate measurable post-secondary goals based on an age appropriate transition assessment' and to describe 'transition services,' then the IEP needs to do so. . . . [T]he failure of the 2011–2012 IEP to include required *individualized* transition goals, transition assessments, and transition services means that the IEP did not comply with the IDEA." (emphasis in original)), aff'd, 581 F. App'x 760 (11th Cir. 2014); Gibson v. Forest Hills Sch. Dist., No. 1:11-cv-329, 2013 WL 2618588, at *19 n.6 (S.D. Ohio June 11, 2013) ("The Court finds that Forest Hills denied Chloe a FAPE by not performing the necessary age appropriate assessments to determine Chloe's postsecondary goals and interests and to target transition services to achieve those goals."); Carrie I. ex rel. Greg I. v. Dep't of Educ., 869 F. Supp. 2d 1225, 1247 (D. Haw. 2012) ("It is . . . undisputed that no assessments were conducted as required under 34 C.F.R. § 300.320(b)(1) in considering transition services.  The lack of assessments alone is enough to constitute a lost educational opportunity."); Dracut Sch. Comm. v. Bureau of Special Educ. Appeals, 737 F. Supp. 2d 35, 49–54 (D. Mass. 2010) (finding a denial of FAPE based on inadequate transition assessments, goals, and services).

45

## POINT II

**THE SRO IGNORED THE MANDATES OF THE IDEA IN FINDING THAT THE DOE OFFERED J.S. A FAPE. THE SRO'S DECISION IS NOT ENTITLED TO DEFERENCE, AND THE DISTRICT COURT'S DECISION TO UPHOLD IT MUST BE REVERSED.**

An SRO decision "must be 'reasoned and supported by the record' to warrant deference." M.H. ex rel. P.H. v. New York City Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 114 (2d Cir. 2007)). Here the SRO failed to apply the correct legal principles and produced a decision that was neither well-reasoned nor supported by the record. The district court erred in deferring to the SRO.

The SRO ignored the IDEA's "frequency, location, and duration" requirement in finding J.S.'s IEP transition program appropriate. The SRO made no finding that J.S.'s IEP mandated a specific time allocation for his work placement. See A170–71. To the contrary, the SRO deemed it permissible for the DOE not to designate in J.S.'s IEP the amount of time he would spend at a work placement because "the parent would learn that information from the public school the student attended." A170.

The district court, in turn, found that J.S.'s IEP transition plan "was not vague" because it "contained annual goals and services related to academics and post-secondary transition," M.M. "received notice from the DOE that the

46

recommended placement school was McSweeney," and a McSweeney school counselor would have met with J.S. and his parents to determine how the goals in the IEP would have been implemented. A129–30. The district court noted the IDEA's "frequency, location, and duration" requirement but offered no analysis as to how the IEP satisfied that requirement with respect to J.S.'s transition services. A129–30. Like the SRO, the district court relied on information to be provided by J.S.'s assigned public school to find the IEP appropriate.

This line of reasoning is contrary to law. The DOE is not permitted to prepare a vague IEP and let the student's assigned school fill in the missing details post-enrollment. "Educational plans for disabled students are the linchpin of the statute. Procedures were instituted so that IEPs could address the educational needs of children in precise detail." Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 (D. Vt. 1996). "[T]he IDEA does not authorize 'transitional' IEPs," i.e., IEPs that are "flexible and subject to change" after the student begins attending the assigned public school. Id.

Evaluated on its own terms, J.S.'s IEP was deficiently vague. The IEP gave M.M. no information about the amount of time J.S. would spend at a work placement, even though she expressed to the CSE that her primary concern was J.S.'s academic development. A586, A611, A633–35. The IEP left M.M. to be informed for the first time when she visited McSweeney that her son would be

47

placed at a full-day work site and receive only limited academic instruction.  A588, A611.  This is not what the IDEA envisioned.

The district court rejected M.M.'s testimony about her June 2012 visit to McSweeney, but in fact it was corroborated by the testimony of Francis Tabone and unrebutted by the DOE.  A130.  M.M. testified that the person she met with at McSweeney told her that "all training for students [J.S.'s] age is done at the work site."  A611.  Mr. Tabone, who accompanied M.M. on her visit to McSweeney, confirmed this report.  A588.  He testified that McSweeney's parent coordinator stated that students of J.S.'s age "are at the work site for the full school day" and "work most of each day," receiving "only brief academic instruction."  A588.

