# 15-1200

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

───────── · · · ─────────

M.M., on behalf of and as Parent of J.S.,
a student with a disability,

*Plaintiff-Appellant*,

*v.*

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee*.

───────── · · · ─────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**JOINT APPENDIX**
**VOLUME II of IV**
**Pages A136 – A379**
**REDACTED**

---

ERIN MCCORMACK-HERBERT
THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
*Attorneys for Plaintiff-Appellant*
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 exts. 229, 246

MARTA SOJA ROSS
OFFICE OF THE CORPORATION COUNSEL
*Attorney for Defendant-Appellee*
100 Church Street, 6-204
New York, New York 10007
(212) 356-0857

## Table of Contents

## Volume I

District Court Docket Sheet ........................................................................ A1

Complaint, March 6, 2014 ......................................................................... A5

Amended Complaint, May 14, 2014 .......................................................... A22

Answer to the Amended Complaint, June 12, 2014 .................................... A45

So-Ordered Letter Motion Concerning the Administrative
    Record, Briefing Schedule, and Waiver of the Requirement
    for the Parties to Submit Statements of Material Facts
    Pursuant to Local Civil Rule 56.1, June 16, 2014 ............................ A64

Order to the Office of State Review Regarding the Certified
    Administrative Record, June 16, 2014 ............................................. A66

Plaintiff's Notice of Motion for Summary Judgment, August 12, 2014 ..... A67

Defendant's Notice of Cross-Motion for Summary Judgment,
    September 12, 2014 ........................................................................... A69

Redacted Transcript of Oral Argument, October 14, 2014 ........................ A71

Memorandum Decision and Order of Hon. George B. Daniels,
    March 17, 2015 ................................................................................. A118

Judgment, March 19, 2015 ......................................................................... A133

Notice of Appeal, April 15, 2015 ............................................................... A134

## Volume II

Office of State Review ("OSR") Certification and OSR Record Contents
for Appeal Nos. 13-157 and 14-018, dated July 21, 2014.................. A136

Impartial Hearing Office Certifications dated August 16, 2013,
August 27, 2013, and January 15, 2014 ............................................ A141

OSR Decisions:

Decision No. 13-157 of the State Review Officer dated
November 8, 2013 .................................................................... A144

Decision No. 14-018 of the State Review Officer dated
March 18, 2013[*] ....................................................................... A156

Impartial Hearing Officer ("IHO") Decisions:

Findings of Fact and Decision of IHO Mary Noe, Esq.
dated July 18, 2013.................................................................... A178

Findings of Fact and Decision of IHO Mary Noe, Esq.
dated December 20, 2013........................................................... A192

Pleadings and Memoranda of the Parties – OSR Appeal No. 13-157:

Notice of Intention to Seek Review and Affidavit of
Personal Service dated August 6, 2013.................................... A204

Notice with Petition dated August 20, 2013; Verified Petition
(Exhibits 1–9 attached) and Affidavit of Verification
dated August 19, 2013; Affidavit (translation) dated
August 20, 2013; Affidavit of Personal Service dated
August 21, 2013 ....................................................................... A207

---

[*] This decision was misdated by the OSR. The cover letter accompanying the decision was dated March 18, *2014*. Upon information and belief, this is the correct date of the decision.

Verified Answer and Cross-Appeal, Affidavit of Verification,
and Affidavit of Service dated September 17, 2013 ............... A274

Verified Reply and Answer to Cross-Appeal, Affidavit of
Verification, and Affidavit (translation) dated
October 4, 2013; Affidavit of Personal Service
dated October 7, 2013 ............................................................ A296

Pleadings and Memoranda of the Parties – OSR Appeal No. 14-018:

Notice of Intention to Seek Review and Affidavit of
Personal Service dated January 9, 2014 ................................... A314

Notice with Petition, Verified Petition (Exhibits 1–2 attached),
Affidavit of Verification, Affidavit (translation), and
Affidavit of Personal Service dated January 23, 2014 ............. A317

Verified Answer, Affidavit of Verification, and Affidavit of
Service dated February 7, 2014 ................................................ A352

Verified Reply to the Verified Answer, Affidavit of
Verification, and Affidavit (translation) dated
February 12, 2014; Affidavit of Personal Service
dated February 13, 2014 .......................................................... A373

## Volume III

Impartial Hearing Transcripts:

May 16, 2013 [Replacement] (Pages 1–111 + Word Index).............. A380

June 6, 2013 [Corrected] (Pages 112–254 + Word Index) ............... A440

June 19, 2013 (Pages 255–296 + Word Index) ................................. A517

## Volume IV

Impartial Hearing Exhibits:

Parent Exhibits A–G, I–S:

Parent's Evidence List ............................................................ A540

Exh. A, New York City Department of Education ("DOE")
    Due Process Response dated April 8, 2013 ................... A542

Exh. B, Letter from Charles Gussow to Gerard Donegan
    dated June 21, 2012, with fax confirmation
    dated June 22, 2012 ...................................................... A545

Exh. C, Letter from Todd Silverblatt to Gerard Donegan
    dated August 22, 2012, with fax confirmation
    dated August 22, 2012 .................................................. A547

Exh. D, Cooke Center Summer Academy, Summer 2012
    Enrollment Contract, signature date June 25, 2012 ....... A550

Exh. E, Cooke Center School Enrollment Contract 2012–13
    Academic Year, signature date June 25, 2012 .............. A552

Exh. F, 2012 Federal Income Tax Return, Form 1040 for
    J.S., Father of J.S. ......................................................... A554

Exh. G, 2012 Federal Income Tax Return, Form 1040 for
    M.M., Mother of J.S. ...................................................... A556

Exh. I, Affidavit of Katherine Hibbard dated May 10, 2013 ... A558

Exh. J, Affidavit of Victoria Fowler dated May 10, 2013 ...... A565

Exh. K, Affidavit of Mary Clancy dated May 10, 2013 ......... A572

Exh. L, Affidavit of M.M. (Spanish) dated May 10, 2013 ...... A577

iv

Exh. M, Affidavit of Sally Ord dated May 10, 2013 ............... A582

Exh. N, Affidavit of Francis Tabone dated May 10, 2013 ....... A587

Exh. O, Letter Brief from Amanda Sen to IHO Mary Noe
    dated April 29, 2013, with e-mail transmission
    dated April 29, 2013 ..................................................... A591

Exh. P, Parent's Motion in Opposition to IHO Mary Noe's
    Verbal Order on April 30, 2013 That the Hearing
    Office Not Translate Affidavits Submitted by
    Either Party in This Matter, dated April 30, 2013,
    with e-mail transmission dated April 30, 2013 .............. A596

Exh. Q, DOE Response to Parent's Motions, dated
    May 1, 2013, with associated e-mails ........................... A600

Exh. R, Parent's Opening Statement (undated), with
    e-mail transmission dated May 13, 2013 ...................... A605

Exh. S, English Translation of May 10, 2013
    Affidavit of M.M. ............................................................ A610

DOE Exhibits 1–22, 25–27:

    DOE Disclosure List ................................................... A614

Exh. 1, Parent's Due Process Complaint dated
    March 18, 2013 ............................................................ A616

Exh. 2, DOE Meeting Invitation Addressed to M.M.
    dated April 30, 2012 ..................................................... A621

Exh. 3, Individualized Education Program ("IEP")
    dated May 22, 2012 ...................................................... A625

Exh. 4, Cooke Center Academy Progress Report
for J.S. dated March 2012 ................................................ A640

Exh. 5, Kennedy Child Study Center Comprehensive
Psychoeducational Evaluation of J.S. dated
March 19, 2009 and June 2, 2009 ................................. A656

Exh. 6, IEP Transition Document prepared by S. Ord,
Cooke Center Academy, dated May 22, 2012 ............... A664

Exh. 7, Cooke Center Academy IEP Annual Review
Discussion Document – Speech & Language,
listing IEP review date May 22, 2012 .......................... A667

Exh. 8, Cooke Center Academy IEP Annual Review
Discussion Document – Academic (English
Language Arts & Social Studies), listing IEP
review date March 22, 2012 .......................................... A669

Exh. 9, Cooke Center Academy IEP Annual Review
Discussion Document – Academic (Math),
listing IEP review date May 22, 2012 .......................... A672

Exh. 10, Cooke Center Academy IEP Annual Review
Discussion Document – Counseling (undated) .............. A674

Exh. 11, May 22, 2012 IEP Meeting Minutes
prepared by Evelyn Alvarez, DOE .............................. A676

Exh. 12, May 22, 2012 IEP Annual Review Report
prepared by Sally Ord, Cooke Center Academy ........... A679

Exh. 13, Cooke Center Academy Progress Report
for J.S. dated June 2012 ................................................ A683

Exh. 14, Cooke Center Student Assessment Portfolio
for J.S. (undated) ........................................................... A700

Exh. 15, Cooke Center Academy Stanford-Binet
    Intelligence Scales, Fifth Edition Narrative
    Report for J.S. dated January 5, 2012 ........................... A707

Exh. 16, DOE Classroom Observation for J.S. dated
    October 27, 2010 ........................................................... A709

Exh. 17, DOE Final Notice of Recommendation:  Annual
    Review and Reevaluation dated June 15, 2012 ............. A710

Exh. 18, Cooke Center Academy Progress Report
    for J.S. dated November 2012........................................ A711

Exh. 19, Cooke Center Academy Progress Report
    for J.S. dated March 2013  ............................................ A727

Exh. 20, Cooke Center Summer Academy 2012
    Report for J.S. (undated)................................................ A744

Exh. 21, Affidavit of Susan Naclerio dated May 9, 2013........ A748

Exh. 22, Affidavit of Evelyn Alvarez dated May 9, 2013  ...... A753

Exh. 25, Cooke Center Academy SKILLs Program
    Description (undated)...................................................... A760

Exh. 26, DOE Opening Statement (undated)  ......................... A765

Exh. 27, Cooke Center Summer Academy 2012:
    Curriculum Outline (undated) ....................................... A768

IHO Exhibits I–II, IV:

    IHO Exhibit I, SKILLs Schedule 2012–2013 (undated).......... A769

    IHO Exhibit II, Pre-Hearing Order dated April 24, 2013 ........ A770

    IHO Exhibit IV, Order dated June 7, 2013 .............................. A773

vii



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643

## CERTIFICATION

**RE:** Index #14-CV-01542 (GBD)
**SED No.:** 13-157 and 14-018

M.M., on behalf of J.S.,
v.
New York City Department of Education

I, Wendy A. Merklen, Associate Attorney, am the custodian of the records of appeals to the New York State Review Officer. To the best of my knowledge, the enclosed materials are accurate and complete copies of the written records in SRO Appeal No. 13-157 and SRO Appeal No. 14-018 that were before the State Review Officer and were relied upon by him in making his decisions.

**Dated:** July 21, 2014

Wendy A. Merklen, Associate Attorney

**Sworn to before me this**

21st day of July, 2014 .

Cynthia J. DiVirgilio

CYNTHIA J. DIVIRGILIO
Notary Public, State of New York
Qualified in Albany County
No. 5034691
Commission Expires Oct. 17, 2014

ii

**A136**



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York   12205-2643

**Record reviewed and submitted by NYS Education Department,**
**Office of State Review (OSR) in Appeal No. 13-157**
**to**
**United States District Court**
**Southern District of New York**
July 21, 2014

**RE:**   Index #14-CV-01542 (Judge: George B. Daniels)
M.M., o/b/o and as parent of J.S. v. New York City Department of
Education

**OSR RECORD CONTENTS**

- Decision No. 13-157 of the State Review Officer.
- Impartial Hearing Officer's Decisions:
  - Findings of Fact and Decision of Impartial Hearing Officer Mary Noe, Esq., dated July 18, 2013.
- Pleadings and Memoranda of the Parties:
  - Notice of Intention to Seek Review and Affidavit of Personal Service;
  - Notice with Petition, Verified Petition (Exhibits 1-9 attached), Affidavit of Verification, Affidavit (translation), and Affidavit of Personal Service;
  - Verified Answer and Cross-Appeal, Affidavit of Verification, and Affidavit of Service;
  - Verified Reply and Answer to Cross-Appeal, Affidavit of Verification, Affidavit (translation), and Affidavit of Personal Service.
- Certification of Record dated August 16, 2013; Certification of Record dated August 27, 2013.
- Hearing Transcripts:
  - May 16, 2013 [Replacement] (Pages 1-111 + Word Index);
  - June 6, 2013 [Corrected] (Pages 112-254 + Word Index);
  - June 19, 2013 (Pages 255-296 + Word Index).[1]
- Electronic transcripts & exhibits (2 CDs).

---

[1] Due to the duplicative nature of the hearing transcripts in SRO Appeal No. 13-157 and SRO Appeal No. 14-018, only one copy of the hearing transcripts has been provided to the Court.



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York   12205-2643

- Exhibits:
    - o Exhibit List and Parent Exhibits A-G; I-S;
    - o Exhibit List and District Exhibits 1-22; 25-27;[2]
    - o Impartial Hearing Officer Exhibits I-II; IV.
- Correspondence:
    - o August 29, 2013 letter from Brian J. Reimels to the Office of State Review;
    - o August 29, 2013 letter from Brian J. Reimels to the Office of State Review stamped with "Application Granted" on August 29, 2013;
    - o September 17, 2013 letter from Brian Reimels to the Office of State Review;
    - o September 19, 2013 letter from Thomas Gray to the Office of State Review;
    - o September 19, 2013 letter from Thomas Gray to the Office of State Review stamped with "Application Granted" on September 20, 2013;
    - o November 8, 2013 letters from the Office of State Review to Thomas Gray, Brian J. Reimels, and Stacey Reeves; and
    - o November 13, 2013 letter from the Office of State Review to Mary Noe.

---

[2] Due to the duplicative nature of the Parent Exhibits and District Exhibits in SRO Appeal No. 13-157 and SRO Appeal No. 14-018, only one copy of the exhibits has been provided to the Court.

iv

**A138**



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York    12205-2643

**Record reviewed and submitted by NYS Education Department,
Office of State Review (OSR) in Appeal No. 14-018**
to
**United States District Court
Southern District of New York**
July 21, 2014

**RE:**    Index #14-CV-01542 (Judge: George B. Daniels)
M.M., o/b/o and as parent of J.S. v. New York City Department of
Education

**OSR RECORD CONTENTS**

- Decision No. 14-018 of the State Review Officer.
- Impartial Hearing Officer's Decisions:
  - Findings of Fact and Decision of Impartial Hearing Officer Mary Noe, Esq., dated December 20, 2013.
- Pleadings and Memoranda of the Parties:
  - Notice of Intention to Seek Review and Affidavit of Personal Service;
  - Notice with Petition, Verified Petition (Exhibits 1-2 attached), Affidavit of Verification, Affidavit (translation), and Affidavit of Personal Service;
  - Verified Answer, Affidavit of Verification, and Affidavit of Service;
  - Verified Reply to the Verified Answer, Affidavit of Verification, Affidavit (translation), and Affidavit of Personal Service.
- Certification of Record dated January 15, 2014.
- Hearing Transcripts:
  - May 16, 2013 [Replacement] (Pages 1-111 + Word Index);
  - June 6, 2013 [Corrected] (Pages 112-254 + Word Index);
  - June 19, 2013 (Pages 255-296 + Word Index).[1]
- Electronic transcripts & exhibits (1 CD).
- Exhibits:

---

[1] Due to the duplicative nature of the hearing transcripts in SRO Appeal No. 13-157 and SRO Appeal No. 14-018, only one copy of the hearing transcripts has been provided to the Court.



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York   12205-2643

- o Exhibit list and Parent Exhibits A-G; I-S;
- o Exhibit list and District Exhibits 1-22; 25-27;[2]
- o Impartial Hearing Officer Exhibits I-II.[3]
- Correspondence:
  - o January 30, 2014 letter from Brian J. Reimels to the Office of State Review;
  - o January 30, 2014 letter from Brian J. Reimels to the Office of State Review stamped with "Application Granted" on January 30, 2014;
  - o February 7, 2014 letter from Brian Reimels to the Office of State Review;
  - o March 18, 2014 letters from the Office of State Review to Thomas Gray, Brian J. Reimels, and Stacey Reeves; and
  - o March 20, 2014 letter from the Office of State Review to Mary Noe.

---

[2] Due to the duplicative nature of the Parent Exhibits and District Exhibits in SRO Appeal No. 13-157 and SRO Appeal No. 14-018, only one copy of the exhibits has been provided to the Court.

[3] Although not listed as Impartial Hearing Officer Exhibits in the decision dated December 20, 2013, the two exhibits identified herein as Impartial Hearing Officer Exhibits I-II were submitted as part of the hearing record in SRO Appeal No. 14-018, and therefore, are included as part of the administrative record. Impartial Hearing Officer Exhibits I-II are identical to those submitted as part of the hearing record in SRO Appeal No. 13-157.



**Department of
Education**

Dennis M. Walcott, Chancellor

**George Vasiliou**
Executive Director
Division of Finance



Stacey Reeves, Esq.
Chief Administrator
Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, NY 11201

**RECEIVED**

AUG 1 9 2013

OFFICE OF STATE REVIEW

**RECEIVED**

AUG 1 9 2013

OFFICE OF STATE REVIEW

**CERTIFICATION**

August 16, 2013

This is to certify that the following documents contained herein comprise the complete record of hearing submitted to the Impartial Hearing Office by the Impartial Hearing Officer in the matter of J███ S███, #143983.

- Pre-Hearing Order dated: 4/24/13
- Order dated: 6/7/13
- Transcript(s) for hearing date(s): 5/16/13, 6/6/13, 6/19/13.
- Final Decision dated: 7/18/13.
- Exhibits.

**Clarification:**

Parent Exhibits
Exhibit H is listed in the Final Decision; however, according to the 6/6/13 transcript (page 243 lines 16-18), it was not admitted into evidence.

DOE Exhibits
Exhibit 23 is listed in the Final Decision; however, according to the 6/6/13 transcript (page 249 lines 4-6), it was not admitted into evidence. Additionally, according to page 250 lines 3-5 of the same transcript, Exhibit 25 (not listed in the Final Decision) was admitted into evidence. Listed below are the correct label and number of pages.

DOE Exhibit 25 – Cooke Center Academy Skills Program Description, 5 pgs

IHO Exhibits
The IHO Exhibits were not submitted.

Additionally for your convenience a CD-ROM Disk containing the transcript(s), exhibits and word index are enclosed herein.

_____
Kimberly Johnson

_____
Impartial Hearing Office

**A141**

**Department of Education**
Dennis M. Walcott, Chancellor

**George Vasillou**
Executive Director
Division of Finance



Stacey Reeves, Esq.
Chief Administrator
Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, NY 11201

**RECEIVED**

AUG 2 8 2013

OFFICE OF STATE REVIEW

<u>**CERTIFICATION**</u>

August 27, 2013

This is to certify that the IHO Exhibits, DOE and Parent Closing Briefs in the matter of ▋ S▋ #143983 are contained herein. Additionally for your convenience an updated CD-ROM Disk containing the exhibits is also enclosed.

_____
Kimberly Johnson

Cheryl N. Williams, Esq.
Impartial Hearing Office

**A142**



**Department of
Education**
Carmen Fariña, Chancellor

**RECEIVED**

JAN 1 6 2014

OFFICE OF STATE REVIEW



Stacey Reeves, Esq.
Chief Administrator
Impartial Hearing Office
131 Livingston Street, Room 201
Brooklyn, NY 11201

## *CERTIFICATION*

January 15, 2014

This is to certify that the following documents contained herein comprise the complete record of hearing submitted to the Impartial Hearing Office by the Impartial Hearing Officer in the matter of J█ S█ #143983.

- **Pre-Hearing Office: 04/24/13**
- **Order date: 6/7/13**
- **Final Decision dated: 12/20/13**
- **Transcripts dated: 5/16/13; 6/6/13; 6/19/13**
- **Exhibits**

**Clarification:**

**Parent Exhibits:**
Exhibit B and Q. the number of pages listed in the Final Decision is not the same submitted into evidence. Listed below is the correct number of pages submitted by the Hearing Officer.

- Parent Exhibit B - 2 pages
- Parent Exhibit Q - 5 pages

**DOE Exhibits**
Exhibit 25, not listed in the Final Decision has been admitted into evidence according to the 6/6/13 Transcript, (page 249 lines 4-12). Listed is below are the correct number of pages.

- DOE Exhibit 25 – Cooke Center Academy Skills Program description, 5 pages

**Missing pages from DOE Exhibits**
- Exhibit 5 - June 2009 Psycho-Educational Evaluation, page 5-6

Additionally for your convenience a CD-ROM Disk containing the transcript(s), exhibits and word index are enclosed herein.

*Darlene David*

**Darlene David,
SED Liaison**

*Cheryl N. Williams, Esq.*

**Impartial Hearing Office**

**A143**

FILE COPY



# The University of the State of New York

### The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 13-157

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Partnership for Children's Rights, attorneys for petitioner, Thomas Gray, Esq., of counsel

Courtenaye Jackson-Chase, Special Assistant Corporation Counsel, attorneys for respondent, Brian J. Reimels, Esq., of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the parent) appeals from the decision of an impartial hearing officer (IHO) which denied her request to be reimbursed for the costs of the student's tuition at the Cooke Academy (Cooke) for the 2012-13 school year. Respondent (the district) cross-appeals from the IHO's failure to decide whether district offered the student a free appropriate public education (FAPE) for the 2012-13 school year. The appeal must be sustained in part. The cross-appeal must be sustained in part.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due

process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2],[c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision, and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

On May 22, 2012, the CSE convened to conduct the student's annual review and to develop his IEP for the 2012-13 school year (Dist. Ex. 3 at pp. 1, 12-13; see Dist. Ex. 11 at pp. 1-4). Finding that the student remained eligible for special education and related services as a student with autism, the May 2012 CSE recommended a 12-month school year program in a 12:1+1 special class placement in a specialized school, and the following related services: three 45-minute sessions per week of individual speech-language therapy, one 45-minute session per week of individual counseling, and one 45-minute session per week of counseling in a small

2

**A145**

group (id. at p. 9-10).[1] The May 2012 CSE also developed annual goals with corresponding short-term objectives and a transition plan (id. at pp. 3-11).

In a final notice of recommendation (FNR) dated June 15, 2012, the district summarized the recommendations made by the May 2012 CSE, and identified the public school site to which the district assigned the student to attend for the 2012-13 school year (see Dist. Ex. 17). The parent visited the assigned public school site on June 20, 2012, and by letter dated June 21, 2012, rejected it because—based upon her observations—the level of academic work fell below the student's current levels, the "chaotic and noisy" environment was not appropriate for the student's social/emotional needs, and the public school site focused on job placement (Parent Ex. B at p. 1). The parent also indicated that the student had not been evaluated since 2009, and thus, the May 2012 CSE did not have sufficient evaluative information to develop an appropriate IEP (id.). As a result, the parent notified the district that until the student was placed in an "appropriate classroom," she intended to reenroll the student at Cooke for the 2012-13 school year and to seek reimbursement for the costs of the student's tuition (id.).[2]

On June 25, 2012, the parent executed an enrollment contract with Cooke for the student's attendance during the 2012-13 school year (see Parent Exs. D at pp. 1-2; E at pp. 1-2).

By letter dated August 22, 2012, the parent informed the district that the 12:1+1 special class placement and related services recommended in the student's May 2012 IEP were not appropriate (see Parent Ex. C at p. 1). The parent also indicated that the May 2012 IEP did not address the student's academic management needs or social/emotional needs, and the May 2012 IEP did not assist the student in transitioning to independent living (id.). In addition, the parent reiterated her concerns about the assigned public school site, which had been set forth in her previous letter, dated June 21, 2012 (id. at pp. 1-2). The parent notified the district of her intentions to reenroll the student at Cooke for the 2012-13 school year and to seek direct payment of the costs of the student's tuition (id. at p. 2).

### A. Due Process Complaint Notice

In a due process complaint notice dated March 18, 2013, the parent alleged that the district failed to offer the student a FAPE for the 2012-13 school year (see Dist. Ex. 1 at p. 1). The parent asserted that the May 2012 CSE failed to conduct a triennial evaluation and a vocational assessment of the student; the May 2012 CSE did not change the student's IEP despite the parent's expressed concerns that the 12:1+1 special class placement was not appropriate; the May 2012 IEP did not provide an appropriate balance between academic instruction and vocational training; the May 2012 CSE did not adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development; and the May 2012 CSE did not consider or recommend transitional teacher support services or parent counseling and training (id. at pp. 2-3). The parent also asserted that the assigned public school site was not appropriate because it primarily functioned as a vocational training center and did

---

[1] The student's eligibility for special education programs and related services as a student with autism is not in dispute (see 34 CFR 200.8[c][1]; 8 NYCRR 200.1[zz][1]).

[2] The Commissioner of Education has not approved Cooke as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student has continuously attended Cooke since the 2008-09 school year (see Parent Ex. N at p. 2).

3

**A146**

not focus on academic instruction, the level of academic instruction was below the student's own instruction levels, the public school site did not provide the "personal training" required by the student's May 2012 IEP, the public school site could not effectively implement the student's May 2012 IEP, the vocational work site placements offered through the public school site were not individualized and could not assist the student in meeting annual goals on the May 2012 IEP; the public school site was too large, noisy and unstructured; and given the age range of students at the public school site, it was not appropriate because the student was "highly susceptible to peer influence" (id. at pp. 3-4).

The parent also asserted that Cooke was an appropriate placement for the student because it provided an appropriate "mix of academic instruction, workplace training, and personal skills training," as well as an "intensive travel training" program (Dist. Ex. 1 at p. 4). In addition, the parent noted that the student made progress at Cooke (id.). As relief, the parent requested direct payment of the costs of the student's tuition at Cooke for the 2012-13 school year (id. at pp. 4-5). The parent also requested an interpreter at "any proceedings" related to the due process complaint notice, as well as "translations of all future documents produced" by the district concerning the student (id. at p. 4).

### B. Prehearing Order and Impartial Hearing

On April 24, 2013, the IHO conducted a prehearing conference with the parties, which resulted in a written order (see Parent Ex. O at p. 1; see also IHO Ex. II at pp. 1-3). In relevant part, the IHO's order referred to State regulation allowing "direct testimony by affidavit in lieu of in-hearing testimony" so long as the "witness giving such testimony shall be made available for cross-examination" (IHO Ex. II p. 1). Accordingly, the IHO directed that "each party should present the direct testimony by affidavit and then call the witness . . . for cross-examination" (id.). The IHO's order allowed for the presentation of "[a]dditional direct examination that [was] not repetitive or irrelevant," and further indicated that both parties had the opportunity to submit a list of witnesses to the IHO who "need[ed] to testify at hearing, the sum and substance of their testimony and the necessity for their direct testimony to be verbal instead of by affidavit" (id.).

In an e-mail dated April 24, 2013, the parent's attorney acknowledged receipt of the IHO's prehearing order, and asked the IHO for direction concerning the "procedures for translating the affidavits of both parties prior to the hearing," noting that the parent's due process complaint notice included a request for an interpreter (Pet. Ex. 8 at p. 1). The parent's attorney also expressed concern about the additional time needed to translate the affidavits (see id.).

In a letter dated April 29, 2013, the parent's attorney objected to and sought clarification of portions of the IHO's prehearing order (see Parent Ex. O at pp. 1-5). In pertinent part, the parent's attorney asserted that the use of affidavits in lieu of direct testimony "may inhibit the ability" of the IHO to make credibility determinations, and therefore, it would be more appropriate to hear oral testimony at the impartial hearing (id. at p. 1).[3] In addition, the parent's attorney asserted that the use of affidavits would inhibit the parties' ability to "challenge lines of

---

[3] In a May 1, 2013 response, the district's attorney affirmatively did not oppose the parent's request for live testimony or the parent's request for translation of the affidavits (see Parent Ex. Q at p. 1). The district's response also noted concern about the parent's due process rights if the affidavits were not translated (id.).

4

**A147**

questions or testimony that may be irrelevant to the proceedings and which may be prejudicial to the parent" (id. at p. 2). The parent's attorney also expressed "[g]rave [c]oncerns" with respect to translating the parent's affidavit from her native language into English, and the consequences that an "[i]nadequate or [u]ntimely" translation of the parent's affidavit may have upon the parent's due process rights (id. at p. 3).

Although the IHO did not respond to the parent's April 24, 2013 e-mail, a district case manager responded via e-mail dated April 30, 2013, and offered to send the affidavits for translation if the parent's attorney sent the affidavits to her (Pet. Ex. 8 at p. 1). According to the hearing record, the IHO conducted a telephone conference on April 30, 2013, and denied the parent's request to order the district to translate the affidavits "for either party to or from" the parent's native language because it was the "responsibility of [p]arent's counsel to translate the affidavits" (see Parent Ex. P at pp. 1-2).[4] In an April 30, 2013 motion seeking to reverse the IHO's directive issued at the telephone conference, the parent argued that such a ruling placed an "undue and prejudicial burden" on the parent since it involved additional time and expense to translate the affidavits, and deprived the parent of due process rights (id. at p. 2). The parent indicated that as noted during the April 30, 2013 telephone conference, her own affidavit would be submitted in her native language (id.).

On May 16, 2013, the parties proceeded to an impartial hearing, which concluded on June 19, 2013 after three days of proceedings (Tr. pp. 1, 112, 255). An interpreter of the parent's native language appeared and provided services throughout the first two days of the impartial hearing (see Tr. pp. 1-254). On the second day of the impartial hearing (June 6, 2013), the parent's attorney requested that the interpreter translate the parent's affidavit prepared in her native language into English by reading it into the hearing record (see Tr. pp. 226-33). The district's attorney also indicated that she wanted the interpreter at the impartial hearing to "read [the parent's affidavit] into evidence" because a "co-worker" who read the English interpretation of the parent's affidavit "disagreed with some" of the interpretation (Tr. pp. 227-29, 231). The IHO did not allow the interpreter to read the parent's affidavit into the hearing record (Tr. pp. 227-30). The IHO explained that the impartial hearing office did not provide "official interpreters to provide services to [the attorney's] clients," and moreover, the hearing office could not be responsible for interpreting a document submitted by a party because it placed an undue burden upon the interpreter and the "[h]earing [o]ffice" to provide an accurate translation of that document (id.; Tr. p. 252). The interpreter also stated on the hearing record that she was "not supposed to do translation" (Tr. p. 232).

On June 7, 2013, the IHO issued an order in response to the parent's request for the interpreter at the impartial hearing to translate the parent's affidavit from her native language into English (see IHO Ex. IV; see also Tr. pp. 226-33). In the order, the IHO indicated that the "Impartial Hearing Office provide[d] interpreters for the purpose of translating testimony during the course of a hearing and not for the parties' preparation of the hearing" (IHO Ex. IV). In addition, the IHO noted that the parent's attorney "failed to appreciate the pre-hearing order" that allowed for the opportunity to verbally present testimony as opposed to the submission of an affidavit (see id.). Notwithstanding this determination, the IHO indicated that the impartial

---

[4] The hearing record does not contain a transcription or a written summary of the April 30, 2013 conference with the IHO.

hearing would continue on an additional date for the "purposes of the direct testimony of the parent" unless both parties stipulated to the translation of the parent's affidavit as it had been submitted into evidence (id.).

On June 19, 2013, the impartial hearing continued, but due to the delayed arrival of the interpreter, the parties dealt with evidentiary issues (Tr. pp. 255-67).[5]  Next, the IHO informed the parties that although a written decision in the case was imminently due, if the parties "want[ed] to have another hearing date, [they could] have another hearing date," and the IHO allowed the attorneys for both parties to further discuss the issue (Tr. pp. 267-69).  As a result, the attorneys for both parties acknowledged that the "Hearing Office" had translated the parent's affidavit from her native language, and the parent's translated affidavit was submitted into the hearing record as an exhibit (Tr. pp. 268-73).[6]  At that time, the parent's attorney made an application to "redo the cross-examination, because of the translation" (Tr. pp. 273-74).  The parent's attorney explained that after completing the second full day of the impartial hearing where six witnesses—including the parent herself—were cross-examined, the parent indicated that she "wasn't able to fully understand the question[s]" at times and that the "full hearing" had been a "problem" due to the interpretation services (Tr. pp. 274-80, 283-85, 291-92).[7]  However, the parent's attorney acknowledged that she had not yet reviewed the June 6, 2013 transcript with her client (Tr. p. 282).  The IHO then asked the parent's attorney to question the parent about her concerns with the translation during the June 6, 2013 hearing date (Tr. pp. 285-87).  Based upon the testimony, the IHO indicated that another hearing date was necessary to recall all of the witnesses who testified on June 6, 2013 (Tr. pp. 287-88).  However, the parent's attorney indicated that it would be "adequate . . . if the [p]arent had an opportunity to review a translated transcript" of the witnesses' testimony, and then to allow the parent to testify after completing that review (Tr. pp. 288-90).[8]  The parent's attorney also renewed her application to have all of the English language affidavits translated into the parent's native language, and the IHO indicated that she would ask the Hearing Office if it could provide this service (Tr. pp. 294-95).  Prior to concluding for the day, the IHO scheduled a hearing date for July 3, 2013 to address the concerns raised by the parent's attorney (Tr. p. 293).

In an e-mail dated July 2, 2013, the parent's attorney wrote to the IHO that upon the parent's review of the June 6, 2013 transcript with an individual within her office, the parent found no "clear errors in the translation that need to be corrected," and therefore, there was "no need for the hearing to continue [on July 3, 2013]" (Pet. Ex. 3 at pp. 1-2).  In addition, the

---

[5] Although unclear, it appears that the parties convened on June 19, 2013 to remediate the parent's direct testimony in light of the issues that arose at the June 6, 2013 hearing date (see Tr. pp. 279-80, 282-83).

[6] The parent's translated affidavit was marked and submitted into the hearing record as Parent Exhibit X (see Tr. p. 273).  However, the IHO did not list Parent Exhibit X in the list of documents entered into the hearing record, which she attached to the IHO Decision (see IHO Decision at pp. 12-13).  The parent included a copy of the parent's translated affidavit in the additional documentary evidence submitted with the petition (Pet. Ex. 4 at pp. 1-4).

[7] The parent's attorney also indicated that she had requested a translated copy of the transcript from the second impartial hearing date (Tr. p. 275).  The parent's attorney did not, however, request a translated copy of the transcript from the first impartial hearing date because "the translation was fine on the first day" (id.).

[8] The district's attorney acknowledged that the Hearing Office would translate the transcripts (Tr. pp. 291-93).

6

parent's attorney indicated that the parent considered the "hearing concluded" and rested her case (id. at pp. 1-3).

### C. Impartial Hearing Officer Decision

In a decision dated July 18, 2013, the IHO initially focused upon the evaluative information available to the May 2012 CSE in the development of the student's IEP (see IHO Decision at pp. 7-9). The IHO then described the concerns related to the interpretation services provided during the impartial hearing, and the scheduling of an additional hearing date to allow the parent the opportunity to "review" a translated transcript of the testimony and to "present translation problems with questions or answers" (id. at p. 9). The IHO also noted, however, that the parent's attorney "cancelled" the additional hearing date and rested her case (id.).

Next, the IHO determined that in light of the evidence presented, the parent's failure to notify the district that she had requested a private psychological evaluation of the student and to provide the district with the results of that evaluation precluded an award of tuition reimbursement based upon equitable considerations (see IHO Decision at pp. 8-9). The IHO also concluded that she need not "review the district's program . . . because the IEP team was at a disadvantage without this updated evaluation, and therefore, could not recommend an appropriate program" (id. at p. 9).[9]

### IV. Appeal for State-Level Review

The parent appeals, and asserts that the IHO's order requiring the presentation of direct testimony by affidavit violated the IDEA and State regulations, and compromised the parent's ability to communicate with her attorney and meaningfully participate in the impartial hearing. In addition, the parent asserts that the IHO's refusal to direct the translation of affidavits into the parent's native language further impeded the parent's participation at the impartial hearing. The parent also asserts that the IHO erred by not allowing the translated affidavits to be submitted into evidence until after the close of testimony. As a result, the IHO's "affidavit scheme" infringed upon the parent's ability to present her case in accord with due process, and required that the case be remanded for a new hearing and decision.

Next, the parent asserts that the IHO erred in not making any determinations regarding whether the district offered the student a FAPE for the 2012-13 school year and whether Cooke was an appropriate placement for the student. For these reasons, the parent also argues that the case must be remanded for a new hearing, or alternatively, that the hearing record supports a finding that the district failed to offer the student a FAPE for the 2012-13 school year and that Cooke was an appropriate placement.

Finally, the parent asserts that the IHO erred in finding that equitable considerations precluded an award of tuition reimbursement. The parent argues that she fully cooperated with the district in its efforts to provide the student with an appropriate program, and thus, equitable considerations weigh in favor of the requested relief. In addition, the parent asserts that she was

---

[9] In a letter dated July 24, 2013, the parent's attorney requested that the IHO issue a corrected decision to specifically include evidence omitted from the exhibit list and to ensure a complete and accurate hearing record in this case (Pet. Ex. 9 at pp. 1-2).

7

**A150**

entitled to direct payment of the student's tuition because the evidence revealed a lack of financial means to pay for the tuition at Cooke. As relief, the parent seeks to remand the case to a different IHO for a new impartial hearing, or in the alternative, for a determination on appeal that the district failed to offer the student a FAPE for the 2012-13 school year, that Cooke was an appropriate placement, and that equitable considerations weigh in favor of the requested relief.

In an answer, the district responds to the parent's allegations and argues that the petition should be dismissed in its entirety. The district argues that the State regulation supports the IHO's prehearing order to present direct testimony by affidavit, and as a reasonable directive, the parties were obligated to comply with the order. In addition, the district asserts that the IHO's prehearing order did not restrict the number of witnesses, the length of the affidavits, or the ability to cross-examine witnesses, and the parent's attorney had the opportunity to present live testimony, as set forth in the prehearing order. The district also refutes the parent's allegations concerning the translation of the affidavits into her native language, and argues that the parent abandoned this issue when she cancelled the additional hearing date scheduled to address these concerns. As such, the IHO's prehearing order did not affect the parent's ability to present her case, her ability to meaningfully participate at the impartial hearing, or deprive her of her due process rights, and the parent's request to remand the case to a new IHO must be dismissed.

The district also argues that the parent did not sustain her burden to establish that Cooke was an appropriate placement, and further, that the IHO properly concluded that equitable considerations precluded an award of tuition reimbursement.

Next, the district cross-appeals the IHO's failure to issue a determination regarding whether the district offered the student a FAPE for the 2012-13 school year. The district also cross-appeals to the extent that the IHO concluded that the May 2012 CSE could not recommend an appropriate program without the parent's private psychological evaluation report. With respect to the parent's contentions about the assigned public school site, the district asserts that the IHO properly declined to address them, as such contentions relate to the implementation of the student's May 2012 IEP and the student never attended the public school site. Alternatively, the district asserts that the evidence supports a finding that the district offered the student a FAPE, and moreover, that Cooke was not an appropriate placement.

In a reply, the parent asserts that she properly preserved issues on appeal related to the IHO's prehearing order affidavit requirement, the IHO's refusal to order translations of the affidavits, and the May 2012 CSE's failure to relay upon sufficient evaluative information to develop the student's May 2012 IEP. With respect to the district's cross-appeal, the parent admits that the IHO erred in failing to determine whether the district offered the student a FAPE for the 2012-13 school year, and rejects the district's assertions that the May 2012 CSE relied upon sufficient evaluative information, the May 2012 CSE developed an appropriate IEP, and that the allegations related to the assigned public school site were speculative.

## V. Discussion

### A. Conduct of Impartial Hearing

As correctly noted in the IHO's prehearing order, State regulation allows an IHO to "take direct testimony by affidavit in lieu of in-hearing testimony, provided that the witness giving

8

**A151**

such testimony shall be made available for cross-examination" (8 NYCRR 200.5[j][3][xii][f]; IHO Ex. II at p. 1). In this case, the IHO's prehearing order also allowed for the presentation of "[a]dditional direct examination that [was] not repetitive or irrelevant," and for both parties to submit a list of all witnesses to the IHO who needed to verbally testify at the impartial hearing, along with a summary of the expected testimony, and the necessity to present the testimony verbally (see id.). Initially, the parent objected to the use of affidavits for direct testimony because it would inhibit the IHO's ability to make credibility findings and prevent the parent from objecting to potentially irrelevant or prejudicial questions or testimony (see Parent Ex. O at p. 1-2). The parent also objected to the use of affidavits for direct testimony because an inadequate or untimely translation of the parent's affidavit could deprive the parent of her due process rights (id. at p. 3).

Contrary to the parent's argument, however, a review of the hearing record does not support a conclusion that the IHO's prehearing order directing the use of affidavits for direct testimony violated either the IDEA or State regulation, or otherwise compromised the parent's ability to communicate with her attorney or meaningfully participate in the impartial hearing. The IHO's prehearing order, while directing the use of affidavits, also allowed the parent to submit a request to testify verbally, and the parent did not avail herself of that opportunity (Tr. pp. 1-296; Dist. Exs. 1-22; 25-27; Parent Exs. A-G; I-R; IHO Exs. I-II; IV). In addition, the hearing record establishes that the IHO provided the parent with an opportunity for an additional day of impartial hearing (July 3, 2013), in order to give the parent additional time to review a translated transcript of the testimony given on June 6, 2013, to determine if more testimony was needed and to present that additional testimony (Tr. pp. 290-93). The hearing record shows that upon review of the translated transcript, the parent cancelled the additional day of impartial hearing and rested her case (Pet. Ex. 3 at p. 1). Based on the above, the evidence establishes that the IHO's prehearing order requiring the presentation of direct testimony by affidavit was within the sound discretion of the IHO, and did not violate the parent's due process rights. Contrary to the parent's assertion, if anything, the IHO's order providing for testimony by affidavit, in addition to live direct testimony if needed, only served to enhance the parent's opportunity to thoughtfully prepare testimony by affidavit outside the confines of an in person hearing as well as to review the district's direct testimony by affidavit more carefully than would be possible with live testimony only.

With respect to the parent's assertion that the IHO's refusal during the impartial hearing to direct the translation of affidavits into the parent's native language further impeded her participation at the impartial hearing, State regulation requires that at all stages of an impartial hearing a district shall provide an interpreter fluent in a parent's native language at district expense, when required (8 NYCRR 200.5[j][3][vi]; see IHO Ex. IV; see also Tr. pp. 226-33). A review of the hearing record reveals that immediately after the IHO issued the prehearing order, the parents' attorney asked about the "procedures for translating the affidavits of both parties prior to the hearing," and expressed concern about the additional time needed to translate the affidavits (Pet. Ex. 8 at p. 1). A district case manager responded to this inquiry, and agreed to provide translations of the affidavits if the parent sent the affidavits to her (Pet. Ex. 8 at p. 1). However, near the conclusion of the second day of the impartial hearing, the IHO did not allow the interpreter to translate or read the parent's affidavit—submitted in her native language—into the hearing record (Tr. pp. 227-30, 252). Notwithstanding this determination, the IHO issued an order scheduling an additional day of impartial hearing "for the purposes of the direct testimony of the parent" unless the parties stipulated to a translation of the parent's affidavit and its

9

**A152**

submission into evidence (IHO Ex. IV). Upon return to the impartial hearing, the parent's attorney raised issues with respect to the interpreter's translation of the testimonial evidence of all of the parent's witnesses that had been presented on the second day of the impartial hearing (Tr. pp. 273-80, 283-85, 291-92). After discussing these concerns, the parent's attorney also renewed her previous request to have all of the affidavits submitted in English translated into the parent's native language (Tr. pp. 294-95).

In this instance, a review of the hearing record demonstrates that all of the direct testimony affidavits and all of the transcripts produced as a result of the impartial hearing have been submitted in English (Dist. Exs. 21-22; Parent Exs. I-K; M-N; see Tr. pp. 1-296).[10] However, the parent does not cite to any case law or regulation requiring the district—at its own expense—to translate the direct testimony affidavits of the parent's own witnesses into the parent's native language, and I have found none (see Bethlehem Area School Dist. v. Zhou, 976 A.2d 1284, 1287 [Pa. Cmwlth. 2009] [overturning a state administrative due process decision requiring the translation of hearing transcripts into the parent's native language when such directive was upon the authority of a hearing policy manual that lacked the force of law]).[11] In addition, when given the opportunity to review the transcript from the second day of testimony when the parent's witnesses testified, the parent voluntarily cancelled the additional date and rested her case (Pet. Ex. 3 at p. 1). In view of what transpired, it cannot be said that the parent's ability to participate in the impartial hearing was impeded based upon the failure to provide her with translated affidavits of her own witnesses' direct testimony.

### B. Determination on the Merits

Both the parent and the district assert that the IHO erred in not making findings with respect to whether the district offered the student a FAPE and whether the student's unilateral placement at Cooke was appropriate prior to making a decision regarding whether equitable considerations weighed in favor of the parent's claim for tuition reimbursement. A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 111 [2d Cir. 2007]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

---

[10] The hearing record includes a copy of the parent's direct testimony affidavit submitted in her native language (Parent Ex. L at pp. 1-5).

[11] State regulations expressly provide that the prior written notice and procedural safeguards notice be translated into the parent's native language (8 NYCRR 200.5[a][4], [f][3]). State law applicable to court proceedings, but not clearly applicable to administrative proceedings, indicates that affidavits must be filed in English, but that affidavits may be filed in another language provided they are "accompanied by an English translation and an affidavit by the translator stating his qualifications and that the translation is accurate" (CPLR § 2101[b]).

10

**A153**

As noted above, parents may qualify for tuition reimbursement if the district fails to offer the student a FAPE, and the private educational services obtained by the parents were appropriate to meet the student's needs (Carter, 510 U.S. at 12-13; Burlington, 471 U.S. at 370). "Once this two prong test is satisfied, 'equitable considerations are relevant in fashioning [the appropriate] relief'" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533-34 [N.D.N.Y. 2001], quoting Burlington, 471 U.S. at 374; Carter, 510 U.S. at 16). Thus, the equitable considerations analysis relates only to the fashioning of relief, i.e., the reduction or limitation of the tuition award (see 20 U.S.C. § 1412[a][10][C][iii]), once it has been determined that the parents qualify for an award of tuition reimbursement under the Burlington/Carter analysis (see Gadsby v. Grasmick, 109 F.3d 940, 955 [4th Cir. 1997] [finding that an appropriate level of relief is considered "once it is determined that reimbursement costs should be awarded"]; see generally M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 67-68 [2d Cir. 2000]).

It is axiomatic that one must first find a harm before one can fashion a remedy. In the Burlington/Carter analysis, a court or administrative agency must first determine if the relief is warranted before it can determine how the relief should be fashioned to fit the circumstances of the case (see Wolfe, 167 F. Supp. 2d at 533-534; see also (Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 [3d Cir. 1994][recognizing that "the school district has the duty in the first instance to provide an appropriate IEP, and moreover, to demonstrate by a preponderance at a due process hearing that the IEP it offered was indeed appropriate"]; Application of a Child with a Disability, Appeal No.·03-003; Application of a Child with a Disability, Appeal No. 96-72). Because, in the instant case, the IHO failed to initially establish whether the district failed to offer the student a FAPE, it was not appropriate to proceed directly to the equitable considerations analysis, and under the circumstances of this case, it must be remanded for determinations on these issues.

## VII. Conclusion

Based on the above, the case must be remanded to an IHO for determinations regarding whether the district offered the student a FAPE for the 2012-13 school year, and if necessary, the appropriateness of the parent's unilateral placement of the student at Cooke and whether equitable considerations weigh in favor of an award of tuition reimbursement (J.F. v. New York City Dep't of Educ., 2012 WL 5984915, at *9 n4 [S.D.N.Y. 2012] [noting the authority to remand undecided matters to an IHO for a determination]). Upon reconvening, if new and relevant testimony is required as rebuttal as a result of continued concerns over the transcribed testimony or direct testimony by affidavit, the presiding IHO may, in his or her discretion, offer another opportunity to schedule additional impartial hearing dates to accommodate such rebuttal testimony. In addition, the presiding IHO's final decision with respect to whether the district offered the student a FAPE for the 2012-13 school year shall be limited to the following issues set forth in the due process complaint notice, unless otherwise agreed to by the parties: whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of a FAPE; whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not appropriate educational placement; whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training; whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational

11

training, and independent skills development; and whether the student was denied a FAPE because May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training.[12]

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**THE CROSS-APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**IT IS ORDERED** that the case is remanded to an IHO for determinations consistent with this decision; and,

**IT IS FURTHER ORDERED** that, if the IHO who initially presided over this case is either unavailable within the stated time frame, or is otherwise unable to render a written decision within the above time frame, the district shall remand the case to a new IHO to issue a decision consistent with this decision.

**Dated:**      **Albany, New York**
                **November   8  , 2013**

                                                    **JUSTYN P. BATES**
                                                    **STATE REVIEW OFFICER**

FILE COPY

---

[12] As the student did not attend the assigned public school site, the IHO's determination regarding whether the district offered the student a FAPE for the 2012-13 school year is limited to the issues identified above.

12

**A155**



# FILE COPY

## The University of the State of New York

### The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 14-018

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Partnership for Children's Rights, attorneys for petitioner, Thomas Gray, Esq., of counsel

Courtenaye Jackson-Chase, Special Assistant Corporation Counsel, attorneys for respondent, Brian J. Reimels, Esq., of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the parent) appeals from the decision of an impartial hearing officer (IHO) which denied her request to be reimbursed for the costs of the student's tuition at the Cooke Center for Learning and Development (Cooke) for the 2012-13 school year. The appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision, and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

On May 22, 2012, the CSE convened to conduct the student's annual review and to develop an IEP for the 2012-13 school year (Dist. Ex. 3 at pp. 1, 12-13; see Dist. Ex. 11 at pp. 1-4). Finding that the student remained eligible for special education and related services as a student with autism, the May 2012 CSE recommended a 12-month school year program in a 12:1+1 special class placement in a specialized school, and the following related services: three 45-minute sessions per week of individual speech-language therapy, one 45-minute session per

2

**A157**

week of individual counseling, and one 45-minute session per week of counseling in a small group (see Dist. Ex. 3 at pp. 9-10).[1] The May 2012 CSE also developed annual goals with corresponding short-term objectives and a transition plan (id. at pp. 3-11).

In a final notice of recommendation (FNR) dated June 15, 2012, the district summarized the special education and related service recommended in the May 2012 IEP, and identified the particular public school site to which the district assigned the student to attend for the 2012-13 school year (see Dist. Ex. 17). The parent visited the assigned public school site on June 20, 2012, and by letter dated June 21, 2012, rejected it because—based upon her observations—the level of academic work fell below the student's current levels, the "chaotic and noisy" environment was not appropriate for the student's social/emotional needs, and the public school site focused on job placement (Parent Ex. B at p. 1). The parent also indicated that the student had not been evaluated since 2009, and thus, the May 2012 CSE did not have sufficient evaluative information to develop an appropriate IEP (id.). As a result, the parent notified the district that until the student was placed in an "appropriate classroom," she intended to reenroll the student at Cooke for the 2012-13 school year and to seek reimbursement for the costs of the student's tuition (id.).[2]

On June 25, 2012, the parent executed an enrollment contract with Cooke for the student's attendance during the 2012-13 school year (see Parent Exs. D at pp. 1-2; E at pp. 1-2).

By letter dated August 22, 2012, the parent informed the district that the 12:1+1 special class placement and related services recommended in the student's May 2012 IEP were not appropriate (see Parent Ex. C at p. 1). The parent also indicated that the May 2012 IEP did not address the student's academic management needs or social/emotional needs, and the May 2012 IEP did not assist the student in transitioning to independent living (id.). In addition, the parent reiterated her concerns about the assigned public school site, which had been set forth in her previous letter, dated June 21, 2012 (compare Parent Ex. C at pp. 1-2, with Parent Ex. B at p. 1). The parent notified the district of her intentions to reenroll the student at Cooke for the 2012-13 school year and to seek direct payment of the costs of the student's tuition (see Parent Ex. C at p. 2).

In a due process complaint notice dated March 18, 2013, the parent alleged that the district failed to offer the student a FAPE for the 2012-13 school year based upon deficiencies in the May 2012 IEP and the parent's determination that the assigned public school site was not appropriate (see Dist. Ex. 1 at pp. 1-5). On May 16, 2013, the parties proceeded to an impartial hearing, which concluded on June 19, 2013 after three days of proceedings (see Tr. pp. 1, 112, 255). In a decision dated July 18, 2013, the IHO concluded that equitable considerations, alone, precluded an award of tuition reimbursement because the parent failed to notify the district that she had requested a private psychological evaluation of the student and the parent failed to

---

[1] The student's eligibility for special education programs and related services as a student with autism is not in dispute (see 34 CFR 200.8[c][1]; 8 NYCRR 200.1[zz][1]).

[2] The Commissioner of Education has not approved Cooke as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student has continuously attended Cooke since the 2008-09 school year (see Parent Ex. N at p. 2).

3

**A158**

provide the district with the results of that evaluation (see Application of a Student with a Disability, Appeal No. 13-157). The parent appealed the IHO's decision, and alleged, among other things, that the IHO erred in not making any determinations regarding whether the district offered the student a FAPE for the 2012-13 school year and whether Cooke was an appropriate unilateral placement (id.). The district asserted the same allegations in a cross-appeal of the IHO's decision (id.). After resolving issues not relevant to the present appeal, the matter was remanded to the same IHO due to the IHO's failure to initially determine whether the district failed to offer the student a FAPE before proceeding directly to the equitable considerations analysis and concluding that the parent was not entitled to an award of tuition reimbursement (id.).

The instructions upon remand were to render determinations regarding whether the district offered the student a FAPE for the 2012-13 school year, and if necessary, the appropriateness of the parent's unilateral placement of the student at Cooke and whether equitable considerations weigh in favor of an award of tuition reimbursement (Application of a Student with a Disability, Appeal No. 13-157). In addition, the IHO was directed to reach a final decision with respect to whether the district offered the student a FAPE for the 2012-13 school year based upon the following limited issues set forth in the due process complaint notice, unless otherwise agreed to by the parties: (1) whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of a FAPE; (2) whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not an appropriate educational placement; (3) whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training; (4) whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development; and (5) whether the student was denied a FAPE because the May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training (see id.). As the student did not attend the assigned public school site, the IHO's determination regarding whether the district offered the student a FAPE for the 2012-13 school year was also limited to the issues so identified (id.).

### A. Impartial Hearing Officer Decision upon Remand

In a decision dated December 20, 2013, the IHO addressed the five issues listed above, and determined that the district offered the student a FAPE for the 2012-13 school year, and accordingly, denied the parent's request for relief (see IHO Decision at pp. 3, 5-8).[3] Turning to the first issue regarding whether the district was required to conduct a triennial evaluation and/or a vocational assessment of the student, the IHO found that at the time of the May 2012 IEP meeting the student's most recent, privately obtained psychoeducational evaluation, dated March 19, 2009 and June 2, 2009 (June 2009 evaluation report), remained with the statutory period, and moreover, an administration of the Stanford-Binet Intelligence Scales, Fifth Edition (SB-5) to the

---

[3] Upon remand the parties were provided the option but waived any rights to additional hearing dates (see IHO Decision at p. 3).

4

student on October 19, 2011, also fell within the statutory period (id. at p. 5).[4] Therefore, the district was not obligated to conduct a triennial evaluation of the student (id.).

Regarding the second issue of whether the district failed to modify the May 2012 IEP in view of the parent's expressed concerns that the 12:1+1 special class placement was not appropriate, the IHO noted that the district addressed the parent's concerns it was aware of at the time of the May 2012 CSE meeting, and the May 2012 IEP reflected the parent's concerns (id. at p. 6). In addition, the IHO indicated that the May 2012 CSE meeting minutes revealed that the parent agreed with the annual goals in the May 2012 IEP (id.). The IHO also noted that during the impartial hearing the parent did not state that she told the May 2012 CSE that the 12:1+1 special class placement was "not an appropriate educational placement" for the student (id.).

Next, the IHO addressed the third issue: whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training (see IHO Decision at pp. 6-7). Based upon the evidence, the IHO found that "nothing" in the May 2012 IEP prevented the student from participating in either a part-time or full-time vocational program at the assigned public school (id. at p. 6). The IHO noted that students involved in a full-time vocational program continued to work on "literacy skills, reading skills, functional math skills, [and] employment skills" (id. at pp. 6-7). In addition, the "work site" afforded students with time during the day to work on "academics" and to "work in the community based program" (id. at p. 7). The IHO further noted that the district special education teacher who attended the May 2012 CSE meeting testified that the student would "benefit" from a "school that provided academic as well as vocational skills," and in the 12:1+1 special class, the student would receive both (id.). Given the availability of either a part-time or full-time vocational program, the IHO indicated that the "program was flexible" enough to "meet the specific needs of this particular student and balanced both an academic and vocation[al] program" (id.).

Regarding the fourth issue concerning whether the May 2012 IEP was not appropriate due to an alleged failure to adequately integrate the student's related services with his academic instruction, the IHO concluded that the parent did not raise any "challenge" at the impartial hearing with respect to whether the "district's school could not provide the student with related services" (IHO Decision at p. 7).

Finally, in response to the fifth issue regarding whether the district failed to offer the student a FAPE because the May 2012 CSE did not consider or the May 2012 IEP did not include transitional teacher support services or parent counseling and training, the IHO found that the "Cooke Report" provided the May 2012 CSE with information to develop the "transition component" of the May 2012 IEP (IHO Decision at p. 7). The IHO also noted that the recommendations in the May 2012 IEP for a 12-month school year program in a 12:1+1 special class placement in a specialized school, together with related services of counseling and speech-language therapy, and a flexible vocational program, accommodated the student's needs, including his academic needs (id. at pp. 7-8). Consequently, the IHO denied the parent's request for tuition reimbursement (id. at p. 8).

---

[4] The parent privately obtained the June 2009 psychoeducational evaluation of the student (see Dist. Ex. 5 at p. 1).

5

## IV. Appeal for State-Level Review

The parent appeals, and asserts that the IHO erred in finding that the district offered the student a FAPE for the 2012-13 school year. The parent also appeals the IHO's failure to address whether Cooke was an appropriate unilateral placement for the student and whether equitable considerations weighed in favor of her request for relief. More specifically, the parent asserts that, contrary to the IHO's finding, the district did not have the results of the SB-5 (administered in October 2011) available for review at the May 2012 CSE meeting. The parent also argues that the IHO erred in finding that the 2009 evaluation of the student fell within the statutory time period, and thus, the district was not obligated to reevaluate the student. With regard to evaluations, the parent further asserts that the IHO erred by failing to address whether the district was required to conduct a vocational assessment of the student. Next, the parent argues that the IHO erred by failing to address whether the 12:1+1 special class placement was appropriate, and instead, only determined that the May 2012 CSE addressed the parent's concerns known at the time. In addition, the parent argues that the May 2012 IEP failed to specify the amount of academic and vocational instruction the student was to receive, and further, that the IHO erred in finding the May 2012 IEP was flexible and met the student's specific academic and vocational needs. The parent contends that the IHO failed to address whether the May 2012 IEP adequately integrated the student's related services with his academic instruction, vocational training and independent skills development. The parent also asserts that the IHO failed to adequately address whether the failure to recommend parent counseling and training, as well as transitional support services, resulted in a failure to offer the student a FAPE. Additionally, the parent contends that although the issues remanded to the IHO precluded those pertaining to the assigned public school site, the assigned public school site was not appropriate and the district failed to present evidence to establish that it could satisfy the requirements of the May 2012 IEP. Finally, the parent alleges that Cooke was an appropriate unilateral placement and equitable considerations weigh in favor of her request for direct reimbursement of the costs of the student's tuition at Cooke for the 2012-13 school year.

In an answer, the district responds to the parent's allegations, and argues to uphold the IHO's decision in its entirety. The district asserts that the May 2012 CSE had sufficient evaluative information—without relying upon results reports in the October 2011 SB-5—to develop an appropriate IEP, and the district was not required to conduct a triennial reevaluation of the student. In addition, the district admits that the May 2012 CSE did not conduct a vocational assessment, but under the circumstances, the failure to do so did not result in a failure to offer the student a FAPE. Next, the district asserts that the IHO properly noted that the May 2012 CSE addressed the parent's expressed concerns, and both the parent and the Cooke attendees had the opportunity to express their opinions at the meeting. With respect to whether the 12:1+1 special class placement was appropriate, the district contends the parent did not raise this as an issue in dispute in the due process complaint notice and thus, it may not now be considered on appeal. Alternatively, the district contends that the evidence in the hearing record supports a finding that the 12:1+1 special class placement was appropriate. Next, the district alleges that the evidence in the hearing record supports a finding that the student would receive an appropriate balance between academic instruction and vocational training pursuant to the May 2012 IEP. Regarding the alleged failure to adequately integrate the student's related services with his academic instruction, the district argues that the hearing record contains no evidence

6

**A161**

that the student required related services provided in this fashion and that none of the May 2012 CSE attendees voiced disagreement with the recommendation to provide related services in a separate location. Finally, with regard to the failure to include parent counseling and training, as well as transitional support services, in the May 2012 IEP, the district argues that as a procedural violation, the absence of parent counseling and training would not result in a determination that the district failed to offer the student a FAPE. Moreover, the hearing record did not contain sufficient evidence that the student required the provision of transitional support services, as the student's recommended placement was comparable in restrictiveness to the student's setting at Cooke. Finally, the district asserts that since the student did not attend the assigned public school site, the district was not obligated to establish its ability to implement the May 2012 IEP.

The district also asserts that the parent did not establish that Cooke was an appropriate unilateral placement, and equitable considerations did not weigh in favor of the parent's request for relief.

In a reply to the district's answer, the parent argues that she raised the issue regarding whether the 12:1+1 special class placement was appropriate for the student in the due process complaint notice. The parent also argues that the May 2012 IEP failed to properly integrate the student's related services with his academic instruction.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; R.E. v. New York City Dep't. of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if procedural

7

**A162**

violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245; A.H. v. Dep't of Educ., 394 Fed. App'x 718, 720, 2010 WL 3242234 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008], aff'd, 361 Fed. App'x 156, 2009 WL 3326627 [2d Cir. Oct. 16, 2009]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007], aff'd, 293 Fed. App'x 20, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; G.B. v. Tuxedo Union Free Sch. Dist., 751 F. Supp. 2d 552, 573-80 [S.D.N.Y. 2010], aff'd, 486 Fed. App'x 954, 2012 WL 4946429 [2d Cir. Oct. 18, 2012]; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. New York City Bd. of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [noting that a CSE must consider, among other things, the "results of the initial evaluation or most recent evaluation" of the student, as well as the "'academic, developmental, and functional needs'" of the student]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services

8

**A163**

(see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see also Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85; M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## VI. Discussion

### A. May 2012 IEP

#### 1. Evaluative Information

The parties dispute whether the district was required to conduct a triennial reevaluation of the student prior to the May 2012 CSE meeting and whether the district was required to conduct a vocational assessment of the student. An independent review of the hearing record supports the IHO's finding that the student's most recent June 2009 evaluation remained timely and the district was not obligated to proceed with a triennial reevaluation at that time. In addition, a review of the hearing record supports a conclusion that the district's failure to conduct a vocational assessment of the student did not result in a failure to offer the student a FAPE for the 2012-13 school year. Consequently, the parent's assertions related to these two issues must be dismissed.

Turning first to the issue regarding a triennial reevaluation of the student, a district must conduct an evaluation of a student where the educational or related services needs of a student warrant a reevaluation or if the student's parent or teacher requests a reevaluation (34 CFR 300.303[a][2]; 8 NYCRR 200.4[b][4]); however, a district need not conduct a reevaluation more

9

**A164**

frequently than once per year unless the parent and the district otherwise agree and at least once every three years unless the district and the parent agree in writing that such a reevaluation is unnecessary (8 NYCRR 200.4[b][4]; see 34 CFR 300.303[b][1]-[2]). In this case, the hearing record indicates that the June 2009 evaluation relied upon, in part, by the May 2012 CSE to develop the student's May 2012 IEP had been completed on June 2, 2009 after two days of testing (see Dist. Ex. 5 at p. 1). Therefore, based upon both federal and State regulations, the district's three-year timeframe within which to conduct the student's triennial reevaluation expired—at the earliest—on or about June 2, 2012 (see 8 NYCRR 200.4[b][4]; 34 CFR 300.303[b][1]-[2]). Therefore, contrary to the parent's contention, the district was not obligated to conduct a triennial reevaluation of the student prior to the May 22, 2012 CSE meeting.

Next, a review of the hearing record also supports the district's contention that the May 2012 CSE had sufficient evaluative information to develop the May 2012 IEP, including the development of the transition plan. According to the hearing record, the following individuals attended the May 2012 CSE meeting: a district special education teacher, a district school psychologist (who also served as district representative), the parent, a Cooke consulting teacher, and the student's then-current English language arts (ELA) teacher at Cooke (Cooke teacher) (via telephone) (compare Dist. Ex. 3 at p. 15, with Dist. Ex. 22 at pp. 1-2, and Parent Ex. M at pp. 1-3, and Parent Ex. S at p. 1).[5] To develop the student's May 2012 IEP, the May 2012 CSE reviewed a June 2009 evaluation report, a March 2012 Cooke progress report, and an "IEP Transition" report (transition report) prepared by Cooke (see Dist. Ex. 22 at p. 2; see also Dist. Exs. 4 at pp. 1-16; 5 at pp. 1-9; 6 at pp. 1-3; 12 at p. 1). In addition, the hearing record indicates that the May 2012 CSE considered input from the parent, the Cooke teacher, and the Cooke consulting teacher (see Tr. pp. 172-79; Dist. Exs. 7 at pp. 1-2; 8 at pp. 1-3; 9 at pp. 1-2; 10 at pp. 1-2; 11 at p. 4; 12 at pp. 1-5; Parent Ex. S at pp. 1-2). Together, the evaluative information provided the May 2012 CSE with a detailed description of the student's needs, as set forth in the present levels of performance and individual needs section of the May 2012 IEP (compare Dist. Ex. 3 at pp. 1-2, with Dist. Exs. 4-10).

As part of the parent's privately obtained June 2009 evaluation of the student, the evaluators administered several formal and informal assessments to measure the student's abilities in the areas of cognition, adaptive behavior, and academics (see Dist. Ex. 5 at p. 1).[6] The June 2009 evaluation report indicated that the student performed "well below grade level" and was described as "socially isolated" (id.). In addition, the evaluation noted a previous finding of "[m]oderate [m]ental [r]etardation," as well as being diagnosed as having autism (id.).

---

[5] Witnesses at the impartial hearing presented direct testimony through affidavits, but appeared live at the impartial hearing for the purposes of cross-examination and redirect testimony (see, e.g., Tr. pp. 54-109; Dist. Ex. 22 at pp. 1-7).

[6] A review of the October 2011 SB-5 narrative report of the student reveals information that was consistent with the June 2009 psychoeducational evaluation report reviewed by the May 2012 CSE (compare Dist. Ex. 15 at pp. 1-2, with Dist. Ex. 5 at pp. 1-9). The October 2011 SB-5 narrative report solely assessed the student's cognitive abilities using the SB-5 (see Dist. Ex. 15 at p. 1). The results of the SB-5 and the results of the WISC-IV (as reported in the June 2009 evaluation report) both indicated the student's overall cognitive abilities fell well below average when compared to his same age peers (see Dist. Exs. 5 at pp. 1-9; 15 at pp. 1-2).

10

**A165**

Behaviorally, the student presented as "variably related and socially awkward" with "poor social skills" (Dist. Ex. 5 at pp. 1-2). An administration of the Wechsler Intelligence Scale for Children—Fourth Edition (WISC-IV) to the student yielded the following standard scores: verbal comprehension, 63 (extremely low range); perceptual reasoning, 67 (extremely low range); working memory, 68 (extremely low range); processing speed, 75 (borderline range); and a full scale IQ of 60 (extremely low range) (id. at p. 2). The student demonstrated similarly developed verbal and nonverbal reasoning abilities (id. at p. 3). However, the student's overall cognitive abilities related to verbal and perceptual reasoning, as well as working memory and processing speed, all fell well below average when compared to the student's same age peers (id. at pp. 2-4).

The evaluators administered the Vineland Adaptive Behavior Scales—Second Edition (Vineland-II) with parent as informant to assess the student's adaptive behavior (see Dist. Ex. 5 at p. 4). The student's adaptive behavior composite score of 64 fell within the low range, indicating significantly below average skills in communication, daily living skills, and socialization (id. at pp. 4-5). Specifically, the student exhibited deficits in receptive, expressive, and written language (id. at p. 4). In addition, the student exhibited difficulties in the areas of self-care skills, as well as household and community tasks (id. at p. 5). Additionally, the student exhibited deficits in the areas of interpersonal relations, play and leisure time, and coping skills (id.). Results from the Child Behavior Checklist (CBCL), with the parent as informant, indicated that the student demonstrated difficulties with anxiety, depression, and withdrawal, as well as internalizing behaviors and externalizing behaviors when compared to his same age peers (id.). Additionally, the student's visual motor integration skills fell within the low average range when compared to his same age peers (id. at p. 7).

An administration of the Woodcock-Johnson III Tests of Achievement (WJ-III ACH) to the student yielded the following standard scores: broad reading, 76; broad math, 68; and broad written language, 88 (see Dist. Ex. 5 at p. 9). Based upon the results, the student demonstrated "limited" skills in math calculation, "limited to average" writing skills, and "very limited" sight word reading skills (id. at pp. 7-8).

The March 2012 Cooke progress report reviewed and relied upon by the March 2012 CSE in the development of the student's March 2012 IEP provided information about the student's academic and social/emotional functioning and related goals (see Dist. Ex. 4 at pp. 1-8, 11, 15-16). The progress report indicated the student received one 45-minute session per week of counseling in a group, one 45-minute session per week of individual counseling, and two 45-minute session per week of speech-language therapy in a group (id. at p. 1). In his ELA class, overall the student demonstrated understanding with support or partial understanding of concepts related to reading comprehension, editing, and communication through informal discussions and formal presentations (id. at p. 2). In "transition mathematics" class, the student worked on adaptive math skills by engaging in cooking activities that involved skills related to fractions, measurement, adding, subtracting, multiplying, and dividing (id. at p. 4). The progress report indicated the student shopped and cooked well with minimal support, and demonstrated emergent skills related to fractions (id.). With respect to social studies class, the student worked on geography and maps and would next work on identifying cause and effect of major European conflicts (id. at p. 6). In his "[i]nvestigations in [s]cience" class, the student distinguished

11

**A166**

between biotic and abiotic factors, used technology for research, performed experimentation and dissection, and applied the scientific method to various activities (id. at p. 7). With respect to his transition skills class, the student understood the role of guardianship in his life with support, and he reflected on his disability as it related to life decisions (id. at p. 11). The progress report also indicated that the student explored post-secondary options of day and work programs (id.). With respect to his internship, the student worked in a hospital in the radiology department where he was responsible for sorting and organizing inventory and filing supply requests (id. at p. 12). While at his internship, the student exhibited a positive attitude and maintained attention as well as worked on improving communication skills (id.). In language skills class, overall the student asked questions, followed multistep verbal and written directions, verbally interacted, and navigated the community with support (id. at pp. 15-16). With respect to ELA, mathematics, social studies, science, transitions, and language skills classes, the March 2012 Cooke progress report indicated that the student always worked collaboratively with peers, participated in class discussions and activities, completed work in a timely fashion, organized and managed class materials, and followed directions and rules (id. at pp. 3-4, 6, 8, 11, 16).

In addition, the May 2012 CSE reviewed a transition report prepared by Cooke staff (see Dist. Ex. 6 at pp. 1-2). The transition report included annual goals and short-term objectives related to transition, the student's transition needs, and a list of transition activities related to community services, related services, employment, and adaptive living skills (see id.).

Although it is undisputed that the May 2012 CSE did not conduct a vocational assessment prior to developing the transition plan in the May 2012 IEP, a review of the hearing record reveals that the May 2012 CSE reviewed adequate postsecondary and vocational related information about the student and developed a comprehensive transition plan in the May 2012 IEP ( Tr. pp. 69, 89, 91-92; Dist. Exs. 6 at p. 1-3).[7] As noted above, the Cooke transition report contained annual goals and short-term objectives related to transition, the student's transition needs, and a list of transition activities related to community services, related services, employment, and adaptive living skills (see Dist. Ex. 6 at pp. 1-2). The hearing record indicates that the May 2012 CSE discussed the student's post-secondary setting, types of transition

---

[7] Here, although the parent did not allege in the due process complaint notice any deficiencies with regard to the transition plan or services set forth in the May 2012 IEP, the parent did assert that the district "never had a vocational assessment or any other assessment designed to identify his needs with respect to training, education, employment, and independent living skills" (Dist. Ex. 1 at p. 3). The IDEA—to the extent appropriate for each individual student—requires that an IEP must focus on providing instruction and experiences that enables the student to prepare for later post-school activities, including postsecondary education, employment, and independent living (20 U.S.C. § 1401[34][A]; see Educ. Law § 4401[9]; 34 CFR 300.43; 8 NYCRR 200.1[fff]). Transition services must be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests" and must include "instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation" (20 U.S.C. § 1401[34][B]-[C]; 8 NYCRR 200.1[fff]). Accordingly, pursuant to federal law and State regulations, an IEP for a student who is at least 16 years of age (15 under State regulations) must include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills (20 U.S.C. § 1414[d][1][A][viii]; 34 CFR 300.320[b]; 8 NYCRR 200.4[d][2][ix]). It must also include the transition services needed to assist the student in reaching those goals (id.). As recently noted by one district court, "the failure to provide a transition plan is a procedural flaw" (M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6, *9 [S.D.N.Y. Mar. 21, 2013], citing Klein Indep. Sch. Dist. v. Hovem, 690 F.3d 390, 398 [5th Cir. 2012] and Bd. of Educ. v. Ross, 486 F.3d 267, 276 [7th Cir. 2007]).

12

activities, the student's transition needs, and the goals the student was currently working on in this area (see Tr. pp. 195-98; Dist. Ex. 6 at pp. 1-3). In addition, the May 2012 CSE developed the student's transition plan based upon the transition report and information obtained from Cooke staff attending the CSE meeting (see Tr. pp. 69-71, 89-92; Dist. Exs. 3 at pp. 3, 10-11; 12 at p. 3; 22 at p. 6; see also Dist. Ex. 6 at p. 1-3). The May 2012 CSE meeting minutes documented that, at that time, the student was exploring vocational interests and completing an internship at a radiology department (see Dist. Ex. 12 at p. 3).

The postsecondary transition plan included in the May 2012 IEP identified long-term adult outcomes and transitional services with respect to the student's instructional activities, community integration, post high school activities, and independent living (see Dist. Ex. 3 at pp. 10-11). Specifically, the transition plan indicated that the student would participate in person-centered planning, participate in a work-study program, and receive instruction in ADL skills and travel readiness skills within the community (id.). The transition plan also indicated that the student would participate in small group activities to develop person-centered planning and self-awareness related to work life, as well as to develop and practice social interactions with unfamiliar adults (id. at p. 11). Additionally, the transition plan provided that the student would practice money handling and budgeting, personal finance skills, and participate in small group vocational activities and a work-study program to develop job work skills (id.). The transition plan further reflected that the student would participate in community projects with sequences of life skills activities, including planning and budgeting a community activity (id.). The May 2012 IEP included measurable postsecondary goals related to education and training, employment, and independent living skills (id. at p. 3). Specifically, the May 2012 IEP indicated that the student would attend a two-year community college or vocational school, gain qualification as teacher assistant, and engage in a part-time job and access available career service agencies after graduation (id.). As a supplement to the transition plan, the May 2012 IEP also included annual goals related to transition (id. at pp. 3-4, 8-9). However, the transition plan did not indicate that the responsible party for implementation regarding transition services (see id. at pp. 10-11).

Based on the hearing record, while the district did not conduct a vocational assessment and the transition plan developed by the May 2012 CSE did not identify the party responsible for implementing transition services, such inadequacies, alone, constitute technical defects that do not render the transition plan or the May 2012 IEP, as a whole, inappropriate (M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6 [S.D.N.Y. Mar. 21, 2013] [observing that a deficient transition plan is a procedural flaw]; K.C. v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 822-26 [E.D. Pa. 2011]; see 20 U.S.C. § 1415[f][3][E][ii]; 34 CFR § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]).

Accordingly, the hearing record establishes that the evaluative information relied upon by the May 2012 CSE and the input from the CSE participants during the meeting provided the May 2012 CSE with sufficient information about the student's cognitive, academic, language, ADL skills, social functioning, and transition needs and his individual needs to enable the May 2012 CSE to develop his IEP (D.B. v. New York City Dep't of Educ., 2011 WL 4916435, at *8 [S.D.N.Y. Oct. 12, 2011]; Application of a Student with a Disability, Appeal No. 11-041; Application of a Student with a Disability, Appeal No. 10-100; Application of a Student with a

13

Disability, Appeal No. 08-015; Application of the Dep't of Educ., Appeal No. 07-098; Application of a Child with a Disability, Appeal No. 94-2).

### 2. 12:1+1 Special Class Placement

Next, the parent argues that the IHO erred by failing to address whether the 12:1+1 special class placement was appropriate, but also erred in finding the May 2012 IEP was flexible and met the student's specific academic and vocational needs. Upon review, and as more fully described below, the hearing record demonstrates that the May 2012 IEP accurately reflected the student's needs, the 12:1+1 special class placement was appropriate, and the May 2012 IEP adequately balanced the student's academic needs, as well as vocational needs.

State regulations provide that a 12:1+1 special class placement is designed for those students "whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students" (8 NYCRR 200.6[h][4][i]). Consistent with State regulation, the May 2012 CSE appropriately recommended a 12:1+1 special class placement to address the student's cognitive, academic, language, ADL skills, social functioning, and transition needs as described in the May 2012 IEP (see Dist. Ex. 1 at pp. 1-3, 10-12).

A review of the May 2012 CSE meeting minutes prepared separately by the district special education teacher and the Cooke consulting teacher indicated that the May 2012 CSE discussed the student's academic, social, and physical present levels of performance, as well as management needs (see Dist. Exs. 11 at pp. 1-4; 12 at pp. 1-5). The same CSE meeting minutes also noted discussions regarding the student's transition needs, as well as discussions related to the evaluative results (see id.). The May 2012 IEP present levels of academic, social, and physical performance and individual needs reflected information commensurate with the information presented to the May 2012 CSE about the student's abilities and needs (compare Dist. Ex. 3 at pp. 1-2; with Dist. Exs. 4-5). Specifically, the student performed well below average in the area of academics, language processing, and ADL skills when compared to his same age peers (compare Dist. Ex. 3 at p. 1; with Dist. Exs. 4-5).

In conjunction with the supports available in the 12:1+1 special class placement, as stated above, the May 2012 IEP recommended a number of modifications and strategies to further address the student's management needs within the 12:1+1 special class placement (see Dist. Ex. 3 at p. 2). In addition, the May 2012 IEP also included annual goals to address the student's identified needs in the areas of money concepts, banking, technology, reading, writing, social/emotional functioning, communication, vocational skills, ADL skills, and travel readiness (id. at pp. 3-9). The hearing record also demonstrates that the May 2012 CSE recommended related services to support the student in his 12:1+1 special class placement, which included speech-language therapy and counseling (id. at p. 9). In addition, the frequency and duration of the related services in the May 2012 IEP were consistent with the frequency and duration of related services the student received at Cooke during the previous school year (compare Dist. Ex. 3 at p. 9, with Dist. Ex. 4 at p. 1).

14

With respect to the parent's concern that the 12:1+1 special class placement could not provide the student with sufficient support, or the May 2012 CSE failed to address her concerns, a review of the hearing record reflects that the May 2012 CSE considered input from the parent and Cooke staff who attended the meeting (see Tr. pp. 61-62; Dist. Exs. 11 at p. 1-4; 12 at pp. 1-5). According to the May 2012 CSE meeting minutes, the parent and Cooke staff expressed their concerns regarding the 12:1+1 special class placement recommendation, noting in particular that the student required a "balance[d] program" and a "real supportive environment" (see Dist. Exs. 11 at p. 4; 12 at pp. 3-4). In addition, the May 2012 CSE meeting minutes indicated that the Cooke consulting teacher "requested a small learning environment" due to concerns that a "large setting" would cause the student to "lose confidence and 'go back into his shell'" and further, that the parent wanted the student to "be safe" and she had "hear[d] things about public schools" (Dist. Ex. 12 at p. 4). However, at the time of the May 2012 CSE meeting, the Cooke consulting teacher indicated that the student attended mathematics class in a 12:1+1 setting and attended ELA class in a 11:1+1 setting at Cooke (see Tr. p. 61; Dist. Ex. 3 at p. 1). Based on the hearing record, although the parent and Cooke staff at the May 2012 CSE meeting disagreed with the 12:1+1 special class placement, the hearing record does not contain sufficient evidence upon which to conclude that the recommendation was not appropriate to meet the student's needs or that it the recommended placement could not provide the student with a small, structured setting or appropriate opportunities for individualized support in a special education environment.

With regard to the parent's contention that the May 2012 IEP did not adequately balance the student's academic needs and vocational needs, the May 2012 IEP included contained both an academic and post-secondary transitional component (see Dist. Ex. 3). More specifically, the May 2012 IEP contained annual goals and services related to academics and post-secondary transition, as well as a recommendation for the student to participate in a work-study program (see Dist. Ex. 3 at pp. 3-9, 11). At the impartial hearing, the district special education teacher who attended the May 2012 CSE meeting testified that within a 12:1+1 special class placement, the student would receive both academic and vocational instruction (see Tr. pp. 57-58). She also testified that the May 2012 IEP identified the vocational skills the student would learn (see Tr. p. 60). However, the May 2012 IEP did not specifically break down how much time the student would receive academic instruction compared to how much time the student would receive vocational instruction, but rather, the district special education teacher testified that the parent would learn that information from the public school the student attended (see Tr. pp. 58-59).

Evidence obtained through IEP coordinator's testimony, as well as through her affidavit, provides support to conclude that the assigned public school site could have implemented both the academic and vocational components of the student's May 2012 IEP. In particular, the IEP coordinator indicated that a school counselor completed intakes with new students and their parents to discuss a student's needs, functional levels, and abilities in order to make an appropriate classroom assignment (see Dist. Ex. 21 at pp. 2-3). The IEP coordinator further indicated that the teachers at the assigned public school site provided differentiated instruction to the students regarding classroom work (id. at p. 3).

In addition, the IEP coordinator reported that the assigned public school site offered both academic and vocational programs for students (see Dist. Ex. 21 at p. 3). The IEP coordinator testified that students at the assigned public school site participated in part-time and full-time

15

**A170**

vocational work placements, which included an academic component (Tr. pp. 4-5, 10-15). According to the IEP coordinator, students worked on their academic and related goals for either part of the school day or for the entire school day depending upon work-site responsibilities (see Dist. Ex. 21 at p. 3). According to the IEP coordinator, the assigned public school site offered both on-site and off-site vocational programs to students (id.). The IEP coordinator also reported that academics remained a "focus at our work study programs" (id.). The IEP coordinator testified that nothing in the student's May 2012 IEP precluded his participation in either a part-time or a full-time vocational work placement (see Tr. pp. 13-14).

According to the IEP coordinator, work-site placements included an academic component, wherein the student worked on skills related to literacy, functional math, and employment skills (see Tr. pp. 14-15). The IEP coordinator also testified that students in the full-time vocational placement worked on academics for approximately one to two hours a day (see Tr. p. 15). Part-time, off-site vocational placements typically required students to work at the site for three and one-half hours per day, two to three days a week, and attend classes for the remainder of the time (see Dist. Ex. 21 at p. 3). Examples of on-site vocational programs offered to all students included wood shop and retail training, as well as a travel-training program (id. at pp. 3-4). According to the IEP coordinator, the assigned public school site could have addressed all of the student's goals and fully implemented the student's May 2012 IEP (id. at p. 4-5). Based on the hearing record, the assigned public school site could have been implemented the academic and vocational components in the student's May 2012 IEP in such a way as to provide the student with an adequate balance of academic programs and vocational programs.

### 3. Transitional Support Services

The parent asserts that the IHO failed to adequately address whether the failure to recommend transitional support services resulted in the district's failure to offer the student a FAPE for the 2012-13 school year. The parent argues that given the student's new eligibility classification of autism, couple with the student's potential transfer from Cooke—a "small and highly supportive environment" to a public school—a "larger school setting"—the May 2012 CSE should have recommended transitional teacher support services. The district rejects the parent's contention, arguing that the 12:1+1 special class placement in a specialized school was not a less restrictive setting when compared to the student's setting at Cooke. A review of the hearing record supports the district's assertions.

State regulation requires that in instances when a student with autism has been "placed in programs containing students with other disabilities, or in a regular class placement, a special education teacher with a background in teaching students with autism shall provide transitional support services in order to assure that the student's special education needs are being met" (8 NYCRR 200.13[a][6]). Transitional support services are defined as "temporary services, specified in a student's [IEP], provided to a regular or special education teacher to aid in the provision of appropriate services to a student with a disability transferring to a regular program or to a program or service in a less restrictive environment" (8 NYCRR 200.1[ddd]). The Office of Special Education issued a guidance document, updated in April 2011, entitled "Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Documents" which describes transitional support services for teachers and how they

16

A171

relate to a student's IEP (see http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf).

First, to the extent that it could be argued that there was any change at all in the restrictiveness of the settings between Cooke and the public school program, such change from a special class in a specialized nonpublic school to a special class in a specialized public school with no change in access to regular education peers would appear to have been minimal, which further diminishes a need to recommend transitional support services on the student's IEP (8 NYCRR 200.1[ddd]).

Second, there is no suggestion that the State regulation regarding transition support services for teachers was intended for certified special education teachers of a highly intensive special class settings, such as the 12:1+1 special class placement recommended in this case. Instead, it is much more likely that an individual with such experience would be the provider of transitional support services to another teacher having either less familiarity or formal training in working with a student with autism (e.g., a regular education teacher).

Third, the IDEA does not require a "transition plan" as part of a student's IEP when a student moves from one school to another (A.D. v. New York City Dep't of Educ., 2013 WL 1155570, at *8 [S.D.N.Y. Mar. 19, 2013]; F.L. v. New York City Dep't of Educ., 2012 WL 4891748, at *9 [S.D.N.Y. Oct. 16, 2012], aff'd, 2014 WL 53264 [2d Cir. Jan. 8, 2014]; A.L. v. New York City Dep't of Educ., 812 F. Supp. 2d 492, 505 [S.D.N.Y. 2011]; E.Z-L. v. New York City Dep't of Educ., 763 F. Supp. 2d 584, 598 [S.D.N.Y. 2011], aff'd sub nom. R.E., 694 F.3d 167; see R.E., 694 F.3d at 195).

However, notwithstanding the above, the May 2012 IEP was designed to facilitate the student's transition to the assigned public school site as the IEP included supports such as counseling, speech-language therapy, accommodations, and strategies as discussed below in addition to the support provided by the student's special education teacher and paraprofessional within the 12:1+1 special class placement (see Dist. Ex. 3 at p. 9). More specifically, the May 2012 IEP recommended accommodations for the student's transition needs through the provision of academic and social supports, including modified instruction materials, small group instruction, discrete teaching of learning strategies and skills, use of graphic organizers and checklists, and repetition of instruction using multiple modalities (id. at p. 2). The May 2012 IEP also included several other accommodations, as follows: introduction of new concepts in small chunks with sufficient time to learn, checklists, reminders, use of manipulatives, direct teaching modeling, visual and auditory cues, one-to-one review, chunking, scaffolded instructions, time to process each step, teacher redirection, access to a counselor when frustrated, and continued opportunities for the student to take a leadership role (id.). In addition, the hearing record reflects that the May 2012 CSE heavily relied upon the detailed progress report from Cooke and the input from the Cooke representatives at the CSE meeting to understand the depth of the student's needs and abilities and to draft appropriate annual goals and set forth appropriate supports and services (see Dist. Exs. 11 at pp. 1-4; 12 at pp. 1-5).

Based upon the foregoing, the May 2012 IEP as a whole addressed the student's transition related needs in the areas of academics and social/emotional functioning, and the hearing record

17

A172

does not support the parent's assertion that the district failed to offer the student a FAPE for the 2012-13 school year because the May 2012 IEP did not include a recommendation for transitional support services.

### 4. Parent Counseling and Training

Turning next to the parties' contentions with respect to the May 2012 CSE's failure to recommend parent counseling and training, the hearing record supports a finding that the absence of this related service did not result in a failure to offer the student a FAPE for the 2012-13 school year.

State regulations require that an IEP indicate the extent to which parent training will be provided to parents, when appropriate (8 NYCRR 200.4[d][2][v][b][5]). State regulations further provide for the provision of parent counseling and training for the purpose of enabling parents of students with autism to perform appropriate follow-up intervention activities at home (8 NYCRR 200.13[d]). Parent counseling and training is defined as: "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program" (8 NYCRR 200.1[kk]; see 34 CFR 300.34[c][8]). However, courts have held that a failure to include parent counseling and training on an IEP does not constitute a denial of a FAPE where a district provided "comprehensive parent training component" that satisfied the requirements of the State regulation (see R.E., 694 F.3d at 191; M.M. v. New York City Dep't of Educ., 583 F. Supp. 2d 498, 509 [S.D.N.Y. 2008]). The Second Circuit has explained that "because school districts are required by [8 NYCRR] 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service" (R.E., 694 F.3d at 191; see M.W. v. New York City Dep't of Educ., 725 F.3d 131, 141-42 [2d Cir. 2013]). The Second Circuit further explained that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement" (R.E., 694 F.3d at 191).

It is undisputed that the May 2012 CSE did not recommend parent counseling and training as a related service in the student's May 2012 IEP. However, the hearing record does not contain sufficient evidence upon which to conclude that the failure to recommend parent counseling and training in the May 2012 IEP, resulted in the district's failure to offer the student a FAPE for the 2012-13 school year. In addition, although the May 2012 CSE's failure to recommend parent counseling and training in the student's IEP constituted a violation of State regulation, this violation alone does not support a finding that the district failed to offer the student a FAPE (R.E., 694 F.3d at 191; see also F.L. v. New York City Dep't of Educ., 2014 WL 53264, at *4 [2d Cir. Jan. 8, 2014]; see also M.W., 725 F.3d at 141-42).[8]

---

[8] The district is cautioned, however, that it cannot continue to disregard its legal obligation to include parent counseling and training on a student's IEP. Therefore, upon reconvening this student's next CSE meeting, the district shall consider whether the related service of parent counseling and training is required to enable the student to benefit from instruction and, after due consideration, provide the parent with prior written notice on the form prescribed by the Commissioner that, among other things, specifically describes whether the CSE

18

### 5. Related Services

Finally, the parent asserts that the IHO failed to address the issue of whether the May 2012 IEP failed to adequately integrate the student's related services with his academic instruction, vocational training, and independent skills development. As discussed below, the hearing record does not support the parent's assertion.

In this case, the May 2012 CSE recommended that the student receive his related services of speech-language therapy and counseling in a "separate location/provider's location" (see Dist. Ex. 3 at pp. 9-10, 12). Although the student was to receive his related services in a separate location, the hearing record shows the student was to receive speech-language therapy in a group, as well as receiving one session of his counseling services in a group, with his peers to improve social skills (see Dist. Ex. 3 at p. 9).[9] The district special education teacher testified that the related services' recommendations in the May 2012 IEP reflected a commensurate level of related services the student received at Cooke (see Tr. p. 67; compare Dist. Ex. 3 at p. 9, with Dist. Ex. 4 at p. 1). The hearing record also indicates that the student received his related services—both speech-language therapy and counseling—in a separate location while he attended Cooke (see Parent Ex. J at p. 6). In addition, the hearing record demonstrates that the student performed well, both academically and socially, while at Cooke (see Dist. Ex. 4).

Based on the above, the hearing record supports a finding that the recommendations to provide the student's related services in a separate location as a pull-out service, as opposed to perhaps a push-in model for a more integrated approach, would not have prevented the student from demonstrating progress in academics, counseling, and speech-language therapy and was reasonably calculated to enable the student to receive educational benefits.

### B. Challenges to the Assigned Public School Site

For the reasons detailed below, I decline to "reassess the logic" of whether the assigned public school was appropriate when the student did not attend the assigned public school site during the 2012-13 school year.

---

recommended or refused to recommend parent counseling and training on the student's IEP, together with an explanation of the basis for the CSE's recommendation, in conformity with the procedural safeguards of the IDEA and State regulations (see 34 CFR 300.503[a], [b]; 8 NYCRR 200.1[oo], 200.5[a]).

[9] The district special education teacher testified that the recommendation for "individual" speech-language therapy sessions in the May 2012 IEP was a typographical error, and further clarified that the student was to receive his speech-language therapy sessions in a small group, which was further corroborated by the notes reflected in the May 2012 CSE meeting minutes (see Tr. pp. 67-69; see Dist. Exs. 3 at p. 9; 11 at p. 4; 12 at pp. 4; 22 at p. 5). In M.H. v. New York City Dep't. of Educ., the Court found that although the district failed to reflect a related services recommendation on a student's IEP, "it would exalt form over substance to hold that the IEP was inappropriate simply because a recommendation, omitted from the IEP because of a clerical error—but which appeared in the CSE meeting minutes, and was reflected in the conduct of the parties—failed to appear within the four corners of the IEP" (M.H. v. New York City Dep't. of Educ., 2011 WL 609880, at *11 [S.D.N.Y. Feb. 16, 2011] [internal quotations and citations omitted]).

19

Challenges to an assigned public school site are generally relevant to whether the district properly implemented a student's IEP, which is speculative when the student never attended the recommended placement. Generally, the sufficiency of the district's offered program must be determined on the basis of the IEP itself (R.E., 694 F.3d at 186-88). The Second Circuit has explained that the parents' "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement" (R.E., 694 F.3d at 195; see F.L., 2012 WL 4891748, at *14-*16; Ganje v. Depew Union Free Sch. Dist., 2012 WL 5473491, at *15 [W.D.N.Y. Sept. 26, 2012] [finding the parents' pre-implementation arguments that the district would fail to adhere to the IEP were speculative and therefore misplaced], adopted at 2012 WL 5473485 [W.D.N.Y. Nov. 9, 2012]; see also K.L. v. New York City Dep't of Educ., 530 Fed. App'x 81, 87, 2013 WL 3814669, at *6 [2d Cir. July 24, 2013]; Reyes v. New York City Dep't of Educ., 2012 WL 6136493, at *7 [S.D.N.Y. Dec. 11, 2012]; R.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 273 [S.D.N.Y. 2012] [explaining that "[g]iven the Second Circuit's recent pronouncement that a school district may not rely on evidence that a child would have had a specific teacher or specific aide to support an otherwise deficient IEP, it would be inconsistent to require evidence of the actual classroom a student would be placed in where the parent rejected an IEP before the student's classroom arrangements were even made"]; Peter G. v. Chicago Pub. Sch. Dist. No. 299 Bd. of Educ., 2003 WL 121932, at *19 [N.D. Ill. Jan. 13, 2003] [noting that the court would not speculate regarding the success of the student's services where the parent removed student from the public school before the IEP services were implemented]).

While several district courts have, since R.E. was decided, continued to wrestle with this difficult issue regarding challenges to the implementation of an IEP made before the student begins attending the school and taking services under the IEP (see D.C. v. New York City Dep't of Educ., 2013 WL 1234864, at *11-*16 [S.D.N.Y. Mar. 26, 2013] [holding that the district must establish that it can implement the student's IEP at the assigned school at the time the parent is required to determine whether to accept the IEP or unilaterally place the student]; B.R. v. New York City Dep't of Educ., 910 F.Supp.2d 670, 677-78 [S.D.N.Y. 2012] [same]; E.A.M. v. New York City Dep't of Educ., 2012 WL 4571794, at *11 [S.D.N.Y. Sept. 29, 2012] [holding that parents may prospectively challenge the adequacy of a "placement classroom" when a child has not enrolled in the school because districts are not permitted to assign a child to a public school that cannot satisfy the requirements of an IEP]), I now find it necessary to depart from those cases. Since these prospective implementation cases were decided in the district courts, the Second Circuit has also clarified that, under factual circumstances similar to those in this case, in which the parents have rejected and unilaterally placed the student prior to IEP implementation, "[p]arents are entitled to rely on the IEP for a description of the services that will be provided to their child" (P.K. v. New York City Dep't of Educ. (Region 4), 526 Fed. App'x 135, 141, 2013 WL 2158587, at*4 [2d Cir. May 21, 2013]), and, even more clearly that "'[t]he appropriate inquiry is into the nature of the program actually offered in the written plan,' not a retrospective assessment of how that plan would have been executed" (K.L., 2013 WL 3814669, at *6 [rejecting as improper the parents claims related to how the proposed IEP would have been implemented]).   Thus, the analysis of the adequacy of an IEP in accordance with R.E. is prospective in nature, but the analysis of the IEP's implementation is retrospective.  Therefore, if it becomes clear that the student will not be educated under the proposed IEP, there can be no denial of a FAPE due to the failure to implement the IEP (R.E., 694 F.3d at 186-88; see also Grim, 346 F.3d at 381-82 [holding that the district was not liable for a denial of a FAPE where

20

A175

the challenged IEP was determined to be appropriate, but the parents chose not to avail themselves of the public school program]).

As explained more recently, "[t]he Second Circuit has been clear, however, that where a parent enrolls the child in a private placement before the time that the district would have been obligated to implement the IEP placement, the validity of a proposed placement is to be judged on the face of the IEP, rather than from evidence introduced later concerning how the IEP might have been, or allegedly would have been, implemented" (A.M. v. New York City Dep't of Educ., 2013 WL 4056216, at *13 [S.D.N.Y. Aug. 9, 2013]; see R.B., 2013 WL 5438605, at *17; E.F., 2013 WL 4495676, at *26; M.R. v. New York City Dep't of Educ., 2013 WL 4834856, at *5 [S.D.N.Y. Aug. 14, 2013] [finding that the argument that the assigned school would not have been able to implement the IEP is "entirely speculative"]; see also N.K. v. New York City Dep't of Educ., 2013 WL 4436528, at *9 [S.D.N.Y. Aug. 13, 2013] [citing R.E. and rejecting challenges to placement in a specific classroom because "'[t]he appropriate inquiry is into the nature of the program actually offered in the written plan'"]). Most recently, the Second Circuit rejected a challenge to a recommended public school site, reasoning that "'[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement,' and '[a] suggestion that some students are underserved' at a particular placement 'cannot overcome the particularly important deference that we afford the SRO's assessment of the plan's substantive adequacy.'" (F.L., 2014 WL 53264, at *6, quoting R.E., 694 F.3d at 195). The court went on to say that "[r]ather, the appropriate forum for such a claim is 'a later proceeding' to show that the child was denied a free and appropriate public education 'because necessary services included in the IEP were not provided in practice'" (id., quoting R.E., 694 F.3d at 187 n.3).

In view of the forgoing, the parent cannot prevail on claims that the district would have failed to implement the May 2012 IEP at the assigned public school site because a retrospective analysis of how the district would have executed the student's May 2012 IEP at the assigned school is not an appropriate inquiry under the circumstances of this case (K.L., 2013 WL 3814669 at *6; R.E., 694 F3d at 186; R.C., 906 F. Supp. 2d at 273). In this case, these issues are speculative insofar as the parent did not accept the May 2012 IEP containing the recommendations of the May 2012 CSE or the programs offered by the district and instead chose to enroll the student in a nonpublic school of their choosing (see Parent Exs. D at pp. 1-2; E at pp. 1-2). Furthermore, in a case in which a student has been unilaterally placed prior to the implementation of an IEP, it would be inequitable to allow the parent to acquire and rely on information that post-dates the relevant CSE meeting and IEP and then use such information against a district in an impartial hearing while at the same time confining a school district's case to describing a snapshot of the special education services set forth in an IEP (C.L.K. v. Arlington Sch. Dist., 2013 WL 6818376, at *13 [S.D.N.Y. Dec. 23, 2013] [stating that "[t]he converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE]).

However, under the facts presented in this case, the district is confined to defending its IEP in view of R.E. and the subsequent district court cases discussed above and it would be inequitable to allow the parents to challenge the May 2012 IEP through information they

21

acquired after the fact. Therefore, the district was not required to demonstrate the proper implementation of services in conformity with the student's May 2012 IEP at the assigned public school site when the parents rejected it and unilaterally placed the student.

## VII. Conclusion

Having determined that the evidence in the hearing record demonstrates that the district sustained its burden to establish that it offered the student a FAPE for the 2012-13 school year, the necessary inquiry is at an end and there is no need to reach the issues of whether the student's unilateral placement at Cooke was appropriate or whether equitable considerations support an award of tuition reimbursement (Burlington, 471 U.S. at 370; M.C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]).

## THE APPEAL IS DISMISSED.

**IT IS ORDERED** that upon reconvening at this particular student's next CSE meeting regarding the student's special education programming, the district shall consider whether it is appropriate to include parent counseling and training in the student's IEP and, thereafter, shall provide the parent with prior written notice consistent with the body of this decision.

Dated:     **Albany, New York**
          **March**   18  , **2013**

                                    **JUSTYN P. BATES**
                                    **STATE REVIEW OFFICER**

22

**A177**

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 143983 |
| Student's Name: | J███ S███ |
| Date of Birth: | ███████, 1994 |
| District: | 2 |
| Hearing Requested By: | Parent |
| Date of Hearing: | May 16, 2013<br>June 6, 2013<br>June 19, 2013 |
| Actual Record Closed Date: | July 10, 2013 |
| Hearing Officer: | Mary Noe, Esq. |

RECEIVED

AUG 28 2013

OFFICE OF STATE REVIEW

RECEIVED

AUG 19 2013

OFFICE OF STATE REVIEW

Hearing Officer's Findings of Fact and Decision                                    1

Case No. 143983

_____

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 16, 2013

For the Student:

AMANDA SEN, Attorney

TODD SILVERBLATT, Attorney

M████ M████ , Parent

KATHERINE HIBBARD, Teacher

MERCEDES PENA, Interpreter

For the Department of Education:

BRITTANIA STEWART, Attorney

SUSAN NACLERIO, IEP/Related Services Coordinator

(Via Telephone)

EVELYN ALVAREZ, Special Ed Teacher (Via Telephone)

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 6, 2013

For the Student:

AMANDA SEN, Attorney

M████ M████ , Parent

MARY CLANCY, Director (Via Telephone)

SALLY ORD, Teacher Consultant (Via Telephone)

VICTORIA FOWLER, Coordinator (Via Telephone)

FRANCIS TABONE, Head of School (Via Telephone)

TODD SILVERBLATT, Attorney

CRISMAILEN GUZMAN, Interpreter

KATHERINE HIBBARD, Teacher (Via Telephone)

For the Department of Education:

BRITTANIA STEWART, Attorney

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 19, 2013

For the Student:

AMANDA SEN, Attorney

M████ M████ , Parent

TODD SILVERBLATT, Attorney

**A179**

Hearing Officer's Findings of Fact and Decision        2

Case No. 143983

THOMAS GRAY, Attorney

For the Department of Education:

BRITTANIA STEWART, DOE Attorney

Hearing Officer's Findings of Fact and Decision                                    3

Case No. 143983

The parent requested a hearing on March 18, 2013. I was appointed on April 18, 2013. The parent is represented by attorneys Amanda Sen and Todd Silverblatt. The district is represented by Brittania Stewart, Esq. A conference call between the hearing officer and the attorneys were conducted on April 30 and May 2 regarding subpoenas. The hearing was held on May 16, June 6, June 19.

The student's classification is autism. The Individualized Education Program (IEP) challenged is dated May 22, 2012 and is for the 2012 – 2013 school year. The student currently attends the Cooke School.

The complaint requests the following relief:

a. Payment by the Department of Education to Cooke for the entire cost of tuition for the 2012 – 2013 school year in the amount of $55,775.00, including $48,500.00 for the September – June academic year and $7,275.00 for the summer academy; and

b. Direction to the Department of Education to provide busing to the student to and from Cooke.(Exh. 1)

The IEP dated May 22, 2012 recommends the following program, a twelve month program, special class 12:1:1 in a special school (D75 Program) with related services of Speech and Language Therapy and Counseling. (Exh. 3)

**EXHIBITS**

IEP dated May 22, 2012

On the date of the IEP, the student was a twelfth grader attending Cooke Academy in a 11:1:1 ELA class and 12:1:1 Math class. He achieved a 3.3 grade equivalent on reading readiness, vocabulary and comprehension. On the Quality Reading Inventory his independent level is 2nd grade. His instructional level is 3rd grade, frustration level is 3rd grade, decoding is at 5th grade independent and 6th grade instructional. The student achieved a 3rd grade 8 month grade equivalent in math. The student's strengths, preferences and interests are that he is hardworking and shows interest in history and world culture. He enjoys socializing with friends and flowing routines. (Exh. 3 p.1)

The parent's concerns are that the student benefits from modified instructional materials, small group instructions, discreet teaching of learning strategies and skills, use of graphic organizers and checklists, repetition of instruction using multiple modalities,

**A181**

Hearing Officer's Findings of Fact and Decision                    4

Case No. 143983

---

introduction of new concepts in small chunks with sufficient time to learn, clear class routines, hands on math skills practice. (Exh. 3 p.2)

Psychoeducational Evaluation dated March 19, June 2, 2009

At the time of the evaluation the student attended a private special education high school. The student's June 2008 IEP classified the student as Speech Impaired. According to a physician at Montefiore Medical Center the student has Moderate Mental Retardation. The parent reported the student was diagnosed with Autism. The student's full scale IQ is 60, Extremely Low. The student performs well below grade level and is described as socially isolated. The student's general adaptive functioning is low. The parent completed a Child Behavior Checklist and the parent reports more problems than are typical for boys aged 12 to 18, particularly problems of anxiety or depression, withdrawn or depressed behavior and thought problems. When compared to others at his age level, the student performance is low average in written language and written expression, low in broad reading and math calculation skills, and very low in mathematics. (Exh. 5 p.8)

Stanford-Binet Intelligence Scales dated October 19, 2011

Test Results: Full Scale IQ score of 68, Overall intelligence is classified as Mildly Delayed. (Exh. 15)

Classroom Observation dated October 27, 2010

The student sat quietly in his seat and did not raise his hand to participate. When called upon to answer, he had a difficult time formulating a verbal response. He remained focused. The teacher commented that the student often needs prompting to respond to questions. He has a difficult time making connections. He is always attentive and works hard. (Exh. 16)

Cooke Center Summer Academy 2012

The student's summer schedule was a follows: Monday through Thursday 8:30 to 11:50 are academic type programs. From 12:30 to 2:45 the student is travel training, community service, art/movement and swimming. Friday's program is academic from 8:30 to 9:00 and then an Education Community Trip and Sports and Fitness. (Exh. 27)

Cooke Center Schedule 2012 – 2013

**A182**

Hearing Officer's Findings of Fact and Decision                    5

Case No. 143983

_____

The student receives ELA four periods a week. Each period is fifty minutes. Five periods per week in Math; two periods of Art, one period of Music and other classes such as Vocational Skills, Current Evens, Speech and Language, Occupational Therapy etc. (Exh. HO 1)

Minutes of IEP meeting of May 22, 2012

Parent agreed with the goals. Sally Ord, a Cooke representative who attended the meeting stated "He needs a balance program. It would not be appropriate for him to be in a vocational school. He needs all the elements to make gain [travel training, life skills, vocational]. He really needs to be in a real supportive environment. "If he was in a big environment he would go back into his shell." The parent stated "I have never been in agreement. I always tried to protect my son. There are so many things going on in the public school. I'm constantly hearing of things on the news. I will go look at any school that is offered." (Exh. 11 p.4)

IEP Annual Review Report prepared by Sally Ord dated May 22, 2012

Ms. Ord notes indicate that the student is reading at a 3rd grade level and his math level is 3rd and 4th grade level. Under the category ELA, the notes are "mum-very responsible and organized; mum happy with what is being taught." Ms. Ord notes under Placement Recommendation "S.Ord-not appropriate for [the student] – D75 program have a strong vocational focus – [the student] requires a balanced program that will address his academic, transition and vocational needs, needs a supportive environment, if in a large setting will lose confidence "go back into his shell" – requested a small learning environment  never been in agreement with program recommendation – wants her son to be safe hears things about public schools (mum) but willing to go to see placement." Under the category "Other" it states "discussion of change in classification – mum unsure about changing classification because of not 'in her heart' accepting his difficulties" "A. Lucio – suggested changing classification to autism as more services available to [the student] with this classification – asked mother to consider this – referring to 2009 Ed-Pysch." "At Cooke for 4 years – previously in Catholic schools. Wanted a different environment – safer, principal recommended Cooke at Middle School level and [the student] began attending in Grade 9" (Exh. 12)

**A183**

Hearing Officer's Findings of Fact and Decision                                          6

Case No. 143983

## TESTIMONY

Susan Naclerio, the IEP coordinator testified that there was a seat for the student at McSweeney school in a 12:1:1 class with students with grade levels similar to the student. (T. 8) At the school, the student would have access to instruction using the internet at the work site. (T. 12) There is nothing in his IEP that would prevent him from being in a part time or full time vocational program. The students who are in a full day vocation programs work on literacy skills, reading skills, functional math skills, employment skills. (T. 13 – 15) The work site has built into it a time during the day when they do academics and a time when they go out and work in the community based program. Students at full time vocational programs work one to two hours a day on academics depending on the program and the agreement they have with the community based work study site. (T. 15)

Katherine Hibbard the student's current literacy teacher testified that the Cooke Skills Program is a transition program designed to help students with special needs prepare for post-secondary life. Ms. Hibbard helps them use their knowledge of academic skills in literacy and mathematics, and take that knowledge and apply it in real life setting and situations that they would experience at home, in the work force, and in the community. (T. 20) There are five students in the class and one teacher. (T. 21) There are four students that require frequent redirection. Every day the student receives seven minutes of one-to-one in his math and literacy classes. (T. 22) The student is able to work independently on material that he is very familiar with. (T. 23) Ms. Hibbard teaches math and literacy every day of the week for 55 minute periods. (T. 29 – 30) In the student's literacy and math class all the students are functioning at a fourth grade level, either as an independent or instructional level. (T. 33) The student has significant increases in progress. He now re-reads his work and self edits his work, which is something he was not doing at the beginning of this school year. He also writes with an awareness of who his audience is. (T. 37) The student is challenged by recall. He might never be able to produce some of the criteria that standardized tests require to show mastery of fourth and five grade level, however he is able to show some skills at that level. (T. 41)

**A184**

Hearing Officer's Findings of Fact and Decision                    7

Case No. 143983

Evelyn Alvarez, special education teacher testified that the student would benefit from both a school that provided academic as well as vocational skills. In a 12:1:1 he would get both an academic and vocational program. (T. 58) Ms. Alvarez testified that since the student attended Cook Center, the staff at the Center spend most of their time with the student and therefore they know the student. Ms. Ord from the Cook Center attended the IEP meeting with the parent and she addressed the transition component as well as the other components. (T. 73) Ms. Alvarez stated that she was the translator from the parent and participated at the meeting. After the meeting she typed the IEP. (T. 76, 81) The transition component of the IEP was provided in a Cooke Report for the IEP. (Exh. 4 p. 12, T. 90, 91) The student's classification was changed at the IEP meeting from Speech and Language disability to autism.     There is no challenge to that classification. (T. 99 – 100) The Stanford-Binet Intelligence Scales, Fifth Edition Narrative Report dated October 19, 2011 testing at the Cooke Center Academy was not provided to the IEP team for the May 2012 IEP meeting. (Exh. 15, T. 103 – 107)

Dr. Francis Tabone testified that he accompanied the parent to visit the McSweeney School. He stated that there were students who were moderate to severe intellectual deficits that would not be appropriate for this student. (T. 224) One person would do one or two periods of academics in the morning before the student would work. (T. 225)

The parent in her affidavit stated that during the IEP meeting on May 22, 2012, no one mentioned training for the parent. The parent visited the McSweeney School and was told that the student would spend more time at the work sites than on academic activities and the parent did not feel this was appropriate since the student still needs to learn academic skills. The parent was told that all training for students as her son is done at the work site and this also would be inappropriate. (Exh. S p. 2; T. 236 - 237) The parent testified that she requested an evaluation from the Cooke Center in August 2012 for an application for Social Security for her son. (T. 239 – 240)

**DISCUSSION**

In determining whether the IEP proposed by the district was appropriate, the Court must determine "(1) whether the state complied with the procedural requirements

Hearing Officer's Findings of Fact and Decision                                    8

Case No. 143983

of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak v. Florida Union Free School Dist.* 142 F.3d 119, 129 (2d Cir.1998) quoting *Board of Educ. v. Rowley,* 458 U.S. at 206-07.

     The IEP dated May 22, 2012 recommends the following program, a twelve month program, special class 12:1:1 in a special school (D75 Program) with related services of Speech and Language Therapy and Counseling.

     Parent's counsel's closing brief sets forth several arguments regarding supporting her position that the IEP was inappropriate, such as the IEP failed to address the student's needs, ignored the parent's concerns and failed to recommend an appropriate program.

     Under the first prong of the Burlington-Carter test, an IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 192, 206-07. An appropriate program begins with an IEP which accurately reflects the results of evaluation to identify the child's needs provides for the use of appropriate special education services to address the child's special education needs, and establishes annual goals and short-term instructional objectives which are related to the child's educational deficits (Application of a Child with a Disability, Appeal No. 93-9; Application of a Child with a Disability, Appeal No. 93-12).

     Sally Ord, consulting teacher at Cooke Center testified that she went to the IEP meeting to speak on behalf of the members of the educational team who are familiar with the student and provide information about the student's program. (T. 210) Ms. Ord stated that she had internal documents that are for her professional usage that were not provided to the IEP team or the parent but she presented the information verbally to the IEP team. (T. 174 – 175, 177 – 178) At the IEP meeting the team changed the student's classification from Speech and Language Impaired to autism and Ms. Ord testified that the parent had expressed concerns accepting the student's new classification. (T. 204) Despite Ms. Ord's consultation with the student's teachers and her access to internal documents she testified she had no knowledge of the October 2011 Stanford Binet Intelligence Scales testing. (T. 208)

     The parent testified that she requested an evaluation for purposes of Social Security application in August 2012. (T. 240) She also stated that she was in the process

Hearing Officer's Findings of Fact and Decision                                    9

Case No. 143983

of obtaining guardianship. (T. 240) The parent first testified that she received the January 2012 evaluation in February, March 2013. (T. 237) The parent then testified that she did not see the evaluation till after the May 22, 2012 IEP meeting. (T. 240)    On June 19 the next day of hearing, the parent's attorney indicated that the "quality of the translation was so poor last time." (T. 270) Parent's counsel further stated "Well, she said the full hearing was a problem...she said that the interpreter was doing badly." (T. 277) In response to my questions, parent's attorney stated "Well, it was both that she felt that the interpreter was not interpreting everything that she said, and that when she was testifying in particular, the simultaneous nature of the translation was very confusing, because she was trying to listen to two people at once. She was trying to understand the English that she could at the same time that she was listening to the interpreter. So it was very confusing." (T. 278) Counsel's statement would lead to the conclusion that the parent was confused as to the questions posed. Yet when requested to specify to the transcript where the parent was confused, the only part of the testimony was on page 238. (T. 281) Parent's entire testimony is captured on the seven pages of transcript (T. 233 – 240).    On June 19, I set another hearing date July 3 for the purpose of the parent's counsel to review the transcript with her client and present translation problems with questions or answers.   (T. 288 – 291)  In a letter dated July 2, 2013 Parent's counsel requested July 3 hearing date be cancelled and parent rested her case. The request was granted.

Finally, without the Cooke Center's evaluation, the student's classification may or may not have been changed.

In light of the testimony and documents in evidence, I find the parent failed to comply with the third prong of *Burlington* by not informing the IEP team that the parent requested an additional evaluation, which was conducted on October 19, 2012 and a report was issued on January 5, 2012. I need not review the district's program for the student, albeit on its face is very similar to the private school's program, because the IEP team was at a disadvantage without this updated evaluation, and therefore could not recommend an appropriate program.

The parent's request is denied.

Hearing Officer's Findings of Fact and Decision                    10

Case No. 143983

Dated: July 18, 2013

MARY NOE, ESQ.
Impartial Hearing Officer

MN;mv

**A188**

Hearing Officer's Findings of Fact and Decision                    11

Case No. 143983

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    12

Case No. 143983

## DOCUMENTATION ENTERED INTO THE RECORD

PARENT

A Due process response, 4/8/13, 3 pages

B Letter to M. Jacoby from Charles Gussow of Partnership for Children's Rights, 6/21/12, 2 pages

C Letter to M. Jacoby from Todd Silverblatt of Partnership for Children's Rights, 6/22/12, 3 pages

D Enrollment contract, Cooke Center Academy Summer 2012 with M▮▮ M▮▮ 6/25/12, 2 pages

E Cooke Center School Enrollment contract  2012/13 Academic Year with M▮▮. M▮▮ , 6/25/12, 2 pages

F 2012 Federal IncomeTax return for J▮ S▮ 2 pages

G 2012 Federal IncomeTax return for M▮ M▮ 2 pages

H PS X721- Stephen McSweeney School expenditures 2010/11, 5/6/13, 1 page   not submitted

I Affidavit of Katherine Hibbard, Dated May 10, 2013, 7 pages

J Affidavit of Victoria Fowler, 5/10/13, 7 pages

K Affidavit of M. Clancy , 5/10/13, 5 pages

L Affidavit of M▮▮ M▮▮ , 5/10/13, 5 pages

M Affidavit of S. Ord, 5/10/13, 4 pages

N Affidavit of Francis Tabone, 5/10/13, 4 pages

O Letter to IHO from A. Sen,4/29/13, 5 pages

P Parent's Motion in opposition to hearing officer Mary Noe's verbal order on 4/30/13. That hearing office did not translate affidavits submitted by either party in this matter, 4/30/13, 4 page

Q District response to parent's motion, 5/1/13, 5 pages

R Parent's opening statement, 5 pages

S Unofficial English affidavit

DEPARTMENT OF EDUCATION

1 Due process complaint, 3/18/13, 5 pages

2 Meeting invitation, 4/30/12, 4 pages

Hearing Officer's Findings of Fact and Decision                13

Case No. 143983

---

3 IEP, 5/22/12, 15 pages

4 Progress report, March 2012, 16 pages

5 Psychoed eval, 6/2009, 9 pages

6 IEP Transition Goals, 5/22/12, 3 pages

7 IEP Annual Review Discussion Doc.- Speech and Lang, 5/22/13, 2 pages

8 IEP Annual Review Discussion Doc. – ELA, 5/22/13, 3 pages

9 IEP Annual Review Discussion Doc.- Math, 5/22/13, 2 pages

10 IEP Annual Review Discussion Doc.- Counseling, 5/22/13. 2 pages

11 E. Alvarez IEP Meeting minutes, 4 pages

12 S. Ord IEP Meeting Minutes, 5 pages

13 Progress report, June 2012, 17 pages

14 Cooke Center assessment Student assessment portfolio, 7 pages

15 Stanford-Binet Intelligence Scales, 1/5/12, 2 pages

16 Classroom observation, 10/27/10, 1page

17 FNR, 6/15/12, 1 page

18 Progress report, November 2012, 16 pages

19 Progress report, March 2013, 16 pages

20 Cooke Center Summer Academy goals, 4 pages

21 Affidavit of S. Naclerio, dated 5/9/13, 5 pages

22 Affidavit of E. Alvarez, 5/9/2013, 7 pages

23 Cooke Center Summer Academy goals, 2 pages

26 DOE opening statement, 3 pages

27 Summer 2012 curriculum outline 1 page

IHO .

I Class schedule

II Order on request for verbal Testimony

IV Response to motion for translation

**RECEIVED**

JAN 1 6 2014

OFFICE OF STATE REVIEW

## FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 143983 |
| Student's Name: | J███ S███ |
| Date of Birth: | ██████, 1994 |
| District: | 2 |
| Hearing Requested By: | Parent |
| Date of Hearing: | May 16, 2013<br>June 6, 2013<br>June 19, 2013 |
| Actual Record Closed Date: | December 10, 2013 |
| Hearing Officer: | Mary Noe, Esq. |

Hearing Officer's Findings of Fact and Decision                    1

Case No. 143983

NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 16, 2013

For the Student:

AMANDA SEN, Attorney

TODD SILVERBLATT, Attorney

M███ M███, Parent

KATHERINE HIBBARD, Teacher

MERCEDES PENA, Interpreter

For the Department of Education:

BRITTANIA STEWART, Attorney

SUSAN NACLERIO, IEP/Related Services Coordinator (Via Telephone)

EVELYN ALVAREZ, Special Ed Teacher (Via Telephone)

NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 6, 2013

For the Student:

AMANDA SEN, Attorney

M███ M███, Parent

MARY CLANCY, Director (Via Telephone)

SALLY ORD, Teacher Consultant (Via Telephone)

VICTORIA FOWLER, Coordinator (Via Telephone)

FRANCIS TABONE, Head of School (Via Telephone)

TODD SILVERBLATT, Attorney

CRISMAILEN GUZMAN, Interpreter

KATHERINE HIBBARD, Teacher (Via Telephone)

For the Department of Education:

BRITTANIA STEWART, Attorney

NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 19, 2013

For the Student:

AMANDA SEN, Attorney

**A193**

Hearing Officer's Findings of Fact and Decision                    2

Case No. 143983

M███████ M██████ Parent
TODD SILVERBLATT, Attorney
THOMAS GRAY, Attorney
For the Department of Education:
BRITTANIA STEWART, DOE Attorney

**A194**

Case 15-1200, Document 43, 07/23/2015, 1560950, Page68 of 252

On July 20, 2013, I submitted a decision on the above referenced case. The District's Individualized Education Program (IEP) dated May 22, 2012 recommended the following program, a twelve month program, special class 12:1:1 in a special school (D75 Program) with related services of Speech and Language Therapy and Counseling. The parent requested an additional evaluation, which was conducted on October 19, 2012 and a report was issued on January 5, 2012 and I found that she did not share that report with the IEP team. My decision was that the Committee on Special Education (CSE) could not recommend an appropriate program because the October 19, 2012 evaluation was withheld.

On appeal, the State Review Officer (13-157) decided *inter alia* that the case should be remanded for "determinations regarding whether the district offered the student a free appropriate public education (FAPE) for the 2012-13 school year, and if necessary, the appropriateness of the parent's unilateral placement of the student at Cooke and whether equitable considerations weigh in favor of an award of tuition reimbursement." Additionally, the decision should be limited to the following issues: "...whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of a FAPE; whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not appropriate educational placement; whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training; whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development; and whether the student was denied a FAPE because May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training." (p. 11)

The parties have waived their rights to any additional hearing dates.

The documents available to the CSE on the date of the IEP meeting on May 22, 2012 were the following:  a Quality Reading Inventory (Exh. 3); a Psychoeducational

Hearing Officer's Findings of Fact and Decision                                    4

Case No. 143983

Evaluation dated March 19, June 2, 2009 (Exh. 5); a Stanford-Binet Intelligence Scales dated October 19, 2011 (Exh. 15); a Classroom Observation dated October 27, 2010 (Exh. 16); a Cooke Center Summer Academy 2012 schedule (Exh. 27); a Cooke Center Schedule 2012 – 2013 (IHO Exh. 1) The following is a review of the information in each of these documents.

On the date of the IEP, the student was a twelfth grader attending Cooke Academy in a 11:1:1 ELA class and 12:1:1 Math class. He achieved a 3.3 grade equivalent on reading readiness, vocabulary and comprehension. On the Quality Reading Inventory his independent level is 2nd grade. His instructional level is 3rd grade, frustration level is 3rd grade, decoding is at 5th grade independent and 6th grade instructional. The student achieved a 3rd grade 8 month grade equivalent in math. The student's strengths, preferences and interests are that he is hardworking and shows interest in history and world culture. He enjoys socializing with friends and flowing routines. (Exh. 3 p.1) The parent's concerns are that the student benefits from modified instructional materials, small group instructions, discreet teaching of learning strategies and skills, use of graphic organizers and checklists, repetition of instruction using multiple modalities, introduction of new concepts in small chunks with sufficient time to learn, clear class routines, hands on math skills practice. (Exh. 3 p.2)

The Psychoeducational Evaluation dated March 19, June 2, 2009 indicates that the student's June 2008 IEP classified the student as Speech Impaired. According to a physician at Montefiore Medical Center the student has Moderate Mental Retardation. The parent reported the student was diagnosed with Autism. The student's full scale IQ is 60, Extremely Low. The student performs well below grade level and is described as socially isolated. The student's general adaptive functioning is low. The parent completed a Child Behavior Checklist and the parent reports more problems than are typical for boys aged 12 to 18, particularly problems of anxiety or depression, withdrawn or depressed behavior and thought problems. When compared to others at his age level, the student performance is low average in written language and written expression, low in broad reading and math calculation skills, and very low in mathematics. (Exh. 5 p.8)

**A196**

Case 15-1200, Document 43, 07/23/2015, 1560950, Page70 of 252

---

The CSE team had the Stanford-Binet Intelligence Scales dated October 19, 2011 that provided the following test Results: Full Scale IQ score of 68, Overall intelligence is classified as Mildly Delayed. (Exh. 15)

The Classroom Observation dated October 27, 2010 stated that the student sat quietly in his seat and did not raise his hand to participate. When called upon to answer, he had a difficult time formulating a verbal response. He remained focused. The teacher commented that the student often needs prompting to respond to questions. He has a difficult time making connections. He is always attentive and works hard. (Exh. 16)

The Cooke Center Summer Academy 2012 student's summer schedule was a follows: Monday through Thursday 8:30 to 11:50 are academic type programs. From 12:30 to 2:45 the student is travel training, community service, art/movement and swimming. Friday's program is academic from 8:30 to 9:00 and then an Education Community Trip and Sports and Fitness. (Exh. 27)

The Cooke Center School Schedule for 2012 – 2013 was as follows: the student receives ELA four periods a week. Each period is fifty minutes. Five periods per week in Math; two periods of Art, one period of Music and other classes such as Vocational Skills, Current Evens, Speech and Language, Occupational Therapy etc. (Exh. HO 1)

**DISCUSSION**

1. Did the May 2012 CSE fail to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of a FAPE. The district conducted a Psychoeducational Evaluation dated March 19, June 2, 2009 (Exh. 5) and a Stanford-Binet Intelligence Scales dated October 19, 2011 (Exh. 15).

"A committee on special education shall arrange for an appropriate reevaluation of each student with a disability ... at least once every three years, except where the school district and the parent agree in writing that such reevaluation is unnecessary." (8 NYCRR 200.4[b][4]

I find that at the time of the IEP meeting the Psycholeducational Evaluation dated March 19, June 2, 2009 and the Stanford-Binet Intelligence Scales dated October 19, 2011 are within the statutory period.

Hearing Officer's Findings of Fact and Decision                                    6

Case No. 143983

2. Did the May 2012 CSE inappropriately fail to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not appropriate educational placement.

The IEP indicates that the parent's concerns are that the student benefits from modified instructional materials, small group instructions, discreet teaching of learning strategies and skills, use of graphic organizers and checklists, repetition of instruction using multiple modalities, introduction of new concepts in small chunks with sufficient time to learn, clear class routines, hands on math skills practice. (Exh. 3 p.2)

In the Minutes of IEP meeting of May 22, 2012, it is stated that the Parent agreed with the goals. The parent stated "I have never been in agreement. I always tried to protect my son. There are so many things going on in the public school. I'm constantly hearing of things on the news. I will go look at any school that is offered." (Exh. 11 p.4) In the document titled IEP Annual Review Report prepared by Sally Ord dated May 22, 2012, under the category "Other" it states "discussion of change in classification – mum unsure about changing classification because of not 'in her heart' accepting his difficulties"

At the hearing on this matter on May 16, June 6, June 19, the parent never stated that she told the CSE team that she felt the 12:1+1 special class was not an appropriate educational placement for the student.

The CSE team addressed the parent's concerns that they were aware of on the date of the meeting.

3. Was the May 2012 IEP inappropriate due to an improper balance between academic instruction and vocational training.

Susan Naclerio, the IEP coordinator testified that there was a seat for the student at McSweeney school in a 12:1:1 class with students with grade levels similar to the student. (T. 8) At the school, the student would have access to instruction using the internet at the work site. (T. 12) There is nothing in his IEP that would prevent him from being in a part time or full time vocational program. The students who are in a full day vocation programs work on literacy skills, reading skills, functional math skills,

Case 15-1200, Document 43, 07/23/2015, 1560950, Page72 of 252

employment skills. (T. 13 – 15) The work site has built into it a time during the day when they do academics and a time when they go out and work in the community based program. Students at full time vocational programs work one to two hours a day on academics depending on the program and the agreement they have with the community based work study site. (T. 15)

Evelyn Alvarez, special education teacher testified that the student would benefit from both a school that provided academic as well as vocational skills. In a 12:1:1 he would get both an academic and vocational program. (T. 58)

The district had two options available to the student regarding a vocational program, one part time and one full time. The program therefore was flexible to meet the specific needs of this particular student and balanced both an academic and vocation program.

4. Was the May 2012 IEP inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction.

At the hearing, there was no challenge raised that the district's school could not provide the student with related services.

5. Was the student denied a FAPE because May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training." (p. 11)

Because the student attended the Cooke School, Ms. Ord from the Cook Center, who attended the IEP meeting with the parent notified the IEP team of the transition component of the IEP. (T. 73) The transition component of the IEP was provided in a Cooke Report for the IEP. (Exh. 4 p. 12, T. 90, 91)

This student was 18 years old on the date of the IEP meeting. His reading and math scores are approximately at a 3rd grade level. (Exh. 3) The Psychoeducational Evaluation dated March 19, June 2, 2009 indicates that according to a physician at Montefiore Medical Center the student has Moderate Mental Retardation. The student's full scale IQ is 60, Extremely Low. (Exh. 5) The Classroom Observation dated October 27, 2010 stated that the student sat quietly in his seat and did not raise his hand to

Hearing Officer's Findings of Fact and Decision                    8

Case No. 143983

participate. When called upon to answer, he had a difficult time formulating a verbal response. He remained focused. The teacher commented that the student often needs prompting to respond to questions. He has a difficult time making connections. On the date of the IEP, the student was a twelfth grader attending Cooke Academy in a 11:1:1 ELA class and 12:1:1 Math class. He is always attentive and works hard. (Exh. 16) The District's IEP dated May 22, 2012 recommended the following program, a twelve month program, special class 12:1:1 in a special school (D75 Program) with related services of Speech and Language Therapy and Counseling. (Exh. 3) The district's flexible part time or full time vocation program would accommodate this student's special needs as well as this student's academic needs. (T. 13 – 15)

I find the IEP dated May 22, 2012 appropriately addressed the student's particular disability.

The parent's request is denied.

Dated: December 20, 2013

MARY NOE, ESQ.
Impartial Hearing Officer

MN:gc

Hearing Officer's Findings of Fact and Decision                                    9

Case No. 143983

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision            10

Case No. 143983

DOCUMENTATION ENTERED INTO THE RECORD

PARENT

A     Due Process Response dated April 8, 2013, 3 pages

B     Letter to Mark Jacoby from Charles Gassow of Partnership for Children's

       Rights, dated June 21, 2013, and fax confirmation 3 pages   ⟶

C     Letter to Mark Jacoby from Todd Silverblatt of Partnership for Children's

       Rights, dated August 22, 2012, and fax confirmation 3 pages

D     Enrollment Contract, Cooke Center Academy Summer 2012 with

       M   M   , signature dated June 25, 2012, 2 pages

E     Cooke Center School Enrollment Contract 2012-2013 Academic Year

       With M   M   signature dated June 25, 2012, 2 pages

F     2012 Federal Income Tax Return for J   S   (social security numbers

       Redacted), 2 pages

G     2012 Federal Income Tax Return for M   M   (social security numbers

       Redacted), 2 pages

I     Affidavit of Katherine Hibbard, dated May 10, 2013, 7 pages

J     Affidavit of Victoria Fowler, dated May 10, 2013, 7 pages

K     Affidavit of M   M   , dated, May 10, 2013, 5 pages

L     Affidavit of M   M   dated May 10, 20a3, 5 pages

M     Affidavit of Sally Ord, dated May 10, 2013, 5 pages

N     Affidavit of Francis Tabone, dated May 10, 2013, 4 pages

O     Letter Brief from Amanda Sen to Hearing Officer Mary Noe, dated April 29,

       2013, and email transmission, 5 pages

P     Parent's Motion in Opposition to Hearing Officer Mary Noe's Verbal Order on

       April 30, 2013 that the Hearing Office Not Translate Affidavits Submitted by

       Either Party in this Matter, dated April 30, 2013, and email transmission, 4 pages

Q     Department's Response to Parent's Motion, dated May 1, 2013 and associate

       email transmission,

R     Parent's Opening Statement, undated, and email transmission dated May 13, 2013

**A202**

Hearing Officer's Findings of Fact and Decision                    11

Case No. 143983

_____

    5 pages

S    Parent's Unofficial English Affidavit, 4 pages

DEPARTMENT OF EDUCATION

1    Due Process Complaint, 3/18/13, 5 pages

2    Meeting Invitation, 4/30/12, 4 pages

3    IEP, 5/22/12, 15 pages

4    March 2012 Cooke Center Academy Progress Report J. S█████ 16 pages

5    June 2009 Psycho-educational Evaluation, 9 pages

6    IEP Transition Goals, 5/22/12, 3pages

7    IEP Annual Review Discussion Doc – Speech & Lang., 5/22/13, 2 pages

8    IEP Annual Review Discussion Doc – ELA, 5/22/13, 3 pages

9    IEP Annual Review Discussion Doc. – Math, 5/22/13, 2 pages

10    IEP Annual Review Discussion Doc. – Counseling, 5/22/13, 2 pages

11    E. Alvarez IEP Meeting Minutes, 4 pages

12    Sally Ord IEP Meeting Minutes, 5 pages

13    June 2012 Cooke Center Progress Report J. S█████, 17 pages

14    Cooke Center Student Assessment Portfolio J. S█████, 7 pages

15    Stanford Binet Intelligence Scales, 1/5/12, 2 pages

16    Classroom Observation, 10/27/10, 1 page

17    Final Notice of Recommendation, 6/15/12, 1 page

18    November 2012 Cooke Academy Progress Report J. S█████ 16 pages

19    March 2013 Cooke Academy Progress Report J. S█████, 16 pages

20    Cooke Center Summer Academy Goals J. S█████, 4 pages

21    Affidavit of Susan Nacherio, 5/9/13, 5 pages

22    Affidavit of Evelyn Alvarez, 5/9/13, 7 pages

26    DOE Opening Statement, 3 pages

27    Summer 2012 Curriculum Outline, 1 page



**RECEIVED**

AUG 0 9 2013

OFFICE OF STATE REVIEW

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M, on behalf of J.S,

                                     Petitioner,

            - against -

New York City Department of Education,

                                 Respondent.
-------------------------------------------------------------------------X

**NOTICE OF INTENTION
TO SEEK REVIEW**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

NOTICE:

      Please be advised that M.M. has retained our office to represent her and her son, J.S.,
in this appeal. Further, please be advised that we intend to seek review of the determination
of the impartial hearing officer concerning the identification, evaluation, program, or
placement of J.S., as set forth in the impartial hearing officer's Findings of Fact and Decision
dated July 18, 2013. Upon receipt of this notice, you are required to have prepared a written
transcript of the proceedings before the impartial hearing officer in this matter. A copy of the
decision of the impartial hearing officer, a bound copy of the written transcript, as well as an
electronic transcript, and the original exhibits accepted into evidence at the hearing and an
index to the exhibits must be filed by the Department of Education with the Office of State
Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, NY
12205-2643, within 10 days after service of this notice.

**A204**



Dated: New York, New York
August 6, 2013

THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for Petitioner
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 x 246
Fax (212) 683-5544
tgray@pfcr.org

2

**A205**

**RECEIVED**

AUG 0 9 2013

OFFICE OF STATE REVIEW

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S,

Petitioner,

- against -

New York City Department of Education,

Respondent.
-------------------------------------------------------------------------X

**AFFIDAVIT OF
PERSONAL SERVICE**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

STATE OF NEW YORK )
                 ss.:
COUNTY OF NEW YORK )

THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 6th day of August, 2013, at 100 Church Street, in New York City, New York County, State of New York, he served the annexed Notice of Intention to Seek Review on the New York City Department of Education by delivering and leaving with said JERRY BRADSHAW at said time and place a true copy thereof.

Deponent further says that he knew the person so served to be the said JERRY BRADSHAW, who is the Unit Chief in said district.

_____
THOMAS GRAY

Subscribed and sworn to before me
this 6th day of August, 2013

_____
Notary Public

AMANDA S. SEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02SE6279054
Qualified in Kings County
My Commission Expires April 08, 2017

**A206**



THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW

**RECEIVED**

AUG **2 6** 2013

--------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

OFFICE OF STATE REVIEW

M.M., on behalf of J.S,

**NOTICE WITH PETITION**

         Petitioner,

     - against -

Impartial Hearing
Case No. 143983

New York City Department of Education,

IHO Mary Noe, Esq.

         Respondent.

--------------------------------------------------------------------X

NOTICE:

   You are hereby required to appear in this review and to answer the allegations contained in this petition. Your answers must conform with the provisions of the regulations of the Commissioner of Education relating to reviews of this nature, copies of which are available from the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, New York 12205-2643.

   Please take notice that such regulations require that an answer to the petition must be served upon the petitioner, or if the petitioner is represented by counsel, upon such counsel, within 10 days after the service of the petition for review, and that a copy of such answer must, within 2 days after such service, be filed with the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, New York 12205-2643.

**A207**

The decision of the State Review Officer shall be based solely on the record before the State Review Officer and shall be final, unless an aggrieved party seeks judicial review.

Dated: August 20, 2013

PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for Petitioner

BY:    THOMAS GRAY
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 x 246

**RECEIVED**

AUG 2 6 2013

OFFICE OF STATE REVIEW

2

**A208**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF
M.M., on behalf of J.S.,

                                        Petitioner,

                against

New York City Department of Education
                                Respondent.
-----------------------------------------------------------------------X

**RECEIVED**

AUG **2 6** 2013

OFFICE OF STATE REVIEW

**VERIFIED PETITION**
Impartial Hearing
Case No. 143983

## PRELIMINARY STATEMENT

1.  Partnership for Children's Rights, attorneys for M.M., mother of J.S., submits this

Petition on behalf of M.M., in support of her claim that Impartial Hearing Officer (IHO) Mary

Noe, Esq., erred in denying her request for an order directing the New York City Department of

Education (DOE) to pay tuition for J.S. at the Cooke Center for Learning and Development

(Cooke) for the 2012-2013 school year.

## BACKGROUND FACTS

2.  J.S. is a 19 year-old student with a disability who, starting in May 2012, the DOE has

classified as Autistic (Exhibit (Exh.) 3 at 1). Prior to May 2012, the DOE classified J.S. as a

student with speech or language impairment (Exh. 1 at 2; *see* Exh. 5 at 1).

3.  J.S. started receiving early intervention services at age two (Exh. 1 at 2). He began

attending Cooke in 2008, at age 14 (Exh. 1 at 2). For each school year at Cooke prior to 2012-

2013, the DOE agreed to fund his tuition via a stipulation (Exh. 1 at 2).

4.  A Comprehensive Psychoeducational Evaluation (Comprehensive Evaluation), based on

tests conducted on March 19 and June 2, 2009, concluded that J.S. scored in the extremely low to

low average ranges on tests of his cognitive abilities (Exh. 5 at 2-4, 7-8). Socially and

emotionally, the Comprehensive Evaluation indicated that J.S.'s general adaptive functioning,

1

**A209**

communication, daily living skills, and socialization were in the low range (Exh. 5 at 4-5). On *Diagnostic and Statistical Manual of Mental Disorders*-oriented scales, J.S.'s affective and anxiety problem scores were in the borderline clinical range (Exh. 5 at 5).

5. A January 5, 2012 Stanford-Binet Intelligence Scales, Fifth Edition, Narrative Report, (Stanford-Binet Report) based on testing conducted on October 19, 2012, classified J.S.'s overall intelligence as mildly delayed (Exh. 15). J.S.'s descriptive classifications on various tests ranged from borderline delayed to average (Exh. 1). The Stanford-Binet Report contains no data on J.S.'s social, emotional, or academic functioning (*see* Exh. 15). M.M. did not obtain a copy of the Stanford-Binet Report until February or March 2013 (Tr. 237-41).

6. A Committee on Special Education (CSE) meeting, held on May 22, 2012, and the corresponding Individualized Education Program (IEP), with an implementation date of July 2, 2012, recommended a "12:1+1" program in a District 75 school for J.S. (Exh. 3 at 9, 15).

7. On June 15, 2013, the DOE issued a Final Notice of Recommendation (Final Notice), placing J.S. at P721X at the Stephen D. McSweeney School (McSweeney) for the 2013-2013 school year (Exh. 17).

8. On June 21, 2012, M.M., through her attorney, notified the DOE that she had visited McSweeney the previous day and determined that it was not appropriate for J.S. because the school's academic program was for lower functioning students; the program focused exclusively on job placement for students of J.S.'s age, which would impede J.S.'s steady academic progress; and McSweeney's environment was too chaotic and noisy for J.S. (Exh. B).

9. Additionally, M.M. asserted that the 2012 IEP underlying J.S.'s placement at McSweeney was insufficient because it was premised on the outdated Comprehensive Evaluation from 2009 (Exh. B; *see* Exh. 5). M.M. indicated that in the absence of an appropriate

2

**A210**

placement, she would re-enroll J.S. in Cooke's 12-month program and seek an order directing the DOE to pay the tuition (Exh. B).

10. By an August 22, 2012 letter, M.M.'s attorney again wrote the DOE seeking an appropriate placement, and re-notified the DOE that J.S. would be re-enrolled at Cooke (Exh. C). The attorney noted that the IEP still recommended the same "12:1:1" class ratio and related services that M.M. had objected to as inappropriate in previous years (Exh. C at 1).

11. On March 18, 2013, M.M.'s attorney filed a Due Process Hearing Complaint (Complaint) alleging that the DOE had failed to provide J.S. a free and appropriate public education (FAPE) for the 2012-2013 school year and requesting that the DOE pay J.S.'s 2012-2013 tuition directly to Cooke (Exh. 1).

## PRE-HEARING ORDERS AND OBJECTIONS

12. The case was assigned to IHO Noe, who, by an April 24, 2013 order, directed that "each party should present the direct testimony by affidavit and then call the witness on the date of the hearing for cross-examination. Additional direct examination that is not repetitive or irrelevant will be allowed" (*attached as* Appeal (App.) Exh. 1).[1]

13. On April 29, 2013, M.M.'s attorney objected to IHO Noe's affidavit scheme and

---

[1] M.M. respectfully requests that the State Review Officer (SRO) permit the addition of the attached order, dated April 24, 2013, as well as five additional exhibits that IHO Noe failed to include in the hearing record: a June 7, 2013 order (App. Exh. 2), a July 2, 2013 letter (App. Exh. 3), M.M.'s English affidavit (App. Exh. 4), as well as the parties' closing briefs (App. Exhs. 5 and 6). M.M. also respectfully requests the admission of three additional exhibits, which are necessary for illustrating this case's procedural history: an email dated April 24, 2013, 3:16:00 PM (App. Exh. 7), in which M.M.'s attorney informed the IHO that M.M. only spoke Spanish; an email dated April 30, 2013, 9:51:10 AM (App. Exh. 8), in which the hearing office offered affidavit translation; and a July 24, 2013 letter from M.M.'s attorney asking the IHO to correct deficiencies in the record (App. Exh. 9). *See Application of a Child with a Disability, App. No. 03-044* ("Documentary evidence not presented at a hearing may be considered in an appeal from the hearing officer's decision, if such evidence was unavailable at the time of the hearing, or when such evidence is necessary to enable [the SRO] to render a decision") (internal citation omitted).

3

**A211**

requested that direct testimony be taken live (Exh. O at 1-2). M.M.'s attorney also noted that M.M. required a Spanish interpreter, which would further complicate the IHO's affidavit scheme as M.M. would need the affidavits to be translated (Exh. O at 3; *see* App. Exh. 7).

14. By a verbal order, issued at an April 30, 2013 telephone conference, IHO Noe directed the hearing office not to translate the affidavits of either party into Spanish (*see* Exh. P at 1).

15. M.M.'s attorney filed a formal objection later that day, noting that the IHO's order placed an undue burden on M.M. in violation of 8 N.Y.C.R.R. § 200.5(j)(3)(vi), requiring the district to provided interpretation, and that the order deprived M.M. of her right to participate in the hearing process (Exh. P at 2). Moreover, the attorney noted that hearing office staff had informed the parties that the hearing office would translate the affidavits (Exh. P at 2; *see also* App. Exh. 8).

16. By a May 1, 2012 letter, the DOE attorney informed IHO Noe that the DOE had no objection to M.M.'s request for live testimony, and the DOE did not oppose M.M.'s request for affidavit translation (Exh. Q at 1). The attorney wrote that the DOE was "concerned that a failure to translate the affidavits may result in a denial of [M.M.'s] due process rights" (Exh. Q at 1).

**THE IMPARTIAL HEARING**

17. A hearing was held before IHO Noe on May 16, June 6, and June 19, 2013 (Tr. 1-296).[2]

18. The DOE presented the affidavits of two witnesses, and made them available for cross-examination: Susan Naclerio, the IEP/Related Services Coordinator at McSweeney; and Evelyn Alvarez, a special education teacher who worked at CSE Region 9 (Exhibits (Exhs.) 21, 22; Tr. 6-16, 54-109).

19. As required by IHO Noe's April 24, 2013 order, M.M. presented her own affidavit as

---

[2] "Tr." refers to the pages of the transcript of the impartial hearing.

4

**A212**

well as affidavits from five additional witnesses: Katherine Hibbard, the Head Teacher of

Literacy and Mathematics at Cooke; Victoria Fowler, an administrative coordinator at Cooke;

Mary Clancy, the Director of the Cooke Summer Academy; Sally Ord, a consulting teacher at

Cooke; and Francis Tabone, the former Assistant Head of the Cooke Center Academy (Exhs. I, J,

K, L, M, N; *see* App. Exhs. 1, 4). M.M. and her witnesses were made available for cross-

examination (Tr. 17-48, 115-241).

### THE FINDINGS OF FACT AND DECISION

20. In her Findings of Fact and Decision (Decision), dated July 18, 2013, IHO Noe gestured

at evaluating M.M.'s tuition claim under the three prong test established in *Sch. Comm. of*

*Burlington v. Dept. of Educ.*, 471 U.S. 359 (1986) (Decision (Dec.) at 6-9).[3] However, without

making findings under *Burlington* Prongs I or II, the IHO determined that M.M. had failed to

"comply with the third prong of Burlington by not informing the IEP team that the parent

requested an additional evaluation, which was conducted on October 19, 2012 and a report was

issued on January 5, 2012" (Dec. at 9). Therefore, the IHO denied M.M.'s request for tuition

payment (Dec. at 9).

### SUMMARY OF CONTENTIONS ON APPEAL

21. M.M. appeals the IHO's affidavit scheme, and her refusal to timely provide translation

for M.M., which prevented M.M. from fully participating in the hearing process. Additionally,

M.M. contests the IHO's Decision, which failed to include findings under *Burlington* Prongs I

and II, and asserts that the IHO's *Burlington* Prong III determination is erroneous. M.M. seeks an

---

[3] *Burlington* provides that parents may be awarded tuition payment when (1) the services offered
by the school district are inadequate or inappropriate (Prong I); (2) the private school selected by
the parent is an appropriate placement for the student (Prong II); and (3) equitable considerations
support the parent's claim (Prong III)). *Burlington*, 471 U.S. 359.

5

**A213**

order either remanding this case for a new hearing before a new IHO or, alternatively, directing the DOE to pay J.S.'s 2012-2013 tuition at Cooke.

### ARGUMENT: PROCEDURAL ERRORS DURING THE IMPARTIAL HEARING PROCESS REQUIRE REMAND, AND THE FINDINGS OF FACT AND DECISION CONTAINS ERRORS OF FACT AND LAW REQUIRING REMAND OR REVERSAL

#### A. Due Process Under the IDEA and the New York State Regulations

22. The first two stated purposes of the IDEA are (1) "to ensure that all children with disabilities have available to them a free appropriate public education," and (2) "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B).

23. A key element in furthering and protecting these interests is the "impartial due process hearing," 20 U.S.C. § 1415(f), which entitles parents to present and adjudicate any complaint pertaining to the provision of a FAPE for their child. 20 U.S.C. § 1415(b)(6). Parents have "the right to present evidence and confront, cross-examine, and compel the attendance of witnesses" at such hearings. 20 U.S.C. § 1415(h)(2); *see also Davis v. District of Columbia Bd. of Educ.*, 522 F. Supp. 1102, 1107-08 (D.D.C. 1981) ("the hearing procedure is to be as open as possible to allow parties to present evidence and to challenge the evidence presented").

24. Ensuring that parents are afforded an opportunity to fairly present their case at the administrative level is also vital to ensuring that courts have available to them a "complete factual record" from which to review the issues in a case. *See Hope v. Cortines*, 872 F.Supp. 14, 19 (E.D.N.Y. 1995). Indeed, "[a]n impartial hearing officer must ensure that there is an adequate record upon which to premise his or her decision and permit meaningful review of the issues." *Application of a Child with a Disability*, App. No. 04-024 at 8.

25. In an IDEA administrative hearing, the IHO is also responsible for ensuring "that the

6

**A214**

procedures at the hearing were consistent with the requirements of due process." *Application of a Student with a Disability*, App. No. 09-142 at 7 (remanding for additional proceedings where parties were not allowed to present evidence, confront, cross-examine, and compel attendance of witnesses); *see also* 34 CFR § 300.514(b)(2)(ii) (on appeal, IDEA hearing procedures must be reviewed to ensure consistency "with the requirements of due process").

26. The New York State Regulations of the Commissioner of Education (NYS Regulations) also provide parents and districts with a broad right to present evidence and witnesses, ensuring that the parties at an IDEA hearing have the "opportunity to present evidence, compel the attendance of witnesses and to confront and question all witness at the hearing." 8 N.Y.C.R.R. § 200.5(j)(3)(xii).

27. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

**B. IHO Noe's Orders Requiring All Witnesses to Testify by Affidavit, and Preventing Affidavit Translation, Violated M.M.'s Right to be Meaningfully Participate and, Therefore, this Case Must be Remanded for a New Hearing**

28. In conducting the hearing in this case, IHO Noe implemented an affidavit scheme in which she required all direct testimony to be submitted via affidavit (*see* App. Exh. 1). This scheme violated due process, the IDEA, and the NYS Regulations. It compromised M.M.'s ability to communicate with her attorney and meaningfully participate in the hearing process.

29. The IHO mistakenly relied on the NYS Regulations, at 8 N.Y.C.R.R. § 200.5(j)(3)(xii)(f),

7

**A215**

to justify the affidavit scheme (*see* App. Exh. 1).[4] While 8 N.Y.C.R.R. § 200.5(j)(3)(xii)(f) allows IHOs to *accept* testimony through affidavits, it does not authorize the IHO to *require* that all direct testimony be provided in this manner. It is encapsulated under 8 N.Y.C.R.R. § 200.5(j)(3)(xii), which, as noted above, ensures parties the "opportunity to present evidence, compel the attendance of witnesses and to confront and question all witness at the hearing." *See also* 34 CFR § 300.512(a)(2) (granting the parties to an impartial hearing the right to "present evidence and confront, cross-examine, and compel the attendance of witnesses").

30. Moreover, the NYS Regulations, at 8 N.Y.C.R.R. § 200.5(j)(3)(xiii), ensure that a party "shall have up to one day to present its case." IHO Noe's affidavit scheme preemptively circumscribed M.M.'s ability to present her case, stunting her ability fully present her position on the record.

31. M.M. formally objected to the IHO's affidavit scheme prior to the hearing, on April 29, 2013, stating that the scheme impeded the process of testing witness credibility and inhibited challenges to prejudicial lines of testimony (*see* Exh. O at 1-2). Notably, the DOE "did not oppose" M.M.'s request for live testimony (Exh. Q at 1). Nevertheless, the IHO proceeded with scheme, only issuing a formal denial of M.M.'s motion in opposition after all the testimony in the case had been heard (Tr. 253).

32. IHO Noe further impeded M.M.'s participation in the hearing with her April 30, 2013 order directing the hearing office not to translate the affidavits into Spanish.

33. The NYS Regulations are clear that "[a]t all stages of the proceedings, where required, interpreters of the deaf, or interpreters fluent in the native language of the student's parent, shall be provided at district expense." 8 N.Y.C.R.R. § 200.5(j)(3)(vi).

---

[4] The IHO's April 24, 2013 order actually cites "8 NYCRR 200.5(3)(xii)(f)," in apparent reference to 8 N.Y.C.R.R. 200.5(j)(3)(xii)(f).

8

**A216**

34. While M.M. is aware of no case law concerning a lack of translation at an IDEA hearing, case law regarding other federally regulated administrative hearings require adequate translation services. *See Di Paolo v. Barnhart*, 01-CV-3123 (JG), 2002 WL 257676 at * 9 (remanding a case where an Administrative Law Judge's denial of claimant's request for an interpreter prevented a claimant from receiving a "full and fair hearing"); *Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir. 1984) (adequate translation is required at a deportation hearing).

35. After M.M. objected to the IHO's April 30, 2012 order, the DOE informed the IHO that it was "concerned that a failure to translate the affidavits may result in a denial of [M.M.'s] due process rights" (*see* Exh. Q at 1). Even the hearing office agreed that it was responsible for translating affidavits (*see* App. Exh. 8). IHO Noe was alone in her belief that M.M. was not entitled to understand the direct testimony presented in her case.

36. M.M. suffered substantive harm as a result of IHO's Noe's orders. Most profoundly, despite M.M.'s efforts, an "official" English translation of M.M.'s affidavit is it not in evidence (Tr. 227-32, 273; *see* Dec. at 12-13). The IHO's initial refusal to provide translations of the affidavits, forced M.M.'s attorney to submit a translation over sustained objections (*see* Exhs. O, P; Tr. 229-31). A translated affidavit was only admitted into evidence after all testimony was taken, and the IHO ultimately failed to include it as part of the record (Tr. 273; *see* Dec. at 12-13). Translations of any documents were not ordered until the end of the hearing when all of the evidence had already been presented, after M.M.'s ability to communicate with, and assist, her attorney had been compromised (Tr. 294-95).

37. Furthermore, the IHO's affidavit scheme, coupled with her delayed order to translate the affidavits into Spanish, impaired M.M.'s ability confronting the DOE witnesses, as the IHO prevented the hearing office from providing translations of those witnesses' affidavits until over

9

**A217**

a month after they had been presented for cross-examination (Exh. P, Tr. 294-95; *see* Tr. 6-16, 54-109).

38. In summary, the IHO's affidavit scheme, and her refusal to allow translation services, infringed on the M.M.'s right to present evidence and witnesses and on her ability to present her case in a "meaningful manner" in accord with due process. *See Mathews v. Eldridge*, 424 U.S. at 333 (1976), 20 U.S.C. § 1415(h). Therefore, at a minimum, the IHO's decision must be vacated and the case must be remanded for a new hearing and decision.

### C. IHO Noe Erred in Failing to Consider *Burlington* Prongs I and II, Both of which Favor M.M.'s Tuition Payment Request

39. IHO Noe's Decision fails to consider *Burlington* Prongs I and II, only making a determination under *Burlington* Prong III (*see* Dec. at 7-9). This was error, as the IHO adjudicated a remedy prior to determining whether the DOE offered J.S. a FAPE.

40. Second Circuit case law is clear that "[t]he two elements to consider in determining whether parents are entitled to tuition reimbursement are (1) whether the defendant failed to provide a free appropriate public education and (2) whether the private education services obtained by the parents were appropriate to their child's needs." *Wolfe v. Taconic-Hills Cent. Sch. Dist.*, 167 F. Supp. 2d 530, 533 (N.D.N.Y. 2001) (citing *Burlington*, 471 U.S. at 370). Only once this two prong test is satisfied do Courts consider whether "'equitable considerations are relevant in fashioning [the appropriate] relief.'" *Wolfe*, 167 F. Supp. 2d at 533-34 (quoting *Burlington*, 417 U.S. at 374; *citing Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 16 (1993)).

41. Furthermore, the SRO recognizes this "axiomatic" procedure holding that "the equitable prong of the Burlington/Carter test relates only to *the fashioning of relief*, i.e., the reduction or limitation of the tuition award." *Application of a Child with a Disability*, App. No. 03-003 (emphasis in original) (internal citations omitted).

10

**A218**

42. Therefore, M.M. respectfully requests that the SRO, at a minimum, remand this case for new hearing before an IHO who is able to adhere to the *Burlington* adjudicative process.

43. Nevertheless, while the IHO's procedural rulings violated M.M.'s ability to present her case and participate in the hearing, the record, as constituted, reveals: (1) that the DOE failed to prove that at it had provided J.S. with a FAPE at *Burlington* Prong I, and (2) that M.M. established that Cooke was an appropriate program at *Burlington* Prong II.

**The DOE Did Not Provide J.S. with a FAPE under *Burlington* Prong I**

44. The DOE's effort to provide J.S. with a FAPE was faulty at its inception due to the DOE's violation of the IDEA's mandate that school districts reevaluate disabled students "at least once every 3 years." 20 U.S.C. § 1414(a)(2)(B)(ii).

45. In this case, the IEP relied on a Comprehensive Evaluation that was based on tests conduced on March 19 and June 2, 2009 (*see* Exh. 5). Ms. Alvarez, the DOE special education teacher present at the May 2012 CSE meeting, claimed that the Comprehensive Evaluation was still valid because the evaluation was dated "within 3 years of the IEP meeting" (Exh. 22 ¶ 16; *see* Tr. 96-97). However, the SRO has expressly rejected this argument. In fact, the DOE had "an obligation to conduct a reevaluation in a time frame that provided it with an understanding of the child's current needs in order to develop an appropriate program for the child for the beginning of the" school year for which the IEP is relevant. *Application of a Child with a Disability*, App. No. 05-025. In this case, the CSE meeting crafted an IEP that was to be implemented on July 2, 2012, at which time the Comprehensive Evaluation was outdated (*see* Exhs. 3 at 1, 5).

46. The lack of up-to-date functional evaluations reveals that M.M. was impeded from participating in the placement process. The IDEA requires that a school district consider "input from the child's parents" in determining whether additional data is needed as part of a

11

**A219**

reevaluation. 20 U.S.C. § 1414(c)(1)(B). In this case, if the IEP team determined that no additional data was needed, the DOE was required to notify M.M. of "that determination and the reasons for the determination" and of her right to request "an assessment to determine whether the child continues to be a child with a disability and to determine the child's educational needs." 20 U.S.C. § 1414(c)(4)(A). If the DOE had engaged M.M. in a discussion about the need for new evaluations, M.M. may have discovered the Stanford-Binet Report prior May 2012 CSE meeting (*see* Tr. 237-40), and the IEP team may have understood that additional academic, adaptive, social, emotional, and vocational evaluations were required.

47. Substantively, the fact that there the IEP team did not develop more current information about J.S.'s functioning resulted in an IEP that contains inadequate supports. Primarily, there is no evaluative data to support the IEP's recommendation of a program with one teacher and one paraprofessional for a 12 student class. Indeed, uncontroverted evidence indicates that in order to progress, J.S. needed a smaller environment, with more potential for individualized attention. Ms. Ord, the Cooke representative at the CSE meeting, informed the team that a classroom with one teacher and one paraprofessional would not be supportive enough for J.S. who requires extensive individual instruction to learn new material (Exh. M ¶¶ 18-19). J.S.'s literacy and math teacher, Ms. Hibbard, stated that J.S. needs extensive one-to-one instruction (Exh. I ¶ 12, Tr. 22-23). He needs frequent check-ins and prompting (Exh. I ¶ 7; Tr. 21-22). He functioned best in a small classroom environment (Exh. I ¶¶ 8, 11).

48. The IEP team's lack of evaluative data is also reflected in the IEP's lack of specificity. The IEP contains academic goals for J.S., but does not indicate how much academic instruction he is to receive (*see* Exh. 3). The IEP contains various vocational goals, yet also does not indicate how much vocational instruction J.S. is to receive (*see* Exh. 3, Tr. 59-60). Notably, the

12

**A220**

IEP was prepared without the benefit of a vocational assessment or any other assessments designed to identify J.S.'s needs with respect to transition from school to post-school activities (*see* Exh. 3). *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); 8 N.Y.C.R.R. § 200.4(b)(6)(viii).

49. The lack of information on J.S.'s academic, vocational, social, and emotional functioning impeded the IEP team's ability to sculpt an appropriate program.

50. Moreover, the DOE failed to prove that the public school placement, McSweeney, could implement the IEP, even with it defects. Contrary to the recommendations in the IEP, Ms. Naclerio, the DOE's witness from McSweeney, testified that bank visits were not part of McSweeney's curriculum (Tr. 12; *see* Exh. 3 at 3-4). Ms. Naclerio could not offer any assurance that J.S. would be admitted to McSweeney's travel training program (Exh. 21 ¶ 27; *see* Exh. 3 at 8-9). J.S. would only have one or two hours a day of academic instruction, which is insufficient to enable J.S. to meet the IEP's academic goals (Tr. 15; *see* Exh. 3 at 4-8).

51. Similarly, Dr. Tabone learned, at his June 2012 visit to McSweeney, that J.S. would be spending most of each school day at a work site and receiving little academic instruction (Exh. N ¶¶ 9-13). McSweeney only provided academic instruction that was below J.S.'s grade level (Exh. N ¶¶ 13-14). The school lacked a specific program for teaching social skills (Exh. N ¶¶ 17-18). Thus, J.S. would have had no opportunity to make academic or social progress at McSweeney.

### Cooke Provided an Appropriate Program for J.S.

52. M.M. satisfied her burden at *Burlington* Prong II, showing that Cooke was an appropriate placement for J.S..

53. Under *Burlington* Prong II, a private school is appropriate if it provides services that are "proper under the Act," *Florence County Sch. Dist. v. Carter*, 510 U.S. at 15; *Burlington*, 471 U.S. at 370, i.e. the services are "'likely to produce progress, not regression,'" *Gagliardo v.*

13

**A221**

*Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)). Parents must show that the "placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982)).

54. In this case, Cooke's summer 2012 program was appropriately designed to help J.S. maintain the skills he had learned during the prior academic year (Exh. K ¶ 17). The academic environment was small, and individualized, with two teachers for the 12-student functionally grouped academic classes (Exh. K ¶¶ 8-9, 11-12). During the summer, J.S. participated in an internship and community activities; he received speech and language therapy, as well as counseling (Exh. K ¶¶ 13, 16, 18, 21-22, 24).

55. Cooke's academic year program for 2012-2013, SKILLs, was also appropriate for J.S. SKILLs provided a small environment as it contained only 34 students (Exh. J ¶¶ 5-6). J.S.'s math and literacy class had one teacher and five students (Exhs. I ¶¶8-9, J ¶ 9). J.S. had individualized support at his internship, where he practiced skills such as self-control, problems solving skills, and appropriate body language (Exh. J ¶¶ 12-17). Cooke provided J.S. with travel training, and three afternoons a week he went out into the community to banks, museums, and libraries (Exh. J ¶¶ 19-20). Cooke's program also included individual counseling once a week, where J.S. worked on voice and body language, improving his frustration tolerance, and channeling his anger (Exh. J at ¶ 21). J.S. received group counseling, three sessions a week of speech and language therapy, as well as occupational therapy (Exh. J ¶¶ 21-22).

56. Moreover, J.S. progressed during the 2012-2013 school year. For instance, in literacy

14

**A222**

class, J.S. was beginning to identify character motivation and emotion (Exh I ¶ 15). He was rereading his written work, and editing for punctuation and grammar; he was typing with two hands and he was nearly able to send an email without prompting (Exh I ¶ 15). In math, J.S. was now able to calculate change mostly in his head (Exh. I ¶ 18). With support, J.S. was going out into the community and using banks and libraries, and shopping at grocery stores (Exh. I ¶¶ 18-19). Socially and emotionally, J.S. had an increased sense of self-awareness and purpose; he had an increasing ability to advocate for his needs; and his use of tone and language were improving (Exh. I ¶ 20, Exh. J ¶ 27). J.S. could now follow and memorize routed directions (Exh. J ¶ 25). He was increasingly able to interact appropriately with clerks and venders (Exh. J ¶ 25). At his internship, J.S. was now able to complete all tasks and observe proper safety precautions without direct prompting (Exh. J ¶ 26).

57. Thus, Cooke was an appropriate placement for J.S..

**D. The IHO's Determination at *Burlington* Prong III is Erroneous**

58. IHO Noe ruled against M.M. at *Burlington* Prong III, finding that the equities did not favor M.M. because she had not submitted the Stanford-Binet Report at the May 2012 CSE meeting (Dec. at 9). However, the IHO's determination is unsupported as the evidence reveals that M.M. was cooperative and complied with the DOE's effort to provide J.S. with an appropriate program and placement.

59. Equitable considerations bear on the appropriate relief to be awarded under the IDEA, *Burlington*, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters.'" *Wolfe*, 167 F.Supp. 2d at 534 (quoting *Burlington v. Dept. of Educ.*, 736 F.2d 773, 801-02 (1st Cir. 1984)).

15

**A223**

60. IHO Noe appears to find that M.M.'s actions regarding the Stanford-Binet Report were somehow uncooperative (*see* Dec. at 8-9). However, the Decision cites only evidence that indicates that M.M. turned over the Stanford-Binet Report to the DOE as soon as she obtained it.

61. Indeed, as the IHO noted, M.M. testified that she first obtained the Stanford-Binet Report in February or March of 2013, when she asked Cooke for the report to submit with a Social Security benefits application for J.S. (Tr. 237-40; *see* Dec. at 9). Moreover, IHO Noe's assertion that the missing report hindered the DOE's ability to place J.S. is undermined by Ms. Alvarez's testimony that, had the CSE meeting seen the report, it would not have influenced any of the recommendations in the IEP (Tr. 107). Indeed, the IHO cites no harm to the ability of the CSE meeting to craft an IEP because it did not possess the Stanford-Binet Report. In fact, the report, which only contains cognitive findings, does not differ markedly from the cognitive findings in the Comparative Evaluation, which the CSE reviewed (*compare* Exh. 5 at 2-4 (indicating J.S.'s full scale intelligence quotient (IQ) was 60) *with* Exh. 15 (indicating J.S.'s full scale IQ was 68)).

62. M.M. participated in the May 2012 CSE meeting, stating she was most interested in J.S. being able to progress academically (App. Exh. 4 ¶ 8).[5]

63. After receiving the Final Notice, M.M. toured McSweeney on June 20, 2012, learning that students in the proposed program spent most of their time at job sites (App. Exh. 4 ¶¶ 10-12). This was inappropriate for J.S. who still needed to learn academic and life skills and become more independent (App. Exh. 4 ¶¶ 11-12). By a June 21, 2012 letter, M.M. notified the

---

[5] While meeting notes report that M.M. stated that she had never been in agreement with a public school placement (*see* Exh. 11 at 4), it should be noted that these notes were created by Ms. Alvarez, who translated for M.M. at the CSE meeting (Tr. 81). Ms. Alvarez is a DOE employee and an interested party (Exh. 22 ¶ 1). There is no dispute that M.M. stated that she would visit any placement offered and that she promptly visited McSweeney and actively investigated whether it was appropriate for J.S. (Exh. 22 ¶ 46, App. Exh. 4 ¶ 10, Tr. 219).

16

**A224**

DOE of her concerns and asked for another school placement (Exh. B). By an August 22, 2012

letter, M.M. again informed the DOE that McSweeney was inappropriate and requested another

placement (Exh. C).

64. M.M. signed the contracts to enroll J.S. at Cooke for the summer and 10-month programs

on June 25, 2012 (Exhs. D, E). Notably, clauses in these contracts released M.M. from these

contracts if, prior July 30, 2012, she choose to enroll J.S. in a DOE provided summer program,

or prior to October 31, 2012, if she chose to accept a DOE placement for the academic year

(Exhs. D ¶ 7.b, E ¶ 10.b).

65. Thus, contrary to IHO Noe's determination, the record establishes that M.M. in no

way impeded the DOE's ability to offer J.S. a FAPE. *Cf. N.R. v. NYC Dept. of Educ.*, 07-CV-

9648 (BSJ), 2009 WL 874061, at *6 (S.D.N.Y. Mar. 31, 2009) (finding in favor of parent on

Prong III where record was "bereft of any evidence that [a parent] hindered [the DOE's] efforts

to provide a FAPE or otherwise frustrated the placement process").

66. In short, the equities support M.M.'s claim for tuition funding.

**E. Direct Payment of Tuition is Appropriate**

67. If this case is not remanded, direct payment of tuition is an appropriate remedy where the

parent satisfies all three *Burlington* prongs, "the parents lack the financial resources to 'front' the

costs of private school tuition, and ... a private school is willing to enroll the student and take the

risk that the parents will not be able to pay tuition costs." *Mr. and Mrs. A v. N.Y.C. Dep't of

Educ.*, 769 F.Supp. 2d 403, 428 (S.D.N.Y. 2011).

68. M.M. offered uncontroverted evidence that her family income was only around

$30,000 for the year, and that she had less than $500 in savings (App. Exh. 4 ¶¶ 23, 25; *see* Exhs.

F, G (2012 tax returns for M.M. and J.S.'s father)).

17

**A225**

69. As all three of the *Burlington* prongs have been satisfied, and as M.M. lacks the financial means to pay J.S.'s Cooke tuition, an award of direct payment is appropriate.

**F. If Remanded, IHO Noe's Conduct Requires this Case to be Sent to a New IHO**

70. Should this case be remanded for a new hearing, it should be before a new IHO, as IHO Noe's conduct during the administrative proceedings indicates that she is either unable administer an IDEA hearing or biased against M.M..

71. As shown above in this Petition's § C, IHO Noe refused to abide by the procedural structure of tuition reimbursement claims brought under the IDEA (*see* Dec. at 6-9).

72. Moreover, IHO Noe's refusal to timely provide translation services for M.M. is inexplicable. Despite objections from M.M. and the DOE, as well as the hearing office's agreement to translate (*see* Exhs. P, Q; App. Exh. 8), the IHO refused to translate these documents until all of the evidence and testimony had already been presented (Tr. 294-95). And still, the IHO failed to include an official English translation of M.M.'s affidavit in record (*see* Dec. at 12-13).

73. Additionally, IHO Noe abdicated her responsibility to make timely rulings and administer an orderly hearing. For example, the IHO did not rule on either of M.M.'s pre-hearing motions, objecting to the affidavit scheme and the lack of translation services, claiming at the June 6, 2013 hearing date that she "didn't get [M.M.'s] motion" and that "I don't know that [M.M.] made a motion" (Tr. 251, 253). However, M.M. filed both objections by email to the email address that the IHO listed in her April 24, 2013 pre-hearing order (*see* App. Exh. 1). The DOE attorney also filed a letter concurring with both of M.M.'s objections prior to the hearing (*see* Exh. Q).

74. Moreover, by her June 7, 2013 order, IHO Noe appeared to blame M.M.'s attorney

18

**A226**

for mishaps in the IHO's application of her own affidavit scheme, writing that "[M.M.'s] counsel failed to appreciate the pre-hearing order which offered counsel an opportunity to submit to the hearing officer any witness to testify verbally rather than by affidavit" (*see* App. Exh. 2). However, M.M.'s attorney filed formal, written objections to the affidavit scheme generally (*see* Exh. O), as well the scheme's likely effect on the non-English speaking M.M.'s ability to participate in the hearing (*see* Exh. P).

75. Finally, the IHO's Decision failed to incorporate evidence that was admitted into record at the hearing. Most notably, the Decision does not contain an official English translation of M.M.'s affidavit; it only lists M.M.'s "Unofficial English affidavit" as Exhibit "S" (*see* Dec. at 12), and fails to incorporate the parties' agreed upon translated affidavit, which had been entered in evidence as "Exhibit X" (*see* Tr. 273, App. Exh. 8).

76. Other evidence that is essential for appellate review that did not make it into the Decision's list of "Documentation Entered into Evidence" includes the IHO's April 24, 2013 pre-hearing order, which was admitted at the June 6, 2013 hearing date (Tr. 252; App. Exh. 1; *see* Dec. at 12-13); the IHO's June 7, 2013 order, in which the IHO articulated her bases for ruling against M.M.'s motions for live testimony and translation services (App. Exh. 2; *see* Dec. at 12-13); the July 2, 2013 letter from M.M.'s attorney referenced in the Decision (App. Exh. 3; *see* Dec. at 9, 12-13); the parties' closing briefs, one of which the Decision cites (App. Exhs. 5, 6; *see* Dec at 8, 12-13). The IHO failed to correct these errors in the evidence despite repeated requests for corrections from M.M.'s attorney (*see* App. Exh. 9). In summary, the IHO's administration of the hearing resulted in a truncated record. *See Application of a Student with a Disability*, App. No. 11-004 at 9 (an IHO has the "responsibility to ensure that there is an adequate record upon which to permit meaningful review").

19

**A227**

77. IHO Noe's conduct requires a remand for a new hearing before a new IHO. *Cf.*
*Application of a Student with a Disability*, App. No.11-091 at 8 (finding that an IHO's "failure to
effectively use the pre-hearing conference procedures at her disposal to simp[lif]y or clarify the
issues in dispute constituted misconduct"); *Application of a Student with a Disability* No. 12-152
at 15 (due to allegations of IHO misconduct, the SRO directed the matter be remanded to a new
IHO).

**RELIEF REQUESTED**

78. Given the IHO's profound procedural errors, which resulted in a truncated record, this
case, at a minimum, must be remanded for a new impartial hearing before a new IHO.

79. Alternatively, despite the IHO's profound procedural errors, the record supports an SRO
decision that: (1) finds that the DOE failed to offer J.S. a FAPE; (2) finds that Cooke was an
appropriate program under *Burlington* Prong II; (3) finds that equitable considerations support
M.M.'s tuition claim; and (4) orders the DOE to pay J.S.'s $55,775 tuitions at Cooke for the 12
month school year, directly to Cooke.

DATE: August 19, 2013
New York, New York

**RECEIVED**

AUG 2 6 2013

OFFICE OF STATE REVIEW
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for M.M.

By: _____

THOMAS GRAY
Staff Attorney
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ex. 246

20

**A228**

**RECEIVED**

Pre-Hearing Order

J███ S███

AUG **2 6** 2013

Case No. 143983

OFFICE OF STATE REVIEW

It is hereby ordered:

1. Pursuant to New York Regulations of the Commissioner 200.5(3)(xii)(f) a impartial hearing officer may take direct testimony by affidavit in lieu of in-hearing testimony, provided that the witness giving such testimony shall be made available for cross-examination.

Therefore, each party should present the direct testimony by affidavit and then call the witness on the date of the hearing for cross-examination. Additional direct examination that is not repetitive or irrelevant will be allowed. The party with the burden of proof shall deliver to the other party their affidavits seven days prior to the hearing. The other party shall deliver to the burden of proof party their affidavit four days prior to the hearing. A copy of all affidavits should be sent to the IHO via the case manager at the IHO office four days prior to the hearing. Both parties may submit to the Hearing Officer the list of witnesses they believe need to testify at hearing, the sum and substance of their testimony and the necessity for their direct testimony to be verbal instead of by affidavit by May 9. Upon receipt, the Hearing Officer will make a determination.

2. Pursuant to 8 NYCRR 200.5[j][5][i-iv] absent a compelling reason or a specific showing of substantial hardship, a request for an extension shall not be granted because of school vacations, a lack of availability resulting from the parties' and/or representatives' scheduling conflicts, settlement discussions between the parties or other similar reasons. Agreement of the parties is not a sufficient basis for granting an extension.

SRO Decision 11-150 Footnote 2

"I note that the hearing record does not indicate that the timelines within which an impartial hearing is to be held were followed in this case. Numerous extensions were granted throughout the course of the ten-month hearing, yet the hearing record does not reflect that the impartial hearing officer documented his reasons for granting the extensions, fully considered the cumulative impact of the factors relevant to granting extensions, or responded in writing to the extensions requests...without a compelling reasons or a showing of substantial hardship in

App. Exh. 1 p. 1

**A229**

violation of State and federal regulations...The hearing record also reflects that at on several hearing dates, the impartial hearing officer solicited a request for extension of the compliance date for issuing a decision from both parties...Such a solicitation on the part of the impartial hearing officer violates federal and State regulations governing impartial hearings which require that requests for extensions be initiated by a party, and that the impartial hearing officer's written response regarding each extension requires be included in the hearing records, even if granted orally."

Therefore, either party may request an extension of the timeline according with the Regulations and SRO decision.

3. The hearing date is May 16 at 10:00. On May 16 the parties should be ready to proceed with their case. If the witnesses are not available then the parties will have deemed to have rested their case unless good cause can be shown.

4. The parties are welcome to have opening and closing statements. The opening statements shall be submitted in writing three days before the hearing and closing statement will be submitted in writing no later than three business days after the hearing.

5. The district will provide to the parent's attorneys copies of all the student's documents including but not limited to IEPs, student's psycho-educational evaluation, social history and any and all other evaluations conducted within the past three year, including provider's reports and the student's attendance records, provider's attendance records. The parents will provide the district with all student's records from any private school.

6. All exhibits should be pre-marked with a cover sheet listing all exhibits and submitted to your adversary as required by law.

7. Any party that requests additional documentation shall do so in writing to the Hearing Office by May 8, 2013.

8. If the case is withdrawn, settled or cancelled, the Parent's attorney and the District representative/attorney **MUST** email me at noe.mary@gmail.com as well as the IHO case manager.

April 24, 2013

_____
Mary Noe
IHO

**A231**

J███ S███
Case No. 143983
Order

Prior to the hearing date, June 6, parent's counsel requested that the Impartial Hearing Officer provide an interpreter so that the parent's affidavit could be translated from Spanish to English. The Impartial Hearing Office provides interpreters for the purpose of translating testimony during the course of a hearing and not for the parties' preparation of the hearing.

At the hearing, parent's counsel offered into evidence the parent's affidavit (Exh. L). The document was admitted into evidence. Parent's counsel renewed their application for the interpreter at the hearing to translate the document. The interpreter stated that she was not qualified to interpret documents but rather translate testimony. Additionally, this translator would perhaps incorrectly interpret the document thereby denying counsel of their right to properly represent their client. District's attorney disputed the parent's counsel's English translation of the document. Therefore no English interpretation of the document was admitted into evidence.

Parent's counsel failed to appreciate the pre-hearing order which offered counsel an opportunity to submit to the hearing officer any witness to testify verbally rather than by affidavit.
"Both parties may submit to the Hearing Officer the list of witnesses they believe need to testify at hearing, the sum and substance of their testimony and the necessity for their direct testimony to be verbal instead of by affidavit by May 9. Upon receipt, the Hearing Officer will make a determination."

The hearing will continue for the purposes of the direct testimony of the parent by parent's counsel on June 14 at 8:00 a.m. unless both parties stipulate to a translation of parent's affidavit and its admission into evidence as Parent's Exhibit T.

June 7, 2013



Mary Noe

App. Exh. 2 pg. 1

**A232**

| From: | Amanda Sen |
|---|---|
| To: | "Mary Noe" |
| Cc: | Stewart Brittania (BStewart2@schools.nyc.gov); MMachado@schools.nyc.gov |
| Subject: | RE: ▉ S▉ , 143983 |
| Date: | Tuesday, July 02, 2013 5:40:00 PM |
| Attachments: | Serrata 143983 July 7 Letter from Parent's Attorney.pdf |

Please find attached a letter indicating that the parent is resting her case and sees no need to continue the hearing tomorrow. Please advise me as to whether or not the parent should appear tomorrow.

Thank you.

Amanda S. Sen

Partnership for Children's Rights

271 Madison Ave., 17th Floor

New York, NY 10016

Phone: (212) 683-7999 ext. 249

Fax: (212) 683-5544

Amanda S. Sen

**From:** Mary Noe [mailto:noe.mary@gmail.com]
**Sent:** Tuesday, July 02, 2013 5:18 PM
**To:** Amanda Sen
**Cc:** Stewart Brittania (BStewart2@schools.nyc.gov); MMachado@schools.nyc.gov
**Subject:** Re: J▉ S▉ , 143983

Please send a letter to me, you can attach it to an email, indicating your request regarding tomorrow's hearing.

M. Noe

On Tue, Jul 2, 2013 at 5:10 PM, Amanda Sen <asen@pfcr.org> wrote:
Yes, I am resting my case.

I would like to submit a written closing statement pursuant to your pre-hearing order.

**From:** Mary Noe [mailto:noe.mary@gmail.com]
**Sent:** Tuesday, July 02, 2013 5:08 PM
**To:** Amanda Sen
**Cc:** Stewart Brittania (BStewart2@schools.nyc.gov); MMachado@schools.nyc.gov
**Subject:** Re: J▉ S▉ 143983

Are you resting your case?

M. Noe

On Tue, Jul 2, 2013 at 5:01 PM, Amanda Sen <asen@pfcr.org> wrote:

App. Exh. 3 p. 1

**A233**

Good afternoon Hearing Officer Noe,

Although the transcript for the June 6 hearing date in the matter of J███ S████ has not yet been translated, the parent reviewed her testimony with a Spanish speaker in my office. She feels that while she would have answered more fully and perhaps more responsively if the translation had been better, there were no clear errors in the translation that need to be corrected. Since that is the case, the parent sees no need for the hearing to continue tomorrow. The parent is willing to consider the hearing concluded and to submit a closing statement for your consideration within three business days. However, if the hearing officer deems it necessary, we will appear tomorrow as scheduled. Please advise me as to how you would like to proceed.

Regards,

Amanda S. Sen
Partnership for Children's Rights
271 Madison Ave., 17th Floor
New York, NY 10016
Phone: (212) 683-7999 ext. 249
Fax: (212) 683-5544

CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying this message or the information herein by anyone other than the intended recipient is prohibited. If you have received this message in error, please notify me immediately by e-mail or telephone.

App. Exh. 3 p. 2

**A234**



**PARTNERSHIP FOR
CHILDREN'S RIGHTS**

July 7, 2013

Impartial Hearing Officer Mary Noe
Impartial Hearing Office
New York City Department of Education
131 Livingston Street, Room 201
Brooklyn, NY 111201

Via email to noe.mary@gmail.com

Re: J█ S█ IH# 143983

Dear Hearing Officer Noe,

Although the transcript for the June 6 hearing date in the matter of █ S█ has not yet been translated, the parent reviewed her testimony with a Spanish speaker in my office. She feels that while she would have answered more fully and perhaps more responsively if the translation had been better, there were no clear errors in the translation that need to be corrected. Since that is the case, the parent sees no need for the hearing to continue tomorrow. The parent is willing to rest her case and to submit a closing statement for your consideration within three business days. However, if the hearing officer deems it necessary, we will appear tomorrow as scheduled. Please advise me as to how you would like to proceed.

Regards,

Amanda S. Sen
Staff Attorney
(212) 683-7999 ext. 249

Cc: Brittania Stewart
    Melissa Machado

271 MADISON AVENUE, 17TH FLOOR, NEW YORK, NY 10016 • 212.683.7999 • Fax: 212.683.5544 • Website: pfcr.org
App. Exh. 3 p. 3

**A235**

DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK
IMPARTIAL HEARING OFFICE

---------------------------------------

In the Matter of

████ S████

                                                            Case No. 143983

---------------------------------------
                              AFFIDAVIT OF M████ M████

STATE OF NEW YORK    )
COUNTY OF NEW YORK ) as:
                     )

I, M████ M████, being duly sworn and under penalty of perjury, I declare:

1.   My name is M████: M████. I live at 2552 Woodhull Avenue, Bronx, NY
     10469.

2.   I am ████ S████s mother. He is 19 years old.

3.   ████ is currently enrolled in the SKILLs program at the Cooke Center
     for Learning and Development ("Cooke"). ████ has been attending
     Cooke since 2008.

4.   J████ did not learn to speak until he turned four. When he was young, I
     had difficulties learning how to help him. When he was younger, he was
     a bit reserved. He has had a hard time in school. My main concern with
     J████ has always been that he gets a good education until he becomes as
     independent as possible.

5.   I would like for J████ to have a job in the future, and although I do not
     want him far from me, I would like him to be able to do some of his own
     things, such as grocery shopping independently. I would like him to feel
     useful with a job.

6.   Las year, J████'s IEP meeting was held on May 22nd, 2012, and I
     personally attended. Also at the meeting, was Sally Ord, who works at
     Cooke and physically attended the IEP meeting, and J████'s English
     teacher, Mrs. Beth Sullivan, who called in. Lastly, the members of the
     Department of Education were Mrs. Aminah Lucio and Mrs. Evelyn
     Alvarez, who translated for me.

7.   During the meeting, ████'s classification was changed to Autism.

Affidavit of M████ M████
App. Exh. 4 p. 1                                                                    1

A236

8.  During the meeting, I stated that what mattered most to me was ▮▮▮'s academic progress because his academic progress will help him be better; it will allow him to find a job and be independent.

9.  During the meeting, no one mentioned training for the parents.

10. I received the notice for final recommendation at the end of June 2012. I visited the school that was recommended, Stephen D. McSweeny (P.S. 721x) in the Bronx, on June 20th, 2012. Mr. Francis Tabone came with me one the visit, and I spoke to someone at the school who speaks Spanish as well as English. She gave us a tour of the school.

11. The person I spoke to at McSweeny told me that the students would spend more time at the work sites than on academic activities. I did not think this would be appropriate for ▮▮▮ because ▮▮▮ still needs to learn academic skills.

12. The person I spoke to at McSweeny also told me that all training for students ▮▮▮'s age is done at the work site. I did not think it would be appropriate for ▮▮▮, because he needs to be taught things, such as how to use the library and how to make purchases at a store in order to be more independent. ▮▮▮ needs to be taught these things in the real world to really understand how to do them. If all these things are taught at work sites, the school cannot provide adequate training so that ▮▮▮ can be more independent in the community.

13. I signed a contract on June 25th, 2012 for the summer program at Cooke. The tuition is $7,272. I do not have the means to pay the tuition, and I have not given her any payment. I understand that I am responsible for the tuition payment.

14. I signed a ten-month contract on June 25th, 2012 for the school year of 2012-2013 at Cooke. The tuition is $48,500. I do not have the means to pay the tuition, and I have no given her any payment. I understand that I am responsible for the tuition payment.

15. I signed these contracts after being clear on the fact that the DOE did not offer ▮▮▮ an appropriate program at the public school during the 2012-2013 school year.

16. On June 21st, 2012, the Partnership for Children's Rights sent a letter in my name to the Department of Education saying that I thought that ▮▮▮'s IEP for the 2012 school year and his placement were inappropriate and that I would at least enroll ▮▮▮ until the Department of Education gave ▮▮▮ an appropriate program and placement.

Affidavit of M▮▮▮ M▮▮▮                                          2
App. Exh. 4 p. 2

X2

17. On August 22nd, 2012, the Partnership for Children's Rights sent another letter in my name to the Department of Education saying that I thought that ████'s 2012 IEP and his placement were inappropriate.

18. I think that Cooke provides an appropriate education for my son and that he has progressed at Cooke.

19. At Cooke, ████ works on academic skills such as reading and writing. He also learns how to handle money and measure things. ████ is able to practice necessary skills at a job and practice activities within the community, such as buying his own lunch or using the library. This is important, because he needs to be able to do his own things in the future.

20. ████ has greatly progressed. He still has difficulties, but I see a lot of progress. Socially, he has shown some progress, especially when he spends time with others. He used to be a very lonely boy, but in time, he has progressed, and he's made some friends who call him at home. He has also learned to do many things he could not do before. For example, J████ can now go to the store and buy his own food. Over the past two years, I have seen a lot of academic progress. ████ can read and handle money. ████ has learned how to be organized at Cooke.

21. Cooke has taught me how to understand J████ and his needs, especially how to help him be more independent. They have taught me to accept that I have a son with disabilities. They have also taught me how to help ████ be more independent. For example, I now make him responsible for his bedroom and his homework.

22. I live with my son J████ and his father ████ S████ . My daughter also lives with us.

23. I work as a cashier at the Fiesta Restaurant Café. In 2012, I earned approximately $9,000 at my job. ████'s father works as a mechanic at S████ Auto Shop. He earned approximately $21,000 in 2012. I expect that my earnings and those of my husband's will be about the same in 2013. My husband and I do not have any other source of income other than our jobs.

24. I recently completed a preliminary benefits application from Supplemental Security Income for J████ , but the application is still pending at the Social Security Administration.

25. I am the owner of the house I live in with my family. I have a mortgage on the house that requires me to pay $1,200 a month. I need to use most

of my earnings to pay the mortgage. My husband and I don't have more than $500 in our savings account.

[signature]
M█████ M█████

Sworn to before me this 10th day of May, 2013.

[signature]
Notary Public

MARJORIE V. JONES
Notary Public, State of New York
No. 01492200B
Qualified in Bronx County
Commission Expires April 26, 2014

Affidavit of M█████ M█████                                    4
App. Exh. 4 p. 4                                              ×4

**A239**

DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK

IMPARTIAL HEARING OFFICE

---

In the Matter of

     J█████ S█████

                                 Case No. 143983

---

### PARENT'S CLOSING STATEMENT

---

### PRELIMINARY STATEMENT

Partnership for Children's Rights submits this closing statement on behalf of M████ M█████ and her son, J████ S█████ ("J███"). Ms. M█████ commenced this action on March 18, 2013 pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), seeking an order finding that the New York City Department of Education ("DOE") failed to offer J████ a free appropriate public education ("FAPE") for the 2012–2013 twelve-month school year and directing the DOE to pay for J████s tuition for the Cooke Center for Learning and Development SKILLS program ("Cooke") for that school year.

The hearings in this case were held on May 16, 2013, June 6, 2013, and June 19, 2013. Additional hearing dates were scheduled for June 14, 2013 and, at the request of the parent, July 3, 2013. The June 14 hearing was adjourned at the hearing office before proceedings began, and the parent withdrew her request for the July 3, 2013 hearing date. The parties were authorized to submit closing statements for the Hearing Officer's consideration in a Pre-Hearing Order. IHO

1

App. Exh. 5 p. 1

**A240**

Exh. II. Parent's counsel respectfully requests that this closing statement and any post-hearing submission submitted by the DOE be included in the administrative hearing record of this case.

## LEGAL STANDARDS

The IDEA is designed to ensure that all children with disabilities are provided with a FAPE. See 20 U.S.C. § 1400(D)(1)(A); Schaffer v. Weast, 546 U.S. 49, 51 (2005). In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). These services must be provided in the least restrictive environment ("LRE") that meets the child's educational needs. 20 U.S.C. § 1412(a)(5).

Under the standard set forth by the United States Supreme Court in School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985), a board of education may be required to pay for educational services obtained by a parent for his or her child if: (1) the services offered by the board were inadequate or inappropriate; (2) the services obtained by the parent were appropriate; and (3) equitable considerations support the parent's claim. Id. at 370, 374. When these three Burlington prongs are satisfied, parents who have unilaterally placed their child in a private school may obtain payment for the cost of the private school tuition. See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993); Burlington, 471 U.S. at 369.

In impartial hearings conducted in New York State, the school district bears the burden of proof on all issues other than the appropriateness of a private school placement for which a parent seeks tuition payment. N.Y. Educ. L. § 4404(1)(c). Consequently, the DOE bore the burden of proof on all issues in this case other than the appropriateness of the private school placement.

2

**A241**

## ARGUMENT

### I. THE DOE FAILED TO OFFER J███ A FAPE FOR THE 2012–2013 SCHOOL YEAR

#### A. THE DOE FAILED TO OFFER J███ AN APPROPRIATE PROGRAM

J███ is a nineteen-year-old student classified with autism. Exh. 3 at 1. He is currently a student in the SKILLs program at Cooke. Exh. J at ¶6. J███ struggles with his working and short-term memory, and he requires frequent teacher check-ins, individual instruction, and repetition to commit new information to memory. Exh. I at ¶¶7, 12, 17. He also "struggles with language processing," id. at ¶7, and has "low frustration tolerance and a need for adherence to strict schedules." Exh. J at ¶10. J███ requires direct instruction to apply knowledge learned in the classroom to community settings. Exh. I at ¶18.

J███'s annual review meeting to update his Individualized Education Program ("IEP") was held on May 22, 2012. Exh. 3 at 12. At that meeting, Ms. M███ told the DOE members of the IEP team that she thought that J███'s program should emphasize academic instruction. Exh. X at ¶8. Sally Ord, the Cooke representative at the meeting, told the team that a classroom with twelve students, one teacher and a paraprofessional was not supportive enough for J███. Exh. M at ¶¶18–19. Ms. Ord also told the team J███ needed a balanced program addressing both academic and vocational skills and that J███ needed instruction in a community setting. Id. at ¶¶16–17.

The DOE members of the IEP team did not consider a class size other than 12:1:1, Exh. 3 at 13, but ███ needs more individualized attention than a 12:1:1 class can provide. Exh. M at ¶¶18–19. He requires individual instruction to learn new material. Exh. I at ¶12. J███ also requires frequent teacher check-ins and prompting. Id. at ¶7; Tr. at 21–22. J███'s social and

3

emotional needs also require a small classroom setting. Exh. I at ¶¶8, 11. The management needs in J███'s IEP, including "direct teacher modeling," "one to one review," and "teacher redirection," Exh. 3 at 2, cannot be satisfactorily met in a 12:1:1 classroom with only one teacher providing instruction. As Katherine Hibbard, J███'s teacher during the 2012–2013 school year, explained, J███ needs extensive one-to-one instruction. Exh. I at ¶12. She provided him with seven to nine minutes of individual instruction per class period in his class of five students during the 2012–2013 school year, Tr. at 22, something not possible in a class of twelve students with only one teacher. Unlike Cooke assistant teachers, DOE paraprofessionals do not provide instruction to students. Exh. M at ¶19; Tr. at 66.

J███'s IEP did not delineate his program with enough specificity to provide the parent with meaningful guidance. The DOE members of the IEP team did not describe the proportion of J███'s time and focus that would be spent on vocational training versus academic skill building. Tr. at 59–60; Exh. 3. Through its lack of specificity, particularly regarding the appropriate balance between academic, vocational, and community activities, the DOE has developed an IEP that abdicates the CSE's responsibility to articulate the specially designed education and services that the IDEA envisions. See 20 U.S.C. 1414(d) (describing requirements of IEPs). As Ms. Alvarez stated, "The school the child was placed in would provide [information about time spent in vocational versus academic skill acquisition]." Tr. at 59. The IEP thus failed to fully describe J███'s educational program, leaving to the discretion of school administrators and classroom teachers how best to fashion an educational program for J███. Any effort to mask the effect of a deficient IEP by presenting testimony that an appropriate program would be developed after the student was enrolled in the public school placement must fail under the Second Circuit's ban on retrospective testimony. R.E. v. New York City Dept. of Ed., 694 F.3d 167 (2d Cir. 2012).

4

In addition to the deficiencies in the IEP noted above, there were other deficiencies in the IEP itself and in the manner in which it was created. The DOE members of the IEP team not only failed to take into account Ms. M███'s concerns, but they failed to record her concerns in the IEP itself, see Exh. 3 at 2; Exh. M at ¶23, despite Ms. M███ stating that she was concerned about J███ continuing to make academic progress. Exh. X at ¶8; Exh. M at ¶23. Although J███'s IEP makes reference to a list of activities for preparing ███ to transition to post-school activities, the IEP does not state who is responsible for those activities. Exh. 3 at 10–11. Furthermore, the DOE members of the IEP team did not consider or recommend parent training in violation of 8 NYCRR 200.13(d). Exh. X at ¶9; Exh. M at ¶24. The parent training Ms. M███ receives from Cooke has been instrumental in helping her support the implementation of J███'s IEP and the educational instruction he receives at Cooke. Exh. X at ¶21; see also Tr. at 204–05. Discontinuation of that training would hinder J███'s progress.

## B. THE DOE FAILED TO OFFER J███ AN APPROPRIATE SCHOOL PLACEMENT

The placement that the DOE offered J███ was inappropriate because it was unable to meet his needs. When J███'s mother visited the school that the DOE recommended for J███, P.S. 721X, the Stephen D. McSweeney School in the Bronx ("McSweeney"), with Dr. Francis Tabone, the parent coordinator told them that, because of J███'s age, he would spend the entire school day at a worksite. Exh. N at ¶9; Exh. X at ¶12. The parent coordinator also stated that students receive brief academic instruction at the work site but engage in vocational work most of the day. Exh. N at ¶9; Exh. X at ¶11. As Dr. Tabone stated, such limited academic instruction would not enable J███ to meet the numerous academic goals set forth in the IEP and therefore would not meet J███s needs. Exh. N at ¶11. The program described to the parent would also

5

not be able to meet the goals in J████'s IEP that require participation in community activities. Id. at ¶19. The placement also offered inadequate social skills training. Id. at ¶18. Therefore, the placement was inappropriate.

The DOE bears the burden of proof on Prong I at the hearing and must demonstrate that its offered placement at McSweeney was appropriate for ████. See N.Y. Educ. L. § 4404(1)(c); T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 420 (2d Cir. 2009) (stating that school districts do not have "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements"); M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 163 (S.D.N.Y. 2010) (finding that "DOE substantively violated the IDEA" by recommending student for placement in "school that could not fulfill his educational needs"), aff'd, 685 F.3d 217 (2d Cir. 2012); B.R. v. New York City Dep't of Educ., No. 11 Civ. 8433 (JSR), 2012 WL 6691046, at *7 (S.D.N.Y. Dec. 26, 2012) (stating that "the burden [is] on the *school district* to prove that the proposed placement was adequate" (emphasis in original)). The DOE failed to meet this burden.

Ms. Naclerio's testimony failed to demonstrate that McSweeney could implement J████'s IEP. Ms. Naclerio stated that she could not say that J████ would not be placed at a vocational site where he would receive only one or two hours per day of academic instruction. Tr. at 11, 14–15. She also stated that she did not know the curriculum of the teachers at the full-day vocational sites. Tr. at 12. J████ has goals on his IEP for which he must conduct "actual real-life" banking transactions and must be able to access the internet, Exh. 3 at 3–4, and the DOE did not demonstrate that McSweeney could meet those goals. Ms. Naclerio stated that visits to banking institutions were not part of the curriculum at McSweeney for students who were in part-time vocational programs and that she did not know whether actual real-life banking transactions were

6

App. Exh. 5 p. 6

part of the curriculum in full-day vocational programs. Tr. 12. Ms. Naclerio also did not know if the work site to which J█████ would be assigned would have internet access. Tr. 12–13.

Moreover, the information presented by Susan Naclerio was not the information presented to the parent at the time that the parent had to make her decision. Ms. Naclerio did not meet with Ms. M████ and did not know what was said to Ms. M████ when she visited McSweeney. Tr. at 6. Ms. M████'s and Dr. Tabone's testimony regarding their school visit is not contradicted in any way. As noted above, the information that they received on the visit clearly indicated that McSweeney could not meet J████'s needs. The DOE cannot now attempt to defeat Ms. M████'s tuition claim based on Ms. Naclerio's retrospective assertion that J█████ could possibly have been placed in a class at McSweeney that was never in fact offered to J████. Cf. R.E., 694 F.3d at 186 (holding that IDEA does not permit "bait and switch" that would occur if school district were permitted to defeat tuition claim based on hearing testimony that "effectively amends or fixes" defective IEP relied upon by parents in making unilateral placement); M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 170 (S.D.N.Y. 2010) (finding conduct of DOE "[c]avalier" and "inequitable" where, as here, it claimed at the hearing that the student's placement would have been a class setting different than any ever shown or offered to the parent), aff'd, 685 F.3d 217 (2d Cir. 2012); id. at 167 (noting that school district is not entitled "to play fast-and-loose with the disabled student's placement"). Indeed, the case law is clear that, as in this case, "a parent may challenge the adequacy of a placement classroom – even if the child never enrolled in the school – if the alleged defects were reasonably apparent to either the parent or the school district when the parent rejected the placement." E.A.M. v. New York City Dep't of Educ., No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *11 (S.D.N.Y. Sept. 29, 2012)).

7

**A246**

## II. THE COOKE CENTER SKILLS PROGRAM IS AN APPROPRIATE PLACEMENT
### FOR J██ FOR THE 2012–2013 SCHOOL YEAR

In order to prevail on Prong II of the <u>Burlington</u> test, parents are not required to demonstrate that their child made significant progress in the unilateral placement, only that the program is designed to allow the child to progress. <u>G.R. v. New York City Dept. of Educ.</u>, No. 07 Civ. 4711(TPG), 2009 WL 2432369, at *3 (S.D.N.Y. Aug. 7, 2009); <u>see also</u> <u>Gagliardo v. Arlington Centr. Sch. Dist.</u>, 489 F.3d 105, 115 (2d Cir. 2007) (noting that evidence of progress is relevant, but not dispositive). In order to be found appropriate, the private school need not meet the IDEA definition of a FAPE, formulate an IEP for the student, or provide the student with teachers certified in special education. <u>Frank G. v. Bd. of Educ.</u>, 459 F.3d 356, 364 (2d Cir. 2006). To meet his or her burden, a parent need only demonstrate that the placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such service as are necessary to permit the child to benefit from instruction." <u>Frank G.</u>, 459 F.3d at 365 (citing <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 188–89 (1982)). Testimony of special education professionals that the program is designed to meet the student's needs is adequate to demonstrate this. <u>Jennifer D. v. New York City Dept. of Educ.</u>, 550 F. Supp. 2d 420, 435–36 (S.D.N.Y. 2008).

Ms. M██ satisfied her burden of showing that Cooke was an appropriate placement for J██ for the 2012–2013 school year. J██'s academic, related service, transition, and social-emotional needs were met at Cooke. During the September to June 2012–2013 school year at Cooke, J██ participated in an internship two times per week for approximately two hours; a math class four times per week; a literacy class four times per week; individual counseling one time per week; group counseling one time per week; speech and language therapy two times per

8

**A247**

week; group occupational therapy three times per week; a current events class two times per week, a vocational skills class one time per week; and an internship forum one time per week. Exh. J at ¶8; IHO Exh. I at 1; Tr. at 165–169, 214–15. J███ was one of five students in his math and literacy classes, Exh. I at ¶8, which included "a lot of structured writing." Id. at ¶13. The other students in his classes had similar academic and social needs. Id. at ¶8. His math and literacy teacher, Katherine Hibbard, was a certified special education teacher. Id. at ¶2. Additionally, J███ had frequent contact with the school counselor. Tr. at 146. He received extensive instruction in community settings, including approximately three school trips into the community each week. Exh. J at ¶19; Tr. 160–61.

J███'s 2012–2013 internship was selected for him based on his interests. Exh. J at ¶¶13–14; Tr. 153–54. He was supported at his internship by a Cooke Inclusion Assistant ("CIA") who has twelve years of experience as a CIA and paraprofessional at Cooke. Exh. J at ¶¶12, 15–16. At his internship, J███ learned both practical skills and "soft skills" such as using appropriate body language and problem solving skills. Id. at ¶¶14, 18. Victoria Fowler, a licensed school counselor, worked with the CIA to determine appropriate internship goals for J███. Id. at ¶¶2, 17. Ms. Fowler also conducted two classes, vocational skills and internship forum, where J███ reflected on his internships and further developed his interpersonal skills as related to working. Id. at ¶9.

J███ progressed during the 2012–2013 school year at Cooke. In his literacy class, J███ improved his ability to identify character motivations, to identify and make his writing accessible to a specific audience, to reread and edit his work for punctuation and grammar, and to send emails. Exh. I at ¶15. In his math class, J███ learned how to use measuring equipment, to calculate change, and to utilize a bank, among other skills. Id. at ¶16. At his internship, J███

9

**A248**

learned to complete his tasks and observe safety precautions without prompting. Exh. J at ¶26. He needed less prompting to stay focused and calm as the year progressed. Id. J██ also improved his ability to function in community settings—he can travel more safely and effectively, and he can interact more appropriately with store clerks and vendors. Id. at ¶25. As J██ s teacher, Ms. Hibbard, testified, standardized testing does not fully capture J██'s progress. Tr. 40–42.

Cooke was also an appropriate program for J██ for the summer of 2012. J██ attended summer school from July 2 to August 8, 2012 at Cooke for the 2012 summer program. Exh. K at ¶¶4, 10. During the summer program, which was designed to help J██ maintain skills he learned during the September to June academic school year, Id. at ¶17, J██'s academic classes included twelve students, a head teacher who has a master's degree in special education and is certified as a teacher in New York, and an assistant teacher. Id. at ¶¶8–9, 11. During the summer program, J██ participated in academic classes, including math and literacy, as well as related services periods, an internship and community activities. Id. at ¶¶13–18. J██ received both speech and language therapy and counseling during the summer program. Id. at ¶¶21–22. J██ was functionally grouped. Id. at ¶12.

### III. EQUITABLE CONSIDERATIONS FAVOR THE PARENT

Equitable considerations bear on the appropriate relief to be awarded under the IDEA, Burlington, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters,'" Wolfe v. Taconic-Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 534 (N.D.N.Y. 2001) (quoting Town of Burlington v. Dept. of Ed., 736 F.2d 773, 801–02 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985)). Moreover, "in considering the equities the Court must not lose sight of the

10

App. Exh. 5 p. 10

[IDEA]'s goal of providing a free appropriate education to all handicapped children." <u>Eugene B. v. Great Neck Union Free Sch. Dist.</u>, 635 F. Supp. 753, 759 (E.D.N.Y. 1986).

Here, equitable considerations favor Ms. M█████ and support an award of direct retrospective payment of J████'s tuition to the Cooke for the 2012–2013 school year. Ms. M█████ was cooperative and reasonable in her interactions with the DOE. Ms. M█████ participated in J████'s May 22, 2012 IEP meeting. Exh. X at ¶¶6–9. She visited the recommended school placement soon after receiving the DOE's placement notice in order to determine if it was an appropriate placement for J████. Exh. X at ¶10; <u>see also</u> Exh. 17 at 1 (June 15, 2012 date on placement notice), Exh. N at ¶6 (stating that Dr. Tabone visited McSweeney with Ms. M█████ on June 20, 2012). Through counsel, Ms. M█████ provided timely written notice to the CSE of her concerns regarding J████'s IEP and recommended school placement, her intent to enroll J████ at Cooke, and her intent to seek payment of the tuition from the DOE. Exh. X at ¶¶16–17; Exhs. B, C. Ms. M█████ did not sign a contract with Cooke until after she visited the school placement and determined that the program and placement offered by the DOE were inappropriate. Exh. X at ¶¶13–15; <u>see also</u> Exhs. D–E (contracts dated June 25, 2012).

Ms. M█████ did not impede the DOE's ability to offer █████ a FAPE. <u>Cf.</u> <u>N.R. v. Dep't of Educ.</u>, No. 07 Cv. 9648 (BSJ), 2009 WL 874061, at *6 (S.D.N.Y. Mar. 31, 2009) (finding in favor of parent on equities where record was "bereft of any evidence that Plaintiff hindered Defendants' efforts to provide a FAPE or otherwise frustrated the placement process").[1] The record shows that Ms. M█████ cooperated fully, and in good faith, in the DOE's IEP and

---

[1] Although the CSE did not possess a Stanford-Binet report conducted at Cooke and dated prior to the May 2012 meeting at the May 2012 meeting, Exh. 22 at ¶19, neither Ms. M█████ nor Ms. Ord had seen or had in their possession that report prior to the May 2012 meeting. Tr. 206–07, 237–38. Ms. Alvarez testified that this report would not have influenced her to change her recommendations in any way. Tr. at 107.

11

placement process.[2] Ms. M▮ expressed concerns to the IEP team, Exh. X at ¶8; Exh. M at ¶23, promptly visited the DOE's recommended placement, Exh. X at ¶10; Exh. N at ¶6, and provided timely written notice to the DOE of her objections to its proposed program and placement. Exhs. D–E.

## IV. DIRECT RETROSPECTIVE TUITION PAYMENT TO COOKE IS AN APPROPRIATE REMEDY

An award of direct retrospective tuition payment to Cooke is an appropriate remedy in this case because the record demonstrates that Ms. M▮ is liable for the Cooke tuition but lacks the financial means to pay the tuition in advance and await reimbursement. Exh. X at ¶¶13–14, 23–25; Exhs. D–G. Mr. and Mrs. A. ex rel. D.A. v. New York City Department of Education, 769 F. Supp. 2d 403 (S.D.N.Y. 2011), holds that the IDEA authorizes an award of retrospective tuition payment directly to a private school where the three Burlington prongs have been satisfied and "the parents, due to a lack of financial resources, have not made tuition payments but are legally obligated to do so." Id. at 406. The Cooke enrollment contract unambiguously creates a binding obligation on Ms. M▮ to pay J▮'s tuition at Cooke for the 2012–2013 school year. Exhs. D–E. Thus, Ms. M▮ has satisfied the test set forth in Mr. and Mrs. A., and direct retrospective tuition payment is an appropriate remedy in this case.

---

[2] While meeting notes state that Ms. M▮ said that she has never been in agreement with a public school placement, Exh. 11 at 4, it should be kept in mind that any quotations noted in notes from the meeting were actually the words of Ms. Alvarez, who translated for Ms. M▮, Tr. at 81, Exh. X at ¶6. Ms. Alvarez herself is an employee of the DOE, an interested party. Exh. 22 at ¶1. It is undisputed that Ms. M▮ stated that she would visit any placement offered. Id. at ¶46. She did in fact visit the placement promptly, Exh. X at ¶10, and she actively evaluated its appropriateness by asking questions. Tr. at 219.

12

## CONCLUSION

The record demonstrates that the DOE failed to offer J█ a FAPE for the 2012–2013 school year, that Cooke is an appropriate placement for him, and that the equities favor Ms. M█. We therefore respectfully request that the Hearing Officer order the DOE to pay J█'s summer school tuition of $7,275 and ten-month school year tuition of $48,500, a total of $55,775, directly to Cooke.

Dated: July 8, 2013

PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for the Parent

BY: AMANDA S. SEN
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ext. 249

13

**A252**

THE NEW YORK CITY

DEPARTMENT OF EDUCATION

IMPARTIAL HEARING OFFICE

-------------------------------------------------x

In the Matter of

J███ S██████                                           IHO Case No.: **143983**

-------------------------------------------------x


**CLOSING BRIEF**

**FOR THE DEPARTMENT OF EDUCATION**


Of Counsel:

Brittania Stewart, Esq.

Administrative Litigation

Office of the General Counsel

New York City Department of Education

(212) 339-1690

Page 1 of **13**

App. Exh. 6 p. 1


**A253**

## I. PRELIMINARY STATEMENT

On March 8, 2013, Partnership for Children's Rights, counsel for parent, filed a Due Process Complaint ("DPC") on behalf of Ms. M███ ("Parent"), J███ S███'s ("J███") mother, alleging that the Department of Education ("DOE") failed to offer J███ a free appropriate public education ("FAPE") for the 2012-2013 school year. Parent alleged that the individualized educational program ("IEP") developed for J███ on May 22, 2012 recommended an inappropriate program. Parent also alleged the DOE failed to conduct a triennial evaluation, did not consider adequate evaluative material in developing the IEP, and did not conduct a vocational assessment. Parent also alleged that the proposed placement would have been inappropriate. J███ was unilaterally placed at the Cooke Center for the 12 month, 2012-2013 school year. Parent seeks prospective payment of tuition for the 2012-2013 school year. This closing brief is respectfully submitted by the DOE, asserting that Parent's request for prospective payment should be denied because J███ was offered a FAPE for the 2012-2013 school year. In fact, the DOE offered a program that was nearly identical to the Cooke Center's program. Given the Parent's complaints about the DOE's program, it would follow that the Cooke Center's program is also not appropriate and its program is not individualized to meet J███'s needs. Lastly, the equities favor the DOE.

## I. THE DEPARTMENT OFFERED J███ A FAPE

### A. Analytical Framework

"The Supreme Court has long recognized that the IDEA allows parents to reject an IEP they feel is inadequate, place their child in an appropriate private school, and seek tuition reimbursement from the school district. *R.E. v. New York City Dep't of Educ.*, 2012 WL 4125833 at *17 (2d Cir. Sept. 20, 2012) citing *Burlington School Comm. v. Dep't of Educ.*, 471

Page 2 of 13

U.S. 359, 369-70 (1985). Under the IDEA, a hearing officer's decision must be based on both procedural and substantive grounds as to whether the student received a free and appropriate public education ("FAPE"). In order to provide a FAPE, the Department must comply with the procedural requirements of the IDEA and develop an individualized education program ("IEP") that is reasonably calculated to enable a student to obtain meaningful educational benefits. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 192 (1982); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003); 20 U.S.C. §1414(d)(1)(A). The Department may be required to reimburse a parent for educational services obtained privately for a student if, and only if, the services offered by the Department are inadequate or inappropriate. *See Burlington School Comm. v. Dep't of Educ.*, 471 U.S. 359 (1985) and *Florence County School Dist. v. Carter*, 510 U.S. 7 (1993).

As discussed in detail below, the Department offered J█████ a FAPE and there is no evidence that there were procedural violations that would result in a deprivation of FAPE. If the Hearing Officer is inclined to find that some procedural violations did occur, the Department asserts that those violations are *de minimus* and do not rise to the level of a denial of FAPE. While school districts are required to comply with all IDEA procedures, ***not all procedural errors render an IEP legally inadequate under the IDEA*** (A.C. v. Bd. of Educ., 553 F.3d 165, 172 (2d Cir. 2009); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003); *Perricelli v. Carmel Cent. Sch. Dist.*, 2007 WL 465211, at *10 (S.D.N.Y. Feb. 9, 2007)) (emphasis added). Under the IDEA, if a procedural violation is alleged, a hearing officer may find that a student did not receive a FAPE **_only_** if the procedural inadequacies (1) impeded the student's right to a FAPE, (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (3) caused a deprivation of

Page 3 of 13

App. Exh. 6 p. 3

**A255**

educational benefits (20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2); 8 NYCRR 200.5(j)(4)(ii); *E.H. v. Bd. of Educ.*, 2008 WL 3930028, at *7 (N.D.N.Y. Aug. 21, 2008); *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007) aff'd, 2008 WL 3852180 (2d Cir. Aug. 19, 2008)).

The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (*Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195, quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130); in that it is likely to provide some "meaningful" benefit (*Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997)). But, a school district is not legally obligated to provide the best possible education available. In this case, the Department has shown that it has met both its procedural and substantive obligations under the IDEA. The Department created an IEP and offered a placement that could have implemented the IEP. The Parent had no legitimate reason for rejecting the IEP or the proposed placement. More specifically, many of the purported deficits listed in the due process complaint do not actually exist.

### B. Petitioner's Claims

Parent alleges that (1) J████'s 2009 evaluation was outdated and the team did not have sufficient evaluative material to create an IEP, (2) that the 12:1:1 program would have been inappropriate, (3) that the IEP did not "provide [J████] with adequate support or an appropriate balance between academic instruction and vocational training," (4) that the IEP team failed to recommend parent training, (5) that the proposed placement did not provide enough academic support, and (6) the academic instruction occurred at a level below J████ s functional levels. Most of the allegations are not supported by the evidence, including Parent's own evidence.

Page 4 of 13

These allegations were drafted by the attorney for the purposes of litigation and were not legitimate parental concerns at the time of the meeting or at the time of the placement decision. In any event, the IEP and proposed placement are appropriate.

As per 8 NYCRR §200.5(j)(ii), a party requesting an impartial hearing may not raise issues at the impartial due process hearing that were not raised in its original due process request unless the other party agrees or the original request is amended at least five days prior to the hearing. The parent has filed an amended due process complaint and the Department has not agreed to address any issues that were not raised in the amended due process complaint. It is essential that the impartial hearing officer disclose his or her intention to reach an issue which the parties have not raised as a matter of basic fairness and due process of law. (SRO Decision No. 08-056; SRO Decision No. 10-105; *see John M. v. Bd. of Educ.*, 502 F.3d 708 (7th Cir. 2007)). Considering such, this closing brief will address only those procedural and substantive deficiencies that are specifically raised in the Due Process Complaint.

II. **THE MAY 22, 2012 IEP DEVELOPED FOR J█████ WAS APPROPRIATE**

A. **The IEP Team Considered Adequate Evaluative Material at the Meeting.**

Ms. Evelyn Alvarez, a DOE special education teacher, and Ms. Ord, a Cooke Center representative provided extensive testimony about the IEP meeting and the documents considered by the IEP team. Ms. Alvarez explained that the team had hard copies of the March 2012 Cooke Center Progress Report and a 2009 psycho-educational evaluation. Ex. 22-3. It is important to note that the Cooke Center representatives and Parent withheld numerous documents from the IEP team so it is quite ironic that Parent now claims that the team did not have sufficient evaluative material. Aside from that, Ms. Ord explained that, during the IEP meeting, she verbally presented the information within written reports prepared by J█████'s

Page 5 of 13

speech language provider, Counselor, ELA and Math teacher. Tr. at 174-79; Exs. 6, 7, 8, 9, 10. Ms. Ord had written copies of the reports but did not provide hard copies to the IEP team or the J███'s mother. Tr. at 174-79 (Ms. Ord testifying that she had various provider reports on her computer but did not provide them to the team or the parent because they were "internal" documents). Ms. Ord also verbally reported J███'s scores on various standardized tests that had been given at the Cooke Center. Ex. 22-3. All of the standardized test scores were less than a year old at the time of the meeting. *Id.*; Exs. 11, 12. Although, Ms. Ord would not provide hard copies of the reports, the IEP clearly reflects that the IEP team put significant effort into taking down Ms. Ord's verbal reports.

Moreover, in October 2011, just a few months prior to the May 2012 IEP meeting, the Cooke Center psychologist conducted intelligence testing. Ex. 15. Although the report was generated several months before the IEP meeting, the Cooke Center and the parent did not provide the document to the DOE. Tr. at 242 (Parent testifying that she requested testing from the Cooke Center and did not provide a copy to the IEP team)[1]. Ms. Ord testified that she did not even know that Cooke Center conducted the testing. Tr. at 206-7. It is important to note that there was no evidence whatsoever which indicated that Parent, or any other meeting participants, stated at the IEP meeting that the team did not have adequate evaluative material. Instead, Parents and the Cooke Center, remained silent thereby indicating to the team that they were satisfied with the information considered by the team, while at the same time withholding documentation that could have been considered by the team. Lastly, there is no evidence that the IEP document actually provides inaccurate information. In fact, all of the information within the

---

[1] Although Parent requested and received new testing from the Cooke Center, Parent did not indicate to the DOE that student required new testing and did not request a reevaluation. Ex. 22-3.

Page 6 of 13

IEP document concerning J████'s present levels of performance was provided during the IEP meeting. In sum, the team considered adequate evaluative material.

### B. The Program Recommendation Was Appropriate.

Parent alleges that the 12:1:1 would not be appropriate and that the IEP did not address academics and vocational skills. First off, the IEP clearly provides numerous supports to address both academics and vocational skills. Ms. Alvarez explained that the IEP and the 12:1:1 program provides academic and vocational support. Tr. at 57-58. The IEP includes specific goals to address vocational and academic skills. Exs. 3-3 – 3-9. The IEP also includes transition goals. Ex. 3-10-3-11.

State regulations mandate that the recommended special education program and services be selected in order for the student to advance appropriately toward attaining the annual goals in the student's IEP. 8 NYCRR 200.4(d)(v)(b). At the time of the meeting, J████ was in a 12:1:1 classroom for math and an 11:1:1 for reading. Ex. 22-4. Ms. Ord's meeting minutes reflect that the ratio for math was "12:1:1" for math and "11:1:1" for reading. Ex. 12-1. Moreover, the report prepared by the ELA teacher states that the classroom was an 11:1:1. Ex. 8; *see also* Ex. 9 stating that math was "12:1:1". Nevertheless, at the time of hearing Ms. Ord essentially testified that her minutes and the annual review discussion documents were incorrect and that J████ was in a 12:1 +1 at the time of the meeting. Tr. at 189-90. Ms. Ord attempted to explain how a 12:1:1 was different from a 12:1+1 by explaining that the +1 at Cooke included an assistant teacher whereas the DOE's 12:1:1 program includes a classroom paraprofessional. *Id.* Her testimony should not be considered because (1) it was not reported to the IEP team at the meeting and (2) the purported assistant teacher has no specific qualifications related to "assistant teaching." *Id.* Instead, the "assistant teacher" title is a Cooke Center designation and there is no

Page 7 of 13

evidence that this designation provides some unique qualifications. In sum, the IEP provided adequate academic and vocational support.

## C. Failure to Include Parent Training and Counseling on The IEP Does Not Result in the Denial of FAPE.

The Second Circuit has held that the absence of parent training and counseling does not result in a violation of FAPE because "[t[he presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the plan . . . Moreover, because school districts are required by section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service. *R.E. v New York City Dept. of Educ.*, 694 F3d 167, 191 (2d Cir 2012). The hearing officer should follow *R.E.* and determine that the absence of parent training and counseling does not result in the denial of FAPE.

### D. The Proposed Placement Is Appropriate

#### a. THE HEARING OFFICER SHOULD ONLY ADDRESS FACTS AND EVIDENCE KNOWN AT THE TIME OF THE PLACEMENT DECISION

In *R.E. v New York City Dept. of Educ.*, 694 F.3d 167, 187 (2d Cir 2012), the Second Circuit was clear that courts must evaluate the IEP and placement "prospectively" and consider only information "reasonably known to the parties at the time of the placement decision." *See also R.E*, 694 F.3d at 195. ("We reiterate our principal holding that courts must evaluate the adequacy of an IEP prospectively as of the time of the parents' placement decision[.]"). The Parents made their decision to reject the public school placement on June 18, 2012 and as stated in *R.E.*, the hearing officer should evaluate the program "as of the time of the parents' placement decision." Ex. E. By June 21, 2012, the Parents had visited the placement

Page **8** of **13**

App. Exh. 6 p. 8

**A260**

and indicated that it was inappropriate for the following reasons: (1) the academic work was below J⬛⬛'s "current levels", (2) that the environment was noisy and chaotic, and (3) that the program focused almost entirely on "job placements." Ex. B.

The Department did not defend a specific classroom or teacher because the law is clear that not only does the Department not have to defend a specific classroom but also it would be inappropriate to do so. *See R.C. v. Byram Hills Sch. Dist.*, 2012 WL 5862736, at *16 (S.D.N.Y. 2012) (holding that "Given the Second Circuit's recent pronouncement that a school district may not rely on evidence that a child would have had a specific teacher or specific aide to support an otherwise deficient IEP, it would be inconsistent to require evidence of the actual classroom a student would be placed in where the parent rejected an IEP before the student's classroom arrangements were even made"); *See R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 187 (2d Cir. 2012) ("The prospective nature of the IEP also forecloses the school district from relying on evidence that a child would have had a specific teacher or specific aide. At the time the parents must decide whether to make a unilateral placement based on the IEP, they may have no guarantee of any particular teacher.").

Although Parent alleges that the students in the program functioned below J⬛⬛, there was no specific testimony provided about the functional levels of the other students in the program. Dr. Tabone's affidavit indicated that during the 2011-2012 school year, the students in the proposed placement functioned between pre-kindergarten to 3rd grade, however those functional levels were not relevant to the 2012-2013 school year. Ex. N-3[2]. Parent was not shown a specific class during the visit so it is interesting that Parent suggested that some non-

---

[2] Even if the functional levels were relevant to 2012-2013 school year, it certainly could be argued that ⬛⬛ could be functionally grouped with at least some of those students since his functional levels ranged between 2nd to 4th grades.

Page 9 of 13

specific group of students functioned below J⬛'s academic levels. Tr. at 225. Dr. Tabone testified that during the visit, they were told that academics were provided one to two periods per day. Tr. at 225.

Although the Parent argues that the proposed placement focused on "job placements" and two periods of academics is not sufficient to meet J⬛'s academic needs, the Cooke Center provides academics only two periods per day. Ex. 28 (Cooke Center class schedule indicated that J⬛ participates in one period a day of Math and one period of reading with the remaining courses are non-academic). If the DOE program does not provide enough academic support, then the Cooke Center also fails to provide enough support. The Parent can't argue that two periods of academics at the Cooke Center is sufficient while two periods of academic instruction at the proposed placement is insufficient. Lastly, although there was an allegation that the environment was noisy and chaotic, there was no evidence presented by Parent to indicate that she observed a noisy and chaotic environment.

### IV. The Cooke Center Is Not An Appropriate Placement.

The DOE may be required to reimburse parents for their expenditures for private educational services obtained for a student if the services offered by the DOE were inadequate or inappropriate, and the services selected by the parents were appropriate. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985). "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement...'" *Gagliardo*, 489 F.3d 105 at 112 (2d Cir. 2007); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, at 364 (2d Cir. 2006) (quoting *Rowley*, 458 U.S. at 207 and identifying exceptions).

Page 10 of 13

App. Exh. 6 p. 10

*Frank G.* explains that the limited exceptions to the general rule are that "a private placement need not provide certified special education teachers or an IEP for the disabled student." 459 F.3d at 364. Moreover, while evidence of progress at a private school is relevant, it does not itself establish that a private placement is appropriate to meet a student's unique special education needs. *Gagliardo*, 489 F.3d at 115. A Parent who "seeks reimbursement bears the burden of demonstrating that their private placement was appropriate . . . [and a] private placement meeting this standard is one that is "likely to produce progress, not regression." *Gagliardo v Arlington Cent. School Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). There is no evidence that the program offered by the Cooke Center was likely to produce progress. A "private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir. 2007). The Parent did not meet their burden of establishing that the Cooke Center's program was specifically designed to meet ███'s needs.

### V. The Equities Do not Support The Parent's claim

#### A. THE PARENT DID NOT ENGAGE IN THE PROCEEDINGS IN GOOD FAITH

The Parent never intended to accept a public school placement and only participated in the IEP meeting, visited the placement, and sent a notice of unilateral placement to give the appearance of cooperation. The E.D.N.Y addressed a parent's lack of good faith in *J.P. ex rel. D.P. v New York City Dept. of Educ.*, 2012 WL 359977, at *14 (EDNY Feb. 2, 2012). In *J.P.*, the court denied reimbursement and held that the parents

> did only the bare minimum necessary to give the appearance of their good faith in the process – physically being present at the IEP and visiting the [proposed placement]. If they had not done so, they would have plainly forfeited any right

Page 11 of 13

**A263**

for reimbursement. . . Moreover, [the parent] did not fully participate in the IEP meeting, as is demonstrated by her failure to voice her view that [student] did not belong in special education. Her attitude as an observer in the process rather than an active participant displays an utter lack of good faith. The record suggests that plaintiffs were attempting to game the system and obtain reimbursement[.]

*J.P.*, at \*23.

As in *J.P.*, the Parent in this case did the "bare minimum necessary to give the appearance of good faith." The Parent was present at the IEP meeting but did not voice objection to the program recommendation or any other aspect of the IEP meeting. In fact, the Parent at the IEP meeting Parent stated that "she has never been in agreement with program recommendation." Ex. 12-4 (Sally Ord Meeting minutes noting that parent did not object). Moreover, Parent did not object to anything during the course of the IEP meeting and did not provide additional documentation concerning the student's performance that could have been used at the IEP meeting. The Cooke Center representatives also interfered with the IEP development process. The Cooke Center withheld several documents concerning J████'s performance at the school in an effort to thwart the IEP development process. The Parent merely visited the placement **to give the appearance that she was considering the public school placement.** The totality of the evidence clearly demonstrates that the parent showed a "lack of good faith effort to cooperate with the DOE" and warrants a denial of prospective payment. *S.W. v New York City Dept. of Educ.*, 646 F.Supp.2d 346, 364 (SDNY 2009).

> The Court is therefore left with the facts that [parent] did not inform the CSE that she was rejecting the public school placement and enrolling M.W. at Bay Ridge, that she signed an enrollment contract agreeing to reject the public school placement two months before even visiting the proposed public school, and that she did not give written notice of her decision to the DOE until seven months after the CSE meeting, four months after M.W. began the 2005-2006 school year at Bay Ridge, and three months after visiting the public school placement. These

Page 12 of 13

App. Exh. 6 p. 12

**A264**

actions evince unreasonable delay and the lack of a good faith effort to cooperate with the DOE to find an appropriate public school placement for her son, and they warrant the denial of direct tuition payment here.

The facts of this case are in line with *S.W.* and *J.P.* This Parent never intended to accept a public school placement and lacked good faith in cooperating with the DOE.

## CONCLUSION

For the reasons set forth in this closing brief, the DOE respectfully requests that the hearing officer deny the Parent's request for prospective payment in its entirety.

| From: | Amanda Sen |
|---|---|
| To: | "Mary Noe" |
| Cc: | BStewart2@schools.nyc.gov; Machado Melissa |
| Bcc: | Todd Silverblatt |
| Subject: | RE: #143983 |
| Date: | Wednesday, April 24, 2013 3:16:00 PM |

Dear Hearing Officer Noe,

I am writing to confirm receipt of your order. As indicated in the parent's hearing request, the parent is a Spanish speaker and requires translation of all testimony at the hearing. Please advise me as to the procedures for translating the affidavits of both parties prior to the hearing. I am concerned that the hearing date may need to changed due to the added time translation will require.

Sincerely,

Amanda S. Sen
Partnership for Children's Rights
271 Madison Ave., 17th Floor
New York, NY 10016
Phone: (212) 683-7999 ext. 249
Fax: (212) 683-5544

**From:** Mary Noe [mailto:noe.mary@gmail.com]
**Sent:** Wednesday, April 24, 2013 2:42 PM
**To:** Amanda Sen; BStewart2@schools.nyc.gov; Machado Melissa
**Subject:** #143983

Attached is a pre-hearing order. Please acknowledge receipt.

M. Noe

App. Exh. 7 p. 1

**A266**

| From: | Machado Melissa |
|---|---|
| To: | Stewart Brittania; Amanda Sen |
| Subject: | RE: #143983 |
| Date: | Tuesday, April 30, 2013 9:51:10 AM |

Good Morning Ladies,

Sorry for the late response, I was out the office yesterday. I have spoken to my boss in regards to the email below. Our can send out the affidavits for translation. Please send them to me and I will forward to the correct place for translation.

*Melissa Machado*

Senior Case Manager
718-935-4981

**From:** Stewart Brittania
**Sent:** Friday, April 26, 2013 4:19 PM
**To:** Amanda Sen; Machado Melissa
**Cc:** Machado Melissa
**Subject:** RE: #143983

Hi Melissa,

Does the IHO have any procedure regarding translation of affidavits for hearing? See below.

**From:** Amanda Sen [mailto:asen@pfcr.org]
**Sent:** Wednesday, April 24, 2013 3:17 PM
**To:** Mary Noe
**Cc:** Stewart Brittania; Machado Melissa
**Subject:** RE: #143983

Dear Hearing Officer Noe,

I am writing to confirm receipt of your order. As indicated in the parent's hearing request, the parent is a Spanish speaker and requires translation of all testimony at the hearing. Please advise me as to the procedures for translating the affidavits of both parties prior to the hearing. I am concerned that the hearing date may need to changed due to the added time translation will require.

Sincerely,

Amanda S. Sen
Partnership for Children's Rights
271 Madison Ave., 17th Floor
New York, NY 10016
Phone: (212) 683-7999 ext. 249

App. Exh. 8 p. 1

A267

Fax: (212) 683-5544

**From:** Mary Noe [mailto:noe.mary@gmail.com]
**Sent:** Wednesday, April 24, 2013 2:42 PM
**To:** Amanda Sen; BStewart2@schools.nyc.gov; Machado Melissa
**Subject:** #143983

Attached is a pre-hearing order. Please acknowledge receipt.

M. Noe

App. Exh. 8 p. 2

**A268**



**PARTNERSHIP FOR
CHILDREN'S RIGHTS**

July 24, 2013

Impartial Hearing Officer Mary Noe
Impartial Hearing Office
New York City Department of Education
131 Livingston Street, Room 201
Brooklyn, NY 11201
via email to noe.mary@gmail.com

Re: J▮▮▮ S▮▮▮ IH# 143983

Dear Hearing Officer Noe,

I write to reiterate my request for a corrected decision in the above-referenced case.

On July 23, 2013, the Hearing Officer responded to my request in an e-mail stating, "I have been informed that the record is closed and no new documents will be admitted into evidence." The e-mail does not indicate what individual or entity so informed the Hearing Officer. However, the New York State Regulations of the Commissioner of Education provide that it is the Hearing Officer who is responsible for determining when the record is closed. 8 N.Y.C.R.R. 200.5(j)(5)(v). The State Review Officer (SRO) has held that Hearing Officers have a "responsibility to ensure that there is an adequate record upon which to permit meaningful review." Application of the XXXX, Appeal No. 110004, at 9. The parent will appeal the Hearing Officer's decision in this matter, and it is the Hearing Officer's obligation to ensure that the SRO will have a full and adequate record to review.

Furthermore, none of the documents addressed is my July 19, 2013 and July 23, 2013 letters is a "new document" other than my July 19, 2013 letter requesting the corrections. Rather, I requested that the exhibit list annexed to the Hearing Officer's decision be corrected to include (1) documents that were omitted from the exhibit list despite having been admitted into evidence by the Hearing Officer on the record; and (2) Hearing Officer orders and documents submitted by the parties during the course of the hearing that constitute part of the full record of the case and that must be included in the official record in order to permit meaningful review on appeal. In addition, I requested that the Hearing Officer produce copies of IHO Exhibits II and IV, which are listed in the decision exhibit list but which have not been included in the record on file at the Impartial Hearing Office and have never been provided to undersigned counsel.

To reiterate my July 19, 2013 request, these documents should be included in the record and a corrected decision should be issued for the following reasons:

- Parent's Exhibit X, the official translation of the parent's affidavit, was entered into evidence on page 273 of the transcript, but it is not listed in the decision. This is an error and should be corrected.

- The Pre-Hearing Order dated April 24, 2013 was entered into evidence on page 252, but it is not listed in the decision. This is an error and should be corrected.

- The Hearing Officer's Order dated June 7, 2013 is not listed in the decision. Without this order, there is no explanation in the record as to why the hearing, which initially ended on June 6, 2013, was resumed on June 19, 2013. Inclusion of the June 7, 2013 order is necessary for meaningful review of the complete record by the SRO.

- The letter sent from parent's counsel to the Hearing Officer on July 2, 2013 is referenced in the decision on page 9, but it is not listed in the decision as an exhibit. The regulations state, "The decision of the impartial hearing officer shall be based solely on upon the record of the proceeding before the impartial hearing officer." 8 NYCRR 200.5(j)(5)(v). Because the July 2 letter is referenced in the decision, this letter should be included in the record as an exhibit and listed in the corrected decision.

- In the parent's closing brief, parent's counsel requested that both the parent's closing brief and the DOE's closing brief be included as part of the record. Moreover, the parent's closing brief is referenced in the decision on page 8. The closing briefs should be included in the record and listed in the corrected decision because they were considered by the hearing officer, see 8 NYCRR 200.5(j)(5)(v), and to permit meaningful review by the SRO.

Sincerely,

Amanda S. Sen
Staff Attorney
(212) 683-7999 ext. 249

cc: Brittania Stewart
Melissa Machado

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

Petitioner,

- against -

New York City Department of Education,

Respondent.
-----------------------------------------------------------------------------X

**RECEIVED**

AUG 2 6 2013

OFFICE OF STATE REVIEW

**AFFIDAVIT OF
VERIFICATION**

Impartial Hearing
Case No. 143983

SRO Appeal No.

STATE OF NEW YORK    )
                                            ss.:
COUNTY OF NEW YORK  )

M▮▮▮ M▮▮▮, being duly sworn, deposes and says that she is the mother of J.S., and is

the Petitioner in this proceeding; that Ms. Ana Lazo, Administrator at Partnership for Children's

Rights, who is bilingual, read and translated for her the annexed Verified Petition so that she

knows the contents thereof; and that the Verified Petition is true to the knowledge of deponent

except as to the matters therein stated to be alleged upon information and belief, and as to those

matters she believes it to be true.

Subscribed and sworn to before me
this 19th day of August, 2013

_____
                 Notary Public

AMANDA S. SEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02SE6279084
Qualified in Kings County
My Commission Expires April 08, 2017

**A271**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                        Petitioner,

        - against -

New York City Department of Education,

                     Respondent.
-------------------------------------------------------------------X

**RECEIVED**

AUG 2 6 2013

OFFICE OF STATE REVIEW

**AFFIDAVIT**

Impartial Hearing
Case No. 143983

SRO Appeal No.

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK  )

Ana Lazo, Administrator at Partnership for Children's Rights, being duly sworn, deposes

and says she that speaks and reads both English and Spanish; and that on August 19, 2013 she

translated the annexed Verified Petition from English into Spanish for M███ M███

                                *Ana Elena Lazo*
                               Ana Lazo

Subscribed and sworn to before me
this 20th day of August, 2013

_____
Notary Public

AMANDA S. SEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02SE6279054
Qualified In Kings County
My Commission Expires April 06, 2017

**A272**

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

Petitioner,

- against -

New York City Department of Education,

Respondent.
-----------------------------------------------------------------------X

**RECEIVED**

AUG **2 6** 2013

OFFICE OF STATE REVIEW

**AFFIDAVIT OF
PERSONAL SERVICE**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

STATE OF NEW YORK      )
                                          ss.:
COUNTY OF NEW YORK   )

THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 21st day of August, 2013, at 100 Church Street, in New York City, New York County, State of New York, he served the annexed Notice of Petition, Verified Petition, Appeal Exhibits 1 through 9, Affidavit of Verification, and Affidavit on the New York City Department of Education by delivering and leaving with said DMITRIY ARONOV at said time and place a true copy thereof.

Deponent further says that he knew the person so served to be the said DMITRIY ARONOV, who is the SERVICE WINDOW CLERK in said district.

_____
THOMAS GRAY

Subscribed and sworn to before me
this 21st day of August, 2013

_____
Notary Public

TODD SILVERBLATT
NOTARY PUBLIC, State of New York
No. 02SI6054774
Qualified in Kings County
Commission Expires May 14, 20__

**A273**

RECEIVED

SEP 1 9 2013

OFFICE OF STATE REVIEW

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
----------------------------------------------------------------X

In the Matter of the Appeal of
MM on behalf of JS,

                            Petitioner,                    **VERIFIED ANSWER
                                                           AND CROSS-APPEAL**


                                                           IHO Case No. 143983
-against-                                                  SRO Case No. 13-157


New York City Department of Education,

                            Respondent.
----------------------------------------------------------------X

Respondent, New York City Department of Education ("DOE"), by its attorneys, Michael

A. Cardozo, Corporation Counsel of the City of New York, and Courtenaye Jackson-Chase,

Special Assistant Corporation Counsel, (Brian J. Reimels, Esq., of Counsel), as and for its

Verified Answer and Cross-Appeal to the Verified Petition dated August 19, 2013 (the

"Petition"), respectfully responds as follows:

1.      Denies the allegations set forth in Paragraphs 1 and 21, except admits that

Petitioner MM ("Petitioner" or "the Parent") is the Parent of JS ("JS" or "the Student"), and that

Petitioner purports to proceed as set forth therein.

2.      Admits the allegations set forth in Paragraphs 2, 7, and 11, and respectfully refers

the State Review Officer ("SRO") to the record for a complete and accurate statement of the

contents therein.

3.      Denies the allegations set forth in Paragraph 3, except admits that JS has attended

the Cooke Center for Learning and Development ("Cooke") since the 2008-2009 school year,

and respectfully refers the SRO to the record for a complete and accurate statement of the

contents therein.

1

A274

4.     Denies the allegations set forth in Paragraphs 4-6, except admits that on May 22, 2012, a Committee on Special Education ("CSE") met to develop an Individualized Education Program ("IEP") for JS for the 2012-2013 school year, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

5.     Denies the allegations set forth in Paragraphs 8-10, except admits that on June 15, 2012, the DOE offered JS a placement at P721X, the Stephen D. McSweeney School ("McSweeney") for the 2012-2013 school year, that the Parent visited McSweeney on June 20, 2012, and that the Parent rejected the DOE's program and placement in letters dated June 21, 2012 and August 22, 2012, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

6.     Denies the allegations set forth in Paragraphs 12-16, except admits that the Impartial Hearing Officer ("IHO") issued a pre-hearing order which allowed for, inter alia, direct examination by affidavit, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

7.     Denies the allegations set forth in Paragraphs 17-20, except admits that on July 18, 2013, the IHO issued her Findings of Fact and Decision (the "Decision"), which ultimately denied the Parent's requested relief, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

8.     Responds that allegations set forth in Paragraphs 22-27, 33-34, 40-41, 53, 59, and 67 constitute conclusions of law, to which no response is required. To the extent a response is deemed required, Respondent denies the allegations set forth therein, and respectfully refers the SRO to the authorities cited therein for a complete and accurate statement of the contents therein.

2

**A275**

9.     Denies the allegations set forth in Paragraphs 28-32, 35-39, 42-52, 54-58, 60-66, and 68-79, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

### AS AND FOR A STATEMENT OF PERTINENT AND MATERIAL FACTS, RESPONDENT RESPECTFULLY ALLEGES:

10.     Petitioner commenced the instant action by filing a Due Process Complaint ("DPC") on March 18, 2013, requesting prospective tuition payment for the unilateral placement of JS at Cooke for the 2012-2013 school year and busing to and from Cooke. Ex. 1-2, 1-5.[1] In the DPC, the Parent alleged, inter alia, that the CSE failed to conduct a triennial reevaluation, that the CSE team did not have adequate evaluative material, that the recommended 12:1:1 program was inappropriate, that the CSE did not balance JS's academic and vocational needs or address the importance of integrating the related services with his other forms of instruction, and the CSE did not recommend or consider any transitional teacher support services or parent training. Ex. 1-3. The Parent also alleged that the recommended placement was inappropriate and that Cooke was appropriate for JS. Ex. 1-3, 1-4.

11.     After an impartial hearing, the IHO noted that the Parent and the Parent's counsel raised concerns about the quality of the Spanish interpreter's translation of the June 6, 2013 hearing to MM. Decision at 9. When asked by the IHO to identify specific portions of the record that were confusing to the Parent, counsel for the Parent only pointed to one page of the transcript. Decision at 9. The IHO then set another hearing date in order to allow for time for Parent and counsel to review a translation of the June 6, 2013 transcript, but Parent's counsel later asked the IHO to cancel the new hearing date and rested their case. Decision at 9.

---

[1] Numbered exhibits. "Ex.," refer to DOE exhibits and lettered exhibits. "Ex.," refer to Parents' exhibits introduced during the hearing. Numerical citations preceded by "Tr." refer to page numbers of the impartial hearing transcript.

12.     As to the Burlington/Carter analysis, the IHO determined that MM failed to comply with the third prong, equitable considerations, by not informing the CSE that she requested an additional evaluation of JS, which was issued on January 5, 2012. Decision at 9. The IHO determined that the CSE was at a disadvantage without the updated evaluation and "could not" recommend an appropriate program as a result. Decision at 9. The IHO did not make prong I or II findings. Decision at 9.

13.     The Parent appeals, claiming that the IHO's "affidavit scheme" and the refusal to timely provide translation for MM prevented MM from fully participating in the hearing process. Petition ¶ 21. The Parent also appeals the IHO's failure to issue a determination on prongs I and II, and appeals from the IHO's specific prong III determination. Petition ¶ 21. The Parent seeks remand to a new IHO, or in the alternative, a finding by the SRO ordering direct payment to Cooke for the costs of tuition for the 2012-2013 school year. Petition ¶ 21. This appeal should be dismissed in its entirety. Respondent cross-appeals from the IHO's failure to issue findings on prong I of the Burlington/Carter analysis (as well as cross-appealing from the IHO's dicta that the DOE "could not" recommend an appropriate program without use of a private evaluation) and submits that the record demonstrates that the DOE offered JS a FAPE for the 2012-2013 school year. This cross-appeal should be sustained.[2]

### Background Prior to the 2012-2013 IEP

14.     At the time of the CSE meeting, JS was an 18-year-old student classified as a student with a speech impairment. Ex. 5-1. JS has attended Cooke since the 2008-2009 school year. Ex. N, ¶ 4; Ex. Ex. 22, ¶ 7.

### JS is Privately Evaluated

---

[2] Although not adjudicated by the IHO, Respondent does not contest that, should Petitioner prevail on all three prongs of the Burlington/Carter analysis (which she should not), she would be entitled to prospective payment of the Cooke tuition. See Petition ¶¶ 67-69.

4

**A277**

15.     On October 19, 2011, JS was evaluated using the Stanford-Binet Intelligence Scales, and a narrative report was issued on January 5, 2012. Ex. 15.

### The May 22, 2012 CSE Meeting

16.     On May 22, 2012, a CSE composed of Evelyn Alvarez (Special Education Teacher), Aminah Lucio (School Psychologist and District Representative), Sally Ord (a Cooke "consulting teacher"), Beth Sullivan (JS's 2011-2012 English language arts teacher at Cooke), and MM met to develop an IEP for JS for the 2012-2013 school year. Ex. 3-15; 11; 12; 22-2.

17.     The CSE utilized several reports in creating the IEP, including a June 2009 psychoeducational evaluation (Ex. 5), and a March 2012 Cooke progress report (Ex. 4) which included a transition report. Ex. 22-2, 22-6; Tr. 70-73, 89-90. The Cooke participants relayed JS's current academic performance, including recent academic assessments (Ex. 3-1; 22-3), as well as JS's social/emotional behavior, physical development, progress toward goals, and recommended goals for the upcoming school year. Ex. 11, 22-4; Tr. 61-62.

18.     The CSE reported JS's scores on several academic assessments. Ex. 3-1, 11; 22-3, 22-4; Tr. 61-62. The IEP noted JS's 3.3 grade equivalent score on the GRADE assessment regarding his overall reading skills. Ex. 3-1, 22-3, 22-4. JS's decoding level was reported to be "level 5 independent and level 6 instructional." Ex. 3-1, 22-3, 22-4. JS achieved a 3.8 grade equivalent on the GMADE assessment regarding his overall math skills. Ex. 3-1, 22-3, 22-4.

19.     In math, JS could perform multi-digit computation for all operations using algorithms, and was working on problem solving skills. Ex. 3-1, 11-2. He benefited from a hands-on approach using manipulatives. Ex. 3-1, 11-2.

20.     Numerous strategies were recommended by the CSE to address JS's academic deficits. Ex. 3-2, 22-5. The CSE recommended, inter alia, modified instructional materials,

5

**A278**

small group instructions, discreet teaching of strategies and skills, graphic organizers and checklists, repetition of instruction with multiple modalities, clear class routines, hands-on math skills practice, introduction of new material in small chunks with sufficient time to learn. Ex. 3-2. The CSE also recommended one-to-one review, scaffolding of instructions, access to a counselor when frustrated, and continued opportunities for JS to take a leadership role. Ex. 3-2.

21. Socially and emotionally, JS was making progress with independent living skills, and was working on increasing his competence in social situations. Ex. 3-2, 22-5. JS was chosen to be a peer helper, giving classmates advice and support. Ex. 3-2The CSE recommended that JS continue to develop independent living skills and garner attention from peers in more mature methods. Ex. 3-2.

22. The CSE developed 15 annual goals and corresponding short-term objectives. Ex. 3-3 – 3-9; 22-5, 22-6. The goals addressed JS's deficits or needs in math and money management (Ex. 3-3, 3-4), reading and Internet research (Ex. 3-4, 3-5), writing and English language arts (Ex. 3-5), counseling (Ex. 3-5, 3-6), SLT (Ex. 3-6, 3-6), transitional activities (Ex. 3-7, 3-8, 3-9), and activities of daily living (Ex. 3-8, 3-9). There were no objections at the CSE meeting to any of the goals. Ex. 11-2, 22-5, 22-6.

23. The CSE recommended several separate long-term goals for living, working, and learning as an adult, including having JS attend a two-year community college and/or a vocational school and gain qualification as a teacher's assistant. Ex. 3-3. In terms of employment, the CSE recommended that JS gain experience in a part-time job related to the career of his choice, and that within one year of his graduation from high school, JS will access relevant services from the Development Disabilities Program. Ex. 3-3.

6

**A279**

24.     A coordinated set of transition activities was also recommended for JS. Ex. 3-10,
3-11, 22-6. The activities included participation in a work-study program, small group
vocational activities, and community projects, instruction in ADLs and travel training,
counseling related to person-centered planning and self-awareness relating to work life, SLT to
develop and practice social interactions with unfamiliar adults, and practice with money
management skills in a community setting. Ex. 3-10, 3-11.

25.     The CSE ultimately recommended changing JS's classification from speech and
language impairment to autism, and placing JS in a special 12:1:1 class in a specialized school
for the 2012-2013 school year on a 12-month basis. Ex. 3-1, 3-9, 3-10, 11-4, 22-6. The CSE
also recommended individual SLT three times per week, group counseling once weekly, and
individual counseling once weekly. Ex. 3-9, 11-4.

26.     The CSE also discussed, but ultimately rejected a special class in a community
school as being unable to provide JS with the level of support he requires. Ex. 3-13.

**The DOE Offers JS a Placement to Implement the IEP for the 2012-2013 School Year**

27.     On June 15, 2012, a Final Notice of Recommendation ("FNR") was sent to the
Parent, offering JS placement at McSweeney, for the 2012-2013 school year. Ex. 17.

**The Parent Visits the Recommended Placement**

28.     MM visited McSweeney on June 20, 2013, along with Francis Tabone, the Head
of School at Cooke. Ex. 21-2, N-2, Exhibit 4-2, attached to Petition.

**The Parent Rejects the Recommended Program and Placement**

29.     On June 21, 2012, Charles Gussow of the Partnership for Children's Rights sent a
letter to the CSE on behalf of MM, informing the CSE that MM was rejecting the recommended
program and placement for JS. Ex. B-1, Exhibit 4-2, attached to Petition. The letter states that

7

**A280**

MM determined that the academic work offered at McSweeney was below JS's current levels, the school was chaotic, and would not be appropriate for JS. Ex. B-1. The letter also stated that MM believed the May 22, 2012 IEP was inappropriate. Ex. B-1. The letter informed the CSE that pending placement in an appropriate classroom, MM would reenroll JS at Cooke the 2012-2013 12-month school year and seek tuition payment. Ex. B-1, Exhibit 4-2, attached to Petition.

### The Parent Re-Enrolls JS at Cooke for the 2012-2013 School Year

30.     On June 25, 2012, MM signed an enrollment contract with Cooke for JS to attend the summer 2012 session, at a cost of $7,275. Ex. D, Exhibit 4-2, attached to Petition. Also on June 25, 2012, MM signed an enrollment contract with Cooke for the 10-month 2012-2013 school year, at a cost of $48,500. Ex. E, Exhibit 4-2, attached to Petition.

### The Parent Again Rejects the Recommended Program and Placement

31.     On August 22, 2012, Todd Silverblatt, Esq., of the Partnership for Children's Rights wrote the CSE on behalf of MM. Ex. C, Exhibit 4-3, attached to Petition. The letter reiterated that MM believed that the IEP was inappropriate for JS as it recommended the same level of services as when JS was classified with a speech and language impairment, and did not include management needs designed to transition JS to independent living. Ex. C-1. The letter also stated that the overall program was insufficient to advance the transition goals. Ex. C-1. The letter also reiterated MM's belief that McSweeney was an inappropriate placement for JS and that MM was reenrolling JS at Cooke for the 2012-2013 school year and would seek tuition payment. Ex. C-1, C-2.

### Cooke

32.     At Cooke, JS was placed in placed in classes with ratios of either 12:1:1 or 11:1:1. Ex. 22-4. JS was also enrolled in a transition program at Cooke. Ex. J-2.

8

**A281**

## The Impartial Hearing

33.     On April 24, 2013, the IHO issued a pre-hearing order, which directed that the parties present the direct testimony of their witnesses by affidavit and call the witnesses on the hearing dates for cross-examination. Ex. 1-1, attached to Petition. The order allowed for additional direct examination of the witness, provided it was not repetitive or irrelevant. Id.

34.     On April 29, 2013, counsel for the Parent objected to the IHO's pre-hearing order, asserting that utilizing affidavits for the purpose of all direct examination may inhibit the IHO's ability to make credibility and factual determinations. Ex. O.

35.     The impartial hearing took place over three days: May 16, June 6, and June 19, 2013. Decision at 3. On June 7, 2013, the IHO issued an order in response to the Parent's contentions that the impartial hearing office should translate the affidavits entered into evidence. Ex. 2, attached to Petition. In that order, the IHO denied the Parent's request, and further noted that the Parent failed to avail herself of the pre-hearing order, which allowed for the Parent to make an application for direct, live testimony. Id. At the June 19, 2013 hearing, the parties agreed to an additional hearing date so that the Parent could review a Spanish translation of the June 6, 2013 hearing and determine if MM would offer additional testimony. Tr. 287-90.[3] On July 2, 2013, counsel for the Parent emailed the IHO, resting her case and informing the IHO there was no need for an additional hearing date. Ex. 3-1, attached to Petition.

## The Decision Below

36.     Initially, the IHO noted that when the Parent was offered an additional hearing date in order to review the June 6, 2013 transcript translation, the Parent thereafter rested her case. Decision at 9. As to the Burlington/Carter analysis, the IHO determined that equities did

_____

[3] Upon information and belief, based upon a conversation with the DOE attorney who represented Respondent at the impartial hearing, on July 1, 2013, Parent's counsel was supplied with Spanish translations of each of the affidavits, and the Parent's counsel acknowledged receipt.

9

**A282**

not favor the Parent as MM did not inform the CSE that she requested an additional evaluation of JS, which was issued on January 5, 2012. Decision at 9. The IHO determined that the CSE was at a disadvantage without the updated evaluation and "could not" recommend an appropriate program as a result. Decision at 9. The IHO did not review the CSE's recommended program or placement, or the appropriateness of Cooke. Decision at 9. The Parent's appeal ensued.

**And As for a First Defense, Respondent Alleges: The IHO Did Not Violate the Parent's Right to Meaningfully Participate at the Hearing and a Remand is Unnecessary**

37.     The Parent claims that although the New York State regulations allow IHOs to "accept" testimony through affidavits, the regulations do not authorize an IHO to "require" that all direct testimony be provided by affidavit. Petition ¶ 29 (emphasis in original). This contention is without legal support and must be rejected by the SRO.

38.     As SROs have held, "the parties to an impartial hearing are obligated to comply with the reasonable directives of the IHO regarding the conduct of the impartial hearing." Application of a Student with a Disability, Appeal No. 12-076 at 9 (emphasis added) (citations omitted). Thus, an IHO may take direct testimony by affidavit in lieu of in-hearing testimony, provided that the witness giving such testimony shall be made available for cross-examination. Id., citing 8 NYCRR § 200.5(j)(3)(xii)(f). Here, the IHO's pre-hearing order specifically provided that each party should present direct testimony through affidavits and call those witnesses on the hearing dates for cross-examination. Ex. 1-1, attached to Petition. Further, the pre-hearing order allowed for additional direct examination, provided that such testimony was not repetitive or irrelevant (id.), and, moreover, allowed the parties to make specific requests that certain witnesses be allowed to give live, direct testimony (id.). The pre-hearing order in no way restricted the number of witnesses, the length of the affidavits, or the potential cross-examination of the witnesses. See id. Additionally, although counsel for the Parent provided a general

10

**A283**

objection to the affidavit portion of the pre-hearing order (see Ex.O-1, O-2), counsel never complied with the IHO's order that requests for a witness to provide live, direct testimony include a list of potential witnesses, the sum and substance of their testimony, and the reasons underlying the necessity for live testimony rather than by affidavit, as correctly noted by the IHO. Compare Exhibit 1-1, attached to Petition with Ex. O-1, O-2 and Exhibit 2-1, attached to Petition. Thus, the IHO's pre-hearing order did not improperly preclude the Parent from meaningfully participating at the hearing and the Parent otherwise did not avail herself of the IHO's order which would have allowed for direct testimony, and the IHO's reasonable directive should be sustained on appeal.

39.     The Parent contends that the IHO's "affidavit scheme" preemptively circumscribed the Parent's ability to present her case. Petition ¶¶ 30-31. To that end, Petitioner appears to claim that although the DOE did not oppose the Parent's request for live, direct testimony, the IHO nevertheless proceeded with the hearing via affidavits. Petition ¶ 30. Again, as stated above, parties are obligated to comply with the reasonable directives of an IHO, and given the reasonableness of the IHO's pre-hearing order, this contention must fail.[4]

40.     Petitioner claims that the IHO further impeded the Parent's participation in the hearing by directing the hearing office not to translate affidavits into Spanish. Petition ¶¶ 32-37.[5] To that end, the Parent claims that the IHO was alone in her belief that the Parent was not entitled to understand the direct testimony in the case as the IHO did not order a translation of

---

[4] To the extent that Petitioner claims that the IHO limited the presentation of their case to less than one day (Petition ¶ 30), such a claim is belied by the record where the hearing was conducted over three days, and where the IHO offered to recall each witness on an additional hearing date when Petitioner expressed concerns about the interpreter (see Tr. 287-88).

[5] On this point, the record is unclear as to which translation of the Parent's affidavit was entered into evidence. Although the record reveals that Exhibit X, the agreed-upon translation of MM's affidavit, was entered into evidence (see Tr. 256, 273), the Decision did not include this in the evidence log, and the IHO otherwise references Exhibit S, a translation offered by the Parent. See Decision at 7, 12. In any event, it is clear that the IHO utilized an affidavit approved of by Petitioner in reaching her decision.

11

**A284**

the affidavits, and that translations of documents were not ordered until the end of the hearing, after the Parent's ability to communicate with her attorney had passed. Petition ¶¶ 35-36. These contentions must fail.

41.    Initially, it appears that Petitioner abandoned this claim before IHO. The Parent raised concerns about the translation of affidavits before the IHO on the hearing dates and in emails to the IHO. See Ex. O-3, Exhibit 2, attached to Petition; Tr. 268-95. In response to the Parent's concerns, the IHO offered to set another hearing date and recall all the witnesses so as to ensure that the Parent fully understood the proceeding. Tr. 287-88. Parent's counsel then asked for an opportunity to review a Spanish translation of the June 6, 2013 transcript and to potentially recall the Parent to testify. Tr. 289-93. And, moreover, as noted supra, Parent's counsel received Spanish translations of each affidavit before the conclusion of the hearing, and then informed the IHO that she would be resting her case and that there was no need to continue the hearing as scheduled. See supra note 3; Ex. 3-1, attached to Petition.

42.    Here, the record reveals that when given the opportunity for the Parent to more fully testify and to allow for additional cross-examination or direct examination of any witness, the Parent decided to forego such an opportunity and rest on the record as presented to the IHO. Indeed, after resting her case without recalling any witnesses, the Parent never mentioned any alleged problems with the "affidavit scheme" or the translations in the closing memorandum of law to the IHO. See Ex. 5, attached to Petition. For the Parent to now appeal the IHO's alleged improper affidavit scheme and her purported refusal to translate the affidavits is disingenuous, especially where the Parent received translations of the affidavits, the IHO offered to essentially restart the hearing upon the concerns of the Parent, and the Parent deliberately did not avail herself of this opportunity.

12

**A285**

43.     In any event, the record demonstrates that the Parent was not denied a meaningful opportunity to participate at the impartial hearing. Initially, it must not be overlooked that the Parent was represented at the hearing by counsel at every stage of the hearing. Next, the regulations provide that "an interpreter fluent in the parent's native language be provided at district expense at all stages of the proceeding 'where required.'" Application of a Student with a Disability, Appeal No. 05-119, quoting 8 NYCRR § 200.5(j)(3)(vi) (internal quotations in original). As the record demonstrates, at each hearing date when either witnesses were called for cross-examination and re-direct examination or when the Parent was asked about translation issues, an interpreter was present and translated for the Parent. See Tr. 1, 112, 285.[6]

44.     Moreover, Petitioner does not point to any portion of the proceeding in which MM's ability to participate in the hearing was purportedly compromised. Petition ¶¶ 35-37. Here, again, MM was represented by competent counsel. Further, the Petition points to no aspect of the proceeding in which the Parent's case would have changed had Petitioner's affidavit been translated earlier or had other documents had been translated earlier. See Petition ¶¶ 36-37. Again, when Parent was offered the opportunity to review and consider the translated June 6, 2013 transcript and the affidavits and recall any witness she wished to, she declined to do so, rested her case, and did not otherwise raise any objections with the impartial hearing in her closing memorandum of law. As such, under the circumstances presented here, the Parent's arguments concerning the IHO's directives and management of the hearing must be rejected.

45.     For the same reasons, the Parent's contentions that should the SRO order a remand, the case should be assigned to a new IHO must also fail. Petition ¶¶ 70-77. Indeed, the record clearly indicates that "both parties were accorded a reasonable opportunity to be heard"

---

[6] The record for the June 19, 2013 hearing date is unclear as to when the interpreter arrived, but the interpreter did translate when the Parent briefly testified on that date. See Tr. 285-87.

13

**A286**

and that "the impartial hearing was conducted in a manner that was consistent with the requirements of due process." See Application of a Student with a Disability, Appeal No. 11-003 at 6. As explained, the IHO's directive concerning the affidavit scheme was reasonable and the Parent voluntarily chose not to avail herself of either the opportunity to present live testimony or to essentially restart the hearing, and, as such, a finding of IHO bias or gross mismanagement of the hearing must be dismissed. Moreover, even if the IHO's administration of the hearing was imperfect (such as failing to include certain exhibits into the official evidence log), such a factor would not be by itself enough to determine that the IHO was biased towards Petitioner or that a new IHO should be appointed on remand. See Application of a Student with a Disability, Appeal No. 11-074 at 5-6. Moreover, given the SRO's ability to independently review the record and render an independent decision, remand is not necessary. See 34 CFR 300.514(b)(2); Application of a Student with a Disability, Appeal No. 12-007 at 2.

### And As for a Second Defense, Respondent Alleges: The Parent Has Not Met Her Burden of Demonstrating that Cooke was Appropriate for JS

46. Although the IHO did not reach the question of whether Cooke was appropriate for JS (Decision at 9), it is respectfully submitted that the record does not support a finding that the Parent met her burden of demonstrating that Cooke was appropriate. See, e.g., Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113-15 (2d Cir. 2007).

### And As for a Third Defense, Respondent Alleges: Equities Do Not Support the Parent

47. The Parent contends that the IHO erred in determining that equities do not favor her. Petition ¶¶ 58-65. Even if, arguendo, the IHO's rationale for finding against the Parent on equities is overturned, it is evident from the record that MM never seriously considered placing JS in a public school (or, indeed, any school other than Cooke).

14

**A287**

48.     MM's actions at the CSE meeting clearly evidence an unwillingness to ever

consider a public school program or placement for JS. MM never objected to any portion of the

IEP. Ex. 11, 22. Although she later voiced concerns over specific aspects of the IEP in her

second rejection letter and in the DPC, she never once voiced these concerns at the CSE meeting.

See Ex. 1, B. Further, although MM visited McSweeney, the record reveals that her visit was

not motivated by a genuine interest in placing JS at a public school. MM expressed at the CSE

meeting (even before receiving the FNR), that she never agrees with a DOE placement. Ex. 11-

4, 22-6.[7]

49.     It is plainly evident from the record that given MM's minimal participation and

unwillingness to seriously consider a public school placement, the Parent cannot meet her burden

of demonstrating that equities favor her claim for relief. See P.G. and D.G. v. New York City

Dep't of Educ., 2013 WL 4055697 at *16 (S.D.N.Y. July 22, 2013); J.P. v. New York City Dep't

of Educ., 2012 WL 359977 at *14 (S.D.N.Y. Feb. 2, 2012).

### And As For A Cross-Appeal: The DOE Offered JS a FAPE for the 2012-2013 School Year

50.     Although the IHO ultimately determined that the Parent was not entitled to relief,

the IHO failed to issue findings on prong I of the Burlington/Carter test. Decision at 9.[8]  Such

was error as a matter of law. As the Second Circuit noted in R.E., only after a finding that the

DOE failed to offer a FAPE, may a decision on prongs II and III be considered.  R.E., 694 F.3d

at 194-95; see also 8 NYCRR 200.5(j)(4)(i). Respondent also cross-appears the IHO's (apparent)

finding that the CSE was unable to recommend an appropriate program without the assistance of

---

[7] Moreover, while not dispositive of the equities determination, JS has attended Cooke since the 2008-2009 school
year, circumstantial evidence of MM's unwillingness to seriously consider a public school placement, or any
placement other than Cooke. See Ex. N-2.
[8] To the extent that the IHO's brief comments at the very end of the Decision constitute a finding on prong I,
Respondent cross-appeals from that determination. See Decision at 9.

15

**A288**

the Stanford-Binet evaluation (Ex. 5). Decision at 9. As explained below, the CSE offered JS a FAPE even without utilizing that evaluation.

51. Here, it is evident that the CSE based its IEP on sufficient evaluative data (Ex. 4, 5) as well as the direct participation of JS's then current-providers at Cooke and MM (Ex. 11, 22-2 – 22-6). The programmatic and related service recommendations as well as the management needs were akin to what JS was receiving at Cooke and were recommended after discussion with the Cooke participants. Ex. 11, 22-2 – 22-6. Indeed, MM never once objected to any of the recommendations at the IEP meeting and the Cooke participants only appeared to have objected to the ultimate 12:1:1 program recommendation. See Ex. 11, 22-2 – 22-6. Further, as explained more below, any claims regarding the ability of McSweeney to implement the IEP were speculative in nature and cannot form the basis for finding a deprivation of FAPE, and in any event, McSweeney could have fully implemented the IEP. See infra Paragraphs 56-57. In sum, it is evident from the record that the DOE offered JS a FAPE for the 2012-2013 school year, and the SRO should sustain the DOE's cross-appeal and otherwise reject the Parent's arguments to the contrary.

52. The Parent claims that the CSE relied on an outdated psychoeducational evaluation. Petition ¶ 45. Here, the CSE meeting was held on May 22, 2012. See Ex. 3, 11. The psychoeducational evaluation was completed on June 2, 2009. Ex. 5-1. Thus, the evaluation was still timely, as it had been completed within three years of the CSE meeting. See Application of a Student with a Disability, Appeal No. 12-122 at 14-15 (evaluation timely where it had been completed "within three years of the [date of the] CSE meeting . . . ."). Moreover, even if the evaluation was untimely (which it was not), there is no indication in the record that the Parent or the Cooke participants requested a reevaluation of the Student (id. at 15), and in

16

**A289**

any event, the CSE team utilized sufficient evaluative material in developing the IEP for JS for the 2012-2013 school year. The CSE team reviewed and utilized a March 2012 Cooke progress report (Ex. 4, 22-3), and Ms. Ord from Cooke orally presented the information and scores contained in several Cooke "discussion documents" (Ex. 7, 8, 9, 10, 22-3; Tr. 174-79). Given the comprehensive nature of the Cooke progress report, coupled with the updated information provided by Ms. Ord, as well as the full participation of the Cooke participants and the Parent (see Ex. 11, 22), it is evident from the record that the CSE team utilized sufficient evaluative material in developing the 2012-2013 school year IEP.

53.     The Parent contends that if "the DOE had engaged MM in a discussion about the need for new evaluations," MM may have discovered the May 2012 Stanford-Binet Report and provided it to the CSE. Petition ¶ 46. Initially, there is no indication on the record that the Parent did not have the opportunity to fully voice any concerns which she may have had. See Ex. 11, 22, N. Moreover, if a discussion for the need for new evaluations never took place, it is because the CSE believed, as Ms. Alvarez testified, that they had sufficient evaluative material on which to develop JS's IEP. See Ex. 22-3, 22-5. Thus, this contention must fail.

54.     The Parent next contends that there was no evaluative data to support the CSE's programmatic recommendation of placing JS in a special 12:1:1 class in a specialized school for the 2012-2013 school year. Petition ¶ 47. The Parent contends that JS requires a smaller environment with more potential for individualized attention. Petition ¶ 47. Here, the Parent never raised this claim in the DPC, and, thus, it is improperly before the SRO on appeal. See Ex. 1; 20 U.S.C. § 1415(f)(3)(B); N.Y. Educ. Law § 4404(1)(c); Application of the Bd. of Educ., Appeal No. 12-010, at 8, appeal filed, 12 CV 5573 (S.D.N.Y.). While the Parent vaguely mentioned JS's purported need for a highly structured setting (Ex. 1-4), that argument was in the

17

**A290**

context of McSweeney's inability to provide such a setting for JS and the DPC otherwise did not raise any similar programmatic objections regarding the IEP. See 1-2, 1-3.

55.     In any event, the recommended program was appropriate for JS. As Ms. Alvarez testified, the 12:1:1 setting was recommended due to, at least in part, JS's progress in a similar 11:1:1 and 12:1:1 settings at Cooke. Ex. 22-6. A specialized school setting was recommended for JS as they serve low functioning students similar to JS, and provide the vocational and life skill training and academic support that he requires. Ex. 22-6. The IEP recommended numerous management strategies and goals to address JS's specific deficits, including, inter alia, modified instruction materials, small group instructions, discreet teaching of learning strategies, graphic organizers, repetition and redirection, introduction of new concepts broken into small chunks with sufficient time to learn, direct teacher modeling, 1:1 review, scaffolding, access to a counselor when frustrated, and opportunities to take a leadership role. Ex. 3-2. The IEP also recommended 15 annual goals and related short-term objectives. Ex. 3-3 – 3-9. Thus, contrary to the Parent's contentions, the IEP as a whole provides JS with check-in and prompts, 1:1 review, small group instruction, and other beneficial management needs that would allow JS to receive a meaningful educational benefit.

56.     The Parent next contends that the annual goals lack specificity as they do not indicate how much academic or vocational instruction JS is to receive. Petition ¶ 48. Again, the DPC did not raise any claim concerning the IEP's annual goals, and, thus, this claim is not properly before the SRO on appeal. See Ex. 1. Initially, the IEP recommends that JS be placed in a 12:1:1 special class for 35 periods each week. Ex. 3-9. Further, as explained by Ms. Alvarez, even if the IEP does not specifically listed the amount of time spent on academic versus vocational skills, the IEP lists what skills need to be covered, and the school placement could

18

**A291**

determine how to address those skills accordingly. See Tr. 58-61. Moreover, as explained by Ms. Naclerio, whether JS was placed in a full-time or part-time vocational program (which was unknown until a student actually enrolls at McSweeney, which JS never did), all of the academic goals would have been addressed and the IEP would have been fully implemented. Ex. 21-4, 21-5. Thus, these contentions must fail.

57.     The Parent also claims that the CSE failed to conduct a vocational assessment. Petition ¶ 48. Here, while the CSE did not conduct a specific vocational assessment, the failure to do so in light of the transition plan included in the IEP and the discussion at the CSE meeting does not rise to the level of a deprivation of FAPE for JS. See Application of the Dep't of Educ., Appeal No. 11-123 at 15-16. Initially, the CSE team asked Cooke for a transition plan; Ms. Ord provided written transition goals to the CSE which were discussed, reviewed and modified, and adopted into the IEP. Ex. 22, ¶38. Moreover, Ms. Ord informed the CSE that Cooke preformed a transition assessment and the information was relayed to the CSE team. Ex. 22, ¶ 40. Further, the IEP includes a detailed transition plan. Ex. 3-3, 3-10, 3-11. Given the detailed nature of the transition plan and the participation of the CSE in its development, the lack of a vocational assessment by the CSE is not, by itself, a deprivation of FAPE. See Application of the Dep't of Educ., Appeal No. 11-123 at 15-16.

58.     The Parent next contends that the DOE failed to prove that McSweeney could implement the IEP. Petition ¶¶ 50-51. JS never attended McSweeney, and, thus, any arguments concerning the implementation of the IEP are an operation in pure speculation and the IHO properly declined to address them. See Ex. 21-2; See Application of the Dep't of Educ., Appeal No. 12-091 at 12; Application of a Student with a Disability, Appeal No. 12-119 at 26-27.

19

**A292**

59.  Moreover, as the Second Circuit stated in R.E. v. New York City Dep't of Educ.,

694 F.3d 167, 187, 195 (2d Cir. 2012), "[s]peculation that the school district will not adequately

adhere to the IEP is not an appropriate basis for [finding a program inappropriate]" see also K.L.

v. New York City Dep't of Educ., 2013 WL 3814669 at *6 (2d Cir. July 24, 2013) ("'[t]he

appropriate inquiry is into the nature of the program actually offered in the written plan,' not a

retrospective assessment of how that plan would have been executed") (citing R.E., 694 F.3d at

187).  In any event, at no time was MM ever informed that McSweeney could not fully

implement the IEP.  See Ex. 4, attached to Petition.  Moreover, Ms. Naclerio stated that the IEP

could have been fully implemented.  Ex. 21-4, 21-5.

60.  In sum, it is clear from the record that the DOE offered JS a FAPE for the 2012-

2013 school year and the SRO should reject the Parent's contrary arguments and sustain the

DOE's cross-appeal.

## CONCLUSION

61.  Wherefore, the DOE respectfully requests that the SRO find that: (1) the IHO's

pre-hearing order and administration of the hearing were reasonable; (2) the DOE offered JS a

FAPE for the 2012-2013 school year; (3) that the Parent did not meet her burden of

demonstrating that Cooke was appropriate for JS; (4) that the equities do not favor funding; (5)

sustain the DOE's cross-appeal; and (6) dismiss this action with prejudice.

Dated: September 17, 2013        Respectfully Submitted,
       Brooklyn, New York

                                 Courtenaye Jackson-Chase,
                                 Special Assistant Corporation Counsel
                                 Brian J. Reimels, of Counsel
                                 New York City Department of Education
RECEIVED                         335 Adams Street – 28th Floor
                                 Brooklyn, New York 11201
SEP 1 9 2013                     (718) 935-4934

OFFICE OF STATE REVIEW

20

**A293**

**STATE OF NEW YORK** )
                  :SS.:
**COUNTY OF KINGS** )

RECEIVED

SEP 1 9 2013

OFFICE OF STATE REVIEW

     Brian J. Reimels, being duly sworn, deposes and says that he is an Attorney in the Office of Legal Services of the Department of Education of the City of New York, and as such that he is an agent of the same. That the statements in the foregoing Verified Answer and Cross-Appeal are true to his knowledge and belief, and as to that matter he believes it to be true. Deponent further says that the reason why this verification is not made by Respondent is that it is a corporation; that the grounds of his belief as to all matters not therein stated upon his knowledge are as follows: information obtained from the books and records of the Department of Education or from statements made to him by certain officers or agents of the Department and/or the City of New York.

_____
Brian J. Reimels

Sworn to before me, this
17th Day of September, 2013

_____
Notary Public

    GORDON C. HARRISS
Notary Public, State of New York
     No. 02HA6136326
  Qualified in New York County Kings County
Commission Expires January 3, 20 14

RECEIVED

SEP 1 9 2013

OFFICE OF STATE REVIEW

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
--------------------------------------------------------------------X
In the Matter of the Appeal of
MM on behalf of JS,

                          Petitioner,

-against-

New York City Department of Education,
                        Respondents.
--------------------------------------------------------------------X

Affidavit of Service

IHO No. 143983
SRO No. 13-157

I, Leah McManigle, being duly sworn, deposes and says:

1. I am employed by the Department of Education, as a Community Associate in the Department of Education's Office of General Counsel.

2. I am not a party to this action and am over the age of eighteen years.

3. On September 17, 2013 at approximately 3:00 p.m., I mailed a true copy of the Verified Answer and Cross-Appeal by mailing it in a postage–paid mail wrapper and dropping it in a United States Post-Office mailbox to Counsel for Petitioners at the address designated by him, Thomas Gray, Esq., Partnership for Children's Rights, 271 Madison Avenue, 17th Floor, New York, NY 10016.

                                Leah McManigle

Sworn to before me, this
17th Day of September, 2013

Notary Public

JESSICA C. DARPINO
NOTARY PUBLIC, STATE OF NEW YORK
#02DA6117398
Qualified in New York County
Commission Expires: October 25, 20___

**A295**

**RECEIVED**

OCT 1 0 2013

OFFICE OF STATE REVIEW

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF
M.M., on behalf of J.S.,

                          Petitioner,

                against

New York City Department of Education
                    Respondent.
-------------------------------------------------------------------X

**VERIFIED REPLY
AND ANSWER TO
CROSS-APPEAL**

Impartial Hearing
Case No. 143983
SRO Case No. 13-157

## PRELIMINARY STATEMENT

1.  On August 21, 2013, Petitioner M.M. served the Respondent New York City

Department of Education (DOE) with a Verified Petition, and related documents, in support of

her claim that Impartial Hearing Officer (IHO) Mary Noe, Esq., erred in denying her request for

an order directing the DOE to pay J.S.'s 2012-2013 school year tuition at Cooke Center for

Learning and Development (Cooke) (*see* Verified Petition (Pet.) ¶¶ 1-79). M.M. requested that

the State Review Officer (SRO) either order the case remanded for a new hearing before a new

IHO or order the DOE to pay J.S.'s tuition (Pet. ¶¶ 78-79).

2.  By a Verified Answer and Cross-Appeal, dated September 17, 2013, the DOE

requested the SRO to determine that IHO Noe's conduct did not require remand for a new

hearing before a new IHO and, further, that the DOE should prevail under the *Burlington*

adjudicatory scheme (*see* Verified Answer and Cross-Appeal (Ans. and C-A) ¶¶ 1-61).

3.  On September 19, 2013, M.M. submitted a letter to the Office of State Review

requesting extensions of time to file a Verified Reply and a Verified Answer to the Cross-

Appeal, and notified the Office of State Review that she intended to file the responsive pleadings

1

**A296**

as one document. On September 20, 2013, the Office of State Review granted M.M.'s application.

4. M.M. now submits this Verified Reply and Answer to Cross-Appeal in response to the Verified Answer and Cross-Appeal.

## REPLY TO THE DOE'S PROCEDURAL DEFENSES

5. The DOE asserts the following procedural defenses in its Verified Answer and Cross-Appeal: (1) M.M. failed to preserve her objection to IHO Noe's affidavit scheme (*see* Ans. and C-A ¶ 38); (2) M.M. abandoned her claim that the IHO's refusal to translate the affidavits from English into Spanish violated her due process rights (*see* Ans. and C-A ¶¶ 40-42); (3) M.M. failed to preserve her claim that the CSE lacked evaluative data to support placing J.S. in a 12:1:1 program (*see* Ans. and C-A ¶ 54); and (4) M.M. waived an argument concerning the specificity of the Individualized Education Program's (IEP's) annual goals (*see* Ans. and C-A ¶ 56). Each of these procedural defenses is without merit.

### M.M. Appropriately Objected to the IHO's Affidavit Scheme

6. The DOE appears to argue that M.M. failed to preserve her objection to IHO Noe's affidavit scheme, asserting that M.M.'s "counsel never complied with the IHO's order" directing her to provide "the reasons underlying the necessity for live testimony rather than by affidavit" with respect to particular witnesses (Ans. and C-A ¶ 38). The DOE is mistaken.

7. In fact, as demonstrated in the Petition, over two weeks prior to the first hearing date M.M.'s counsel filed a detailed motion objecting to the affidavit scheme in its entirety (Pet. ¶ 31, *see* Exhibit (Exh.) O at 1-2). By ignoring M.M.'s motion, and falsely asserting that she never received it, the IHO demonstrated her inability to fairly administer the hearing, which requires

2

**A297**

this case to be remanded to for a new hearing before a new IHO (*see* Pet. ¶¶ 74-75; Appeal
Exhibit (App. Exh.) 2).

8. Moreover, the DOE's assertion that M.M.'s objection to the IHO's order is waived
because "she did not avail herself of the IHO's order which would have allowed for direct
testimony," is belied by the contents of M.M.'s objection. Indeed, in her April 29, 2013 motion,
M.M. wrote that the IHO's affidavit scheme would prevent her from challenging prejudicial
questions to, and prejudicial testimony from, all witnesses (*see* Exh. O at 1-2).

9. Thus, contrary to the DOE's assertion, M.M.'s objection to IHO Noe's affidavit
scheme is preserved.

### M.M.'s Objection to the IHO's Refusal to Provide Affidavit Translation is Preserved for Appeal

10. The DOE asserts that "it appears that M.M. abandoned" her claim that IHO Noe's
unwillingness to translate the affidavits in the case violated her due process rights (Ans. and C-A
¶ 41). The DOE appears to believe that because M.M. proceeded through a compromised hearing
process, in which she was belatedly allowed to review translated affidavits, she waived her right
to fully participate in the hearing process (Ans. and C-A ¶¶ 40-42). The DOE is wrong.

11. As noted in the Petition, IHO Noe only offered to provide translations of the
affidavits for M.M. at the end of the last hearing date, June 19, 2013 (Pet. ¶¶ 72-74; *see* Tr. 294-
95). This late offer was fundamentally inadequate. It was made 51 days after M.M. moved for
translation of the affidavits, and after two hearing dates worth of testimony and argument had
been taken (*see* Exh O at 3; Tr. 294-95).

12. The DOE endorses the IHO's conduct (*see* Ans. and C.A.¶ 40-42), which forced
M.M. to choose between her right to meaningfully participate in the hearing process (*Mathews v.
Eldridge*, 424 U.S. 319, 333 (1976)) and her right to a timely adjudication of her claim (34

3

**A298**

C.F.R. § 300.515(a)). Such a choice was unjust and, at the very least, requires remand for a new hearing before a new IHO.

### M.M. Raised and Preserved Her Claim That There was Insufficient Evaluative Data to Support the IEP's 12:1:1 Program Recommendation

13. The DOE asserts that M.M.'s due process complaint "never raised" the claim that the CSE lacked evaluative data to support placing J.S. in a 12:1:1 program and, therefore, the claim is waived (Ans. and C-A ¶ 54). The DOE is profoundly mistaken.

14. M.M.'s due process complaint reads, in relevant part: "The IEP team did not provide adequate evaluative data to develop an appropriate IEP, and it was impossible to make meaningful program decisions without current information" (Exh. 1 at 3). The next sentence faults the IEP for failing to incorporate concerns that "a 12:1:1 class in a District 75 program would not be appropriate to address [J.S.'s] individual needs and that […] placement in such a program would not provide [J.S.] with adequate support or an appropriate balance between academic instruction and vocational training" (Exh. 1 at 3).

15. Indeed, J.S.'s inappropriate placement in a 12:1:1 program was central to M.M.'s due process claim that the DOE failed to provide J.S. with a free and appropriate education (FAPE) (*see* Exh. 1).

### M.M. Fully Articulated her Claim that Outdated Evaluative Data Resulted in an Impermissibly Vague IEP

16. Citing to the Petition's paragraph 48, the DOE asserts a final waiver defense in stating that M.M.'s due process complaint "did not raise any claim concerning the IEP's annual goals, and, thus, this claim is not properly before the SRO on appeal" (Ans. and C-A ¶ 56, *citing* Pet. ¶ 48). The DOE misconstrues M.M.'s argument.

4

**A299**

17. Paragraph 48 of the Petition contains M.M.'s argument that the CSE lacked the evaluative data necessary to craft a sufficiently specific IEP, which failed to specify the balance between the academic versus vocational instruction J.S. was to receive (*see* Pet. ¶ 48). The due process complaint contains this claim (*see* Exh. 1 at 3 ("[t]he IEP team did not have adequate evaluative data to develop an appropriate IEP, and it was impossible to make meaningful program decisions without current information;" "The IEP team did not address the appropriate balance between academic instruction and vocational training …"). Thus, the argument articulated in the Petition's paragraph 48 is preserved.

**M.M.'S ANSWER TO THE FACTUAL ALLEGATIONS
IN THE CROSS-APPEAL**

18. With respect paragraph 50 of the DOE's Cross-Appeal, M.M. admits that IHO Noe committed legal error in failing to make a finding under *Burlington* Prong I. M.M. denies the DOE's allegation and argument that it offered J.S. a FAPE for the 2012-2013 school year.

19. M.M. denies the allegations and arguments of fact and law contained in paragraph 51, and affirmatively states that J.S.'s 2012 IEP was premised on insufficient evaluative data and that the DOE failed to offer J.S. a FAPE for the 2012-2013 school year (Pet. ¶¶ 9, 45-49). Furthermore, M.M. states that McSweeney, the recommended public school placement, was inappropriate as it was unable to implement J.S.'s IEP and would not have allowed him to make academic progress (Pet. ¶¶ 8, 50-51).

20. M.M. admits the allegation contained in paragraph 52, that the CSE meeting was held on May 22, 2012. M.M. denies the remaining allegations and arguments of fact and law, and affirmatively states that the CSE's reliance on the June 2, 2009 Comprehensive Evaluation, and the DOE's failure to conduct a new evaluation pursuant to 20 U.S.C. § 1414(a)(2)(B)(ii), was error that denied J.S. a FAPE for the 2012-2013 school year (Pet. ¶¶ 9, 45-49).

5

**A300**

21. M.M. denies that allegations and arguments in paragraph 53 and, affirmatively states that the DOE violated the IDEA's requirement, at 20 U.S.C. § 1414(c)(4)(A), that it notify M.M. of its determination that no additional data was needed to determine J.S.'s educational needs (Pet. ¶ 46).

22. M.M. denies paragraph 54. The allegations and arguments contained in paragraph 54 have no basis in fact. Instead, M.M. affirmatively states that her argument that the IEP's 12:1:1 program was unsupported by evaluative data and other evidence before the CSE was articulated in the due process complaint (Exh. 1 at 3). M.M.'s due process complaint also included her claim that J.S. required a smaller environment than a DOE 12:1:1 program could provide (Exh. 1 at 3).

23. M.M. denies that allegations and arguments of fact and law contained in paragraph 55.

24. Paragraph 56 misstates M.M.'s arguments and contentions and, therefore, M.M. denies the statements in paragraph 56. Instead, M.M. states that her Petition's paragraph 48 contains her argument that the CSE's lack of evaluative data resulted in an IEP that lacked sufficient specificity (Pet. ¶ 48). The DOE's Cross-Appeal, at paragraph 56, admits that the IEP's lack of specificity impermissibly required McSweeney to determine the amount of time J.S. would be "placed in a full-time or part time vocational program …" (Ans. and C-A ¶ 56).

25. M.M. admits the allegation contained in paragraph 57 that the DOE failed to conduct a vocational assessment as required under the New York State Regulations, at 8 N.Y.C.R.R. § 200.4(b)(6)(viii). M.M. denies the remaining allegations and arguments of fact and law contained in paragraph 57.

26. With regard to paragraphs 58 and 59, M.M. admits that one of her contentions is that McSweeney was unable to implement the IEP. M.M. denies the DOE's contention that "any

6

**A301**

arguments concerning the implementation of the IEP are an operation in pure speculation," and instead states that the evidence in this case demonstrates that McSweeney was not capable of implementing J.S.'s IEP and would not have offered him an appropriate education (Pet. ¶¶ 50-51). M.M. denies the remaining allegations and arguments of fact and law contained in paragraphs 58 and 59.

27. M.M. denies paragraph 60.

### ANSWER TO THE DOE'S CROSS-APPEAL

#### The 2012 IEP Was Based on Insufficient, Outdated Evaluative Data

28. The DOE cross-appeals IHO Noe's failure to make a determination under *Burlington* Prong I and takes specific issue with IHO Noe's statement that the CSE lacked the evaluative data necessary to make an appropriate program recommendation (Ans. and C-A ¶ 50, *see* Dec. at 9). The DOE's assertion that the 2012 IEP is based on sufficient evaluative data must be rejected (Ans. and C-A ¶¶ 50-54).

29. In asserting that the 2012 IEP was based on sufficient evaluative data, the DOE argues that there was no requirement for the CSE to conduct a vocational assessment because the IEP contained a transition plan of a "detailed nature" that was partially developed from the materials that Cooke provided to the CSE (Ans. and C-A ¶ 57).

30. Initially, it should be noted that the DOE does not dispute that it violated the New York State Regulation's requirement that students age 12 and older "shall receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests." 8 N.Y.C.R.R. § 200.4(b)(6)(viii). *See also* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (requiring an annual age appropriate transition assessment for every child age 16 and older).

7

**A302**

31. Furthermore, as stated in the Petition, while the IEP contains various vocational goals, it fails to indicate the amount of academic versus vocational instruction J.S. was to receive (*see* Pet. ¶ 48, Exh. 3, Tr. 59-60). Indeed, the DOE admits that the IEP failed to specify whether J.S. would be "placed in a full-time or part-time vocational program" for the 2012-2013 school year (Ans. and C-A ¶ 56). Thus, the DOE's failure to perform a vocational assessment resulted in an impermissibly vague IEP.

32. In attempting to justify the DOE's failure to comply with the IDEA's evaluation requirements, the DOE appears to assert that it was M.M.'s obligation to request a triennial reevaluation (Ans. and C-A ¶ 52). This assertion is belied by the plain language of the IDEA, which, as noted in the Petition, requires the DOE to consider "input from the child's parent" prior to determining whether a reevaluation is needed (Pet. ¶ 46). 20 U.S.C. § 1414(c)(1)(B).

33. Furthermore, beyond failing to initially contact M.M. to seek her input on the need for reevaluations, the DOE also failed to adhere to the IDEA's requirement that the "IEP Team and other qualified professionals" notify a parent of a determination not to obtain new evaluations, and the reasons for that determination, as well as that parent's right to request an assessment (Pet. ¶ 46). *See* 20 U.S.C. § 1414(c)(4)(A). Moreover, the IDEA requires a new evaluation at the parent's request even if an IEP Team has determined that a new evaluation is unnecessary. *See* 20 U.S.C. § 1414(c)(4)(B). In this case, there is no evidence that the DOE contacted M.M. regarding the need for new evaluations at any time prior to the start of the 2012-2013 school year. Therefore, the only party that failed to meet its obligation under the IDEA was the DOE.

34. The DOE also pointlessly faults M.M. for not objecting to "any of the recommendations at the IEP meeting" in arguing that there was sufficient evaluative data to

8

**A303**

place J.S. in a 12:1:1 program (Ans. and C-A ¶ 51). However, refraining from voicing an objection to an IEP's recommendations is irrelevant to the issue of whether or not the DOE had an obligation to develop additional evaluative data. Indeed, the Cross-Appeal does not contest the plain language of the IDEA, which required the DOE to review the existing evaluations and "on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed." 20 U.S.C § 1414(c)(1). Thus, contrary to the DOE's position, it was the DOE's affirmative obligation to contact M.M. and discuss with her whether the collected evaluative data was sufficient to meet J.S.'s needs.

35. It was essential for the DOE to have engaged M.M. in the process of determining whether a reevaluation was necessary. The DOE's failure to include M.M. in the decisions shaping J.S.'s education violated a fundamental purpose of the IDEA to "ensure that the rights of children with disabilities and parents of such children are protected" and to ensure that "parents have the necessary tools to improve educational results for children with disabilities." 20 U.S.C. § 1400(d). Additionally, if the DOE had engaged in the required reevaluation process it is likely to have recommended an appropriate program and to have crafted an IEP that specified the balance between the academic classes and the vocational training J.S. was to receive.

36. The DOE's argument that the Comprehensive Evaluation, completed on June 2, 2009, was "still timely, as it had been completed within three years of the CSE meeting" is logically untenable and must be rejected. (Ans. and C-A ¶ 52).

37. Initially, it should be noted that regardless of the date the Comprehensive Evaluation was completed, the bulk of the evaluation's data was older than three years old at the time the May 22, 2012 CSE convened as the majority of the tests contained in the Comprehensive Evaluation were conducted on March 19, 2009 (*see* Exh. 5).

9

**A304**

38. Moreover, the DOE's position that the IDEA's triennial revaluation requirement should be measured by the date the CSE meeting convened fails to cure the 2012 IEP's substantive deficiency, which is that it was based on assessment data that, by any measure, was out of date by the start of the 2012-2013 school year. The IDEA, at 20 U.S.C. § 1414(a)(2)(B)(ii), plainly states that a reevaluation shall occur "at least once every three years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." Therefore, starting from the date of the Comprehensive Evaluation, June 2, 2009, the IDEA required the DOE to conduct a new evaluation by June 2, 2012, 11 days after the May 22, 2012 CSE meeting. Even assuming, for the sake of argument, that the Comprehensive Evaluation was technically "still timely" on May 22, 2012, because an up-to-date triennial reevaluation was necessary for determining "the content of the child's [IEP,]" the DOE was required to convene a new CSE, and consider a timely evaluation, once the Comprehensive Evaluation became three years old on June 3, 2012. *See* 20 U.S.C. § 1414(b)(2)(A)(ii).

39. The DOE also asserts, more generally, that the information the CSE obtained from Cooke provided sufficient evaluative information to support the IEP (Ans. and C-A ¶ 51). While Cooke educator Ms. Ord provided the CSE with a broad picture of J.S.'s educational needs, this was not a substitute for specific up-to-date evaluative data (*see* Exh. M ¶ 11-20). Indeed, the information obtained from Cooke did not relieve the DOE from adhering to the IDEA's requirement that it "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information." 20 U.S.C. § 1414(b)(2)(A). And, as further detailed below, despite the testimony and information that Ms. Ord provided, the DOE's failure to meet any of its reevaluation obligations resulted in denying J.S. a FAPE for the 2012-2013 school year.

10

**A305**

**The 2012 IEP's 12:1:1 Program Recommendation was Not Appropriate for J.S.**

40. Primarily relying on CSE Region 9 special education teacher Ms. Alvarez's contention that the IEP's 12 students per one teacher and one paraprofessional program was similar to the program offered at Cooke, the DOE claims that the 12:1:1 program recommendation was appropriate (Ans. and C-A ¶¶ 32, 55, *see* Exh. 22 ¶¶ 27, 29, 42). However, Ms. Alvarez's contention is inaccurate.

41. As Ms. Ord explained, during 2011-2012 school year J.S. "was in a class with ten to twelve students and two teachers" (Exh. M ¶ 18). Ms. Ord informed the CSE that "the level of support at Cooke is two teachers in the classroom," as opposed to one teacher and one paraprofessional in a DOE 12:1:1 program (Exh. M ¶ 19). And further, "[a]t Cooke, the assistant teacher works together with the teacher. They work on instructional materials and planning; they co-teach" (Exh. M ¶ 19). Ms. Ord explained that she had observed DOE classrooms that contained twelve students one teacher and one paraprofessional, and that "a class paraprofessional in a DOE setting does not have the same instructional role as a Cooke assistant teacher" (Exh. M ¶ 19). Ms. Ord stated that J.S. required "one-to-one and small group instruction because he needs repetition and individualized support," which a DOE 12:1:1 student-to-teacher/paraprofessional ratio could not provide. (Exh. M ¶ 18).

42. Ms. Hibbard, J.S.'s literacy and math teacher, stated that J.S. needed "frequent check-ins and regular teacher prompting to ensure that he is committing new information to long-term memory" (Exh. I ¶ 7). He needed a small setting so that a teacher could give immediate and explicit feedback about what he was learning and about his social behavior (Exh. I ¶¶ 8, 11). J.S. needed "a teacher to sit right next to him and walk him through new material

11

**A306**

repeatedly in a variety of different settings and at a variety of different times and days" (Exh. I ¶ 12; *see* Exh. I ¶ 17).

43. Indeed, as shown in the Petition, during the 2012-2013 school year J.S.'s math, literacy, and vocational skills classes at Cooke had five students and one teacher (Pet. ¶ 55, *see* Exhs. I ¶¶ 8-9, J ¶ 9). J.S.'s classes during the Cooke Summer Academy contained 12 students and two teachers, and in the afternoons there were three teachers assigned to his class (Exh. K ¶ 11).

44. Thus, it is clear that J.S. needed a program with more potential for individualized attention than the IEP's recommended 12:1:1 program.

### McSweeney Could Not Provide J.S. with an Opportunity to Progress

45. Citing *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), the DOE argues that the because J.S. never attended McSweeney "any arguments concerning the implementation of the IEP are an operation in pure speculation and the IHO properly declined to address them" (Ans. and C-A ¶¶ 58-59).

46. The DOE's assertion that a parent is precluded from challenging a public school placement if their child does not attend the school is a misunderstanding of *R.E.. R.E.* does not preclude an assessment of whether a public school placement is able to implement an IEP. Rather, *R.E.* holds that "the IEP must be evaluated prospectively as of the time of its drafting" and that "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered." *R.E.*, 694 F.3d at 186. The Court explained: "[T]estimony regarding state-offered services may only explain or justify what is listed in the written IEP. Testimony may not support a modification that is materially different

12

**A307**

from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." *R.E.*, 694 F.3d at 185.

47. Therefore, while *R.E.* bars testimony that retrospectively cures deficiencies in an IEP, *R.E.* does not foreclose a finding that FAPE was denied where the placement was not able to implement the IEP's mandates. To the contrary, *R.E.* explicitly reaffirms the Second Circuit's prior holding in *T.Y. v. N YC Dep't of Educ.*, 584 F.3d 412 (2d Cir. 2009) that a school site selected by the school district must "conform[] to the program offered in the IEP." *R.E.*, 694 F.3d at 191-92; *see also T.Y.*, 584 F.3d at 420 (school districts do not "have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements"); *S.F. v. NYC Dep't. of Educ.*, 11-CV-0870(DLC), 2011 WL 5419847, at *13 (S.D.N.Y. Nov. 9, 2011) ("the Parents may challenge whether the DOE denied the Student a FAPE as a substantive matter if the Placement Classroom cannot deliver the services determined in the IEP . . . ."); *E.A.M. v. NYC Dep't of Educ.*, 11-CV-3730, 2012 WL 4571794 at *11 (S.D.N.Y. September 29, 2012) ("[A] parent may challenge the adequacy of a placement classroom - even if the child never enrolled in the school - if the alleged defects were reasonably apparent to either the parent or the school district when the parent rejected the placement").

48. Initially, the IEP's lack of specificity, detailed above, resulted in J.S.'s placement in a school that was incapable of meeting the IEP's long term goals. For instance, McSweeney's primarily vocational program would prevent J.S. from making the academic progress necessary to achieve a long term goal to "attend a two-year community college" or a vocational school and ultimately work as a teacher's assistant (Exh. 3 at 3; *see* Exh. N ¶¶ 9-11, 14).

49. Additionally, McSweeney was unable to implement J.S.'s 2012 IEP as written. McSweeney students of J.S.'s age spent the full school day at work sites, worked the majority of

13

**A308**

their day, and received only brief academic instruction (Exh. N ¶ 9). The IEP goals would not have been met in this setting. As Dr. Tabone stated, this program would limit J.S.'s academic growth and prevent him from reaching the IEP's academic goals (Exh. N ¶¶ 10-11).

50. Furthermore, McSweeney could not provide J.S. with an appropriate level of academic instruction. McSweeney's academic instruction was at the pre-K to third grade level (Exh. N ¶ 14). However, according the 2012 IEP, J.S.'s instructional level in reading ranged from third to sixth grade, and he was independently performing math at the third grade to fourth grade level (Exh. N ¶ 14; Exh. 3 at 1). *See E.A.M.*, 2012 WL 4571794 at *11-12 (finding that the question of whether a student's proposed placement provided proper functional grouping was not speculative where "the record supports the inference that the alleged defects about which the Parent complains were reasonably apparent to the *District* when the Parent rejected the [placement]" (emphasis in original). Notably, Ms. Naclerio, the McSweeney educator at the hearing, did not indicate that McSweeney provided academic instruction at J.S.'s level (Exh. 21, *see* Tr. 6-16). In short, McSweeney's program would have precluded J.S. from progressing academically.

14

**A309**

**RELIEF REQUESTED**

51. M.M. respectfully requests the SRO issue an order remanding for a new impartial hearing before a new IHO. Alternatively, M.M. requests the SRO to issue an order that: (1) finds that the DOE failed to offer J.S. a FAPE; (2) finds that Cooke was an appropriate program under *Burlington* Prong II; (3) finds that equitable considerations support M.M.'s tuition claim; and (4) orders the DOE to pay J.S.'s $55,775 tuitions at Cooke for the 12 month school year, directly to Cooke.

DATE: October 4, 2013
      New York, New York

PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for M.M.

By:

THOMAS GRAY
Staff Attorney
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ex. 246

**RECEIVED**

OCT 1 0 2013

OFFICE OF STATE REVIEW

15

**A310**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                  Petitioner,

       - against -

New York City Department of Education,

                 Respondent.
-----------------------------------------------------------------------X

**AFFIDAVIT OF
VERIFICATION**

Impartial Hearing
Case No. 143983

SRO Case No. 13-157

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK  )

     M███ M███, being duly sworn, deposes and says that she is the mother of J.S., and is

the Petitioner in this proceeding; that Ms. Ana Lazo, Administrator at Partnership for Children's

Rights, who is bilingual, read and translated for her the annexed Verified Reply and Answer to

Cross-Appeal so that she knows the contents thereof; and that the Verified Reply and Answer to

Cross-Appeal is true to the knowledge of deponent except as to the matters therein stated to be

alleged upon information and belief, and as to those matters she believes it to be true.

RECEIVED ███

Subscribed and sworn to before me
this 4th day of October, 2013

OCT 1 0 2013

OFFICE OF STATE REVIEW

_____
Notary Public

AMANDA S. SEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02SE6279054
Qualified in Kings County
My Commission Expires April 08, 2017

**A311**

RECEIVED

OCT 1 0 2013

OFFICE OF STATE REVIEW

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
---------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,                                    **AFFIDAVIT**

                                    Petitioner,

                                                           Impartial Hearing
        - against -                                        Case No. 143983

New York City Department of Education,                     SRO Case No. 13-157

                                    Respondent.
---------------------------------------------------------------X

STATE OF NEW YORK    )
                              ss.:
COUNTY OF NEW YORK  )

        Ana Lazo, Administrator at Partnership for Children's Rights, being duly sworn, deposes

and says she that speaks and reads both English and Spanish; and that on October 4, 2013 she

translated the annexed Verified Reply and Answer to Cross-Appeal from English into Spanish

for M███ M███.

                                                    _Ana Elena Lazo_
                                        **RECEIVED**   Ana Lazo

Subscribed and sworn to before me           OCT 1 0 2013
this 4th day of October, 2013

                                        OFFICE OF STATE REVIEW
    _____
    Notary Public

                                        **AMANDA S. SEN**
                                        **NOTARY PUBLIC-STATE OF NEW YORK**
                                        **No. 02SE6279054**
                                        Qualified in Kings County
                                        My Commission Expires April 08, 2017

**A312**

RECEIVED

OCT 1 0 2013

OFFICE OF STATE REVIEW

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
------------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                  Petitioner,

     - against -

New York City Department of Education,

                  Respondent.
------------------------------------------------------------------------X

**AFFIDAVIT OF
PERSONAL SERVICE**

Impartial Hearing
Case No. 143983
SRO Case No. 13-157

IHO Mary Noe, Esq

STATE OF NEW YORK  )
                      ) ss.:
COUNTY OF NEW YORK  )

     THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 7th day of October, 2013, at 100 Church Street, in New York City, New York County, State of New York, he served the annexed Verified Reply and Answer to Cross-Appeal, Affidavit of Verification, and Affidavit on the New York City Department of Education by delivering and leaving with said AMANDA GONZALES at said time and place a true copy thereof.

     Deponent further says that he knew the person so served to be the said AMANDA GONZALES, who is the DOCKETING CLERK in said district.

RECEIVED

OCT 1 0 2013

OFFICE OF STATE REVIEW

Subscribed and sworn to before me
this 7th day of October, 2013

Notary Public

MICHAEL D. HAMBDEN
NOTARY PUBLIC, STATE OF NEW YORK
No. 4678623
Qualified in Westchester County
Commission Expires 10/31/14

**A313**

**RECEIVED**

JAN 1 5 2014

OFFICE OF STATE REVIEW

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
--------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M, on behalf of J.S,

                       Petitioner,

         - against -

New York City Department of Education,

                   Respondent.
--------------------------------------------------------------------X

**NOTICE OF INTENTION
TO SEEK REVIEW**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

NOTICE:

Please be advised that M.M. has retained our office to represent her and her son, J.S., in this appeal. Further, please be advised that we intend to seek review of the determination of the impartial hearing officer concerning the identification, evaluation, program, or placement of J.S., as set forth in the impartial hearing officer's Findings of Fact and Decision dated December 20, 2013. Upon receipt of this notice, you are required to have prepared a written transcript of the proceedings before the impartial hearing officer in this matter. A copy of the decision of the impartial hearing officer, a bound copy of the written transcript, as well as an electronic transcript, and the original exhibits accepted into evidence at the hearing and an index to the exhibits must be filed by the Department of Education with the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite 203, Albany, NY 12205-2643, within 10 days after service of this notice.

**A314**

Dated: New York, New York
January 9, 2014

THOMAS GRAY
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for Petitioner
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 x 246
Fax (212) 683-5544
tgray@pfcr.org

**RECEIVED**

JAN 1 5 2014

OFFICE OF STATE REVIEW

2

**A315**

**RECEIVED**

JAN 1 5 2014

OFFICE OF STATE REVIEW

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S,

                                Petitioner,

           - against -

New York City Department of Education,

                             Respondent.
-----------------------------------------------------------------------X

**AFFIDAVIT OF
PERSONAL SERVICE**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

STATE OF NEW YORK    )
                         ss.:
COUNTY OF NEW YORK  )

THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 9th day of January, 2014, at 100 Church Street, in New York City, New York County, State of New York, he served the annexed Notice of Intention to Seek Review on the New York City Department of Education by delivering and leaving with said ALEXANDER LY at said time and place a true copy thereof.

Deponent further says that he knew the person so served to be the said ALEXANDER LY, who is the DEPUTY UNIT CHIEF in said district.

                                              THOMAS GRAY

Subscribed and sworn to before me
this 9th day of January, 2014

Notary Public

NOTARY PUBLIC, State of New York
TODD SILVERBLATT
No. 02SI6055274
Qualified in Kings County
Commission Expires May 14, 20__

**A316**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S,

                                              Petitioner,

                    - against -

New York City Department of Education,

                                              Respondent.
-------------------------------------------------------------------------X

**RECEIVED**

JAN 2 7 2014

OFFICE OF STATE REVIEW

**NOTICE WITH
PETITION**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

NOTICE:

        You are hereby required to appear in this review and to answer the allegations contained
in this petition.  Your answers must conform with the provisions of the regulations of the
Commissioner of Education relating to reviews of this nature, copies of which are available from
the Office of State Review of the New York State Education Department, 80 Wolf Road, Suite
203, Albany, New York 12205-2643.

        Please take notice that such regulations require that an answer to the petition must be
served upon the petitioner, or if the petitioner is represented by counsel, upon such counsel,
within 10 days after the service of the petition for review, and that a copy of such answer must,
within 2 days after such service, be filed with the Office of State Review of the New York State
Education Department, 80 Wolf Road, Suite 203, Albany, New York 12205-2643.

**A317**

The decision of the State Review Officer shall be based solely on the record before the State Review Officer and shall be final, unless an aggrieved party seeks judicial review.

Dated: January 23, 2014

PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorneys for Petitioner

BY:    THOMAS GRAY
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 x 246

**RECEIVED**

JAN 2 7 2014

OFFICE OF STATE REVIEW

2

**A318**

**RECEIVED**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW

JAN 2 7 2014

OFFICE OF STATE REVIEW

------------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF
M.M., on behalf of J.S.,

                 Petitioner,

      against

New York City Department of Education,
              Respondent.

------------------------------------------------------------------------X

**VERIFIED PETITION**
Impartial Hearing
Case No. 143983

## PRELIMINARY STATEMENT

1. Partnership for Children's Rights, attorneys for M.M., mother of J.S., submits this Petition on behalf of M.M., in support of her claim that Impartial Hearing Officer ("IHO") Mary Noe, Esq., erred in denying her request for an order directing the New York City Department of Education ("DOE") to pay tuition for J.S. at the Cooke Center for Learning and Development ("Cooke") for the 2012-2013 school year.

## BACKGROUND FACTS

2. J.S. is a 19 year-old student with a disability whom, starting in May 2012, the DOE classified as Autistic (Exhibit ("Exh.") 3 at 1). Prior to May 2012, the DOE classified J.S. as a student with Speech or Language Impairment (Exh. 1 at 2; *see* Exh. 5 at 1).

3. J.S. started receiving early intervention services at age two (Exh. 1 at 2). He began attending Cooke in 2008, at age 14 (Exh. 1 at 2).

4. For each school year at Cooke prior to 2012-2013, the DOE agreed to fund J.S.'s tuition via a stipulation (Exh. 1 at 2).

5. A Committee on Special Education ("CSE") meeting was held on May 22, 2012 (Exh. 3). The corresponding Individualized Education Program ("IEP"), with an implementation date of July 2, 2012, recommended a "12:1+1" program in a District 75 school for J.S. (Exh. 3 at 1, 9).

1

**A319**

6. At the time of the May 2012 CSE meeting, J.S.'s most recent triennial reevaluation had been conducted in the spring of 2009 (*see* Exh. 5).

7. A Comprehensive Psychoeducational Evaluation ("Comprehensive Evaluation"), based on tests conducted on March 19 and June 2, 2009, concluded that J.S. scored in the extremely low to low average ranges on tests of his cognitive abilities (Exh. 5 at 2-4, 7-8). Socially and emotionally, the Comprehensive Evaluation indicated that J.S.'s general adaptive functioning, communication, daily living skills, and socialization were in the low range (Exh. 5 at 4-5). J.S.'s affective and anxiety problem scores were in the borderline clinical range (Exh. 5 at 5).

8. The DOE did not perform a triennial revaluation of J.S. prior to the May 2012 CSE meeting or prior to the start of the 2012-2013 school year (*see* Tr. 83-84, Exh. 22 ¶ 18).

9. Prior to the May 2012 CSE meeting, the DOE had never performed a vocational assessment or any other type of transitional assessment on J.S.

10. In or about the late summer of 2011, M.M. requested that Cooke conduct intellectual testing on J.S. (Tr. 240-41). M.M. made this request in connection with a disability benefits application she had filed on behalf of J.S., as well as in support of her effort to obtain a guardianship order (241).

11. Cooke produced a January 5, 2012 Stanford-Binet Intelligence Scales, Fifth Edition, Narrative Report ("Stanford-Binet Report"), based on testing conducted on October 19, 2011, that classified J.S.'s overall intelligence as mildly delayed (Exh. 15).

12. M.M. did not obtain a copy of the Stanford-Binet Report until February or March 2013, and did not have it to provide to the May 2012 CSE meeting (Tr. 237-41).

13. On June 15, 2012, the DOE issued a Final Notice of Recommendation ("FNR")

2

**A320**

recommending J.S. for placement at P721X at the Stephen D. McSweeney School

("McSweeney") for the 2012-2013 school year (Exh. 17).

14. On June 21, 2012, M.M., through her attorney, notified the DOE that she had received

the written IEP and the FNR on June 18, 2013 (Exh. B). The letter stated that M.M. had visited

McSweeney the previous day and determined that it was not appropriate for J.S. because the

school's academic program was for lower functioning students; the program focused exclusively

on job placement for students of J.S.'s age, which would impede J.S.'s steady academic

progress; and McSweeney's environment was too chaotic and noisy for J.S. (Exh. B).

Additionally, M.M. asserted that the May 2012 IEP underlying J.S.'s placement at McSweeney

was insufficient because the DOE had not evaluated J.S. since 2009 (Exh. B). M.M. indicated

that in the absence of an appropriate placement, she would re-enroll J.S. in Cooke's 12-month

program and seek an order directing the DOE to pay the tuition (Exh. B).

15. By an August 22, 2012 letter, M.M.'s attorney again wrote to the DOE providing notice

of M.M.'s concerns regarding the DOE's IEP and proposed placement, as well as J.S.'s

reenrollment at Cooke (Exh. C). On March 18, 2013, M.M.'s attorney filed a Due Process

Complaint ("Complaint") alleging that the DOE had failed to provide J.S. with a free and

appropriate public education ("FAPE") for the 2012-2013 school year and requesting that the

DOE pay J.S.'s tuition directly to Cooke (Exh. 1).

### THE IMPARTIAL HEARING AND THE JULY 18, 2013<br>FINDINGS OF FACT AND DECISION

16. The case was assigned to IHO Noe, who, by an April 24, 2013 order, directed that "each

3

A321

party should present the direct testimony by affidavit and then call the witness on the date of the hearing for cross-examination" (Petition ("Pet.") Exh. 1).[1]

17. The hearing was held before IHO Noe on May 16, June 6, and June 19, 2013 (Tr. 1-296).

18. The DOE presented two witnesses: Susan Naclerio, the IEP/Related Services Coordinator at McSweeney; and Evelyn Alvarez, a special education teacher who worked at CSE Region 9 (Exhibits ("Exhs.") 21, 22; Tr. 6-16, 54-109).

19. M.M. presented five witnesses in addition to herself: Katherine Hibbard, the Head Teacher of Literacy and Mathematics at Cooke; Victoria Fowler, an administrative coordinator at Cooke; Mary Clancy, the Director of the Cooke Summer Academy; Sally Ord, a consulting teacher at Cooke; and Francis Tabone, the former Assistant Head of the Cooke Center Academy (Exhs. I, J, K, L, M, N; *see* Pet. Exhs. 1, 4; Tr. 17-48, 115-241).

20. IHO Noe initially issued a Findings of Fact and Decision on July 18, 2013. In that Decision, the IHO failed to make findings under Prongs I and II of the three-prong test for tuition payment established in *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1986) (7/18/13 Decision ("Dec.") at 6-9).[2] Rather, the IHO denied M.M.'s request for tuition payment on the ground that M.M. had failed to "comply with the third prong of Burlington by not informing the IEP team that the parent requested an additional evaluation, which was conducted on October 19, 2012 [sic] and a report was issued on January 5, 2012" (7/18/13 Dec. at 9).

---

[1] M.M. submitted nine "appellate exhibits," which IHO Noe had failed to include as part of her July 18, 2013 Decision, to the State Review Officer ("SRO") as attachments to her previous August 19, 2013 Petition. The SRO incorporated these exhibits into the record, citing to the exhibits as "Pet. Ex." in its November 8, 2013 Decision remanding this case to the IHO for a new decision. *See* SRO Appeal No. 13-157 (Nov. 8, 2013)

[2] *Burlington* provides that parents may be awarded tuition payment when (1) the services offered by the school district are inadequate or inappropriate ("Prong I"); (2) the private school selected by the parent is an appropriate placement for the student ("Prong II"); and (3) equitable considerations support the parent's claim ("Prong III"). *Burlington*, 471 U.S. 359.

4

## PROCEEDINGS BEFORE THE STATE REVIEW OFFICER

21. By a Verified Petition, dated August 19, 2013, M.M. appealed IHO Noe's July 18, 2013 Decision, alleging that the case must be reversed or remanded (*see* 8/19/13 Pet. ¶¶ 21-79). The DOE filed a Verified Answer and Cross-Appeal on September 17, 2013. M.M. then filed a Verified Reply and Answer to Cross-Appeal, dated October 4, 2013.

22. On November 8, 2013, the SRO remanded the case to IHO Noe to decide the following issues: (1) "whether the May 2012 CSE failed to conduct a required triennial evaluation and/or vocational assessment of the student, and if so, whether such violation resulted in a denial of FAPE;" (2) "whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not [an] appropriate educational placement;" (3) "whether the May 2012 IEP was inappropriate due to an improper balance between academic instruction and vocational training;" (4) "whether the May 2012 IEP was inappropriate due to the alleged failure to adequately integrate the student's related service with his academic instruction, vocational training, and independent skills development;" (5) "whether the student was denied a FAPE because [the] May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling and training." SRO Appeal No. 13-157, at 11-12 (Nov. 8, 2013) ("SRO Decision").

## THE DECEMBER 20, 2013 FINDINGS OF FACT AND DECISION

23. IHO Noe issued a second Decision on December 20, 2013, posing five questions based on the issues identified in the SRO's remand order, answering each of those questions in the negative, and again denying M.M.'s tuition claim (*see* 12/20/13 Dec. at 5-8). As demonstrated below, the IHO's determinations are wrong.

5

**A323**

## CONTENTIONS AND ARGUMENTS ON APPEAL

24. M.M. appeals from all five findings in the IHO's December 20, 2013 Decision and from her finding that the DOE offered J.S. a FAPE for the 2012-2013 school year. M.M. also appeals the IHO's failure to make a finding that Cooke was an appropriate placement for J.S. under *Burlington* Prong II, as well as the IHO's failure to make a finding under *Burlington* Prong III that the equities favor her tuition claim.

### 1) The DOE Denied J.S. a FAPE by Failing to Engage in the Triennial Reevaluation Process

25. IHO Noe determined that the DOE had met its triennial reevaluation requirement because "at the time of the IEP meeting" the Comprehensive Evaluation and the Stanford-Binet Report were "within the statutory period" (12/20/13 Dec. at 5). This determination is contrary to the facts of this case and the law.

26. In the Decision's introductory paragraph, the IHO recounts her July 18, 2013 determination that the "[CSE] could not recommend an appropriate program because the [Stanford-Binet Report] was withheld" (12/20/13 Dec. at 3). Then, in assessing the DOE's adherence to the triennial reevaluation requirement, the IHO made the opposite factual finding, writing that "at the time of the IEP meeting the Psychoeducational Evaluation dated March 19, June 2, 2009 and the Stanford-Binet Intelligence Scales dated October 19, 2011 are within the statutory period" (12/20/13 Dec. at 5). While the Stanford-Binet Report may be "within the statutory period," the CSE did not possess the report, and the report itself does not constitute a triennial reevaluation (*see* Exh. 22 ¶¶ 13, 19; Hearing Transcript ("Tr.") 107, 237-41).[3]

---

[3] Even if the CSE had obtained the Stanford-Binet Report, the DOE would still be required to engage in the reevaluation process. As the comments to the federal regulations make clear, an independent educational evaluation obtained by a parent "would be considered as a potential source of additional information that the public agency and parent could consider in determining

6

**A324**

27. Additionally, the IHO's finding that the 2009 Comprehensive Evaluation was "within the statutory period" is incorrect (12/20/13 Dec. at 5). In fact, the last time that a triennial reevaluation was conducted was in the winter and spring of 2009, as the DOE was in the process of preparing J.S.'s IEP for the 2009-2010 school year (*see* Exh. 5). Since that time, three school years ensued: 2009-2010, 2010-2011, and 2011-2012. Therefore, the DOE was required to reevaluate J.S. prior to the start of the 2012-2013 school year.[4] Furthermore, the IEP was based on outdated information regarding J.S.'s cognitive functioning (*compare* Exh. 5 *with* Exh. 15).

28. Moreover, the IHO's determination demonstrates a profound misunderstanding of the triennial reevaluation requirement, which does not simply involve the administration of a particular test (*see* 12/20/13 Dec. at 5). Rather, a triennial reevaluation is a process that a school district engages in with a student's parent to identify all of a student's special education needs. *See* 20 U.S.C. § 1414(a)(2)(B)(ii) (school districts must reevaluate each student with a disability "at least once every three years, unless the parent and the local educational agency agree otherwise"); *see also* 8 N.Y.C.R.R. § 200.4(b)(4) ("A committee on special education shall arrange for an appropriate reevaluation ... at least once every three years, except where the school district and the parent agree in writing that such reevaluation is unnecessary").

29. A school district is required to ensure that the evaluation is "sufficiently comprehensive

whether the educational or related services needs of the child warrant a reevaluation" but "would not be considered a reevaluation" in itself. 71 Fed. Reg. 45540, 46641 (Aug. 14, 2006).
[4] *See* SRO Appeal No. 05-025 (April 25, 2005) ("Respondent [school district] acknowledges that petitioner's son was due to be reevaluated at the end of the 2004 school year ... [, but] contends that a reevaluation was not necessary because the IEP was developed prior to the end of the 2003-04 school year. Respondent's argument is not persuasive. The April 14, 2004 IEP was formulated for period of time ending April 14, 2005. Under the circumstances here, respondent had an obligation to conduct a reevaluation in a time frame that provided it with an understanding of the child's current needs in order to develop an appropriate program for the child for the beginning of the child's 2004-05 school year. They did not do so and thereby denied the child educational benefits and a substantive program reasonably calculated to confer educational benefits.").

7

to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). To this end, school districts must assess students "in all areas related to the suspected disability ..." 34 C.F.R. § 300.304(c)(4).

30. A school district is required to seek input from a student's parents in determining whether additional data is needed as part of a reevaluation. 20 U.S.C. § 1414(a)(2)(B)(ii). If a district determines that additional data is not needed, the district must notify the parents of that determination, including "the reasons for the determination" and "[t]he right of the parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs." 34 C.F.R. §§ 300.305(d)(i)-(ii); *see* SRO Appeal No. 12-033 at 8-9 (April 25, 2012) (outlining the above triennial reevaluation process).

31. In this case, the DOE failed to engage in the required reevaluation process. It failed to involve M.M. in any of the three determinative steps the Individuals with Disabilities Education Improvement Act ("IDEA") requires with respect to reevaluations. First, the DOE offered no evidence that there was an agreement that a reevaluation was unnecessary per 20 U.S.C. § 1414(a)(2)(B)(ii) and 8 N.Y.C.R.R. § 200.4(b)(4). Second, the DOE offered no evidence that it contacted M.M., as required under 20 U.S.C. § 1414(c)(1)(B), to seek her input in determining whether additional data was needed as part of the reevaluation process. Third, the DOE offered no evidence that it notified M.M. of any determination that no additional data was needed and the reasons for the determination; and the DOE did not notify M.M. of her right to request an assessment to determine J.S.'s educational needs, as required under 20 U.S.C. § 1414(c)(4)(A) and 34 C.F.R. § 300.305(d).

32. CSE teacher representative Evelyn Alvarez was the only DOE witness who addressed

8

M.M.'s allegation that a reevaluation was required. In her May 9, 2013 affidavit, she asserted that M.M. "did not request a new psycho-educational evaluation at the time of the [CSE] meeting" (Exh. 22 ¶ 18). However, it is not the parent's burden to request a reevaluation. Rather, it is the "local educational agency" that "shall ensure that a reevaluation of each child with a disability is conducted …" 20 U.S.C. § 1414(a)(2)(A). Indeed, at the impartial hearing, Ms. Alvarez admitted that the triennial reevaluation process included "consulting the parent about whether evaluations or assessments need to be conducted" (Tr. 83).

33. Additionally, the IHO made no findings regarding the DOE's failure to conduct a vocational assessment, and did not appreciate that J.S., then 18 years-old, required a vocational evaluation (*see* 12/20/13 Dec. at 5-8). *See* 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring districts to ensure that students who have reached age 12 "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests").[5] Obtaining school records does not absolve a district from performing a vocational assessment as the IHO appears to suggest later in the Decision (*see* 12/20/13 Dec. at 7 ("[t]he transition component of the IEP was provided in a Cooke Report")).

34. Indeed, the fact that the DOE has never conducted the required vocational evaluation of J.S is particularly egregious, given his placement in a vocational program at McSweeney for the 2012-2013 school year (*see* Exh. N ¶¶ 9, 19; Tr. 11-15). Since there was little information about J.S.'s vocational interests, abilities, or needs in the IEP (*see* Exh. 3), the DOE's recommended program could not be reasonably calculated to confer educational benefit.

---

[5] *See also* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring that "beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills").

9

35. In summary, the DOE's procedural failure to engage in the triennial revelation process resulted in a denial of FAPE in that it significantly impeded M.M. participation in the decision making process. 20 U.S.C. § 1415(f)(3)(E)(ii)(II). The May 2012 IEP's lack of updated information on J.S.'s present cognitive functioning or his vocational interests, abilities, and needs caused a deprivation of educational benefits 20 U.S.C. § 1415(f)(3)(E)(ii)(III).

### 2) The IEP's 12:1:1 Program Recommendation Was Inappropriate for J.S.

36. IHO Noe did not make a finding on the appropriateness of the IEP's recommended 12:1:1 program, only writing that the "CSE team addressed the parent's concerns that they were aware of on the date of the meeting" (12/20/13 Dec. at 6, 8). Inasmuch as the IHO claims that M.M. failed to object to the 12:1:1 program at the CSE meeting, she is wrong.

37. First, it should be noted that M.M. does not speak English and communicated at the CSE meeting through DOE employee Ms. Alvarez, an interested party (Exhs. 12 at 5, 22 ¶ 1).

38. Second, the CSE meeting minutes from both Ms. Alvarez and Ms. Ord, the Cooke representative at the meeting, reveal that M.M. disagreed with the IEP's 12:1:1 program (*see* Exh. 11 at 4 (noting that M.M. had "never been in agreement"); Exh. 12 at 4 (indicating that M.M. had "never been in agreement with program recommendation"). Furthermore, Ms. Ord stated that J.S. needed a smaller program, with more one-to-one and small group instruction than the DOE's 12:1:1 program offered (Exh. M ¶¶ 18-19, *see* Exhs. 11 at 4, 12 at 4).

39. Additionally, while the record lacked the requisite up-to-date evaluative evidence, the most definitive evidence in the record reveals that a 12:1:1 program was inappropriate for J.S., as the Cooke educators who taught J.S. testified that a DOE 12:1:1 program was inadequate. Ms. Ord stated that J.S. required "one-to-one and small group instruction because he needs repetition and individualized support," which a DOE 12:1:1 program could not provide. (Exh. M ¶ 18). Ms.

10

**A328**

Hibbard, J.S.'s literacy and math teacher, stated that J.S. needed "frequent check-ins and regular

teacher prompting to ensure that he is committing new information to long-term memory" (Exh.

I ¶ 7). He needed a small setting so that a teacher could give immediate and explicit feedback

about what he was learning and about his social behavior (Exh. I ¶¶ 8, 11). J.S. needed "a teacher

to sit right next to him and walk him through new material repeatedly in a variety of different

settings and at a variety of different times and days" (Exh. I ¶ 12; *see* Exh. I ¶ 17). *C.f.* SRO

Appeal No. 13-181 at 9 (Nov. 29, 2013) (finding a "12:1+1 special class placement and program

... failed to offer [a student] a FAPE due to [ ] its class size, teacher ratio and lack of services to

address the student's needs related to reading"). Thus, the IEP's 12:1:1 program recommendation

denied J.S. a FAPE.

### 3) The IEP Failed to Specify the Amount of Academic and Vocational Instruction J.S. Was to Receive

40. The SRO ordered the IHO to assess "whether the May 2012 IEP was inappropriate due to

an improper balance between academic instruction and vocational training" (SRO Dec. at 11).

Citing primarily to testimony from Ms. Naclerio, McSweeney's IEP coordinator who did not

attend the CSE meeting (*see* Exh. 3 at 13-14), IHO Noe determined that the IEP's program was

"flexible to meet the specific needs of this particular student and balanced both an academic and

vocation program" (12/20/13 Dec. at 6-7). The IHO's determination is erroneous.

41. The IHO's reliance on Ms. Naclerio's statement that "[t]here is nothing in his IEP that

would prevent [J.S.] from being in a part time or full time vocational problem" (*see* 12/20/13

Dec. at 6) is simply a restatement of M.M.'s allegation that the "IEP team did not address the

appropriate balance between academic instruction and vocational training" (Exh. 1 at 3).

42. In fact, J.S.'s IEP is deficiently vague with respect to the academic and vocational

11

**A329**

programs to be provided. Ms. Naclerio's retrospective testimony about the flexibility of the

program at McSweeney cannot cure this deficiency. The Second Circuit in *R.E. v. NYC Dep't of*

*Educ.*, 694 F.3d 167 (2d Cir. 2012) was clear: "In determining the adequacy of an IEP, both

parties are limited to discussing the placement and services specified in the written plan and

therefore reasonably known to the parties at the time of the placement decision." *Id.* at 187.

Thus, the IEP's failure to specify the academic and vocational balance to be struck in J.S.'s

educational program cannot be cured by Ms. Naclerio's retrospective testimony. Moreover, the

IHO's finding that the IEP was "flexible to meet the needs" of J.S. (12/20/13 Dec. at 7), only

confirms that M.M.'s opportunity to participate in the decision making process on this essential

aspect of J.S.'s education was significantly impeded. 20 U.S.C. § 1415(f)(3)(E)(ii)(II). The IEP's

failure to define the nature of J.S.'s course of study prevented M.M. from making an informed

decision about J.S.'s education.[6]

43. Furthermore, as demonstrated above, the DOE failed to perform the required vocational

evaluation and therefore lacked a basis for determining the nature of J.S.'s vocational program.

Even assuming for the sake of argument that a McSweeney administrator had the discretion to

_____

[6] *See Letter to Spitzer-Resnick et al.*, at 2 (June 22, 2012) (letter from Director of U.S.
Department of Education - Office of Special Education Programs stating that "[i]f an IEP team
determines that work placement is an appropriate transition service for a child, it must be
included in the child's IEP."), *available at*
www2.ed.gov/policy/speced/guid/idea/memosdcltrs/062212workplacelre2q2012.pdf; *id.* ("If a
public agency is proposing … a work placement that is part of a child's transition services, the
public agency would be required to provide the parent with written notice … a reasonable time
before the proposed placement is initiated or changed."); *id.* at 4 ("[W]hen an IEP Team includes
a work placement as part of the student's transition services, the IEP team must consider, and
include in the IEP, as appropriate, any supplementary aids and services needed to enable the
student to participate with other students with disabilities and nondisabled students in the work
placement described in the IEP."); *see also Memorandum from Rebecca H. Cort, New York State
Education Dep't, to District Superintendents et al.*, at 2 (Nov. 2011) (stating that the IEP must
include "the student's needs as they related to transition from school to post-school activities,
including the courses of study to be provided to the student to reach those goals") (emphasis in
original), *available at* www.p12.nysed.gov/specialed/publications/transitionplanning-nov11.pdf.

12

**A330**

determine the balance of academic and vocational instruction J.S. was to receive, there was no information in the IEP upon which an appropriate decision could be made.

44. Moreover, J.S. still needed a robust academic program, which the deficiently vague IEP failed to recommend. J.S.'s 2011-2012 Cooke progress report, which was presented at the CSE meeting, demonstrated that J.S. continued to be interested in his academic classes and was learning and making progress across subjects (*see* Exh. 4). At the CSE meeting, Ms. Ord explicitly stated that "[i]t would not be appropriate for [J.S.] to be in a vocational" program (Exh. 11 at 4; *see also* Exh. 12 at 4 (Ms. Ord noted at the CSE meeting that a program with a "strong vocational focus" was not appropriate for J.S.)).

45. Thus, the IEP's failure to articulate the nature of J.S.'s course of study cannot be justified as "flexible." Rather, the IEP's lack of specificity denied M.M. the opportunity to participate in the decision making process about J.S.'s education, and denied J.S. a substantively adequate IEP.

#### 4) The IEP Failed to Integrate J.S.'s Related Services with his Instruction

46. The SRO ordered the IHO to determine whether J.S.'s IEP "adequately integrated [J.S.'s] related service with his academic instruction, vocational training, and independent skills development" (SRO Dec. at 11-12). The IHO failed to respond to this issue, simply asserting that, "[a]t the hearing, there was no challenge raised that the district's school could not provide the student services" (12/20/13 Dec. at 7).

47. In fact, this issue was explicitly raised in M.M.'s Complaint (*see* Exh. 1 at 3 ("The *IEP* did not address the importance of integrating [J.S.'s] related services …") (emphasis added). At the CSE meeting, Ms. Ord "emphasized the importance of related services being integrated with each other and with [J.S.'s] academic instruction and asked that this be reflected in [J.S.'s] IEP" (Exh. M ¶ 15). Yet, the IEP baselessly recommended related services be provided at a

13

**A331**

"Separate Location" (Exh. 3 at 9). Thus, the IHO's assessment of the integration of J.S.'s related services with his other instruction was deficient and must be reversed.

### 5) The IEP Failed to Recommend Parent Counseling or Transitional Support Services as Required under New York State Law

48. The SRO ordered the IHO to determine "whether the student was denied a FAPE because [the] May 2012 CSE did not consider or the IEP did not include transitional teacher support services or parent counseling or training" (SRO Dec. at 11-12). The IHO's two sentence assessment of this issue is garbled and entirely irrelevant. IHO Noe writes: "Because the student attended the Cooke School, Ms. Ord from the Cook Center, who attended the CSE meeting with the parent notified the IEP team of the transition component of the IEP ... The transition component of the IEP was provided in a Cooke Report for the IEP." (12/20/13 Dec. at 7). These two sentences do not constitute an assessment of SRO's question.

49. In fact, the IEP's failure to recommend either parent counseling or transitional support services deprived J.S. of educational benefits and resulted in a denial of FAPE. By itself, an IEP's lack of a provision for parent counseling will not always result in a denial of a FAPE. However, in this case, where J.S.'s classification was changed from Speech or Language Impairment to Autism, and where the parent expressed concern about this new classification (*see* Exh. 12 at 5), the DOE's error in failing to recommend parent counseling is especially acute. For parents of autistic children, the New York State regulations require parent counseling to enable parents "to perform appropriate follow-up intervention activities at home." 8 N.Y.C.R.R. § 200.13(d).[7] Given J.S.'s new classification, it was essential that M.M. receive counseling and training to ensure that J.S. had the supports necessary to progress.

---

[7] "*Parent counseling and training* means assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to

14

**A332**

50. Similarly, the IEP's failure to recommended transitional supports services for J.S. is particularly deficient in light of J.S.'s new Autism classification and the fact that J.S. was to be transferred from Cooke, a school that he had attended for the prior four school years and which provided a small and highly supportive environment, to a larger school setting (*see* Exh. 12 at 4-5. Transitional support services are necessary to "aid in the provision of appropriate services to a student with a disability transferring to a regular program or a program or service in a less restrictive environment." 8 N.Y.C.R.R. § 200.1(ddd). *See also* 8 N.Y.C.R.R. § 200.13(a)(6) ("In those instances where a student [with autism] has been placed in programs containing students with other disabilities, or in a regular class placement, a special education teacher with a background in teaching students with autism shall provide transitional support services in order to assure that the student's special education needs are being met"). Indeed, Cooke educators repeatedly expressed concern about placing J.S. in a larger, less supportive environment (Exhs. 12 at 4, I ¶ 10, M ¶¶ 18-19). Therefore, the IEP's failure to recommended transitional support services caused a deprivation of educational benefit.

51. Moreover, the IEP's failure to recommend parent counseling and transitional support services, in combination with the DOE's other, multiple procedural violations, as outlined above, resulted in a denial of FAPE. *See Matrejek v. Brewster Cent. Sch. Dist.*, 471 F.Supp.2d 415, 419 (S.D.N.Y. 2007) (FAPE is denied where procedural violations "individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP"), *aff'd*, 293 Fed.Appx. 20 (2d Cir. 2008).

### 6) McSweeney Could not Provide an Appropriate Program for J.S.

52. On remand, the SRO ordered the IHO not to address the appropriateness of McSweeney,

---

acquire the necessary skills that will allow them to support the implementation of their child's [IEP]." 8 N.Y.C.R.R. § 200.1(kk) (emphasis in original); *see* 34 C.F.R. § 300.34(c)(8)(iii).

because "the student did not attend the assigned public school" (*see* SRO Dec. at 12 n. 12). The SRO has made similar rulings in other recent decisions. *See, e.g.*, SRO Appeal No. 12-177 at 18-19 (July 5, 2013). M.M. respectfully requests the SRO to reassess the logic of such a rule, which absolves school districts of the responsibility to provide appropriate placement facilities. Taken to its logical end, the rule would enable a district to write a highly detailed IEP, fail to implement that IEP, yet be absolved of any financial responsibility for the cost to the parent of securing an appropriate private school placement for the student. Even when a school could not implement an IEP, a parent would be required to send her child to the inappropriate school and expose her child to inappropriate schooling. This result is contrary to the primary purpose of the IDEA to "ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. 1400(d)(1)(A).

53. In this case, the DOE failed to prove that McSweeney could met the goals of J.S.'s IEP as written. *See T.Y. v. NYC Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) ("[A] school district does not have 'carte blanche to assign a child to a school that cannot satisfy the IEP's requirements'"). For example, contrary to the IEP's recommendations, Ms. Naclerio testified that bank visits were not part of McSweeney's curriculum (Tr. 12; *see* Exh. 3 at 3-4). Ms. Naclerio could not offer any assurance that J.S. would be admitted to McSweeney's travel training program (Exh. 21 ¶ 27; *see* Exh. 3 at 8-9). J.S. would only have one or two hours a day of academic instruction, which was insufficient to enable J.S. to meet the IEP's academic goals (Tr. 15, Exh. N ¶¶ 9-13; *see* Exh. 3 at 4-8). McSweeney only provided academic instruction that was below J.S.'s grade level (Exh. N ¶¶ 13-14), and the school lacked a program for teaching social skills (Exh. N ¶ 17). Thus, McSweeney's program would not have allowed J.S. to progress.

16

**A334**

### 7) Cooke Provided an Appropriate Program for J.S.

54. M.M. satisfied her burden on *Burlington* Prong II, showing that Cooke was an appropriate placement for J.S.

55. Under *Burlington* Prong II, a private school is appropriate if it provides services that are "proper under the Act," *Florence County Sch. Dist. v. Carter*, 510 U.S. at 15; *Burlington*, 471 U.S. at 370, *i.e.*, the services are "'likely to produce progress, not regression,'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)). Parents must show that the "placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982)).

56. In this case, Cooke's summer 2012 program was appropriately designed to help J.S. maintain the skills he had learned during the prior academic year (Exh. K ¶ 17). The academic environment was small, and individualized, with two teachers for the 12-student functionally grouped academic classes (Exh. K ¶¶ 8-9, 11-12). During the summer, J.S. participated in an internship and community activities; he received speech and language therapy, as well as counseling (Exh. K ¶¶ 13, 16, 18, 21-22, 24).

57. Cooke's academic year program for 2012-2013, SKILLs, was also appropriate for J.S. SKILLs provided a small environment as it contained only 34 students (Exh. J ¶¶ 5-6). J.S.'s math and literacy class had one teacher and five students (Exhs. I ¶¶8-9, J ¶ 9). J.S. had individualized support at his internship, where he practiced skills such as self-control, problem solving, and appropriate body language (Exh. J ¶¶ 12-17). Cooke provided J.S. with travel

17

**A335**

training, and three afternoons a week he went out into the community to banks, museums, and libraries (Exh. J ¶¶ 19-20). Cooke's program also included individual and group counseling, speech and language therapy, as well as occupational therapy (Exh. J ¶¶ 21-24).

58. Moreover, J.S. progressed during the 2012-2013 school year. For instance, in literacy class, J.S. was beginning to identify character motivation and emotion (Exh I ¶ 15). He was rereading his written work, and editing for punctuation and grammar; he was typing with two hands and he was nearly able to send an email without prompting (Exh I ¶ 15). In math, J.S. was now able to calculate change mostly in his head (Exh. I ¶ 18). With support, J.S. was going out into the community and using banks and libraries, and shopping at grocery stores (Exhs. I ¶¶ 18-19, J ¶ 25). Socially and emotionally, J.S. had an increased sense of self-awareness and purpose; he had an increasing ability to advocate for his needs; and his use of tone and language were improving (Exh. I ¶ 20, Exh. J ¶ 27). At his internship, J.S. was now able to complete all tasks and observe proper safety precautions without direct prompting (Exh. J ¶ 26). In short, Cooke was an appropriate placement for J.S.

**8) Equitable Considerations Support M.M.'s Claim for Tuition Funding**

59. Equitable considerations bear on the appropriate relief to be awarded under the IDEA, *Burlington*, 471 U.S. at 374, and "'include the parties' compliance or noncompliance with state and federal regulations pending review, the reasonableness of the parties' positions, and like matters.'" *Wolfe v. Taconic-Hills Cent. School Dist.*, 167 F.Supp.2d 530, 534 (N.D.N.Y. Sept. 19, 2001) (quoting *Burlington v. Dep't of Educ.*, 736 F.2d 773, 801-02 (1st Cir. 1984)).

60. M.M. participated in the May 2012 CSE meeting, stating she was most interested in J.S. being able to progress academically (Pet. Exh. 4 ¶ 8). As the IHO determined in the July 18, 2013 Decision, M.M. requested that Cooke produce the Stanford-Binet Report, but she did not

18

**A336**

obtain a copy of the report until early 2013 (7/18/13 Dec. at 8-9, *see* Tr. 237, 240). M.M. objected to the IEP's recommended program, but nevertheless stated that she would visit the public school placement to see if it was appropriate (Exhs. 11 at 4, 12 at 4).

61. After receiving the FNR, M.M. toured McSweeney, learning that students in the proposed program spent most of their time at job sites, which was inappropriate for J.S. as he still needed to learn academic and life skills and become more independent (Pet. Exh. 4 ¶¶ 10-12). By a June 21, 2012 letter, M.M. notified the DOE of her concerns and asked for another school placement (Exh. B). By an August 22, 2012 letter, M.M. again informed the DOE that McSweeney was inappropriate and requested another placement (Exh. C).

62. M.M. signed the contracts to enroll J.S. at Cooke for the summer and academic year programs on June 25, 2012 (Exhs. D, E). Notably, clauses in these contracts released M.M. from these contracts if, prior July 30, 2012, she choose to enroll J.S. in a DOE provided summer program, or prior to October 31, 2012, if she chose to accept a DOE placement for the academic year (Exhs. D ¶ 7.b, E ¶ 10.b).

63. Thus, the record establishes that M.M. in no way impeded the DOE's ability to offer J.S. a FAPE. *Cf. N.R. v. NYC Dep't of Educ.*, 07-CV-9648 (BSJ), 2009 WL 874061, at *6 (S.D.N.Y. Mar. 31, 2009) (finding in favor of parent on Prong III where record was "bereft of any evidence that [a parent] hindered [the DOE's] efforts to provide a FAPE or otherwise frustrated the placement process"). The equities support M.M.'s claim for tuition funding.

### 9) Direct Payment of Tuition is Appropriate

64. Direct payment of tuition is an appropriate remedy where the parent satisfies all three *Burlington* prongs, "the parents lack the financial resources to 'front' the costs of private school tuition, and ... a private school is willing to enroll the student and take the risk that the parents

19

**A337**

will not be able to pay tuition costs." *Mr. and Mrs. A v. N.Y.C. Dep't of Educ.*, 769 F.Supp.2d 403, 428 (S.D.N.Y. Feb. 1, 2011).

65. M.M. offered uncontroverted evidence that her family income was only around $30,000 for the year, and that she had less than $500 in savings (Pet. Exh. 4 ¶¶ 23, 25; *see* Exhs. F, G (2012 tax returns for M.M. and J.S.'s father)).

66. As all three of the *Burlington* prongs have been satisfied, and as M.M. lacks the financial means to pay J.S.'s Cooke tuition, an award of direct payment is appropriate.

### RELIEF REQUESTED

67. M.M. respectfully requests that the SRO: (1) find that the DOE failed to offer J.S. a FAPE; (2) find that Cooke was an appropriate program under *Burlington* Prong II; (3) find that equitable considerations support M.M.'s tuition claim; and (4) order the DOE to pay J.S.'s $55,775 tuition at Cooke for the 12 month school year, directly to Cooke.

DATE: January 23, 2014
      New York, New York

PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for M.M.

By:                         

THOMAS GRAY
Senior Staff Attorney
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 ex. 246
tgray@pfcr.org

**RECEIVED**

JAN 2 7 2014

OFFICE OF STATE REVIEW

20

**A338**



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

**JUN 2 2 2012**

Jeffrey Spitzer-Resnick, Beth Swedeen, Lisa Pugh
Disability Rights Wisconsin
131 W. Wilson St.
Suite 700
Madison, Wisconsin 53703

Dear Mr. Spitzer-Resnick, Ms. Swedeen, and Ms. Pugh:

This is in response to your letter to me, dated December 22, 2011, following up on our conversation of December 2, 2011, in which you request an opinion from the Office of Special Education Programs (OSEP) on the applicability of the least restrictive environment (LRE) requirements under Part B of the Individuals with Disabilities Education Act (IDEA) to transition work placements. Below you will find your questions and OSEP's responses.

**Question 1:** Is the individualized education program (IEP) Team required to include work placement in a transition-age student's IEP?

**OSEP's**
**Response:** Neither Part B of the IDEA nor its implementing regulations in 34 CFR Part 300 use the term "transition work placements." Under 34 CFR §300.320(b), beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, and updated annually, thereafter, the IEP must include: (1) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and (2) the transition services (including courses of study) needed to assist the child in reaching those goals.

As defined in 34 CFR §300.43, transition services are a coordinated set of activities for a child with a disability that: (1) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation; (2) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and (3) includes: (a) instruction; (b) related services; (c) community experiences; (d) the development of employment and other post-school adult living objectives; and (e) if appropriate, acquisition of daily living skills and provision of a functional vocational evaluation. Transition services for children with disabilities may be special

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Jeffrey Spitzer-Resnick, Beth Spedeen, Lisa Pugh

education[1], if provided as specially designed instruction, or a related service, if required to assist a child with a disability to benefit from special education.

Nothing in the IDEA requires a specific service, placement, or course of study, but leaves such decisions to the IEP Team for the individual child. The IDEA emphasizes the importance of parental involvement and student involvement, when appropriate, in the development of the IEP. As indicated above, transition services are defined broadly and include a range of services, including vocational and career training that are needed to meet the individual needs of a child with a disability.[2] Work placement can be an appropriate transition service, depending on the individual needs of a student, but is not a required component of all IEPs that address transition services. If an IEP team determines that work placement is an appropriate transition service for a child, it must be included in the child's IEP.

**Question 2:** Is the IEP Team required to provide parents with "notice of placement" when determining a student's work placement?

**OSEP's**
**Response:** Under 34 CFR §300.503(a), written notice that meets the requirements of 34 CFR §300.503(b), must be given to the parents of a child with a disability a reasonable time before the public agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education (FAPE) to the child.

If the work placement is included in a student's IEP, it becomes part of the student's educational program and part of the provision of FAPE to the student. If a public agency is proposing or refusing to initiate or change a work placement that is part of a child's transition services, the public agency would be required to provide the parent with written notice, as described above, a reasonable time before the proposed placement is initiated or changed. Therefore, initiating or changing a child's work placement that is part of the child's IEP would require such prior written notice as outlined in 34 CFR §300.503.

**Question 3:** Can segregated work be considered an appropriate outcome, particularly with appropriate assessment in a LRE before such a placement occurs?

**OSEP's**
**Response:** The LRE requirements are a fundamental provision of Part B of the IDEA. According to the LRE requirements in 34 CFR §§300.114–300.118, each public agency must ensure that (1) to the maximum extent appropriate, children with disabilities, including

---

[1] The definition of special education in 34 CFR §300.39 includes vocational education, which is defined as organized educational programs that are directly related to the preparation of individuals for paid or unpaid employment, or for additional preparation for a career not requiring a baccalaureate or advanced degree.

[2] See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, Final Rule, *Analysis of Comments and Changes*, 71 Fed. Reg. 46540, 46579 (August 14, 2006)).

**A340**

Page 3 – Jeffrey Spitzer-Resnick, Beth Spedeen, Lisa Pugh

children in public or private institutions or other care facilities, are educated with children who are nondisabled; and (2) special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Before a child with a disability can be placed outside the regular educational environment, the group of persons making the placement decision must consider whether supplementary aids and services could be provided that would enable education of the child in the regular educational setting to be achieved satisfactorily. If a determination is made that a particular child with a disability cannot be educated satisfactorily in the regular educational environment, even with the provision of appropriate supplementary aids and services, that child then could be placed in a setting other than the regular educational setting. Placement decisions, including those related to transition services (including work placement), must be based on these LRE principles and made by the IEP Team.

Under 34 CFR §300.320(b), as you point out, the IEP must include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and the transition services (including courses of study) needed to assist the child in reaching those goals. The specific transition assessments used to determine appropriate measurable postsecondary goals will depend on the individual needs of the child, and are, therefore, best left to States and districts to determine on an individual basis.[3] Therefore, there is no specific requirement that placement in various work environments be part of the assessment process. Under the IDEA, a segregated employment program may be an appropriate work placement for a particular student if determined appropriate by that student's IEP Team based on the LRE requirements and the specific individualized needs of that student. That is, the IDEA does not prohibit segregated employment, but the LRE provisions would apply equally to the employment portion of the student's program and placement.

**Question 4:** Is the LEA required to provide supplemental aids and services to allow the student to participate in the least restrictive work placement possible?

**OSEP's**
**Response:** Supplementary aids and services are defined in 34 CFR §300.42 as aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§300.114-300.116. Under 34 CFR §300.320(a)(4), the IEP for each child with a disability must include a statement of the special education and related services and the supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of

---

[3] See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, Final Rule, *Analysis of Comments and Changes*, 71 Fed. Reg. 46540, 46667 (August 14, 2006).

**A341**

Page 4 – Jeffrey Spitzer-Resnick, Beth Spedeen, Lisa Pugh

the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child: (1) to advance appropriately toward attaining the annual goals; (2) to be involved in and make progress in the general education curriculum in accordance with 34 CFR §300.320(a)(1), and to participate in extracurricular or other nonacademic activities; and (3) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this section.

Therefore, when an IEP Team includes a work placement as part of the student's transition services, the IEP team must consider, and include in the IEP, as appropriate, any supplementary aids and services needed to enable the student to participate with other students with disabilities and nondisabled students in the work placement described in the IEP. The LEA must provide any supplementary aids and services that are identified on the IEP

**Question 5:** How must LRE for work placements be monitored?

**OSEP's**
**Response:** Under 34 CFR §300.120, the State educational agency (SEA) must carry out activities to ensure that the LRE requirements in 34 CFR §300.114 are implemented by each public agency. If there is evidence that a public agency makes placements that are inconsistent with 34 CFR §300.114, the SEA must: (1) review the public agency's justification for its actions; and (2) assist in planning and implementing any necessary corrective action. Additionally, it would be appropriate for States, as part of their use of data in monitoring activities, to review due process complaints (under 34 CFR §§300.507-300.518), and State complaints (under 34 CFR §§300.151-300.153) to identify potential problems related to secondary transition, including work placements.

**Question 6:** Are States required to consider a student's work placement when they report the number of students participating in regular education?

**OSEP's**
**Response:** Under IDEA section 618(a)(1)(A)(ii), States are required to report on the number of children with disabilities participating in regular education. The instructions for the data collection form that OSEP uses to collect this data states that educational time spent in age-appropriate community-based settings that include individuals with and without disabilities, such as college campuses or vocational sites, should be counted as time spent inside the regular classroom. Therefore, time spent in a work placement that that includes individuals with and without disabilities should be counted as time spent inside the regular classroom.

**A342**

Page 5 – Jeffrey Spitzer-Resnick, Beth Spedeen, Lisa Pugh

Based on section 607(e) of the IDEA, we are informing you that our response is provided as informal guidance and is not legally binding, but represents an interpretation by the U.S. Department of Education of the IDEA in the context of the specific facts presented.

If you have additional questions, please do not hesitate to contact Lynne Fairfax at 202-245-7337 or by email at Lynne.Fairfax@ed.gov.

Sincerely,

Melody Musgrove, Ed.D.
Director
Office of Special Education Programs

cc: State Director of Special Education

A343



THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

ASSOCIATE COMMISSIONER, OFFICE OF P-12 EDUCATION: Office of Special Education
Tel.     (518) 473-4818 Albany
         (718) 722-4558 New York City
Fax      (518) 402-3534 Albany
         (718) 722-4793 New York City

November 2011

To:      District Superintendents
         Superintendents of Public Schools
         Superintendents of State-Operated and State-Supported Schools
         Superintendents of Special Act School Districts
         Executive Directors of Approved Private Schools
         Principals of Public, Nonpublic and Charter Schools
         New York City Department of Education
         Commissioner's Advisory Panel for Special Education Services
         Impartial Hearing Officers
         Community Dispute Resolution Centers
         Regional Special Education Technical Assistance Support Centers
         Special Education Parent Centers
         Other State Agencies
         Organizations, Parents and Individuals Concerned with Special Education

From:    Rebecca H. Cort

Subject: Transition Planning and Services for Students with Disabilities

The purpose of this memorandum is to provide guidance to school districts regarding transition planning and services for students with disabilities and information about resources that can assist school districts to meet their responsibilities in this area. Appropriate transition planning for students with disabilities is essential to prepare them for post-school living, learning and working.

For the past few years, New York State (NYS) has conducted annual monitoring of school districts to ensure that they are appropriately developing students' individualized education programs (IEPs) in the area of transition planning. Last year, NYS reviewed 3,321 IEPs and found that, of the IEPs reviewed, only 2,232 were in compliance with all IEP transition requirements. School districts must take steps to ensure Committees on Special Education (CSEs) have the knowledge and skills to ensure appropriate transition planning.

NYS has established State and regional no-cost resources (listed on page 4 of this memorandum) to provide professional development and technical assistance to school districts to improve transition planning. In addition, the State's IEP form, required for use by all districts beginning with IEPs to be in effect for this school year, should result in improved documentation in IEPs to meet the transition requirements.

**A344**

Upon a finding by the State that a school has an IEP that does not meet the transition requirements, the district will be required to convene another meeting of the CSE to revise the student's IEP and take corrective action steps to ensure all students' IEPs are appropriately developed. Therefore, schools are strongly encouraged to take advantage of these technical assistance resources to appropriately develop IEPs in the first instance.

Transition Requirements

Measurable post-secondary goals and recommendations for transition services and activities must be included in each student's IEP beginning not later than the first IEP to be in effect when the student is age 15 (and at a younger age, if determined appropriate), and updated annually. The IEP must include:

- measurable post-secondary goals in the areas of training, education, employment and, where appropriate, independent living skills. These goals must be based on age-appropriate transition assessments[1];

- the student's needs as they relate to transition from school to post-school activities, including the courses of study to be provided to the student to reach those goals;

- annual goals that document the knowledge/skills the student is expected to achieve that will incrementally prepare him/her to meet the post-secondary goals; and

- transition services/activities the student will need to facilitate his/her movement from school to post-school activities. Transition services are a coordinated set of activities developed for a student with a disability, designed to improve his/her academic and functional achievement in order to facilitate the student's movement from school to post-school activities. Coordinated means the CSE has recommended a combination of activities that will lead the student to reach his/her post-secondary goals, including instruction, related services, community experiences, development of employment and other post-school adult living objectives and, when appropriate, acquisition of daily living skills and a functional vocational evaluation.

Students must be invited to CSE meetings when transition goals and services will be discussed. If a student does not attend, the district must take steps to ensure the student's preferences and interests are considered. The school district must also invite a representative of a participating agency that is likely to be responsible for providing or paying for transition services. Parental consent (or the consent of the student who is age 18 or older) must be obtained prior to inviting other agency representatives. If the

---

[1] For information on age-appropriate transition assessments, see http://www.nsttac.org/content/age-appropriate-transition-assessment-toolkit

invited agency does not attend, the school must take steps to involve the agency in the planning of any transition services.

## Student Exit Summary

Federal law requires that the school district provide a student with a disability a summary of the student's academic achievement and functional performance prior to school exit for a student whose eligibility for special education services terminates due to graduation from secondary school with a regular diploma or due to exceeding the age eligibility for a free appropriate public education (FAPE) under State law. A student with a disability exiting with an IEP diploma prior to the end of the school year in which he/she turns age 21 must also receive the student exit summary and it is recommended that students with disabilities exiting with a High School Equivalency Diploma also be provided this summary.

The purpose of the Student Exit Summary is to provide the student with a written report that provides essential information to consider as the student transitions from secondary school. The Student Exit Summary should be a useful and relevant document that summarizes individual student abilities, skills, needs and limitations and provides recommendations to support successful transition to adult living, learning and working. The Student Exit Summary should be designed to assist the student in establishing eligibility for reasonable accommodations and supports in postsecondary settings, the workplace and community and to aid the student in accessing adult services as appropriate. It should help the student better understand the impact of his/her disability and articulate individual strengths and needs as well as supports that would be helpful in post-school life.

Information on the Student Exit Summary can be found at: http://www.p12.nysed.gov/specialed/idea/studentexit.htm

## Key Elements of Successful Transition Plans and Services

The *goal* of transition planning is to identify and provide students with opportunities and necessary supports while they are in school that will lead the student to achieve his/her post-secondary goals for lifelong learning, community participation, and work for pay. The *process* of transition planning requires a partnership among the student, family and school, and, as appropriate, other agencies that can provide transition activities for the student. By its very nature, transition planning is a collaborative effort and must be thought of as an on-going process across multiple school years. The *provision* of meaningful and effective transition services requires the district to have appropriate instructional, career and work-related and community experiences available to students.

In the development of transition service plans, schools should consider the following key factors to ensure the most successful transition for students with disabilities to adult life.

**A346**

- The results of age-appropriate transition assessments provided to the student.

- Engagement of the parent and student as partners so that the parents' concerns for the education of their child and the student's needs, strengths, preferences and interests are considered and documented.

- Collaboration with participating State and community agencies to provide the student with appropriate services that will assist the student to meet his or her post-school goals.

- Instruction toward the career development and occupational standards (CDOS).

- Opportunities for career development activities, including in-school and out-of-school job training and career and technical education (CTE) coursework in order to enhance employment opportunities and outcomes for the student.

### Resources

There are numerous resources schools can turn to for more information about IEP planning and instruction and activities that lead to student post-school success.

- Technical assistance is available through the State Education Department's (SED) Regional Special Education Technical Assistance Support Centers (RSE-TASC). Each RSE-TASC has one or more Transition Specialists who can assist districts with professional development and technical assistance for effective transition practices and strategies.
  Contact information for the RSE-TASC Transition Specialists can be found at http://www.p12.nysed.gov/specialed/techassist/rsetasc/tslist.htm.

- The State's Transition Services Professional Development Support Center (PDSC). PDSC's website is devoted to information relating to effective transition planning, including a web-based planning tool based on five quality indicators of effective transition planning.
  See http://www.transitionsource.org.

- SED's website at http://www.p12.nysed.gov/specialed/transition/.

- SED field memorandums and guidance documents:
  o IEP Diploma Memo -
    http://www.p12.nysed.gov/specialed/publications/iepdiploma.htm
  o Student Exit Summary -
    http://www.p12.nysed.gov/specialed/idea/exitsumm.htm

**A347**

- o Transition Services Planning and Implementation Guide -
  http://www.p12.nysed.gov/specialed/publications/transition/guide.htm
- o IEP form and guidance -
  http://www.p12.nysed.gov/specialed/formsnotices/IEP/home.html and
  http://www.p12.nysed.gov/specialed/publications/iepguidance.htm

- ▪ SED's CTE website - http://www.p12.nysed.gov/cte/home.html

- ▪ NYS Department of Labor's Career Zone website –
  http://www.nycareerzone.org/

- ▪ The National Secondary Transition Technical Assistance Center (NSTTAC) -
  http://www.nsttac.org/

Questions relating to this memorandum may be directed to SPECED@mail.nysed.gov or by calling Ms. Sophie McDermott at 518-486-7462. To ensure dissemination to appropriate individuals within a school district, I ask Superintendents to please share this memorandum with individuals such as Building Principals, Directors of Special Education, School Psychologists, Guidance Counselors, Directors of Pupil Personnel and Parent Teacher Associations.

*Please note:
If you would like to receive notification of our publications via email, register at http://www.p12.nysed.gov/specialed/publications/register.htm.

**A348**

**RECEIVED**

JAN 2 7 2014

OFFICE OF STATE REVIEW

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
--------------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                                        Petitioner,

            - against -

New York City Department of Education,

                                        Respondent.
--------------------------------------------------------------------------X

STATE OF NEW YORK     )
                                  ss.:
COUNTY OF NEW YORK   )

**AFFIDAVIT OF
VERIFICATION**

Impartial Hearing
Case No. 143983

SRO Appeal No.

M█████ M█████, being duly sworn, deposes and says that she is the mother of J.S., and is

the Petitioner in this proceeding; that Ms. Ana Lazo, Administrator at Partnership for Children's

Rights, who is bilingual, read and translated for her the annexed Verified Petition so that she

knows the contents thereof; and that the Verified Petition is true to the knowledge of deponent

except as to the matters therein stated to be alleged upon information and belief, and as to those

matters she believes it to be true.

Subscribed and sworn to before me
this 23rd day of January, 2014

Notary Public

THOMAS C GRAY
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GR6291278
Qualified In Kings County
My Commission Expires October 15, 2017

**A349**

**RECEIVED**

JAN **2 7** 2014

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW

OFFICE OF STATE REVIEW

----------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

**AFFIDAVIT**

                        Petitioner,

Impartial Hearing
Case No. 143983

    - against -

New York City Department of Education,

SRO Appeal No.

                        Respondent.

----------------------------------------------------------------------X

STATE OF NEW YORK   )

                 ss.:

COUNTY OF NEW YORK  )

        Ana Lazo, Administrator at Partnership for Children's Rights, being duly sworn, deposes

and says she that speaks and reads both English and Spanish; and that on January 23, 2014 she

translated the annexed Verified Petition from English into Spanish for M██ M██.

*Ana Lazo*

Ana Lazo

Subscribed and sworn to before me
this 23rd day of January, 2014

Notary Public

THOMAS C GRAY
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GR6291278
Qualified in Kings County
My Commission Expires October 15, 2017

**A350**

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                        Petitioner,

          - against -

New York City Department of Education,

                       Respondent.
-------------------------------------------------------------------X

**AFFIDAVIT OF**
**PERSONAL SERVICE**

Impartial Hearing
Case No. 143983

IHO Mary Noe, Esq.

STATE OF NEW YORK    )
                      ss.:
COUNTY OF NEW YORK  )

        THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 23rd day of January, 2014, at 100 Church Street, in New York City, New York County, State of New York, he served the annexed Notice of Petition, Verified Petition, Affidavit of Verification, and Affidavit on the New York City Department of Education by delivering and leaving with said MADELYN SANTANA at said time and place a true copy thereof.

        Deponent further says that he knew the person so served to be the said MADELYN SANTANA, who is the DOCKETING CLERK in said district.

                                             THOMAS GRAY

Subscribed and sworn to before me
this 23rd day of January, 2014

Notary Public

MICHAEL D. HAMPDEN
NOTARY PUBLIC, STATE OF NEW YORK
No. 41-78628
Qualified in Westchester County
Commission Expires 10/31/14

**RECEIVED**

JAN 2 7 2014

OFFICE OF STATE REVIEW

**A351**

**RECEIVED**

FEB 1 0 2014

OFFICE OF STATE REVIEW

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
----------------------------------------------------------------X
In the Matter of the Appeal of
MM on behalf of JS,

                    Petitioner,          **VERIFIED ANSWER**

                                      IHO Case No. 143983
-against-                          SRO Case No. 14-018

New York City Department of Education,

                    Respondent.
----------------------------------------------------------------X
        Respondent, New York City Department of Education ("DOE"), by its attorneys, Zachary

Carter, Corporation Counsel of the City of New York, and Courtenaye Jackson-Chase, Special

Assistant Corporation Counsel, (Brian J. Reimels, Esq., of Counsel), as and for its Verified

Answer to the Verified Petition dated January 23, 2014 (the "Petition"), respectfully responds as

follows:

        1.      Denies the allegations set forth in Paragraphs 1 and 24, except admits that

Petitioner MM ("Petitioner" or "the Parent") is the Parent of JS ("JS" or "the Student"), and that

Petitioner purports to proceed as set forth therein.

        2.      Denies the allegations set forth in Paragraph 2, except admits that JS is classified

as a student with autism and respectfully refers the State Review Officer ("SRO") to the record

for a complete and accurate statement of the contents therein.

        3.      Denies the allegations set forth in Paragraphs 3 and 4, except admits that JS has

attended the Cooke Center for Learning and Development ("Cooke") since the 2008-2009 school

year, and respectfully refers the SRO to the record for a complete and accurate statement of the

contents therein.

1

**A352**

4. Denies the allegations set forth in Paragraphs 5-12, except admits that on May 22, 2012, a Committee on Special Education ("CSE") met to develop an Individualized Education Program ("IEP") for JS for the 2012-2013 school year, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

5. Denies the allegations set forth in Paragraphs 13-15, except admits that on June 15, 2012, the DOE offered JS a placement at P721X, the Stephen D. McSweeney School ("McSweeney") for the 2012-2013 school year, that the Parent visited McSweeney on June 20, 2012, that the Parent rejected the DOE's program and placement in letters dated June 21, 2012 and August 22, 2012, and that on March 18, 2013, the Parent filed a Due Process Complaint ("DPC") seeking direct tuition payment for the Parent's unilateral placement of JS at Cooke for the 2012-2013 school year, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

6. Denies the allegations set forth in Paragraph 16, except admits that the Impartial Hearing Officer ("IHO") issued a pre-hearing order which allowed for, inter alia, direct examination by affidavit, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

7. Denies the allegations set forth in Paragraphs 17-20, except admits that on July 18, 2013, the IHO issued her Findings of Fact and Decision (the "July 18, 2013 Decision"), which ultimately denied the Parent's requested relief, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

8. Admits the allegations set forth in Paragraph 21 and 22, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

2

A353

9.      Denies the allegations set forth in Paragraph 23, except admits that after the SRO remanded the case, the IHO, on December 20, 2013, issued a Findings of Fact and Decision (the "Dec. 20, 2013 Decision") which determined that the DOE offered JS a FAPE for the 2012-2013 school year and denied the Parent's requested relief, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

10.      Denies the allegations set forth in Paragraphs 25-28, 31-54, 56-58, 60-63, and 65-67, and respectfully refers the SRO to the record as cited therein for a complete and accurate statement of the contents therein.

11.      Responds that allegations set forth in Paragraphs 29-30, 55, 59, and 64 constitute conclusions of law, to which no response is required.  To the extent a response is deemed required, Respondent denies the allegations set forth therein, and respectfully refers the SRO to the authorities cited therein for a complete and accurate statement of the contents therein.

## AS AND FOR A STATEMENT OF PERTINENT AND MATERIAL FACTS, RESPONDENT RESPECTFULLY ALLEGES:

12.      Petitioner commenced the instant action by filing a DPC on March 18, 2013, requesting prospective tuition payment for the unilateral placement of JS at Cooke for the 2012-2013 school year and busing to and from Cooke. Ex. 1-2, 1-5.[1]  In the DPC, the Parent alleged, inter alia, that the CSE failed to conduct a triennial reevaluation, that the CSE team did not have adequate evaluative material, that the recommended 12:1:1 program was inappropriate, that the CSE did not balance JS's academic and vocational needs or address the importance of integrating the related services with his other forms of instruction, and the CSE did not recommend or consider any transitional teacher support services or parent training. Ex. 1-3. The Parent also

---

[1] Numbered exhibits, "Ex.," refer to DOE exhibits and lettered exhibits, "Ex.," refer to Parents' exhibits introduced during the hearing. Numerical citations preceded by "Tr." refer to page numbers of the impartial hearing transcript.

alleged that the recommended placement was inappropriate and that Cooke was appropriate for JS. Ex. 1-3, 1-4.

13.     After an impartial hearing, in a July 18, 2013 decision, the IHO dismissed the Parent's claims concerning the quality of the Spanish interpretation of the transcript. July 18, 2013 Decision at 9-11. As to the Burlington/Carter analysis, the IHO determined that MM failed to comply with the third prong, equitable considerations, by not informing the CSE that she requested an additional evaluation of JS, which was issued on January 5, 2012. July 18, 2013 Decision at 9. The IHO determined that the CSE was at a disadvantage without the updated evaluation and "could not" recommend an appropriate program as a result. July 18, 2013 Decision at 9. The IHO did not make prong I or II findings. July 18, 2013 Decision at 9.

14.     The Parent appealed the July 18, 2013 Decision in a Verified Petition dated August 19, 2013, claiming, inter alia, that the Parent was prevented from fully participating in the impartial hearing as a result of the IHO's "affidavit scheme" and a refusal to timely provide translations. The DOE, by a Verified Answer and Cross-Appeal dated September 17, 2013, opposed the Parent's appeal and cross-appealed the IHO's failure to issue findings on prong I of the Burlington/Carter analysis (as well as cross-appealing from the IHO's dicta that the DOE "could not" recommend an appropriate program without use of a private evaluation). The Parent submitted a Reply and Answer to the Cross-Appeal on October 4, 2013.

15.     Thereafter, by decision dated November 8, 2013, the SRO rendered a decision in Appeal No. 13-157, sustaining the Parent's appeal in part, and sustaining the DOE's cross-appeal in part, and remanding the case to the IHO to issue a determination on whether the DOE offered JS a FAPE for the 2012-2013 school year. See Application of a Student with a Disability, Appeal No. 13-157 ("Appeal No. 13-157") at 11-12.

4

**A355**

16.     On remand, after the Parties waived their rights to additional hearing dates, the

IHO determined that the DOE offered JS a FAPE for the 2012-2013 school year. Dec. 20, 2013

Decision at 3, 5-8. The Parent's appeal ensued.

### Background Prior to the 2012-2013 IEP

17.     At the time of the CSE meeting, JS was an 18-year-old student previously

classified as a student with a speech and language impairment. Ex. 5-1. JS has attended Cooke

since the 2008-2009 school year. Ex. N, ¶ 4; Ex. Ex. 22, ¶ 7.

### JS is Privately Evaluated

18.     On October 19, 2011, JS was evaluated using the Stanford-Binet Intelligence

Scales, and a narrative report was issued on January 5, 2012. Ex. 15.

### The May 22, 2012 CSE Meeting

19.     On May 22, 2012, a CSE composed of Evelyn Alvarez (Special Education

Teacher), Aminah Lucio (School Psychologist and District Representative), Sally Ord (a Cooke

"consulting teacher"), Beth Sullivan (JS's 2011-2012 English language arts teacher at Cooke),

and MM met to develop an IEP for JS for the 2012-2013 school year. Ex. 3-15; 11; 12; 22-2.

20.     The CSE utilized several reports in creating the IEP, including a June 2009

psychoeducational evaluation (Ex. 5), and a March 2012 Cooke progress report (Ex. 4) which

included a transition report. Ex. 22-2, 22-6; Tr. 70-73, 89-90.  The Cooke participants relayed

JS's current academic performance, including recent academic assessments (Ex. 3-1; 22-3), as

well as JS's social/emotional behavior, physical development, progress toward goals, and

recommended goals for the upcoming school year. Ex. 11, 22-4; Tr. 61-62.

21.     The CSE reported JS's scores on several academic assessments. Ex. 3-1, 11; 22-

3, 22-4; Tr. 61-62. The IEP noted JS's 3.3 grade equivalent score on the GRADE assessment

5

**A356**

regarding his overall reading skills. Ex. 3-1, 22-3, 22-4. JS's decoding level was reported to be "level 5 independent and level 6 instructional." Ex. 3-1, 22-3, 22-4. JS achieved a 3.8 grade equivalent on the GMADE assessment regarding his overall math skills. Ex. 3-1, 22-3, 22-4.

22.     In math, JS could perform multi-digit computation for all operations using algorithms, and was working on problem solving skills. Ex. 3-1, 11-2. He benefited from a hands-on approach using manipulatives. Ex. 3-1, 11-2.

23.     Numerous strategies were recommended by the CSE to address JS's academic deficits. Ex. 3-2, 22-5. The CSE recommended, inter alia, modified instructional materials, small group instructions, discreet teaching of strategies and skills, graphic organizers and checklists, repetition of instruction with multiple modalities, clear class routines, hands-on math skills practice, and introduction of new material in small chunks with sufficient time to learn. Ex. 3-2. The CSE also recommended one-to-one review, scaffolding of instructions, access to a counselor when frustrated, and continued opportunities for JS to take a leadership role. Ex. 3-2.

24.     Socially and emotionally, JS was making progress with independent living skills, and was working on increasing his competence in social situations. Ex. 3-2, 22-5. JS was chosen to be a peer helper, giving classmates advice and support. Ex. 3-2. The CSE recommended that JS continue to develop independent living skills and garner attention from peers in more mature methods. Ex. 3-2.

25.     The CSE developed 15 annual goals and corresponding short-term objectives. Ex. 3-3 – 3-9; 22-5, 22-6. The goals addressed JS's deficits or needs in math and money management (Ex. 3-3, 3-4), reading and Internet research (Ex. 3-4, 3-5), writing and English language arts (Ex. 3-5), counseling (Ex. 3-5, 3-6), SLT (Ex. 3-6, 3-6), transitional activities (Ex.

6

**A357**

3-7, 3-8, 3-9), and activities of daily living (Ex. 3-8, 3-9). There were no objections at the CSE meeting to any of the goals. Ex. 11-2, 22-5, 22-6.

26.     The CSE recommended several separate long-term goals for living, working, and learning as an adult, including having JS attend a two-year community college and/or a vocational school and gain qualification as a teacher's assistant. Ex. 3-3. In terms of employment, the CSE recommended that JS gain experience in a part-time job related to the career of his choice, and that within one year of his graduation from high school, JS will access relevant services from the Development Disabilities Program. Ex. 3-3.

27.     A coordinated set of transition activities was also recommended for JS. Ex. 3-10, 3-11, 22-6. The activities included participation in a work-study program, small group vocational activities, community projects, instruction in ADLs and travel training, counseling related to person-centered planning and self-awareness relating to work life, SLT to develop and practice social interactions with unfamiliar adults, and practice with money management skills in a community setting. Ex. 3-10, 3-11.

28.     The CSE ultimately classified JS as a student with autism and recommended placing him in a special 12:1:1 class in a specialized school for the 2012-2013 school year on a 12-month basis. Ex. 3-1, 3-9, 3-10, 11-4, 22-6. The CSE also recommended individual SLT three times per week, group counseling once weekly, and individual counseling once weekly. Ex. 3-9, 11-4.

29.     The CSE also discussed, but ultimately rejected a special class in a community school as being unable to provide JS with the level of support he requires. Ex. 3-13.

7

**A358**

**The DOE Offers JS a Placement to Implement the IEP for the 2012-2013 School Year**

30.     On June 15, 2012, a Final Notice of Recommendation ("FNR") was sent to the Parent, offering JS placement at McSweeney for the 2012-2013 school year. Ex. 17.

### The Parent Visits the Recommended Placement

31.     MM visited McSweeney on June 20, 2012, along with Francis Tabone, the Head of School at Cooke. Ex. 21-2, N-2, S-2.[2]

### The Parent Rejects the Recommended Program and Placement

32.     On June 21, 2012, Charles Gussow of Partnership for Children's Rights sent a letter to the CSE on behalf of MM, informing the CSE that MM was rejecting the recommended program and placement for JS. Ex. B-1, S-2. The letter states that MM determined that the academic work offered at McSweeney was below JS's current levels, the school was chaotic, and would not be appropriate for JS. Ex. B-1. The letter also stated that MM believed the May 22, 2012 IEP was inappropriate. Ex. B-1. The letter informed the CSE that pending placement in an appropriate classroom, MM would reenroll JS at Cooke the 2012-2013 12-month school year and seek tuition payment. Ex. B-1, S-2.

### The Parent Re-Enrolls JS at Cooke for the 2012-2013 School Year

33.     On June 25, 2012, MM signed an enrollment contract with Cooke for JS to attend the summer 2012 session, at a cost of $7,275. Ex. D, S-2. Also on June 25, 2012, MM signed an enrollment contract with Cooke for the 10-month 2012-2013 school year, at a cost of $48,500. Ex. E, S-2.

---

[2] Respondent notes that Petitioner previously included an affidavit from MM, attached to the August 19, 2013 Petition. On the present appeal, however, Petitioner did not do so. Therefore, Respondent cites to MM's translated affidavit as entered into evidence at the hearing below (Ex. S).

8

**A359**

**The Parent Again Rejects the Recommended Program and Placement**

34.     On August 22, 2012, Todd Silverblatt, Esq., of Partnership for Children's Rights wrote the CSE on behalf of MM. Ex. C, S-3. The letter reiterated that MM believed that the IEP was inappropriate for JS as it recommended the same level of services as when JS was classified with a speech and language impairment, and did not include management needs designed to transition JS to independent living. Ex. C-1. The letter also stated that the overall program was insufficient to advance the transition goals. Ex. C-1. The letter also reiterated MM's belief that McSweeney was an inappropriate placement for JS and that MM was reenrolling JS at Cooke for the 2012-2013 school year and would seek direct tuition payment from the DOE. Ex. C-1, C-2.

**Cooke**

35.     At Cooke, JS was placed in placed in classes with ratios of either 12:1:1 or 11:1:1. Ex. 22-4. JS was also enrolled in a transition program at Cooke. Ex. J-2.

**The Decision Below**

36.     As stated supra, the IHO determined that the DOE offered JS a FAPE for the 2012-2013 school year. Dec. 20, 2013 Decision at 5-8. Initially, the IHO noted that the parties waived their rights to additional hearing dates. Id. at 3. Next, the IHO addressed each of the five issues as set forth in the Parent's DPC, as identified by the SRO in the remand order. Compare id. at 5-8 with Appeal No. 13-157 at 11-12. Specifically, the IHO determined that the CSE utilized a timely psychoeducational evaluation, that the CSE properly addressed the Parent's concerns regarding the CSE's recommended 12:1:1 program, that the recommended program adequately balanced academic instruction and vocational opportunities, that the Parent did not challenge the recommend school's ability to implement the related service mandate, that the CSE appropriately utilized a Cooke transition report at the IEP meeting, and that the recommended

9

**A360**

program offered by the DOE appropriately addressed JS's specific needs. See Dec. 20, 2013
Decision at 5-8. The Parent's appeal ensued.

### And As for a First Defense, Respondent Alleges: The IHO Properly Determined that the DOE Offered JS a FAPE for the 2012-2013 School Year

37.     The Parent claims that the IHO erred in determining that a June 2, 2009
psychoeducational evaluation was not outdated at the time of the CSE meeting, and that the CSE
otherwise lacked sufficient evaluative material. Petition ¶¶ 25-35. Here, the CSE meeting was
held on May 22, 2012. See Ex. 3, 11. The psychoeducational evaluation was completed on June
2, 2009. Ex. 5-1. Thus, the evaluation was still timely, as it had been completed within three
years of the CSE meeting. See Application of a Student with a Disability, Appeal No. 12-122 at
14-15 (evaluation timely where it had been completed "within three years of the [date of the]
CSE meeting . . . ."). Therefore, the Parent's contrary claims (Petition ¶ 27) must be rejected.

38.     Moreover, even if the evaluation was untimely (which it was not), there is no
indication in the record that the Parent or the Cooke participants requested a reevaluation of the
Student (Application of a Student with a Disability, Appeal No. 12-122 at 15), and in any event,
the CSE team utilized sufficient evaluative material in developing the IEP for JS for the 2012-
2013 school year. The CSE team reviewed and utilized a March 2012 Cooke progress report
(Ex. 4, 22-3), and Ms. Ord from Cooke orally presented the information and scores contained in
several Cooke "discussion documents" (Ex. 7, 8, 9, 10, 22-3; Tr. 174-79). Given the
comprehensive nature of the Cooke progress report, coupled with the updated information
provided by Ms. Ord, as well as the full participation of the Cooke participants and the Parent
(see Ex. 11, 22), it is evident from the record that the CSE team utilized sufficient evaluative
material from multiple sources in developing the 2012-2013 school year IEP. Thus, the Parent's
contentions (Petition ¶¶ 26-32, 35) must fail.

10

**A361**

39. The Parent contends that the IHO contradicted herself in claiming that the CSE possessed a timely Stanford-Binet Report dated October 19, 2011 while also previously claiming that the report was withheld by the Parent. Petition ¶ 26. Here, even though the IHO may have mistakenly determined that the Stanford-Binet report was provided to the CSE (which it was not), such a de minimus error in her determination is of no consequence because, as explained supra, the report was not necessary for the CSE to make an appropriate recommendation as the CSE possessed sufficient evaluative material, coupled with the full participation of the CSE team, including the Parent. See Paragraphs 37-38. Thus, any claim concerning the IHO's Dec. 20, 2013 Decision vis-a-vis the Stanford-Binet report must be rejected.

40. The Parent contends that the DOE failed to engage the Parent in the required reevaluation process. Petition ¶¶ 28-32. Here, however, such allegations are a nonissue since the DOE was not required, by law, to conduct a reevaluation prior to the May 2012 CSE meeting as the June 2009 evaluation was timely and appropriate, and the CSE did not require new evaluative material (beyond what was provided by the Parent and Cooke) to recommend an appropriate program for JS for the 2012-2013 school year. See supra Paragraph 38. Indeed, Ms. Alvarez testified that the CSE possessed adequate information to develop JS's IEP. Ex. 22-5. Thus, any allegations relating to the DOE's purported failure to engage the Parent in the reevaluation process are without merit and must be rejected.

41. The Parent claims that the CSE failed to conduct a vocational assessment, contributing to the purported deprivation of FAPE. Petition ¶¶ 33-34, 43. Here, while the CSE concededly did not conduct a specific vocational assessment, the failure to do so in light of the transition plan included in the IEP and the discussion at the CSE meeting does not rise to the level of a deprivation of FAPE for JS. See Application of the Dep't of Educ., Appeal No. 11-123

11

**A362**

at 15-16. Initially, the CSE team asked Cooke for a transition plan; Ms. Ord provided written transition goals to the CSE which were discussed, modified, and adopted into the IEP. Ex. 22, ¶ 38. Moreover, Ms. Ord informed the CSE that Cooke preformed a transition assessment and the information was relayed to the CSE team. Ex. 22, ¶ 40. Further, the IEP includes a detailed transition plan. Ex. 3-3, 3-10, 3-11. Given the detailed nature of the transition plan and the participation of the CSE in its development, the lack of a vocational assessment by the CSE is not, by itself, a deprivation of FAPE. See Application of the Dep't of Educ., Appeal No. 13-154 at 15-16; Application of the Dep't of Educ., Appeal No. 11-123 at 15-16.

42.     The Parent contends that the IHO erred in determining that the CSE team considered and addressed concerns raised by the Parent during the CSE meeting. Petition ¶¶ 36-38. These contentions must fail.

43.     Initially, the Parent claims that "it should be noted" that MM does not speak English and that at the CSE meeting, MM communicated through an interested DOE party. Petition ¶ 37. In addition to this issue not being raised in the DPC and thus not properly before the SRO on appeal (see Ex. 1),[3] there is no indication that MM was in any way prejudiced by the translation services provided to her at the CSE meeting, or that she was unable to meaningfully participate. Rather, the record reveals that MM was able to fully voice her opinions regarding the CSE's recommendations (see Ex. 11, 22); as such, this contention must fail.

44.     Next, while the record reflects that the Parent and the Cooke participants were given the opportunity to express their opinions and concerns regarding the CSE's recommendations (see Ex. 11, 12, 22), that the CSE recommended a different program from those preferred by the Parent or JS's then current-providers does not amount to a finding of a

---

3 In fact, the DPC affirmatively alleges that MM was an active participant at the CSE meeting, who "expressed [her] concerns" to the CSE. Ex. 1-3.

12

**A363**

denial of FAPE. See Application of the Dep't of Educ., Appeal No. 13-176 at 9. Moreover, it appears from the record that MM offered no specific objections to the recommended program, other than a general statement that she never agrees with the CSE's recommendations. Ex. 22-6; Petition ¶ 38. Thus, as the record demonstrates that the Parent and all the CSE members were allowed to meaningfully participate at the CSE meeting, this contention must fail.

45.     The Parent also claims that notwithstanding the Parent's purported objection to the recommended program, the evidence presented at the hearing did not support the CSE's programmatic recommendation of a special 12:1:1 class in a specialized school and that JS required a smaller environment with more potential for individualized attention. Petition ¶¶ 39, 44. Here, the Parent never raised this claim in the DPC, and, thus, it is improperly before the SRO on appeal (as the SRO properly noted). See Appeal No. 13-157 at 11; Ex. 1; 20 U.S.C. § 1415(f)(3)(B); N.Y. Educ. Law § 4404(1)(c). While the Parent vaguely mentioned JS's purported need for a highly structured setting (Ex. 1-4), that argument was in the context of McSweeney's inability to provide such a setting for JS and the DPC otherwise did not raise any similar programmatic objections regarding the IEP. See 1-2, 1-3.

46.     In any event, the recommended program was appropriate for JS. As Ms. Alvarez testified, the 12:1:1 setting was recommended due to, at least in part, JS's progress in similar 11:1:1 and 12:1:1 settings at Cooke. Ex. 22-6. A specialized school setting was recommended for JS as they serve students functioning at levels similar to JS, and provide the vocational and life skill training and academic support that he requires. Ex. 22-6. The IEP recommended numerous management strategies and goals to address JS's specific deficits, including, inter alia, modified instruction materials, small group instructions, discreet teaching of learning strategies, graphic organizers, repetition and redirection, introduction of new concepts broken into small

13

**A364**

chunks with sufficient time to learn, direct teacher modeling, 1:1 review, scaffolding, access to a counselor when frustrated, and opportunities to take a leadership role. Ex. 3-2. The IEP also recommended 15 annual goals and related short-term objectives. Ex. 3-3 – 3-9. Thus, contrary to the Parent's contentions, the IEP as a whole provides JS with check-in and prompts, 1:1 review, small group instruction, and other beneficial management needs that would allow JS to receive a meaningful educational benefit. See Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877-88 (2d Cir. 1984) (reviewing the IEP as a whole to determine whether a school district offered the student a FAPE).

47. The Parent next contends that IHO's determination concerning the balance between academic instruction and vocational training was erroneous. Petition ¶¶ 40-45. Here, the record reflects that JS would receive an appropriate education as well as vocational opportunities. Initially, the IEP recommended that JS be placed in a 12:1:1 special class for 35 periods each week. Ex. 3-9. Further, as explained by Ms. Alvarez, even if the IEP does not specifically list the amount of time spent on academic versus vocational skills, the IEP lists what skills need to be covered, and the school placement could determine how to address those skills accordingly. See Tr. 58-61. Moreover, as explained by Ms. Naclerio, whether JS was placed in a full-time or part-time vocational program (which was unknown until a student actually enrolls at McSweeney, which JS never did), all of the academic goals would have been addressed and the IEP would have been fully implemented. Ex. 21-3, 21-4, 21-5.[4] Thus, these contentions must fail. See Application of the Dep't of Educ., Appeal No. 13-186 at 15-17 (even where

---

[4] Contrary to the claim raised by the Parent, Ms. Naclerio's testimony is not impermissible retrospective evidence. Petition ¶ 42. Ms. Naclerio was not attempting to rehabilitate a defective IEP; rather, she was describing how JS's IEP would have been implemented at the school which also provides for vocational opportunities. See R.E. v. New York City Dep't of Educ., 694 F.3d 167, 185 (2d Cir. 2013) (testimony may "explain or justify what is listed in the written IEP."). That Ms. Naclerio also described other activities and opportunities available at the school not does render her testimony impermissible. However, as noted infra, any claim concerning the implementation of the IEP is speculative as a matter of law and must fail. See Paragraphs 51-52.

14

**A365**

student may have been required to attend a vocational program at the recommended site, not a deprivation of FAPE where school otherwise would have fully implemented the IEP as written).

48.　　The Parent contends that the IHO failed to address the claim that the IEP did not recommend the integration of related services with JS's academic instruction. Petition ¶¶ 46-47. Initially, the IHO properly concluded that the Parent did not raise any claim concerning the implementation of the related services at McSweeney. Dec. 20, 2013 Decision at 7; Ex. 1. In any event, even if the IHO's Decision on this point was not a model of clarity, the record is devoid of any indication that JS required such integration, other than a mere statement from his then-current private school teacher. See Petition ¶ 47. Indeed, as Ms. Alvarez testified, the counseling and SLT goals were adopted based on the recommendations of JS's providers at Cooke, and that the CSE recommended the related services provided to JS at Cooke. Ex. 22-5, 22-6. There was no disagreement noted about the CSE's recommendation that such services be provided in a separate location. See Ex. 11, 22. In any event, that the CSE did not adopt the recommendation of Ms. Ord on the location or integration of the related services does not equate to a finding that the recommendation was inappropriate. See Application of the Dep't of Educ., Appeal No. 13-176 at 9.

49.　　Next, the Parent contends that the IHO did not adequately assess the "SRO's question" regarding the IEP's failure to recommend parent training or transitional support services. Petition ¶¶ 48-51. Again, even if the IHO's Decision on these points was ambiguous, the record reflects that neither allegation rises to the level of a deprivation of FAPE. Indeed, as the Second Circuit has stated, the lack of parent training and counseling by itself does not rise to a deprivation of FAPE, and the SRO should otherwise reject the Parent's contrary arguments. See R.E. 694 F.3d at 193; F.L. v. New York City Dep't of Educ., 2014 WL 53264 at *6 (2d Cir.

15

**A366**

Jan. 8, 2014) ("Because New York requires such counseling and training without regard to whether an IEP specifically recommends it, see id. [8 NYCRR] § 200.13(d), we have held that an IEP's failure to provide for counseling ordinarily does not, by itself, result in the denial of a free and appropriate public education or warrant tuition reimbursement" (citations omitted)).

50.     Next, the CSE was not required to recommend transitional support services as the CSE recommended a program which would have placed JS in a program with comparable restrictiveness as Cooke. Compare Ex. 22-4 with 3-9; see 8 NYCRR § 200.1(ddd); see also Application of a Student with a Disability, Appeal No. 13-200 at 9, n.6. Moreover, the record is devoid of any indication that JS struggled with transitions during the school day or when he advanced grades. See generally Ex. 3, 4, 5, 22. Further, the IEP included a multitude of strategies designed to address JS's specific management needs, including, inter alia, access to a counselor when frustrated. Ex. 3-2. Thus, the lack of transitional support services in this case was not a deprivation of FAPE, and the SRO should reject the Parent's contrary arguments. See Application of the Dep't of Educ., Appeal No. 12-227 at 13-14; Application of the Dep't of Educ., Appeal No. 12-034 at 15-16.

51.     Although the Parent acknowledges that the SRO limited the remand order to allegations pertaining to the IEP and not to its implementation at McSweeney (as JS never attended), the Parent nevertheless requests that the SRO "reassess the logic of such a rule" and further find that McSweeney could not have implemented the IEP. Petition ¶¶ 52-53. The SRO, however, is obligated to apply the law as set out by higher courts in its jurisdiction. Here, the Second Circuit has held that "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for [finding a program inappropriate]." R.E. 694 F.3d at 187, 195; see also K.L. v. New York City Dep't of Educ., 2013 WL 3814669 at *6 (2d Cir. July 24,

16

**A367**

2013) ("'[t]he appropriate inquiry is into the nature of the program actually offered in the written plan,' not a retrospective assessment of how that plan would have been executed" (citing R.E., 694 F.3d at 187) (alteration in original)); F.L. v. New York City Dep't of Educ., 2014 WL 53264 at *6 (2d Cir. Jan. 8, 2014). Thus, the SRO must reject the Parent's contrary claims as a matter of law.

52.   In any event, at no time was MM ever informed that McSweeney could not fully implement the IEP. See Ex. S. Moreover, Ms. Naclerio stated that the IEP could have been fully implemented. Ex. 21-4, 21-5. Thus, the SRO must reject any claim that the recommended placement could not have fully implemented the IEP.

53.   In sum, it is clear from the record that the DOE offered JS a FAPE for the 2012-2013 school year and the SRO should reject the Parent's contrary arguments.

### And As for a Second Defense, Respondent Alleges: The Parent Has Not Met Her Burden of Demonstrating that Cooke was Appropriate for JS

54.   Although the IHO did not reach the question of whether Cooke was appropriate for JS, it is respectfully submitted that notwithstanding the Parent's contrary arguments (Petition ¶¶ 54-58), the record does not support a finding that the Parent met her burden of demonstrating that Cooke was specifically designed to meet JS's unique needs. See, e.g., Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113-15 (2d Cir. 2007).

### And As for a Third Defense, Respondent Alleges: Equities Do Not Support the Parent

55.   The Parent contends that the equities favor her claim for tuition funding. Petition ¶¶ 59-63. It is evident from the record, however, that MM never seriously considered placing JS

17

**A368**

in a public school (or, indeed, any school other than Cooke), and thus, the Parent cannot meet her burden of demonstrating that equities favor direct tuition funding.[5]

56.     MM's actions at the CSE meeting clearly evidence an unwillingness to ever consider a public school program or placement for JS. MM never objected to any portion of the IEP at the CSE meeting. Ex. 11, 22. Although she later voiced concerns over specific aspects of the IEP in her second rejection letter and in the DPC, she never once voiced these concerns at the CSE meeting where such objections could have been addressed. See Ex. 1, 11, 22, B.

57.     Further, although MM visited McSweeney, the record reveals that her visit was not motivated by a genuine interest in placing JS at a public school. Indeed, MM's lack of cooperation with the CSE process is evidenced by her statement at the CSE meeting (even before receiving the FNR), that she "never agrees" with a DOE placement. Ex. 11-4, 22-6.[6]

58.     It is plainly evident that the record supports a finding that MM provided only minimal participation during the IEP development and placement process; her unwillingness to seriously consider a public school placement must result in a finding that the Parent cannot meet her burden of demonstrating that equities favor her claim for relief. See P.G. and D.G. v. New York City Dep't of Educ., 2013 WL 4055697 at *16 (S.D.N.Y. July 22, 2013); J.P. v. New York City Dep't of Educ., 2012 WL 359977 at *14 (S.D.N.Y. Feb. 2, 2012).

---

[5] Although not adjudicated by the IHO given her determination on FAPE, Respondent submits that the Parent bears the burden of demonstrating that equities support her requested relief. See R.E., 694 F.3d at 185 (in the context of N.Y. Educ. Law § 4404(1)(c),"[i]f the board fails to carry this burden [of proving that it offered a FAPE], the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them" (emphasis added)); M.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013) ("[S]hould the DOE fail to meet that burden [of showing it provided a FAPE], the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them.") (emphasis added) (citations omitted)).

[6] Moreover, while not dispositive of the equities determination, JS has attended Cooke since the 2008-2009 school year, circumstantial evidence of MM's unwillingness to seriously consider a public school placement, or any placement other than Cooke. See Ex. N-2.

18

**A369**

## CONCLUSION

59.     Wherefore, the DOE respectfully requests that the SRO find that: (1) the DOE

offered JS a FAPE for the 2012-2013 school year; (2) that the Parent did not meet her burden of

demonstrating that Cooke was appropriate; (3) that the Parent did not meet her burden of

demonstrating that the equities favor relief; and (4) dismiss this action with prejudice.

Dated:  February 7, 2014
        Brooklyn, New York


Respectfully Submitted,


Courtenaye Jackson-Chase,
Special Assistant Corporation Counsel
Brian J. Reimels, of Counsel
New York City Department of Education
335 Adams Street – 28th Floor
Brooklyn, New York 11201
(718) 935-4934

**RECEIVED**

FEB 1 0 2014

OFFICE OF STATE REVIEW

19

**A370**

**RECEIVED**

STATE OF NEW YORK )

                   :SS.:

COUNTY OF KINGS )

FEB 1 0 2014

OFFICE OF STATE REVIEW

       Brian J. Reimels, being duly sworn, deposes and says that he is an Attorney in the Office of Legal Services of the Department of Education of the City of New York, and as such that he is an agent of the same. That the statements in the foregoing Verified Answer are true to his knowledge and belief, and as to that matter he believes it to be true. Deponent further says that the reason why this verification is not made by Respondent is that it is a corporation; that the grounds of his belief as to all matters not therein stated upon his knowledge are as follows: information obtained from the books and records of the Department of Education or from statements made to him by certain officers or agents of the Department and/or the City of New York.

Brian J. Reimels

Sworn to before me, this
7th Day of February, 2014

Notary Public

GORDON C. HARRISS
Notary Public, State of New York
No. 02HA6139326
Qualified in New York County Kings County
Commission Expires January 3, 20 18

**A371**

STATE REVIEW OFFICER
NEW YORK STATE EDUCATION DEPARTMENT
----------------------------------------------------------------X
In the Matter of the Appeal of
MM on behalf of JS,

                                   Petitioners,

-against-

New York City Department of Education,

                                   Respondent.
----------------------------------------------------------------X

**RECEIVED**

FEB 1 0 2014

OFFICE OF STATE REVIEW

Affidavit of Service

IHO No. 143983
SRO No. 14-018

I, Leah McManigle, being duly sworn, deposes and says:

1. I am employed by the Department of Education, as a Community Associate in the Department of Education's Office of General Counsel.

2. I am not a party to this action and am over the age of eighteen years.

3. On February 7, 2014 at approximately 12:15 p.m., I mailed a true copy of the Verified Answer by mailing it in a postage–paid mail wrapper and dropping it in a United States Post-Office mailbox to Counsel for Petitioners at the address designated by him, Thomas Gray, Esq., Partnership for Children's Rights, 271 Madison Ave., 17th Floor, New York, NY 10016.

Leah McManigle

Sworn to before me, this
7th Day of February, 2014

Notary Public

JESSICA C. DARPINO
NOTARY PUBLIC, STATE OF NEW YORK
#02DA6117398
Qualified in New York County
Commission Expires: October 25, 2016

**A372**

**RECEIVED**

FEB 1 8 2014

OFFICE OF STATE REVIEW

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
--------------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF
M.M., on behalf of J.S.,

                              Petitioner,

                  against

New York City Department of Education
                              Respondent.
--------------------------------------------------------------------------X

**VERIFIED REPLY TO
THE VERIFIED ANSWER**
Impartial Hearing
Case No. 143983
SRO Case No. 14-018

## PRELIMINARY STATEMENT

1. Partnership for Children's Rights, attorneys for M.M., submits this Verified Reply to

the Verified Answer, in further support of M.M.'s claim that IHO Noe erred in denying her

request for an order directing the DOE to pay for J.S.'s tuition at Cooke for the 2012-2013

school year.

### M.M. PRESERVED HER CLAIMS THAT THE IEP'S 12:1:1 PROGRAM WAS INAPPROPRIATE FOR J.S. AND THAT THE IEP FAILED TO INTEGRATE J.S.'S RELATED SERVICES WITH HIS ACADEMIC INSTRUCTION

#### 1) M.M. Raised the Claim that the IEP's 12:1:1 Program was Inappropriate in Her Due Process Complaint

2. In its Verified Answer, the DOE appears to assert that M.M. did not raise the claim that

the IEP's recommended 12:1:1 program could not provide J.S. with the small environment and

individualized attention he required (Verified Answer ¶ 45). As demonstrated in M.M.'s

previously filed October 4, 2013 Verified Reply and Answer to Cross-Appeal at paragraphs 14

and 15, the DOE's assertion is wrong.

3. M.M.'s due process complaint reads, in relevant part: "The IEP team did not provide

adequate evaluative data to develop an appropriate IEP, and it was impossible to make

meaningful program decisions without current information" (Exh. 1 at 3). The next sentence

1

**A373**

faults the IEP for failing to incorporate concerns that "a 12:1:1 class in a District 75 program would not be appropriate to address [J.S.'s] individual needs and that [...] placement in such a program would not provide [J.S.] with adequate support or an appropriate balance between academic instruction and vocational training" (Exh. 1 at 3). Indeed, J.S.'s inappropriate placement in a 12:1:1 program is central to M.M.'s claim that the DOE failed to provide J.S. with a free and appropriate education (*see* Exh. 1).

4.  Furthermore, in his November 8, 2013 Decision, the SRO ordered IHO Noe to determined "whether the May 2012 CSE inappropriately failed to modify the student's IEP in view of the parent's expressed concerns that a 12:1+1 special class was not [an] appropriate educational placement" (SRO Appeal No. 13-157 at p. 11). Thus, the SRO has already determined that M.M.'s claims regarding the IEP's 12:1:1 program needed to be addressed.

5.  The DOE also alleges that because the fact that M.M. communicated with the CSE team through an interested DOE party, Ms. Alvarez, was not raised in her due process complaint, it is "not properly before the SRO on appeal" (Verified Answer ¶ 43). However, that Ms. Alvarez translated for M.M. at the CSE meeting is not an "issue," but an undisputed fact (*see* Verified Answer ¶ 43; Exh. 12 at 5; Exh. 22 ¶ 1).

6.  M.M. referenced the fact that Ms. Alvarez translated for her at the CSE meeting in her January 23, 2014 Petition in the context of illustrating that IHO Noe failed to make a determination regarding the appropriateness of the IEP's recommended 12:1:1 program, as the SRO ordered her to do (*see* Petition ¶¶ 36-39; SRO Appeal No. 13-157 at page 11). That Ms. Alvarez was translating for M.M. was cited to illustrate the fact M.M.'s ability to make highly specific statements to the CSE team was somewhat curtailed (*see* Petition ¶¶ 36-39).

7.  In short, M.M. clearly articulated her claim that that IEP's 12:1:1 program could not

2

**A374**

provide J.S. with the environment or supports he needed to progress.

**2) J.S.'s IEP Failed to Properly Integrate His the Related Services**

8. The DOE also asserts that "the IHO properly concluded that the Parent did not raise any claim concerning the implementation of the related services at McSweeney" (Verified Answer. ¶ 48). The DOE's assertion is irrelevant.

9. M.M.'s allegation regarding related services does not include an assertion regarding McSweeney's ability to implement the recommended related services (*see* Petition ¶¶ 46-47). Rather, M.M. alleged that "[t]he IEP did not address the importance of integrating [J.S.'s] related services …" (Petition ¶ 47; Exh. 1 at 3). To this end, at the CSE meeting, Ms. Ord "emphasized the importance of related services being integrated with each other and with [J.S.'s] academic instruction and asked that this be reflected in [J.S.'s] IEP" (Petition ¶ 47; *see* Exh. M ¶ 15). The SRO demonstrated it understood the nature of M.M.'s allegation in ordering the IHO to determine whether the IEP "adequately integrated [J.S.'s] related service with his academic instruction, vocational training, and independent skills development" (SRO Appeal No. 13-157 at 11-12). Thus, the DOE's assertion regarding McSweeney's ability to implement the IEP's related services recommendation is irrelevant to M.M.'s allegation that J.S.'s IEP failed to integrate his related services with each other and his academic instruction.

**RELIEF REQUESTED**

10. In light of the forgoing, as well as the arguments presented in her January 23, 2014 Petition, M.M. again requests that the SRO: (1) reverse the IHO's finding that the DOE offered J.S. a FAPE; (2) find that Cooke was an appropriate program under *Burlington* Prong II; (3) find that equitable considerations support M.M.'s tuition claim; and (4) order the DOE to pay J.S.'s $7,275 and $48,500 tuitions at Cooke for the 2012-2013 school year, directly to Cooke.

3

**A375**

DATE: February 12, 2014
      New York, New York

                         PARTNERSHIP FOR CHILDREN'S RIGHTS
                         Attorney for Petitioner

By:

                         THOMAS GRAY
                         Partnership for Children's Rights
                         271 Madison Avenue, 17th Floor
                         New York, New York 10016
                         (212) 683-7999 ex. 246

**RECEIVED**

FEB 1 8 2014

OFFICE OF STATE REVIEW

4

**A376**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW
-----------------------------------------------------------------------X
IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

                                Petitioner,

        - against -

New York City Department of Education,

                              Respondent.
-----------------------------------------------------------------------X

**RECEIVED**

FEB 1 8 2014

OFFICE OF STATE REVIEW

**AFFIDAVIT OF
VERIFICATION**

Impartial Hearing
Case No. 143983

SRO Appeal No. 14-018

STATE OF NEW YORK   )
                         ss.:
COUNTY OF NEW YORK  )

        M██  M██, being duly sworn, deposes and says that she is the mother of J.S., and is the Petitioner in this proceeding; that Ms. Ana Lazo, Administrator at Partnership for Children's Rights, who is bilingual, read and translated for her the annexed Verified Reply to the Verified Answer so that she knows the contents thereof; and that the Verified Petition is true to the knowledge of deponent except as to the matters therein stated to be alleged upon information and belief, and as to those matters she believes it to be true.

M██  M██

Subscribed and sworn to before me
this 12th day of February, 2014

_____
        Notary Public

**THOMAS C GRAY**
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GR6291278
Qualified In Kings County
           October 15, 2017

**A377**

THE NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW

RECEIVED

FEB 1 8 2014

OFFICE OF STATE REVIEW

-----------------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

**AFFIDAVIT**

Petitioner,

Impartial Hearing
Case No. 143983

- against -

New York City Department of Education,

SRO Appeal No. 14-018

Respondent.

-----------------------------------------------------------------------X

STATE OF NEW YORK    )
                                            ss.:
COUNTY OF NEW YORK  )

Ana Lazo, Administrator at Partnership for Children's Rights, being duly sworn, deposes

and says she that speaks and reads both English and Spanish; and that on February 12, 2014 she

translated the annexed Verified Reply to the Verified Answer from English into Spanish for

M███ M███.

Ana Lazo

Subscribed and sworn to before me
this 12th day of February, 2014

Notary Public

THOMAS C GRAY
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GR6291278
Qualified in Kings County
My Commission Expires October 15, 2017

**A378**

NEW YORK STATE EDUCATION DEPARTMENT
OFFICE OF STATE REVIEW

**RECEIVED**

FEB 1 8 2014

OFFICE OF STATE REVIEW

---------------------------------------------------------------X

IN THE MATTER OF THE APPEAL OF

M.M., on behalf of J.S.,

**AFFIDAVIT OF PERSONAL SERVICE**

Petitioner,

- against -

Impartial Hearing
Case No. 143983
SRO Appeal No. 14-018

New York City Department of Education,

IHO Mary Noe, Esq.

Respondent.

---------------------------------------------------------------X

STATE OF NEW YORK     )
                                      ss.:
COUNTY OF NEW YORK   )

THOMAS GRAY, being duly sworn, deposes and says that he is over the age of eighteen years and is not a party in this proceeding; that on the 13th day of February, 2014, he served the annexed Verified Reply to the Verified Answer, Affidavit of Verification, and Affidavit on the New York City Department of Education (ATTN: Brian Reimels, Esq., NYC Dept. of Educ., 335 Adams Street, 28th Floor, Brooklyn, NY 11201) by delivering a true copy of the same by mail, enclosed in a postage paid properly addressed envelope in a post office mail box, an official depository under the exclusive case and custody of the United States Post Office.

_____
THOMAS GRAY

Subscribed and sworn to before me
this 13th day of February, 2014

_____
Notary Public

NOTARY ... New York
...

**A379**