McSweeney IEP Coordinator Susan Naclerio, the only witness from the school who appeared at the hearing, testified that she did not meet with M.M. in June 2012 and did not know what M.M. was told during her visit.  A382 (Tr. 6).  In any event, Ms. Naclerio testified that there was nothing in J.S.'s IEP that prevented his assignment to either a full-day or part-day work placement, and the SRO cited that testimony in support of his decision.  A171, A386 (Tr. 13–14).  The district court's contrary conclusion that "[t]here is nothing in J.S.'s IEP to suggest that he would be placed in an all-day work site program" ignores both the record and the extent of the IEP's vagueness.  A130.

In order to remedy the deficiencies in the DOE's IEP, the SRO and the

district court relied on impermissible retrospective evidence. As this Court has held, "the IEP must be evaluated prospectively as of the time of its drafting"; "[a] school district cannot rehabilitate a deficient IEP after the fact" with testimony about services available at the student's assigned public school. <u>R.E. ex rel. J.E. v. New York City Dep't of Educ.</u>, 694 F.3d 167, 186 (2d Cir. 2012). School districts "must include all of the services they intend to provide in the written plan," <u>id.</u> at 188, so parents "have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision," <u>id.</u> at 186.

Ms. Naclerio attested to the IEP's vagueness by revealing the lack of constraints it placed on McSweeney with respect to implementing J.S.'s work study mandate. To that extent her testimony was permissible under <u>R.E.</u> – it spoke to what the IEP did and did not say. However, <u>R.E.</u> does not condone the SRO's reliance on Ms. Naclerio's further testimony describing the various vocational programming options offered at McSweeney to *excuse* the IEP's vagueness. A170–71. Nor does <u>R.E.</u> permit the district court's inference that the IEP was not vague because of additional information that McSweeney would have provided to J.S.'s parents. A129–30. The appropriate inquiry for the SRO and the district court was not whether McSweeney hypothetically could have crafted an appropriate transition program by filling in missing details from IEP's mandates. It was whether the IEP itself was adequate.

49

The SRO and district court analyses were likewise flawed with respect to the DOE's failure to conduct a triennial evaluation of J.S. The SRO found that the DOE was not required to conduct a triennial evaluation of J.S. in connection with the May 22, 2012 IEP meeting because J.S.'s 2009 Kennedy Child Study Center evaluation "remained timely" as of that date. A164. This finding was erroneous as a matter of law, violating both the principle that an independent evaluation obtained by a parent is not a triennial evaluation and the principle that reevaluation is a process, not a single report or assessment. Point I.B supra (citing 34 C.F.R. § 300.304(c)(4), (c)(6); 71 Fed. Reg. at 46,641; T.P. v. Bryan County Sch. Dist., No. 14-11789, 2015 WL 4038715, at *5 n.13 (11th Cir. July 2, 2015)).

In addition to being legally erroneous, the SRO's reasoning was illogical. Assuming, *arguendo*, that the 2009 Kennedy Child Study Center evaluation constituted a triennial evaluation under the IDEA, then the corresponding reevaluation had to be completed three years later. 20 U.S.C. § 1414(a)(2)(B)(ii) (requiring a reevaluation "at least once every 3 years"). The Kennedy evaluation was based on testing conducted on March 19 and June 2, 2009, rendering the reevaluation deadline no later than June 2, 2012 – 11 days after the May 22, 2012 IEP meeting and prior to the start of the 2012–2013 school year. A656; N.Y. Educ. L. § 2(15) (defining "school year" as beginning on July 1 and ending on June 30). Thus the DOE still would have been required to complete a triennial evaluation for

J.S. and revise J.S.'s IEP as appropriate to address the results of that reevaluation in connection with the school year at issue in this case. 20 U.S.C. § 1414(d)(4)(A)(ii)(II) (requiring the school district to revise a student's IEP "as appropriate to address . . . the results of any reevaluation").

Unlike the SRO, the district court correctly found that the DOE was required to conduct a triennial evaluation of J.S. in connection with the 2012–2013 school year. A119 ("The DOE did not conduct a triennial reevaluation of J.S. pursuant to the IDEA . . . ."); A126 (noting the lack of a triennial evaluation as required by the IDEA). The district court then proceeded to the analysis of whether this procedural violation resulted in a denial of FAPE. A126–30. The SRO did not conduct this analysis, having erroneously found no violation of the IDEA's triennial evaluation requirement. See A164–69. However, the district court deferred to the SRO's separate finding regarding the adequacy of the evaluative information before the CSE to conclude that the lack of a triennial evaluation "did not render the IEP inappropriate." A126.[10] The district court then independently concluded that the lack of a triennial evaluation did not significantly impede M.M.'s participation in the educational decision-making process. A127.

---

[10] In assessing the adequacy of the evaluative information before the CSE, the district court erroneously stated that M.M. "d[id] not argue that the lack of a vocational assessment resulted in insufficient information to develop J.S.'s IEP." A128. M.M. presented this argument in her principal and opposition-reply briefs before the district court. District Court Docket No. 19 at 18–20; District Court Docket No. 23 at 11–12.

The district court erred in concluding that the DOE's failure to conduct a triennial evaluation of J.S. was a harmless error. As set forth above, the lack of a triennial evaluation contributed to the deficiency of the IEP transition plan, impeding J.S.'s right to a FAPE and depriving him of educational benefits. Point I.B. supra. The SRO erred in concluding that the evaluative information before the CSE was sufficient, A165–69, and the district court erred in deferring to that determination to conclude that the lack of a triennial evaluation "did not render the IEP inappropriate," A126.

The district court also erred in its assessment of M.M.'s parental participation. The court concluded that the lack of a triennial evaluation did not significantly impede M.M.'s opportunity to participate in the decision-making process regarding FAPE because she had "significant opportunities to participate" in the IEP meeting and in visiting the DOE's recommended placement school. A127. This logic is fallacious.

Parents have a right to participate in both the triennial reevaluation process and their child's IEP meeting. 20 U.S.C. § 1414(b)(1), (c)(1)(B), (c)(4)(A), (d)(1)(B)(i), (d)(3)(A)(ii). One court has held that parents also have a "procedural right to evaluate the school assignment, *i.e.*, the right to acquire relevant and timely information as to the proposed school." C.U. ex rel. G.U. v. New York City Dep't

52

of Educ., 23 F. Supp. 3d 210, 227 (S.D.N.Y. 2014).[11]  The impact of a parent's

exclusion from one of these three phases of educational planning is not obviated by

her inclusion in the other two.  The IDEA's procedural safeguards "guarantee

parents . . . an opportunity for meaningful input into *all* decisions affecting their

child's education."  Honig v. Doe, 484 U.S. 305, 311 (1988) (emphasis added).

The district court reasoned that regardless of what additional information the

DOE would have obtained through a mandated triennial evaluation, the information

the DOE did have about J.S. was "sufficient" for M.M. to "participate in the

decision-making process for J.S.'s education needs."  A127.  This analysis ignores

the additional information the DOE would have obtained through the missing

vocational and transition assessments, the truncated transition discussion held during

J.S.'s IEP meeting, and the crucial deficiencies in the IEP transition plan.  See Point

I.A–B supra; see also Davis v. Wappingers Cent. Sch. Dist., 431 F. App'x 12, 15 (2d

Cir. 2011) (summary order) (noting that the failure "to consider timely evaluative

data" is a type of procedural violation "likely to deny the student educational

benefits and to impede the parents' participation in the IEP's development").

---

[11] As the C.U. decision notes, this right is distinct from the "right to participate in
school *selection*."  C.U., 23 F. Supp. 3d at 227 (emphasis in original).  The school
district "may select the specific school without the advice of the parents so long as
it conforms to the program offered in the IEP."  R.E. ex rel. J.E. v. New York City
Dep't of Educ., 694 F.3d 167, 191–92 (2d Cir. 2012).

## CONCLUSION

For the reasons set forth above, Plaintiff-Appellant M.M. requests that the Court reverse the judgment of the district court, find that the DOE failed to offer J.S. a FAPE for the 2012–2013 school year, and remand the case to the district court to determine whether the Cooke Center was an appropriate placement for J.S. and equitable considerations support M.M.'s tuition claim.

Dated: New York, New York
      July 16, 2015

                        Respectfully submitted,


                        _____/s_____
                        Erin McCormack-Herbert
                        *Attorney for Plaintiff-Appellant*
                        Partnership for Children's Rights
                        271 Madison Avenue, 17th Floor
                        New York, NY 10016
                        (212) 683-7999 ext. 229

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with Rule 32(a)(7) of the Federal Rules of Appellate Procedure. The brief is in 14-point Times New Roman, a proportional font. The brief contains 12,706 words counted by Microsoft Word, the system used for its preparation.

Dated: New York, New York
        July 16, 2015

                                    /s
                        Erin McCormack-Herbert
                        *Attorney for Plaintiff-Appellant*
                        Partnership for Children's Rights
                        271 Madison Avenue, 17th Floor
                        New York, NY 10016
                        (212) 683-7999 ext. 229